## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| HDR HOLDING, INC., *et al.* [1] | Case No.:  19-11396 (MFW) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507,
BANKRUPTCY RULES 2002, 4001, 6004 AND 9014 AND LOCAL
BANKRUPTCY RULE 4001-2:  (I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING,
(II) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL, (III) GRANTING
ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") seek

entry of an interim order (the "<u>Interim Order</u>") and a final order (the "<u>Final Order</u>" and, together

with the Interim Order, the "<u>DIP Orders</u>") substantially in the form attached hereto as <u>Exhibit 1</u>,

pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11

U.S.C. §§ 101, *et seq.* (as amended, the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004 and 9014

of the Federal Rules of Bankruptcy Procedure (as amended, the "<u>Bankruptcy Rules</u>"), and Rule

4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the District of Delaware (the "<u>Local Rules</u>"): (i) authorizing the Debtors to obtain up to

$6,000,000 in principal amount of postpetition financing, and to access up to $3,000,000 in the

interim and  granting  liens and providing superpriority claims with respect to such postpetition

financing; (ii) authorizing the Debtors use cash collateral; (iii) granting adequate protection to

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: HDR Holding, Inc. (2015) and Schramm, Inc. (0480).  The Debtors' mailing address is 800 E. Virginia Ave., West Chester, PA 19380.

certain prepetition secured lenders as set forth herein, (iv) scheduling a final hearing to consider entry of the Final Order, and (v) granting related relief.  In support of this motion, the Debtors submit the *Declaration of Craig Mayman in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), and the *Declaration of Michael Fixler In Support of DIP Financing* (the "DIP Declaration"), both of which are incorporated herein by reference.  In further support of this motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.      In October of 2018, the Debtors, in consultation with their legal and financial advisors, began exploring transactions through which to sell all or substantial parts of their businesses.  To that end, the Debtors engaged FocalPoint Partners LLC ("FocalPoint") to conduct an extensive and comprehensive marketing process.  FocalPoint contacted 146 strategic and financial investors regarding potential transactions.  Of those parties, two (2) parties submitted indicative non-binding term sheets.  One indicative term sheet sought to structure a transaction solely involving the acquisition of the Debtors' secured debt along with some contingent consideration.  While the other party originally contemplated a cash investment into the Debtors, along with a restructuring of the Debtors' secured debt, after further diligence and discussions, this interested party indicated it would be only willing to provide such investment in connection with an acquisition of the secured term loan debt which it would use to bid on the Debtors' assets in a court-supervised sale process.  Ultimately, even this party chose to pass on the investment opportunity.  While the Debtors were unable to reach an agreement with the various parties on an out-of-court basis, the Debtors believe this process was sufficiently broad to reach the full universe of parties likely to be interested, and reflected a reasonable attempt to

---

[2] Capitalized terms not defined in the Preliminary Statement shall have the meanings ascribed below.

reach an out-of-court transaction with a strategic or financial party given the Debtors' liquidity and time constraints.

2.        Prior to the Petition Date, the Debtors entered into that certain asset purchase agreement by and between Schramm II Inc., an acquisition vehicle created by GenNx360 Capital Partners, L.P. (in such capacity, the "Stalking Horse Bidder"), as the purchaser, and the Debtors, as sellers, (the "APA") for the sale of substantially all of their assets.  The APA, among other things, The Stalking Horse Purchase Agreement contemplates a value-maximizing purchase price for the Purchased Assets of not less than $10,300,000 plus the balance owing under the Debtors' postpetition secured financing facility estimated to be $6,000,000, consisting of a credit bid and the assumption of certain liabilities as set forth in the APA.

3.         On the date hereof, the Debtors filed a motion (the "Sale Motion") for entry of orders, among other things, (i) approving certain bidding and auction procedures (the "Bidding Procedures"), (ii) designating the Stalking Horse Bidder, and (iii) authorizing the sale of substantially all of the Debtors' assets to the Stalking Horse Bidder or another successful bidder (the "Proposed Sale").

4.        To continue operating their business in the ordinary course to preserve the going-concern value of the Debtors' assets and complete the Proposed Sale, it is imperative that the Debtors have access to the DIP Facility and use of Cash Collateral during the Chapter 11 Cases. Without access to the DIP Facility and use of Cash Collateral, the Debtors will not have sufficient liquidity, whether in the form of unencumbered cash on hand or generated from their operations, to pay their necessary operating expenses or consummate the Proposed Sale.  As such, the Debtors have an immediate need for the DIP Facility.  The Debtors are commencing

01:24604637.5

the Chapter 11 Cases with limited cash on hand, and without access to the DIP Facility on an interim basis, the Debtors' estates will suffer immediate and irreparable harm.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order"). This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory and legal bases for relief requested herein are sections 105(a), 107, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003 and 6004 and Local Rules 2002-1 and 4001-2.

## BACKGROUND

7.      On the date hereof (the "Petition Date"), both of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in the Chapter 11 Cases and no request has been made for the appointment of a trustee or an examiner.

8.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the First Day Declaration.

01:24604637.5

## RELIEF REQUESTED

9.      By this motion, the Debtors seek entry of the Interim Order and the Final Order,

pursuant to sections 361, 363 and 364 of the Bankruptcy Code and Local Rules 2002-1(b) and

4001-2, authorizing the Debtors to enter into the DIP Loan Documents (as defined below) with

Schramm II Inc.  More specifically, the Debtors are seeking:

      a.   authorization for (a) the Debtors, including Schramm, Inc., a Pennsylvania corporation (the "Borrower"), to obtain up to $6,000,000 in principal amount of postpetition financing (the "DIP Facility"), and to access up to $3,000,000 in the interim and pending a final hearing all on the terms and conditions set forth in the Interim Order and that certain Debtor-in-Possession Delayed Draw Term Loan Promissory Note (the "DIP Note," substantially in the form attached to the Interim Order as Exhibit A and together with the Interim Order, and all appendices, exhibits or schedules thereto and to the DIP Note, including, without limitation, the DIP Budget (as defined below) as the same may be amended, restated or supplemented from time to time in accordance with the terms hereof and thereof, collectively, the "DIP Loan Documents"),[3] among the Borrower, HDR Holding, Inc., a Delaware corporation (the "Guarantor") and Schramm II Inc., a Delaware corporation (in its capacity as such, with its successors and assigns, collectively, the "DIP Lender"), and (b) the Guarantor to guaranty the Borrower's obligations in respect of the DIP Loans and all other obligations and indebtedness of the Borrower under or arising in connection with the DIP Loan Documents;

      b.   authorization for the Debtors to, subject to the Carve-Out and Permitted Prior Senior Liens, grant security interests, liens, and superpriority claims (including a superpriority administrative claim pursuant to sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Lender to secure all obligations of the Debtors under and with respect to the DIP Facility (collectively, the "DIP Obligations"), including, subject to entry of the Final Order, on the proceeds and property recovered in respect of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under Chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548 and 550 or any other similar state or federal law (collectively, the "Avoidance Action Proceeds");

      c.   authorization for the Debtors, pursuant to sections 105, 361, 362, 363 and 507 of the Bankruptcy Code to use cash collateral, as such term is defined in

---

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to those terms in the DIP Loan Documents.

section 363(a) of the Bankruptcy Code ("Cash Collateral", which shall not include loan proceeds of the DIP Facility), and all other Prepetition Collateral (defined below), in accordance with the terms of the Interim Order and the DIP Budget, as provided herein and in the Interim Order;

d.  to, subject to the Carve-Out and any Permitted Prior Senior Liens, provide Adequate Protection of the liens and security interests (such liens and security interests, the "Prepetition Liens") of the prepetition lenders (such financial institutions in such capacities, the "Prepetition Lenders") under that certain Amended and Restated Credit Agreement, dated as of March 23, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement", and together with any other agreements, instruments, notes, guaranties and other documents related thereto, collectively the "Prepetition Financing Documents")), among the Borrower, the Guarantor, the various institutions from time to time party thereto as Prepetition Lenders, and Hark Capital I, LP (f/k/a/ Enhanced Credit Supported Loan Fund, LP), as Agent (in such capacity, the "Agent", and together with the Prepetition Lenders, collectively, the "Prepetition Secured Parties"), which Prepetition Liens are being primed by the DIP Facility, as more fully set forth in the Interim Order;

e.  modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the Final Order;

f.  that the Court schedule a final hearing (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis; and

g.  waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim Order or the Final Order (including a waiver pursuant to Bankruptcy Rule 6004(h)).

**PREPETITION SECURED DEBT**

10.    As of the Petition Date, the Debtors owe approximately $20 million of consolidated secured indebtedness to third parties, all of which, as a result of a series of agreements and transactions further described below, is owed to Hark, Citizens Bank, N.A., as agent for certain lenders under the 2012 Loan Agreement (defined below) (in such capacity, "Citizens"), and GenNx360 Capital Partners, L.P. ("GenNx360"). These obligations consist of (i) Term Loan A to Hark in the principal amount of $5,300,000, (ii) Term Loan B to GenNx360

in the principal amount of $6,500,000, and (iii) Term Loan C to Citizens in the principal amount of $6,000,000.

**(i)**    ***2012 Credit Agreement***

11.    The Debtors were parties to that certain Credit Agreement, dated as of June 29, 2012 (as amended, the "2012 Credit Agreement") with Citizens, as administrative agent, which provided the Debtors with a $72,000,000 secured credit facility.  As a result of the Debtors' inability to repay various obligations under the 2012 Credit Agreement in addition to other events of default related to financial covenants, the Debtors and Citizens entered into a Forbearance and Amendment Agreement on August 29, 2014 (the "First Forbearance Agreement"), which provided the Debtors with a forbearance from Citizens' right to exercise certain remedies through June 30, 2015.

12.    As a result of additional events of default related to minimum liquidity and failure to meet additional financial covenants in the First Forbearance Agreement, on March 19, 2015, the Debtors and Citizens entered into the Second Forbearance Agreement (the "Second Forbearance Agreement"), under which Citizens agreed to forbear from exercising certain remedies through April 30, 2015.  As part of the Second Forbearance Agreement, GenNx360 made a loan to the Debtors in the amount of $2,000,000.

13.    On June 5, 2015, the Debtors and Citizens entered into the Third Forbearance and Amendment Agreement (the "Third Forbearance Agreement") as a result of continuing liquidity and other financial defaults.  Pursuant to the Third Forbearance Agreement, Citizens agreed to forbear from exercising certain remedies through June 30, 2016, during which period the Debtors sought to refinance their obligations under the 2012 Credit Agreement.  As part of the Third Forbearance Agreement, GenNx360 made an additional $4,000,000 loan to the Debtors which

loan was *pari passu* with the obligations owed to Citizens under the 2012 Credit Agreement, provided however that Citizens was entitled to the first payment of proceeds from the sale of certain existing rig inventory (the "Third Forbearance Term Loan").

### ii.    Amended Credit Agreement

14.    On March 23, 2016, the Debtors, Citizens, Hark and GenNx360 entered into that certain Amended and Restated Credit Agreement (the "Amended Credit Agreement").    In connection with the Amended Credit Agreement, Hark (i) acquired debt issued under the 2012 Loan Agreement in the outstanding principal amount of $20,641,071.18, (ii) agreed to forgive an amount of the loans under the Original Loan Agreement in an amount sufficient to reduce the outstanding amount of such loans held by Hark to $12,300,000, and (iii) agreed to make an additional term loan to the Debtors in the amount of $1,200,000.    The amounts owed to Hark ($12,300,000 plus $1,200,000) constitute first-priority Term Loan A obligations under the Amended Credit Agreement.    GenNx360 executed a guaranty of the Debtors' Term Loan A obligations in favor of Hark (the "Guaranty").

15.    GenNx360 agreed to forgive the Third Forbearance Term Loan and acquire loans issued under the 2012 Loan Agreement in the outstanding principal amount of $6,500,000, which obligation constitutes a second-priority Term Loan B under the Amended Credit Agreement, junior to the Term Loan A obligations owed to Hark under the Amended Credit Agreement and senior to the Term Loan C obligations owed to Citizens under the Amended Credit Agreement.

16.    Citizens, on behalf of certain of the lenders under the 2012 Loan Agreement, agreed to forgive an amount of the remaining loans under the Original Loan Agreement in an amount sufficient to reduce the outstanding amount of such loans held by such lenders to $6,000,000 and in connection therewith, were issued warrants in the Debtors.    The remaining

$6,000,000 obligation constitutes a third-priority Term Loan C under the Amended Credit Agreement, junior in priority to both the Term Loan A and Term Loan B.

17.    On June 17, 2019, under the terms of the Guaranty, GenNx360 made a payment to Hark in the amount of $11,000,029.00 in partial satisfaction of the Term Loan A.

### THE DEBTORS' EFFORTS TO OBTAIN POSTPETITION FINANCING

18.    Given the Debtors' desire to avoid the cost and uncertainty of a postpetition DIP Facility that would attempt to non-consensually prime the Hark, GenNx360, or the Agent, the Debtors concluded that, under the circumstances, acceptable third-party financing was not reasonably obtainable.  Moreover, the Debtors would be unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code, or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code, and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lender (as defined in the DIP Motion) on terms more favorable than the terms of the DIP Facility.  The only viable source of secured credit available to the Debtors, other than the use of cash collateral, is the DIP Facility.

19.    As a component of FocalPoint's pre-petition services, it talked to multiple potential third-party debt and equity financing sources, including with respect to a hypothetical transaction that included a voluntary subordination of the existing senior secured indebtedness. Given the Debtors' leverageable asset base and trailing financing performance, no parties were interested in submitting a term sheet with respect to any amount of debt financing.  The Prepetition Secured Parties' refusal to consent to a priming financing from a third party almost assuredly precluded any party from submitting a debt term sheet.    Given the Debtors'

challenging liquidity situation and the fact that no third-party lender was willing to provide financing on a junior basis to the existing secured facilities, or to refinance in full the existing secured debt as well as provide incremental capital to fund the Debtors' Chapter 11 Cases, the Debtors determined that the DIP Facility provided the best path forward for the Debtors to maximize the value of their estates in the Chapter 11 Cases.

## NECESSITY OF DIP FACILITY TO PRESERVE VALUE OF DEBTORS' ESTATES

20.    As set forth in detail in the First Day Declaration and the DIP Declaration, facing tightening liquidity, the Debtors, in consultation with their legal and financial advisors, made the good-faith decision to commence the Chapter 11 Cases to pursue a sale of substantially all of the Debtors' assets.  Prior to the Petition Date, the Debtors ran a robust prepetition marketing campaign.  After consideration of various expressions of interest, the Debtors entered into the APA with the Stalking Horse Bidder.  The APA was the result of exhaustive arms-length negotiations, will preserve the Debtors' business as a going concern, and will result in the continued employment for many of the Debtors' employees.  The Debtors require postpetition financing to maintain operations until the Proposed Sale is closed.  As no third party financing was reasonably available, the Debtors looked to the Prepetition Secured Parties to provide funding on a postpetition basis.  Only GenNx360 was willing to provide such funding.

21.    Absent the liquidity infusion provided by the DIP Facility, the Debtors will be unable to continue operations, reassure their customers and vendors that business operations will continue, or pay their employees, vendors, and service providers, and therefore, the Debtors will suffer irreparable harm.  Even if the Debtors had the ability to use cash collateral, the liquidity at the company is at insufficient levels to fund operations through the Proposed Sale.  As discussed above and in the DIP Declaration, no outside funding is reasonably obtainable.  Consequently,

the DIP Facility represents the only option for the Debtors to meet their operational obligations, and provides the best opportunity to preserve value for the benefit of their stakeholders.

## SUMMARY OF TERMS OF DIP FACILITY[4]

22.     Pursuant to Bankruptcy Rule 4001(b), (c) and (d), the following is a concise statement and summary of the proposed material terms of the DIP Facility, as specified in the DIP Loan Documents and DIP Orders:

| SUMMARY OF DIP FACILITY | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| **Borrower**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Schramm, Inc. | DIP Note Introduction; Interim Order, Introduction |
| **Guarantor**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | HDR Holding, Inc. | DIP Note Introduction; Interim Order, Introduction |
| **DIP Lender**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Schramm II Inc. | DIP Note Introduction; Interim Order, Introduction |
| **DIP Facility**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | A superpriority senior secured debtor-in-possession delayed draw term loan composed of a secured note in the amount of $6,000,000. | DIP Note ¶ 1; Interim Order, Introduction |
| **Borrowing Limits**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The aggregate principal amount of all Loans outstanding shall not exceed $6,000,000, plus all interest added to the outstanding principal amount pursuant to the DIP Note. | DIP Note, ¶ 1; Interim Order, Introduction |
| **Budget**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Prior to the Petition Date, the DIP Lender shall receive a 13-week DIP Budget substantially in the form attached to the Interim Order, which budget shall be in form and substance reasonably satisfactory to the DIP Lender.<br><br>Borrower shall from time to time as set forth below prepare and provide to the DIP Lender a rolling 13-week cash flow forecast setting forth on a line item basis the Debtors' projected cash receipts and cash disbursements on a weekly basis, substantially in the form of the initial budget annexed to the Interim Order as Exhibit B (the initial budget and each subsequent budget, a "DIP Budget"). The Borrower may use the proceeds of the DIP Facility and Cash Collateral, for the | DIP Note, ¶ 14; Interim Order, ¶ 3 |

---

[4]  The following summary is included for convenience only and is qualified in its entirety by reference DIP Facility documents, which shall control in the event of any inconsistencies. Unless otherwise defined herein, capitalized terms used in this summary shall have the meaning ascribed to them in the DIP Loan Document.

| SUMMARY OF DIP FACILITY | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | purposes and up to the amounts set forth in the DIP Budget, together with Permitted Variances (defined in the DIP Note) subject to the terms and conditions set forth in the DIP Note and the Interim Order.  No later than 5:00 p.m. (Eastern Time) on Tuesday of each calendar week, commencing on July 2, 2019, the Debtors shall provide the DIP Lender with a report (the "<u>DIP Budget Variance Report</u>") of the aggregate variance between actual disbursements and projected disbursements as set forth in the DIP Budget for the most recently ended Applicable Period.    Subject to a Permitted Variance, the Debtors' actual disbursements during an Applicable Period shall not exceed those projected in the DIP Budget for such Applicable Period. | |
| **Use of DIP Proceeds and Cash Collateral** Fed. R. Bankr. P. 4001(c)(1)(B)(ii);(c)(1)(B) | The Borrower may use the proceeds of the DIP Facility and Cash Collateral, for the purposes and up to the amounts set forth in the DIP Budget, together with Permitted Variances (defined in the DIP Note) subject to the terms and conditions set forth in the DIP Note and the Interim Order. | Interim Order, ¶ 3 |
| **Payments on Prepetition Debt;** Fed. R. Bankr. P. 4001(c)(1)(B) | None. | N/A |
| **Cross Collateralization** Fed. R. Bankr. P. 4001(c)(1)(B)   **Local Rule 4001-2(a)(i)(A)** Cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors | None, other than adequate protection. | Interim Order, ¶ 20 |
| **Identity of Each Entity with Interest in Cash Collateral** Fed. R. Bankr. P. 4001(b)(1)(B)(i) | The Prepetition Secured Parties have interest in the Cash Collateral. | N/A |
| **Interest Rates** Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Facility will accrue interest at a rate of 12% per annum. | DIP Note, ¶ 4 |
| **Maturity Date** Fed. R. Bankr. P. 4001(c)(1)(B); | The earliest of: (i) Stated Maturity Date, (ii) the date on which the Obligations are declared to be, or otherwise become, due and payable in full due to the occurrence of an Event of Default; and (iii) the date of delivery of a Termination Notice. | DIP Note, ¶ 20 |

| SUMMARY OF DIP FACILITY | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| **Financial Covenants** Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Note contains affirmative and negative covenants, in form and substance customary for debtor-in-possession financings of this type such as the Approved Budget and Permitted Variances (as defined therein) and taking into account the specific transaction, subject to, where appropriate, carve-outs and exceptions to be agreed (which will be applicable to the Borrower and the Guarantor), and shall reflect the status of the DIP Facility as a debtor-in-possession facility. | DIP Note, ¶¶ 15 & 16 |
| **Collateral and Priority** Fed. R. Bankr. P. 4001(c)(1)(B)(i); | As of the date of the Interim Order, the DIP Liens of the DIP Lender under the DIP Loan Documents and as approved and perfected by the Interim Order include, *inter alia*, liens upon and security interests in (i) all of those items and types of collateral in which security interests may be created under Article 9 of the Uniform Commercial Code, (ii) to the extent not expressly prohibited by law or contract, all of those items and types of collateral not governed by Article 9 of the Uniform Commercial Code, including, without limitation, licenses issued by any federal or state regulatory authority, any leasehold or other real property interests, and commercial tort claims of the Debtors, (iii) any and all other collateral of any nature or form, and (iv) the products, rents, offspring, profits, and proceeds of any of the foregoing (collectively, (i)-(iv), the "DIP Collateral").  None of the DIP Obligations, DIP Liens, or DIP Superpriority Claims shall (a) be subject to or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, (b) be subject to or *pari passu* with any inter-company claim, whether secured or unsecured, of any Debtor or any domestic or foreign subsidiary or affiliate of any Debtor, (c) be subject to sections 510, 549, or 550 of the Bankruptcy Code or (d) hereafter be subordinated to or made *pari passu* with any other lien or security interest under sections 361, 363 or 364 of the Bankruptcy Code or otherwise, except as expressly provided in the Interim Order. | Interim Order, ¶¶ 12 & 15 |
| **Adequate Protection** Fed. R. Bankr. P. 4001(b)(1)(B)(iv), (c)(1)(B)(ii) | With respect to the Prepetition Secured Parties, the APA by the Stalking Horse Bidder provides adequate protection.  In addition, the Interim Order provides:<br><br>• in accordance with sections 361, 363(e) and 364(d) of the Bankruptcy Code, the Agent will be granted, for the benefit of the Prepetition Secured Parties, valid, binding, enforceable and perfected junior security interests and replacement liens (the "Adequate Protection Liens") upon all property of the Debtors whether arising prepetition or postpetition of any nature whatsoever, wherever located, in each case to secure the Prepetition Secured Obligations against, without duplication, the aggregate diminution, if any, subsequent to the Petition Date, in the value of the Prepetition Collateral by:  (i) the reduction in Prepetition Collateral available to satisfy Prepetition Secured Obligations as a consequence of the priming of the Prepetition Secured Obligations by the DIP Obligations; | Interim Order, ¶ 20 |

| SUMMARY OF DIP FACILITY | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | (ii) depreciation, use, sale, loss, decline in market price or otherwise of the Prepetition Collateral as a consequence of the use, sale or lease of the Prepetition Collateral by the Debtors or as a result of the imposition of the automatic stay; and (iii) the sum of the aggregate amount of all Cash Collateral and the aggregate value of all non-cash Prepetition Collateral that is applied in payment of the DIP Obligations or any other obligations or expenses of the Debtors other than Prepetition Secured Obligations, but only to the extent of any decrease in the value of the Prepetition Collateral on account of subsections (i), (ii) and (iii) above, all to the extent authorized by the Bankruptcy Code. The Adequate Protection Liens are subject and subordinate to (A) the Carve-Out, (B) the DIP Obligations, the DIP Liens and the DIP Superpriority Claims, and (C) the Permitted Prior Senior Liens. The Adequate Protection Liens will not (x) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, (y) be subject to any inter-company claim, whether secured or unsecured, of any Debtor or any domestic or foreign subsidiary or affiliate of any Debtor, or (z) hereafter be subordinated to or made *pari passu* with any other lien or security interest under sections 361, 363 or 364 of the Bankruptcy Code or otherwise except as expressly provided in the Interim Order and the DIP Loan Documents, including, without limitation, with respect to the Carve-Out, Permitted Prior Senior Liens, DIP Obligations, DIP Liens and DIP Superpriority Claims.<br><br>• to the extent that the Agent shall hold claims allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code, notwithstanding the provision of Adequate Protection hereunder, the Agent for the benefit of the Prepetition Secured Parties are hereby each granted an administrative expense claim pursuant to section 507(b) of the Bankruptcy Code (each, a "<u>Section 507(b) Claim</u>") with priority over all other administrative expenses, but in all cases subject and subordinate to the Carve-Out, the Permitted Prior Senior Liens, DIP Obligations, DIP Liens and DIP Superpriority Claims. | |
| **Debtors' Stipulations** Fed. R. Bankr. P. 4001(c)(1)(B)(iii), (viii) <br><br> **Local Rule 4001-2(a)(i)(B)** Findings of fact that bind the state to the validity, perfection, or amount of the secured creditors' prepetition lien or waiver | The Debtors make certain customary admissions and stipulations with respect to the amounts outstanding under the Prepetition Financing Documents, the validity, perfection, enforceability and priority of liens and security interests securing the obligations under the Prepetition Financing Documents, the non-existence of any grounds for the Debtors to challenge any aspect of the Prepetition Financing Documents and the obligations thereunder or the respective holders thereof and a release by the Debtors with respect to the foregoing. | Interim Order, ¶ C |

| SUMMARY OF DIP FACILITY | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| of claims against the secured creditor | | |
| **Material Conditions to Closing any Loan** Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Lender, in its reasonable discretion, shall not be obligated to fund any Loan, if, as of the date thereof:<br><br>• the Borrower or Guarantor has not paid any amount then payable hereunder or under any other Loan Document or shall not have performed any of their respective obligations hereunder or under any other Loan Document;<br><br>• the Borrower or Guarantor has not duly executed and delivered the DIP Note;<br><br>• the Borrower or Guarantor has not delivered corporate resolutions, incumbency certificates, and similar documents, in form and substance satisfactory to Lender in its reasonable discretion, with respect to the DIP Note and the other Loan Documents and the transactions contemplated hereby and thereby;<br><br>• the Borrower and Guarantor have not (i) duly paid any and all fees, costs, and expenses then payable hereunder or under any other Loan Documents (including, without limitation, the reasonable and documented fees, costs, and expenses of counsel to the DIP Lender) and (ii) fully performed all of their respective obligations hereunder or under any other Loan Documents;<br><br>• either (i) the Bankruptcy Court has not entered the Interim Order within three (3) days of the Petition Date, or (ii) the Interim Order has been stayed, vacated, reversed, modified, or amended without the DIP Lender's consent in its sole discretion;<br><br>• on any such date that is on or after the date that is thirty (30) calendar days after the Petition Date, (i) the Bankruptcy Court has not entered the Final Order, or (ii) the Final Order has been stayed, vacated, reversed, modified, or amended without the DIP Lender's consent in its sole discretion;<br><br>• the Borrower has not delivered to the DIP Lender the Approved Budget that is in form and substance satisfactory in the DIP Lender's sole discretion, or shall not have updated the Approved Budget in accordance with the DIP Note;<br><br>• a Bankruptcy Court order has been entered (i) authorizing the Borrower or the Guarantor to obtain financing or credit pursuant to section 364 of the Bankruptcy Code from any Person other than the DIP Lender; or (ii) providing adequate protection to any Person under sections 361 through 364 of the Bankruptcy Code other than as authorized pursuant to the Interim Order or with the consent and approval of the DIP Lender;<br><br>• any representation or warranty by the Borrower or the Guarantor contained in the DIP Note or in any other Loan | DIP Note, ¶ 2 |

| SUMMARY OF DIP FACILITY | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | Documents shall be untrue or incorrect as of such date in any material respect; | |
| | • either (i) any Event of Default shall have occurred and be continuing or would result after giving effect to any requested Loan; or (ii) any Default shall have occurred and be continuing or would result after giving effect to any requested Loan, and the DIP Lender in its sole discretion shall have determined not to make any Loan so long as such Default is continuing; | |
| | • except as occasioned by the commencement of the Chapter 11 Cases and the actions, proceedings, investigations, and other matters related thereto, any event or circumstance having a Material Adverse Effect shall have occurred since the date hereof and the DIP Lender shall have determined not to make any Loan so long as such Material Adverse Effect is continuing; | |
| | • the Debtors shall not have filed the Sale Motion in form and substance acceptable to the DIP Lender; | |
| | • the Sale Motion has been withdrawn or an order approving the Sale Motion (which order must be in form and substance acceptable to the DIP Lender) has not been entered by the date set forth in the Interim Order; | |
| | • on any date after the Sale Order has been entered, the Sale Order is stayed, vacated, reversed, modified (without Lender's consent), or on appeal; or | |
| | • after giving effect to any Loan, the outstanding principal amount of all Loans would exceed the lesser of (i) the Maximum Amount, (ii) the amount then authorized by the Interim Order, and (iii) the amount permitted to be borrowed for the applicable period as set forth in the Approved Budget, subject to Permitted Variances. | |
| **Indemnification** Fed. R. Bankr. P. 4001(c)(1)(B)(ix) | The Debtors have agreed to indemnify the DIP Lender and its affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "<u>Indemnified Person</u>") and hold each of them harmless from and against all costs, expenses (including reasonable fees, disbursements and other charges of counsel), and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Debtors or any of their affiliates or shareholders) that relates to the DIP Facility or the Interim Order, including the financing contemplated hereby, the Chapter 11 Cases, or any transactions in connection therewith; provided that no Indemnified Person will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence, willful misconduct, fraud, or violations of the | Interim Order, ¶ 22 |

| SUMMARY OF DIP FACILITY | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | Interim Order.  Other than with respect to the proviso at the end of the immediately preceding sentence, nothing in the Interim Order is meant to limit the scope of any indemnity provided for the benefit of the DIP Lender in the DIP Loan Documents. | |
| **Events of Default**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Notwithstanding the provisions of section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, but subject to the provisions of the Interim Order and/or Final Order (as applicable), the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default": | DIP Note, ¶ 17 |
| | • The Borrower or the Guarantor (i) shall fail to make any payment of principal or interest on, or fees owing in respect of the Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the DIP Lender for any expense reimbursable under any Loan Document in accordance with the Interim Order or Final Order (as applicable). | |
| | • Any representation or warranty in any Loan Document or in any written statement, report, financial statement, or certificate made or delivered to the DIP Lender by the Borrower or the Guarantor is untrue or incorrect in any material respect as of the date when made or deemed made. | |
| | • Any provision of any Loan Document shall for any reason cease to be valid, binding, and enforceable in accordance with its terms (or the Borrower or the Guarantor shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any Loan Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any Loan Document shall cease to be a valid and perfected first priority Lien (except as otherwise permitted) in any of the Collateral purported to be covered thereby. | |
| | • There shall be a change in the business, assets, operations, or financial condition of the Borrower or the Guarantor that results in a Material Adverse Effect, other than those customarily caused by commencing a case under chapter 11 of the Bankruptcy Code and other than a sale pursuant to the terms of the Stalking Horse APA which results in the indefeasible payment in full in cash of the Obligations. | |
| | • A line item deviation in actual cash disbursements or receipts from the Approved Budget in excess of such line item's Permitted Variance shall occur. | |
| | • Any event constituting an event of default or termination event as set forth in the Interim Order or Final Order (as applicable) (each, a "Termination Event") shall occur. | |

01:24604637.5

| SUMMARY OF DIP FACILITY | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | • Any of the following shall occur:<br><br>  a. Any milestone set forth on <u>Exhibit C</u> to the Interim Order or <u>Exhibit C</u> to the Final Order, as applicable, shall not have been satisfied.<br><br>  b. The Stalking Horse APA is terminated.<br><br>  c. A motion or other pleading is filed in any of the Chapter 11 Cases to dismiss or convert such Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, which motion or pleading is not withdrawn within five (5) calendar days, or otherwise overruled or dismissed by the Bankruptcy Court within fourteen (14) calendar days.<br><br>  d. A motion or other pleading is filed in any of the Chapter 11 Cases for entry of an order authorizing the appointment of an interim or permanent trustee in such Chapter 11 Case or the appointment of an examiner (other than a fee examiner) in such Chapter 11 Case, which motion or pleading is not withdrawn within five (5) calendar days, or otherwise overruled or dismissed by the Bankruptcy Court within fourteen (14) calendar days.<br><br>  e. The Borrower or Guarantor moves in the Chapter 11 Cases (or fails to contest in good faith a motion brought by any other Person) to approve a sale or other disposition of substantially all of the Debtors' assets that does not provide for the termination of Lender's Commitment to make Loans and the indefeasible payment in full in cash of all Obligations and all indebtedness and obligations owing to the DIP Lender or its Affiliates under the Prepetition Financing Documents, in each case, upon the consummation of such sale.<br><br>  f. The Borrower or the Guarantor moves for (or fails to contest in good faith a motion brought by any other Person), or the Bankruptcy Court enters, an order confirming a chapter 11 plan, which plan is not in form and substance acceptable to the DIP Lender in its sole discretion, unless such plan provides for the termination of Lender's Commitment to make Loans and the indefeasible payment in full in cash of all Obligations and all indebtedness and obligations owing to the DIP Lender or its Affiliates under the Prepetition Financing | |

| SUMMARY OF DIP FACILITY | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | Documents, in each case, on or prior to the effective date of such plan. | |
| | g. The Borrower or the Guarantor moves in the Chapter 11 Cases (or fails to contest in good faith a motion brought by any other Person or such motion succeeds): (i) to obtain financing from any Person other than the DIP Lender or one of its wholly-owned subsidiaries under sections 364(c) or 364(d) of the Bankruptcy Code (other than any such financing that provides for the termination of Lender's Commitment to make Loans and the indefeasible payment in full in cash of all Obligations and all indebtedness and obligations owing to the DIP Lender or its Affiliates under the Prepetition Financing Documents, in each case, on the effective date of such financing); (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral (other than any such Lien securing financing that provides for the termination of Lender's Commitment to make Loans and the indefeasible payment in full in cash of all Obligations and all indebtedness and obligations owing to the DIP Lender or its Affiliates under the Prepetition Financing Documents, in each case, on the effective date of such financing); (iii) to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code; or (iv) to authorize any other action or actions adverse to the DIP Lender, or its rights and remedies hereunder or its interests in the Collateral, that would, individually or in the aggregate, have a Material Adverse Effect. | |
| | h. The allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any Collateral. | |
| | i. The Interim or Final Order is reversed, vacated, revoked, stayed, amended, supplemented, or otherwise modified in any manner without the prior written consent of the DIP Lender in its sole discretion. | |
| | j. The occurrence of any postpetition judgments, liabilities or events that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. | |

01:24604637.5

| SUMMARY OF DIP FACILITY | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | k.  The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner (other than a fee examiner) in the Chapter 11 Cases. | |
| | l.  The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code without the consent of the DIP Lender. | |
| | m.  The entry of an order in the Chapter 11 Cases avoiding or requiring repayment of any portion of the payments made to the DIP Lender on account of the Obligations owing under the DIP Note or the other Loan Documents. | |
| | n.  The entry of an order in the Chapter 11 Cases granting any other superpriority administrative claim or Lien equal to or superior to that granted to the DIP Lender, unless consented to by the DIP Lender in its sole discretion. | |
| | o.  The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor (other than the DIP Lender) to execute upon or enforce a Lien on any Collateral, or (ii) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority that could reasonably be expected to have a Material Adverse Effect. | |
| | p.  There shall commence any suit or action against the DIP Lender by or on behalf of (i) the Borrower or Guarantor or (ii) the Committee, in each case, that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the DIP Lender and, if such suit or action is commenced by any Person other than Borrower or the Guarantor, such suit or action shall not have been dismissed or stayed within ten (10) calendar days after service thereof on the DIP Lender, and, if stayed, such stay shall have been lifted. | |
| | •  The Borrower or the Guarantor shall fail or neglect to perform, keep or observe any of the provisions of the DIP | |

| SUMMARY OF DIP FACILITY | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | Note that is not the subject of any other clause of section 17 of the DIP Note and such failure remains uncured for five (5) Business Days after notice. | |
| **Milestones**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B)(vi) | The DIP Facility and use of Cash Collateral shall require compliance with the following milestones (the "Milestones") unless waived by the DIP Lender:<br><br>• On the Petition Date, the Debtors shall have filed a motion seeking approval of the DIP Facility.<br><br>• On or before June 27, 2019, the Interim Order authorizing and approving the DIP Facility and the transactions contemplated thereby on an interim basis, in form and substance satisfactory to the DIP Lender as confirmed in writing in its sole and absolute discretion, shall have been entered by the Bankruptcy Court.<br><br>• On or before June 27, 2019, the Debtors shall have filed a motion (the "Bid Procedures Motion") with the Bankruptcy Court to approve bid procedures and establish the date of an auction to determine a winning bidder or bidders for the Debtor's assets (the "Auction"). The Bid Procedures Motion will provide for the selection of a stalking horse bidder and entry into the APA with the Stalking Horse Bidder, subject to better and higher bids as set forth therein, acceptable to the DIP Lender in its sole and absolute discretion as confirmed in writing.<br><br>• On or before July 19, 2019 (no later than twenty-five (25) days following the Petition Date), or the first business day thereafter that the Bankruptcy Court is available, an order approving the Bid Procedures Motion (the "Bid Procedures Order"), in form and substance satisfactory to the DIP Lender as confirmed in writing in its sole and absolute discretion, shall have been entered by the Bankruptcy Court.<br><br>• On or before July 24, 2019 (no later than thirty (30) days following the Petition Date), or the first business day thereafter that the Bankruptcy Court is available, the Final Order authorizing and approving the DIP Facility and the transactions contemplated thereby on a final basis, in form and substance satisfactory to the DIP Lender as confirmed in writing in its sole and absolute discretion, shall have been entered by the Bankruptcy Court.<br><br>• On or before August 28, 2019 (no later than sixty-five (65) days following the Petition Date), or the first business day thereafter that the Bankruptcy Court is available, the Bankruptcy Court shall have convened and concluded a hearing to consider approval of a sale to the Stalking Horse Bidder or to the Successful Bidder following an Auction and an order approving the sale (the "Sale Order"), in form and substance satisfactory to the DIP Lender as confirmed in writing in its sole and absolute | Interim Order, Exhibit C |

| SUMMARY OF DIP FACILITY | | |
| --- | --- | --- |
| **Term** | **Summary** | **Reference** |
| | discretion, which Sale Order shall approve a sale to the Successful Bidder at any Auction conducted under the Bid Procedures Order or to the Stalking Horse Bidder if there are no other qualified bidders, shall have been entered by the Bankruptcy Court (a "Sale"). <br><br> • On or before September 3, 2019 (no later than seventy (70) days following the Petition Date), or the first business day thereafter, the closing of the Sale shall have occurred. | |
| **Liens on Avoidance Actions** <br> Fed. R. Bankr. P. 4001(c)(1)(B)(xi) <br><br> **Local Rule 4001-2(a)(i)(D)** <br> Liens on Debtors' causes of action | Collateral does not include any claims and causes of action under the Avoidance Actions but attaches to proceeds of Avoidance Actions upon entry of the Final Order. | Interim Order, ¶ 11 |
| **Waiver or Modification of the Automatic Stay** <br> Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | Modification of the automatic stay to the extent necessary to implement and effectuate the terms of the Loan Documents. | Interim Order, Introduction |
| | Modification of the automatic stay to the extent necessary to permit the DIP Lender to exercise its rights under the Interim Order, under the Loan Documents, and/or applicable non-bankruptcy law. | Interim Order, Introduction |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** <br> Fed. R. Bankr. P. 4001(c)(1)(B)(vii) | The Debtors expect that all of the DIP Liens granted the DIP DIP Lender and Adequate Protection Liens granted to the Prepetition Secured Parties shall be effective and perfected upon entry of the Interim Order and without any further action. | Interim Order, ¶ 15 |
| **Section 506(c) Waiver** <br> Fed. R. Bankr. P. 4001(c)(1)(B)(x) <br><br> **Local Rule 4001-2(a)(i)(C)** <br> Waiver of estate rights with respect to section 506(c) | Subject to entry of a Final Order (among other things), the DIP Lender and the Prepetition Secured Parties shall be entitled to a 506(c) waiver. | Interim Order, ¶ 14 |
| **Section 522(b) Waiver** <br> Fed. R. Bankr. P. 4001(c)(1)(B) <br><br> **Local Rule 4001-2(a)(i)(H)** <br> Provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. §552 | Subject to entry of a Final Order, the waiver of the Debtors' right to surcharge the Prepetition Secured Obligations and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code. | Interim Order, ¶ 14 |

| SUMMARY OF DIP FACILITY | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Fed. R. Bankr. P. 4001(c)(1)(B)(viii) | The admissions, stipulations, agreements, releases, and waivers set forth in Paragraphs C and 16 of the Interim Order (collectively, the "Prepetition Lien and Claim Matters") are and shall be binding on the Debtors, any subsequent trustee (including any chapter 7 trustee), responsible person, examiner with expanded powers, any other estate representative and all parties-in-interest and all of their successors-in-interest and assigns, including, without limitation, the Committee, if any, <u>unless</u>, and solely to the extent that, a party-in-interest with standing and requisite authority, (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in Paragraph 18 of the Interim Order) challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") by the later of 75 days from entry of the Interim Order or 60 days from formation of a Committee (the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Agent (with respect to the Prepetition Collateral) or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, provided, however, if the Chapter 11 Cases convert to Chapter 7 prior to the Challenge Deadline, the Challenge Deadline shall be extended for the Chapter 7 trustee to 10 days after the appointment of such trustee, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.  For the avoidance of doubt, any trustee appointed or elected in these Chapter 11 Cases shall, until the expiration of the period provided set forth in the Interim Order for asserting Challenges, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations and stipulations of the Debtors in the Interim Order. | Interim Order, ¶ C, 16 & 17 |

23.     Pursuant to Local Rule 4001-2, the terms of the DIP Facility contain the following

provisions.  This chart shall not repeat provisions to the extent already identified above.

01:24604637.5

| HIGHLIGHTED PROVISIONS | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| **Local Rule 4001-2(a)(ii)**<br><br>Summary of essential terms | See table above. | N/A |
| **Local Rule 4001-2(a)(i)(A)**<br><br>Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors | None, other than adequate protection, discussed above. | Interim Order, ¶ 20 |
| **Local Rule 4001-2(a)(i)(F)**<br><br>Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out | The DIP Liens, the DIP Superpriority Claims, the liens of the Prepetition Secured Parties, the Adequate Protection Liens, and the Section 507(b) Claims (defined below) of the Prepetition Secured Parties, shall be subject to the payment, without duplication, of the following fees and expenses (the amounts set forth in the Interim order, together with the limitations set forth therein, collectively, the "<u>Carve-Out</u>") from, at the Debtors' discretion, any of loan proceeds of the DIP Facility, Cash Collateral, or proceeds resulting from liquidation of DIP Collateral or Prepetition Collateral (and not from either cash collateral or proceeds resulting from the liquidation of any collateral of any holder of a Permitted Prior Senior Lien):<br><br>• the reasonable fee and expense claims of the respective retained professionals of the Debtors and the Committee, if any, that have been approved by this Court at any time during the Chapter 11 Cases pursuant to sections 330 and 331 of the Bankruptcy Code including any interim approval as set forth in any procedures approved by the Court relating to the interim approval of fees and expenses of the Retained Professionals (the Court approved professionals of the Debtors and any Committee are collectively referred to as the "<u>Retained Professionals</u>"), the reasonable expenses of members of the Committee, if any ("<u>Committee Member Expenses</u>", which shall not include legal fees and expenses of Committee members) which were incurred (A) on and after the Petition Date and before the Carve-Out Trigger Date (defined below), and (B) on and after the Carve-Out Trigger Date in an aggregate amount not exceeding $50,000 for all Retained Professionals, CRO, if any, and Committee Member Expenses; <u>provided</u> that, in each case, such fees and expenses of the Retained Professionals, CRO, if any, and Committee Member Expenses are ultimately allowed on a final basis by this Court pursuant to sections 330 and 331 of the Bankruptcy Code or otherwise and are not excluded from the Carve-Out under Paragraph 18**Error! Reference source not found.** of the Interim Order (provided that | Interim Order, ¶ 13 |

| HIGHLIGHTED PROVISIONS | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| | nothing in the Interim Order waives the right of any party to object to the allowance of any such fees and expenses). | |
| | • any accrued and unpaid postpetition fee and expense claims, without regard to when such fees and expenses accrued, related to the appointment of the Debtors' Chief Restructuring Officer (the "CRO") appointed under section 363 of the Bankruptcy, if any, including any interim or final approval as set forth in any order of the Court approving the appointment of any CRO or, if applicable, any procedures approved by the Court relating to the compensation of the CRO; provided however, that any Court-approved bonus, transaction, success fees, completion fees, substantial contribution fees or any other fees of similar import of any of the person or entity referenced in paragraph 13(a)(i) and (ii) of the Interim Order shall be paid solely from the net proceeds of the Court approved transaction giving rise to such award. | |
| | • the unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code plus statutory interest, if any, imposed under 31 U.S.C. § 3717. There is no limitation on the obligations of the Debtors and their estates with respect to unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code. | |
| | As used herein, the term "Carve-Out Trigger Date" means the date on which the DIP Lender provides written notice to the Debtors, the U.S. Trustee and counsel to the Committee, if any, that the Carve-Out is invoked, which notice may be delivered only on or after the occurrence of an Event of Default under the DIP Loan Documents or upon the Maturity Date. | |
| **Local Rule 4001-2(a)(i)(G)**<br><br>Nonconsensual priming | The Debtors do not expect the Interim Order to provide for any non-consensual priming of Hark, GenNx360, or the Agent other than with respect to the Carve-Out. | Interim Order, Introduction |

## BASIS FOR RELIEF

**I.      The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Loan Documents**.

### A.      Entry into the DIP Facility Is an Exercise of the Debtors' Sound Business Judgment.

24.      The Court should authorize the Debtors, as an exercise of their sound business

judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue

using the Cash Collateral.  Courts grant a debtor-in-possession considerable deference in acting

in accordance with its business judgment in obtaining postpetition secured credit, so long as the

agreement to obtain such credit does not run afoul of the provisions of, and policies underlying,

the Bankruptcy Code.  *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D.

Del. 1994) (approving a postpetition loan and receivables facility because such facility

"reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313

(Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in

the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y.

1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized

on grounds that permit reasonable business judgment to be exercised so long as the financing

agreement does not contain terms that leverage the bankruptcy process and powers or its purpose

is not so much to benefit the estate as it is to benefit a party in interest.").

25.    Specifically, to determine whether the business judgment standard is met, a court

need only "examine whether a reasonable business person would make a similar decision under

similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In

re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should

not second guess a debtor's business decision when that decision involves "a business judgment

made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under

the [Bankruptcy] Code").

26.    Further, in considering whether the terms of postpetition financing are fair and

reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo.

2003) (finding financing terms, many of which favored the DIP Lender, reasonable when "taken

in context, and considering the relative circumstances of the parties"); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. **Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization**. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

27.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment, which follows an arm's-length process and a careful evaluation of the available alternatives. Specifically, and in the face of insufficient cash-on-hand, the Debtors and their advisors determined that the Debtors would require postpetition financing to support their operational needs and chapter 11 activities. Given their capital structure, the Debtors determined that negotiating a financing facility with the Prepetition Secured Parties was the most cost effective and expedient way to secure sufficient funding during the chapter 11 cases. The Debtors negotiated the DIP Loan Documents with the DIP

Lender in good faith, at arm's-length and with the assistance of their respective advisors, and the Debtors believe that they have obtained financing on the best terms available given the circumstances of these chapter 11 cases. Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Documents, including the DIP Note, as a reasonable exercise of the Debtors' sound business judgment.

**B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims**.

28.     The Debtors propose to obtain financing under the DIP Facility by providing the security interests and liens set forth in the DIP Loan Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide the DIP Lender with perfected first priority claims and priming liens, and security interests in the DIP Collateral and Prepetition Secured Obligations.

29.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (stating that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether: (i) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim; (ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders. *See In re L.A. Dodgers LLC*, 457 B.R. at 312

(Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp*., 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp*., 71 B.R. at 549.

30.      As described above and as set forth in the First Day Declaration and the DIP Declaration, the Debtors are in need of an immediate capital infusion, yet substantially all of the Debtors' existing assets are encumbered under their existing capital structure.  In light of the foregoing, the Debtors, in consultation with their advisors, have concluded that the success of the Chapter 11 Cases hinges on whether such financing had the support of, or was provided by, the Debtors' existing secured lenders.  Without postpetition financing, the Debtors lack sufficient funds to operate their businesses, continue paying their debts as they come due, pursue the sale of their assets, and cover the projected costs of the Chapter 11 Cases.  Absent the DIP Facility, which will provide the Debtors with sufficient liquidity to administer the Chapter 11 Cases through the sale process, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the current circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Loan Documents, are fair, reasonable, and adequate.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

31.      In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is

subject to a lien." 11 U.S.C. § 364(c).  As described above, given the Debtors' capital structure, the Debtors would be unable to obtain unsecured credit.  Therefore, approving a superpriority claim in favor of the DIP Lender is reasonable and appropriate.

32.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties have consented, or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.  Here, the Prepetition Secured Parties have consented to the DIP Facility.  Moreover, the proposed Superpriority Claims and DIP Liens are subject to valid, perfected and non-avoidable Permitted Prior Senior Liens (as defined in the Interim Order).  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

C.     **No Comparable Alternative to the DIP Facility Is Reasonably Available**.

33.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor,

as here, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (requiring a debtor to show that it made reasonable efforts to seek other sources of financing under sections 364(a) and (b)).

34.     As noted above, and in the First Day Declaration and the DIP Declaration, Hark has senior liens on substantially all of the Debtors' assets through the Term A Loan, GenNx360 has liens on substantially all of the Debtors' assets through the Term B Loan, and Citizens has liens on substantially all of the Debtors' assets through the Term C Loan.  In negotiating the terms of their proposed postpetition financing, Hark and GenNx360 were unwilling to consent to the priming of their prepetition liens by a third-party lender, even if such third-party lender was willing to lend, and GenNx360 was the only Prepetition Secured Lender willing to lend additional funds.  The proposed debtor-in-possession financing was negotiated by the Debtors in consultation with their legal and financial advisors, and was negotiated in good faith and at arms' length.  The proposed postpetition financing proposes certain highly favorable terms, including that the DIP Lender will not be charging the Debtors fees and no post-petition debt service payments and avoids a potentially costly and uncertain priming fight.  Thus, the Debtors have determined that the DIP Facility provides the best opportunity available to the Debtors under the

circumstances to fund the Chapter 11 Cases.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

II.    **The Debtors Should Be Authorized to Use the Cash Collateral**.

35.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor-in-possession to use cash collateral with the consent of the secured party.  Here, Hark and GenNx360 consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

36.    Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis").

37.    As set forth above, under the terms of the Interim Order, the Debtors have agreed to provide the Prepetition Secured Parties with a variety of adequate protection measures to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay, including (i) replacement security interests and liens, (ii) administrative expense claims under sections 503(b) and 507(a)(2) of the Bankruptcy Code, subject to the payment in full of amounts

due under the Carve Out and the DIP Facility, and (iii) the bid submitted by the Stalking Horse Bidder.

38.     The Debtors submit that the proposed adequate protection measures protect the Prepetition Secured Parties from any diminution in value to the Cash Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed adequate protection to be provided for the benefit of the Prepetition Secured Parties is appropriate and sufficient.  Thus, the proposed adequate protection is not only necessary to protect against any diminution in value, but is fair and appropriate under the circumstances of the Chapter 11 Cases to ensure the Debtors use of Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

III.    **The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lender Under the DIP Loan Documents**.

39.     Pursuant to the DIP Note and the proposed Interim Order, the Debtors have agreed to pay the reasonable prepetition and postpetition fees and expenses of the attorneys and advisors for the DIP Lender.  The proposed postpetition financing otherwise proposes certain highly favorable terms, including that the DIP Lender will not be charging the Debtors any fee in connection with the extension of credit.  The Debtors have agreed to pay attorneys' fees and expenses in connection with the following:

(a)     any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the Loan Documents or advice in connection with the administration of the Loans made pursuant thereto or the DIP Lender's rights thereunder;

(b)     the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 cases, attendance at meetings or hearings related to the Chapter 11 Cases and any subsequent Chapter 7 cases, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 cases;

(c)     any litigation, contest, dispute, suit, proceeding, or action (whether instituted by the DIP Lender, the Borrower, a Guarantor, or any other

Person, and whether as a party, witness, or otherwise) in any way relating to the Collateral, any of the Loan Documents, or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding, or action, and any appeal or review thereof, in connection with a case commenced by or against the Borrower, a Guarantor or any other Person that may be obligated to the DIP Lender by virtue of the Loan Documents, including any such litigation, contest, dispute, suit, proceeding, or action arising in connection with any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

(d)     any attempt to enforce any remedies of the DIP Lender against the Borrower, the Guarantor, or any other Person that may be obligated to the DIP Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

(e)     any work-out or restructuring of the Loans during the pendency of one or more Events of Default; and

(f)     any efforts to (i) monitor the Loans or any of the other Obligations, (ii) evaluate, observe or assess the Borrower, Guarantor, or their respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate, or otherwise dispose of any of the Collateral.

The Debtors, in consultation with their advisors, believe that the payment of the fees and expenses of the advisors to the DIP Lender are an integral component of the overall terms of the DIP Facility, were required by the DIP Lender as consideration for the extension of postpetition financing, and are reasonable and customary for similar transactions.  Accordingly, the Court should authorize the Debtors to pay the fees and expenses of advisors provided under the DIP Loan Documents in connection with entering into those agreements.

### IV.     **The DIP Lender Should Be Deemed a Good-Faith Lender Under Section 364(e)**.

40.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

01:24604637.5

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).  As explained herein, in the First Day Declaration and the DIP Declaration, the DIP Loan Documents are the result of (a) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain vital postpetition financing, and (b) extended arm's-length, good-faith negotiations between the Debtors and the DIP Lender.  The Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

**V.     The Automatic Stay Should Be Modified on a Limited Basis**.

41.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to permit (i) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Lender may request to assure the perfection and priority of the DIP Liens, (ii) the Debtors to take all appropriate action to grant the replacement liens and to take all appropriate action to ensure that such replacement liens are perfected and maintain the priority set forth in the Interim Order, (iii) the Debtors to incur all liabilities and obligations to the DIP Lender as contemplated under the DIP Loan Documents,

(iv) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the Interim Order and the DIP Loan Documents, and (v) the implementation of the terms of the Interim Order.

42.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Chapter 11 Cases.  *See, e.g., In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default).

**VI.  Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

43.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

44.     The Debtors request that the Court conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility.  The Debtors require the initial funding, in the amount of $3,000,000 under the DIP Facility, prior to the Final Hearing and entry of the Final Order to continue operating, pay their administrative expenses and implement the relief requested in the Debtors' other "first day" motions.  Absent receipt of the initial funding amount and access to cash collateral, the Debtors will be unable to, among other things, pay

employee wages.  Accordingly, this relief will enable the Debtors to preserve and maximize value and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

**REQUEST FOR FINAL HEARING**

45.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

**SATISFACTION OF BANKRUPTCY RULE 6003(b)**

46.     Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003(b).  As set forth above, absent access to the DIP Facility, the Debtors will be unable to pay, among other things, their employees and providers of parts and services, and will be unable to service their customers.  Such a situation would leave the Debtors with no alternative but to immediately cease operating and convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

47.     Accordingly, the Debtors respectfully submit that Bankruptcy Rule 6003 has been satisfied.

**WAIVER OF BANKRUPTCY RULES 6004(h)**

48.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their

businesses without interruption and to preserve value for their estates.

49.    For this reason and those set forth above, the Debtors submit that cause exist to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

## **NOTICE**

50.    Notice of this Motion shall be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Debtors' thirty (30) largest unsecured creditors; and (v) counsel to the Debtors' prepetition and proposed postpetition secured lenders and agents; (vi) all parties known to have asserted a lien or security interest in the Debtors' property and (vii) the Debtors' Banks.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter the proposed DIP Orders, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

01:24604637.5

Dated:  June 24, 2019

*/s/ Sean T. Greecher*
Pauline K. Morgan (Bar No. 3650)
Sean T. Greecher (Bar No. 4484)
Joseph M. Mulvihill (Bar No. 6061)
Jared W. Kochenash (Bar No. 6557)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:     (302) 571-6600
Fax:    (302) 571-1253

*Proposed Counsel to Debtors and Debtors in Possession*

01:24604637.5

# **EXHIBIT 1**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HDR Holding, Inc., *et al.*,[1] | Case No. 19-11396 (MFW) |
| Debtors. | (Jointly Administered)<br>**Ref. Docket No. _____** |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507, BANKRUPTCY RULES 2002, 4001, 6004 AND 9014 AND LOCAL BANKRUPTCY RULE 4001-2 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING, (II) AUTHORIZING THE DEBTORS' LIMITED USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of the above referenced debtors and debtors in possession (collectively, the "Debtors") in the above-referenced chapter 11 cases (the "Chapter 11 Cases"), for entry of an interim order (this "Interim Order") and a final order ("Final Order"), pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, *inter alia*:

(i)     authorization for (a) the Debtors, including Schramm, Inc., a Pennsylvania corporation (the "Borrower"), to obtain up to $6,000,000.00 in principal amount of postpetition financing (the "DIP Facility"), and to access up to $3,000,000.00 in the interim and pending a final hearing all on the terms and conditions set forth in this Interim Order and that certain Debtor-in-Possession Delayed Draw Term Loan Promissory Note (the "DIP Note," substantially in

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: HDR Holding, Inc. (2015) and Schramm, Inc. (0480).  The Debtors' mailing address is 800 E. Virginia Ave., West Chester, PA 19380.

.

the form attached hereto as <u>Exhibit A</u> and together with this Interim Order, and all appendices, exhibits or schedules hereto and to the DIP Note, including, without limitation, the DIP Budget (as defined below) as the same may be amended, restated, or supplemented from time to time in accordance with the terms hereof and thereof, collectively, the "<u>DIP Loan Documents</u>"),[2] among the Borrower, HDR Holding, Inc., a Delaware corporation (the "<u>Guarantor</u>") and Schramm II Inc., a Delaware corporation (with its successors and assigns, collectively, the "<u>DIP Lender</u>"), and (b) the Guarantor to guaranty the Borrower's obligations in respect of the DIP Loans and all other obligations and indebtedness of the Borrower under or arising in connection with the DIP Loan Documents;

(ii) authorization for the Debtors to, subject to the Carve-Out (defined below) and Permitted Prior Senior Liens, grant security interests, liens, and superpriority claims (including a superpriority administrative claim pursuant to sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Lender to secure all obligations of the Debtors under and with respect to the DIP Facility (collectively, the "<u>DIP Obligations</u>"), including, subject to entry of the Final Order, on the proceeds and property recovered in respect of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under Chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, and 550 or any other similar state or federal law (collectively, the "<u>Avoidance Action Proceeds</u>");

(iii) authorization for the Debtors, pursuant to sections 105, 361, 362, 363, and 507 of the Bankruptcy Code to use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>", which shall not include loan proceeds of the DIP Facility), and all other Prepetition Collateral (defined below), in accordance with the terms of this Interim Order and the DIP Budget, as provided herein;

(iv) to, subject to the Carve-Out and any Permitted Prior Senior Liens, provide Adequate Protection of the liens and security interests (such liens and security interests, the "<u>Prepetition Liens</u>") of the prepetition lenders (such financial institutions in such capacities, the "<u>Prepetition Lenders</u>") under that certain Amended and Restated Credit Agreement, dated as of March 23, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>", and together with any other agreements, instruments, notes, guaranties, and other documents related thereto, collectively, the "<u>Prepetition Financing Documents</u>")), among the Borrower, the Guarantor, the various institutions from time to time party thereto as Prepetition Lenders, and Hark Capital I, LP (f/k/a Enhanced Credit Supported Loan Fund, LP), as

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to those terms in the DIP Loan Documents.

Agent (in such capacity, the "Agent", and together with the Prepetition Lenders, collectively, the "Prepetition Secured Parties"), which Prepetition Liens are being consensually primed by the DIP Facility, as more fully set forth in this Interim Order;

(v)     modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the Final Order;

(vi)    that this Court hold an interim hearing (the "Interim Hearing") to consider the relief sought in the Motion and entry of the proposed Interim Order;

(vii)   that this Court schedule a final hearing (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis; and

(viii)  waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim Order or the Final Order (including a waiver pursuant to Bankruptcy Rule 6004(h));

and the Interim Hearing having been held by this Court on June [__], 2019; and pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, due and sufficient notice of the Motion and the relief sought at the Interim Hearing having been given under the particular circumstances by the Debtors; this Court having considered the Motion and all pleadings related thereto, including the record made by the Debtors at the Interim Hearing; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AS FOLLOWS:**

A.     On June 24, 2019 (the "Petition Date"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.     No official committee of unsecured creditors ("Committee"), as provided for under section 1102 of the Bankruptcy Code, has been appointed in the Chapter 11 Cases.

AmericasActive:13694729.8

C.      Subject to Paragraph 17 below, without prejudice to the rights, if any, of any other party, the Debtors admit, stipulate, and agree that: as of the Petition Date, the Debtors were indebted and liable, without defense, counterclaim, or offset of any kind to the Prepetition Secured Parties under the Prepetition Financing Documents, including under (i) Term Loan A in the amount not less than $5,347,722.47 plus any other accrued and accruing unpaid Obligations thereunder, including interest, fees and expenses (including legal fees and expenses), (ii) Term B Loan in the amount not less than $6,500,000.00 plus any other accrued and accruing unpaid Obligations thereunder, including interest, fees and expenses (including legal fees and expenses), and (ii) Term C Loan in the amount not less than $6,000,000.00 plus any other accrued and accruing unpaid Obligations thereunder, including interest, fees and expenses (including legal fees and expenses).  All obligations of the Debtors arising under the Credit Agreement or any other Prepetition Financing Documents, including all loans, advances, debts, liabilities, principal, interest, fees, charges, expenses, and obligations for the performance of covenants, tasks, or duties or for the payment of monetary amounts owing to the Prepetition Secured Parties by the Debtors, of any kind or nature, whether or not evidenced by any note, agreement, or other instrument, shall be referred to herein collectively as the "Prepetition Secured Obligations".  The Prepetition Secured Obligations are secured by the security interests granted in those certain Security Documents (as defined in the Credit Agreement, as amended, restated, supplemented, or otherwise modified from time to time), pursuant to which each Debtor granted to the Agent, for the benefit of the Prepetition Secured Parties, to secure such Debtor's Prepetition Secured Obligations, a first priority security interest in the Collateral (as defined in the Credit Agreement and referred to in this Interim Order as the "Prepetition Collateral"), including (i) all Accounts; (ii) all cash and Cash Equivalents; (iii) all Chattel Paper (including Electronic Chattel Paper);

4

(iv) all Commercial Tort Claims as set forth on Schedule 3.16(d) to the Credit Agreement (as updated from time to time in accordance with the Credit Agreement); (v) all Copyright Licenses; (vi) all Copyrights; (vii) all Deposit Accounts; (viii) all Documents; (ix) all Equipment; (x) all Fixtures; (xi) all General Intangibles; (xii) all Goods; (xiii) all Instruments; (xiv) all Inventory; (xv) all Investment Property; (xvi) all Letter-of-Credit Rights; (xvii) all Material Contracts and all such other agreements, contracts, leases, licenses, tax sharing agreements, or hedging arrangements now or hereafter entered into by an Obligor (as defined in the Credit Agreement), as such agreements may be amended or otherwise modified from time to time (collectively, the "Assigned Agreements"), including without limitation, (A) all rights of an Obligor to receive moneys due and to become due under or pursuant to the Assigned Agreements, (B) all rights of an Obligor to receive proceeds of any insurance, indemnity, warranty, or guaranty with respect to the Assigned Agreements, (C) claims of an Obligor for damages arising out of or for breach of or default under the Assigned Agreements, and (D) the right of an Obligor to terminate the Assigned Agreements, to perform thereunder, and to compel performance and otherwise exercise all remedies thereunder; (xviii) all Patent Licenses; (xix) all Patents; (xx) all Payment Intangibles; (xxi) all Securities Accounts; (xxii) all Software; (xxiii) all Supporting Obligations; (xxiv) all Trademark Licenses; (xxv) all Trademarks; (xxvi) all books, records, ledger cards, files, correspondence, computer programs, tapes, disks, and related data processing software (owned by such Obligor or in which it has an interest) that at any time evidence or contain information relating to any Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon; (xxvii) all other personal property of any kind or type whatsoever owned by such Obligor; and (xxviii) to the extent not otherwise included, all Accessions, Proceeds and products of any and all of the foregoing.

5

F.      The Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facility and to use Cash Collateral, among other things, to fund working capital requirements, costs, and expenses of administration of the Chapter 11 Cases and fees and expenses relating to the DIP Facility during the pendency of the Chapter 11 Cases.  Without access to the DIP Facility and the continued use of Cash Collateral to the extent authorized pursuant to this Interim Order, the Debtors and their estates would suffer immediate and irreparable harm.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without access to the DIP Facility and the authorized use of Cash Collateral.

G.      In light of the Debtors' circumstances, the Debtors would be unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code, or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code, and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lender on terms more favorable than the terms of the DIP Facility. The only viable source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facility.  The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral under the terms of this Interim Order to satisfy their postpetition liquidity needs.

H.      The DIP Lender has indicated a willingness to provide the Debtors with certain financing commitments, but solely on the terms and conditions set forth in this Interim Order and in the DIP Loan Documents.  Accordingly, after considering all of their practical alternatives, the

6

Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of this Interim Order and the DIP Loan Documents represents the best financing currently available to the Debtors.

I.    The consent of the Prepetition Secured Parties to the priming of their liens by the DIP Liens, the Carve-Out, and use of the Prepetition Collateral, including Cash Collateral, by the Debtors, is limited to this Interim Order and the DIP Facility presently before this Court and shall not extend to any other postpetition financing or to any modified version of this DIP Facility with any party other than the DIP Lender.  Furthermore, the consent of the Prepetition Secured Parties to the priming of their liens by the DIP Liens, the Carve-Out, and use of the Prepetition Collateral, including Cash Collateral, by the Debtors does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Secured Parties that their interests in the Prepetition Collateral are adequately protected pursuant to this Interim Order or otherwise, provided, however, the Prepetition Secured Parties agree that the Adequate Protection granted to the Prepetition Secured Parties in this Interim Order is reasonable and calculated to protect the interests of the Prepetition Secured Parties, subject to the rights of the Prepetition Secured Parties to seek a modification of such Adequate Protection, as set forth below.

J.    The security interests and liens granted pursuant to this Interim Order to the DIP Lender are appropriate under section 364(d) of the Bankruptcy Code because, among other things, (i) such security interests and liens do not impair the interests of any holder of a valid, perfected, prepetition security interest or lien in the property of the Debtors' estates, (ii) the holders of such valid, perfected, prepetition security interests and liens have consented to the security interests and priming liens granted pursuant to this Interim Order to the DIP Lender or

(iii) the interests of any holder of a valid, perfected, prepetition security interest or lien are otherwise adequately protected.

K.      Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2(b).   In particular, the authorization granted herein for the Debtors to execute the DIP Loan Documents, to continue using the Prepetition Collateral, including Cash Collateral, and to obtain interim financing, including on a priming lien basis, is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  Entry of this Interim Order is in the best interest of the Debtors, their estates and creditors.  The terms of the DIP Loan Documents (including the Debtors' continued use of the Prepetition Collateral, including Cash Collateral) are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration for the Prepetition Secured Parties' consent thereto.

L.      The Debtors, the DIP Lender, and the Agent have negotiated the terms and conditions of the DIP Loan Documents (including the Debtors' continued use of the Prepetition Collateral, including Cash Collateral) and this Interim Order in good faith and at arm's length. Any credit extended and loans made to the Debtors pursuant to this Interim Order shall be, and hereby are, deemed to have been extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.  The Prepetition Secured Parties are entitled to receive Adequate Protection as set forth herein pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code for any diminution in the value of their respective interests in the Prepetition Collateral, including Cash Collateral, resulting from the automatic stay or the

8

Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, during the Chapter 11 Cases.

M.      The Debtors acknowledge, represent, stipulate, and agree, that, (i) subject to the entry of this Interim Order, the Debtors have obtained all known authorizations, consents, and approvals necessary from, and have made all known filings with and given all known notices to, all federal, state, and local governmental agencies, authorities, and instrumentalities required to be obtained, made, or given by the Debtors in connection with the execution, delivery, performance, validity, and enforceability of the DIP Loan Documents; and (ii) due to the commencement of these Chapter 11 Cases, the Debtors are in default with respect to their Prepetition Secured Obligations and an Event of Default has occurred under the Prepetition Financing Documents.

N.      Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**[3]

1.      <u>Jurisdiction and Venue</u>.   Consideration of the Motion constitutes a "core-proceeding" as defined in 28 U.S.C. § 157(b)(2).   This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      <u>Notice</u>.   On the Petition Date, the Debtors filed the Motion with this Court and pursuant to Bankruptcy Rules 2002, 4001, and 9014, and the Local Bankruptcy Rules of this

---

[3] Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact.

Court, the Debtors provided notice of the Motion and the Interim Hearing by electronic mail, facsimile, hand delivery, or overnight delivery to the following parties or to their counsel as indicated below: (i) the Office of the United States Trustee for this District (the "U.S. Trustee"); (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) counsel to the DIP Lender and the Agent; (iv) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (v) the local office for the Internal Revenue Service; and (vi) any party having filed requests for notice in the Chapter 11 Cases (collectively, (i)-(vi), the "Notice Parties").  Given the nature of the relief sought in the Motion, this Court concludes that the form, scope, and timing of the foregoing notice complies with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable law, and, under the circumstances, no further notice relating to the Interim Hearing or Motion is necessary or required.

      3.     The DIP Budget.

      (a)     Subject to and in accordance with the terms of the DIP Note, the Borrower shall from time to time as set forth below prepare and provide to the DIP Lender a rolling 13-week cash flow forecast setting forth on a line item basis the Debtors' projected cash receipts and cash disbursements on a weekly basis, substantially in the form of the initial budget annexed hereto as Exhibit B (the initial budget and each subsequent budget, a "DIP Budget").  The Borrower may use the proceeds of the DIP Facility and Cash Collateral, for the purposes and up to the amounts set forth in the DIP Budget, together with Permitted Variances (defined in the DIP Note) subject to the terms and conditions set forth in the DIP Note and this Interim Order. No later than 5:00 p.m. (New York time) on Tuesday of each calendar week, commencing on July 2, 2019, the Debtors shall provide the DIP Lender and the Agent with a report (the "DIP Budget Variance Report") of the aggregate variance between actual disbursements and projected

10

disbursements as set forth in the DIP Budget for the most recently ended Applicable Period. Subject to a Permitted Variance, the Debtors' actual disbursements during an Applicable Period shall not exceed those projected in the DIP Budget for such Applicable Period.  Except with respect to fees and expenses of Retained Professionals (as hereinafter defined), the amount of the DIP Facility and Cash Collateral authorized to be used hereby shall not exceed the amounts reflected in the DIP Budget (together with Permitted Variances), which shall be in form and substance satisfactory to the DIP Lender for the time period set forth therein, but in no event beyond the Maturity Date.  Except as expressly provided for herein, this Order does not create any rights for the benefit of any third party, whether as direct, indirect, or incidental beneficiary.

(b)     The DIP Budget may be amended, supplemented, extended, or otherwise modified from time to time in any manner as to which Debtors and the DIP Lender mutually agree in writing without further order of this Court; provided that notice of any amendments shall be given to the U.S. Trustee and counsel to any Committee.

4.     Reports.  The Debtors shall promptly provide any DIP Budget Variance Report and any modified DIP Budget to the U.S. Trustee and counsel to any Committee; provided, however, the Debtors may take appropriate actions with respect to confidentiality of any portion of the DIP Budget and DIP Budget Variance Report.

5.     Use of Prepetition Collateral (including Cash Collateral).  Immediately upon entry of this Interim Order, the Debtors are authorized to use Cash Collateral, subject to and as set forth in the DIP Budget, this Interim Order, and the DIP Loan Documents.  The Debtors are further authorized to use the Prepetition Collateral (including Cash Collateral) during the period from the Petition Date through and including the Maturity Date in accordance with the terms and

AmericasActive:13694729.8

conditions of this Interim Order; provided, that the Prepetition Secured Parties are granted Adequate Protection as set forth in this Interim Order.

      6.    Borrowing Authorization.

      (a)    [Reserved].

      (b)    The DIP Facility.  The Debtors are authorized to enter into and perform the transactions contemplated in this Interim Order and the DIP Loan Documents and such additional documents, instruments, and agreements as may be reasonably required by the DIP Lender to implement the terms or effectuate the purposes of this Interim Order, and to receive financial accommodations and borrow under the Interim DIP Facility up to $3,000,000.00 subject to the terms set forth in the DIP Note.  The DIP Note and the other DIP Loan Documents shall constitute and are hereby deemed to be the legal, valid, and binding obligations of the Debtors and each of their respective estates, enforceable in accordance with the terms hereof and the DIP Loan Documents against each such Debtor, its respective estate, and any successor of each such Debtor or any representative of the estates (including a trustee, responsible person, or examiner with expanded powers).  The Debtors are authorized to obtain financial accommodations pursuant to the terms of the DIP Budget, this Interim Order, the DIP Note, and the other DIP Loan Documents and the Guarantor is hereby authorized to guaranty such financial accommodations and borrowings in accordance with the terms of this Interim Order, the DIP Note, and the other DIP Loan Documents.

      (c)    Use of Proceeds.  The Debtors are authorized to utilize the proceeds of Loans to fund working capital requirements, costs and expenses of administration of the Chapter 11 Cases, and fees and expenses relating to the DIP Facility during the pendency of the Chapter 11 Cases.

7.     <u>Due Authorization</u>.   The Debtors acknowledge, represent, stipulate, and agree, and this Court hereby finds and orders, that:

(a)     [Reserved].

(b)     in entering into the DIP Loan Documents and obtaining the use of Cash Collateral, and as consideration therefor and for the other accommodations and agreements of the DIP Lender reflected herein and in the DIP Loan Documents, the Debtors hereby agree that until such time as all of the DIP Obligations are indefeasibly paid in full in cash and the DIP Note and DIP Loan Documents are terminated in accordance with the terms thereof, the Debtors shall not in any way prime or seek to prime the DIP Obligations, the DIP Liens, or the DIP Superpriority Claims provided to the DIP Lender under this Interim Order by offering a subsequent lender or a party in interest a superior or *pari passu* lien or administrative expense pursuant to sections 105(a), 326, 328, 330, 331, 364(c), 364(d), 503, 506, 507, 546(c), 552(b), 726 (other than expenses of a trustee under section 726(b)) or 1114 of the Bankruptcy Code) or otherwise or acquiescing thereto except as expressly authorized in the DIP Note (<u>provided</u>, that the DIP Liens, the DIP Superpriority Claims, the liens of the Prepetition Secured Parties, the Adequate Protection Liens (defined below), and the Section 507(b) Claims (defined below) of the Prepetition Secured Parties, shall be subordinate and subject to the Carve-Out (defined below);

(c)     the Guarantor is liable for, and hereby absolutely and unconditionally guarantees to the DIP Lender and its successors and assigns, the full and prompt payment when due (whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter) and performance of, all DIP Obligations owed or hereafter owing to the DIP Lender by the Borrower.  The Guarantor agrees that (i) its guarantee obligation hereunder shall be, and is, absolute and unconditional for all purposes in these Chapter 11 Cases and is a present and

13

continuing guaranty of payment and performance and not of collection, and (ii) its obligations under this Interim Order and any DIP Loan Document shall not be discharged until the indefeasible payment and performance, in full in cash of the DIP Obligations, and the termination of the lending commitments under the DIP Loan Documents; and

(d)    in no event shall the DIP Lender by entering into the DIP Loan Documents be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors, so long as the actions of the DIP Lender do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs by the lender of a vessel or facility owned or operated by a debtor, or otherwise cause liability to arise to the federal or state government, or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the Comprehensive Environmental Response, Compensation and Liability Act, sections 9601 et seq. of title 42, United States Code, as amended, or any similar federal or state statute).

8.    [Reserved].

9.    <u>DIP Interest and Payment of Expenses</u>.

(a)    The DIP Obligations shall bear interest at the applicable rate (including any applicable default rate after the occurrence of an Event of Default) set forth in the DIP Loan Documents, and be due and payable in accordance with this Interim Order and the DIP Loan Documents, in each case without further notice, motion or application to, order of, or hearing before this Court.

(b)    The Debtors shall pay the reasonable and documented prepetition and postpetition fees and expenses of the attorneys and advisors (each, a "<u>DIP Lender Advisor</u>") for

the DIP Lender as provided under the DIP Loan Documents.  No attorney or advisor to the DIP Lender shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.  Each DIP Lender Advisor seeking compensation for services or reimbursement of expenses under the DIP Loan Documents, this Interim Order, or a Final Order shall transmit a reasonably detailed invoice to counsel to the Debtors, the U.S. Trustee, and the Committee, if any, provided that any such invoice may be reasonably redacted by the DIP Lender Advisor to protect from disclosure any confidential information or information otherwise subject to a protective privilege such as attorney-client privilege or attorney work-product privilege.  The Debtors, U.S. Trustee, and the Committee, if any, shall have ten (10) Business Days in which to raise an objection to the payment of any fees and expenses of such attorneys and advisors.  Upon the expiration of such ten (10) Business Day period, the Debtors shall promptly pay any portion of such fees and expenses to which no objection has been interposed.  To the extent any objection has been interposed and cannot be consensually resolved, the dispute will be scheduled for adjudication at the next regularly-scheduled omnibus hearing in the Chapter 11 Cases.[4]

10.     <u>Amendments</u>.  Each of the Debtors is expressly authorized and empowered to enter into amendments, supplements, extensions, or other modifications from time to time in any manner as to which Debtors and the DIP Lender mutually agree in writing without further order of this Court; <u>provided</u>, that any material modification or amendment shall be subject to Court approval following notice of such any material modification or amendment by the Debtors to the Agent, the U.S. Trustee, counsel to the Committee, if any, and the Rule 2002 service list, which parties may object to such modification or amendment, in writing, within five (5) Business Days

---

[4] Subject to the priorities set forth herein, nothing in this Interim Order affects the Agent's or the Prepetition Secured Parties' rights to seek prepetition and postpetition professional fees and other expenses arising under the Prepetition Financing Document as part of any allowed claim in the Chapter 11 Cases.

from the date of the transmittal of such notice (which, to the extent such contact information for such parties is known to the Debtors, shall be transmitted by fax or e-mail, and, if not known, by overnight mail); provided, further, that if such objection is timely provided, then such modification or amendment shall be permitted only pursuant to an order of this Court, the entry of which may be sought on an expedited basis.

11.    Superpriority Claims and DIP Liens.  In respect of the DIP Obligations under the DIP Note, the other DIP Loan Documents and this Interim Order, the DIP Lender is granted the following with respect to the Debtors, their estates and all DIP Collateral:

(a)    a superpriority administrative expense claim pursuant to section 364(c)(1) Bankruptcy Code with priority over all other administrative expenses pursuant to the Bankruptcy Code (including the kinds specified in or arising or ordered pursuant to sections 105(a), 326, 328, 330, 331, 503(b), 506(c)(subject to entry of the Final Order), 507, 546(c), 552(b), 726 (other than expenses of a trustee under section 726(b)), and 1114 of the Bankruptcy Code or otherwise), which superpriority expenses of the DIP Lender shall be subordinate to the DIP Liens (defined below) and the Carve-Out (the "DIP Superpriority Claims"); provided that pursuant to applicable bankruptcy law, the granting of such DIP Superpriority Claims does not affect the status and superior priority of any liens, including the liens of the DIP Lender, the Prepetition Secured Parties and the holder of any Permitted Prior Senior Lien (defined below).

(b)    a first priority, priming security interest in and lien pursuant to section 364(d)(1) of the Bankruptcy Code on all encumbered property of the Debtors and their estates (the "Section 364(d)(1) Liens"), which Section 364(d)(1) Liens shall be senior to any existing liens or claims, subject only to (i) the Carve-Out and (ii) liens on property of the Debtors (including the proceeds of such property) that are in existence on the Petition Date but only, if

16

applicable, (A) to the extent a lien on any property is valid, perfected, and not avoidable, (B) the lien on such property (or the proceeds of such property, as applicable) on the Petition Date is a valid, perfected, and non-avoidable Permitted Lien (as defined in the Credit Agreement) senior in priority to the prepetition liens on such property, or (C) valid, non-avoidable liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the foregoing clauses (A)-(C) being referred to collectively as the "Permitted Prior Senior Liens");

(c)      a first priority security interest and lien pursuant to section 364(c)(2) of the Bankruptcy Code on all unencumbered property of the Debtors (the "Section 364(c)(2) Liens"), including, subject to entry of the Final Order, Avoidance Action Proceeds, which Section 364(c)(2) Liens shall be subject only to the Carve-Out; and

(d)      a junior security interest and lien pursuant to section 364(c)(3) of the Bankruptcy Code on all property of the Debtors and their estates that is subject to a Permitted Prior Senior Lien (collectively, the "Section 364(c)(3) Liens"), which Section 364(c)(3) Liens are also subject to the Carve-Out.  The Section 364(d)(1) Liens, Section 364(c)(2) Liens, and Section 364(c)(3) Liens shall be collectively referred to as the "DIP Liens."

12.   DIP Collateral.  The DIP Liens of the DIP Lender under the DIP Loan Documents and as approved and perfected by this Interim Order include, inter alia, liens upon and security interests in (i) all of those items and types of collateral in which security interests may be created under Article 9 of the Uniform Commercial Code, (ii) to the extent not expressly prohibited by law or contract, all of those items and types of collateral not governed by Article 9 of the Uniform Commercial Code, including, without limitation, licenses issued by any federal or state regulatory authority, any leasehold or other real property interests, and commercial tort claims of

17

the Debtors, (iii) any and all other collateral of any nature or form, and (iv) the products, rents, offspring, profits, and proceeds of any of the foregoing (collectively, (i)-(iv), the "DIP Collateral").  None of the DIP Obligations, DIP Liens, or DIP Superpriority Claims shall (a) be subject to or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, (b) be subject to or *pari passu* with any inter-company claim, whether secured or unsecured, of any Debtor or any domestic or foreign subsidiary or affiliate of any Debtor, (c) be subject to sections 510, 549, or 550 of the Bankruptcy Code, or (d) hereafter be subordinated to or made *pari passu* with any other lien or security interest under sections 361, 363, or 364 of the Bankruptcy Code or otherwise, except as expressly provided in this Interim Order.

13.    <u>Carve-Out</u>.

(a)    <u>Generally</u>.  The DIP Liens, the DIP Superpriority Claims, the liens of the Prepetition Secured Parties, the Adequate Protection Liens, and the Section 507(b) Claims (defined below) of the Prepetition Secured Parties, shall be subject to the payment, without duplication, of the following fees and expenses (the amounts set forth below, together with the limitations set forth therein, collectively, the "<u>Carve-Out</u>") from, at the Debtors' discretion, any of loan proceeds of the DIP Facility, Cash Collateral, or proceeds resulting from liquidation of DIP Collateral or Prepetition Collateral (and not from either cash collateral or proceeds resulting from the liquidation of any collateral of any holder of a Permitted Prior Senior Lien):

(i)    the reasonable fee and expense claims of the respective retained professionals of the Debtors and the Committee, if any, that have been approved by this Court at any time during the Chapter 11 Cases pursuant to sections 330 and 331 of the Bankruptcy Code including any interim approval as set forth in any procedures approved by the Court relating to

the interim approval of fees and expenses of the Retained Professionals (the Court approved professionals of the Debtors and any Committee are collectively referred to as the "Retained Professionals"), the reasonable expenses of members of the Committee, if any ("Committee Member Expenses", which shall not include legal fees and expenses of Committee members) which were incurred (A) on and after the Petition Date and before the Carve-Out Trigger Date (defined below), and (B) on and after the Carve-Out Trigger Date in an aggregate amount not exceeding $50,000 for all Retained Professionals, CRO, if any, and Committee Member Expenses; provided that, in each case, such fees and expenses of the Retained Professionals, CRO, if any, and Committee Member Expenses are ultimately allowed on a final basis by this Court pursuant to sections 330 and 331 of the Bankruptcy Code or otherwise and are not excluded from the Carve-Out under Paragraph 18 of this Interim Order (nothing herein shall waive the right of any party to object to the allowance of any such fees and expenses);

(ii)    any accrued and unpaid post-petition fee and expense claims, without regard to when such fees and expenses accrued, related to the appointment of the Debtors' Chief Restructuring Officer (the "CRO") appointed under section 363 of the Bankruptcy, if any, including any interim or final approval as set forth in any order of the Court approving the appointment of any CRO or, if applicable, any procedures approved by the Court relating to the compensation of the CRO; provided however, that any Court-approved bonus, transaction, success fees, completion fees, substantial contribution fees, or any other fees of similar import of any of the person or entity referenced in the foregoing paragraph 13(a)(i) and (ii) shall be paid solely from the net proceeds of the Court approved transaction giving rise to such award; and

AmericasActive:13694729.8

(iii)    the unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code plus statutory interest, if any, imposed under 31 U.S.C. § 3717.  There is no limitation on the obligations of the Debtors and their estates with respect to unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code.

(b)    Carve-Out Trigger Date.  As used herein, the term "Carve-Out Trigger Date" means the date on which the DIP Lender provides written notice to the Debtors, the U.S. Trustee, and counsel to the Committee, if any, that the Carve-Out is invoked, which notice may be delivered only on or after the occurrence of an Event of Default under the DIP Loan Documents or upon the Maturity Date.

(c)    Reduction of Amounts.  The fixed dollar amount available to be paid under the Carve-Out following the Carve-Out Trigger Date on account of allowed fees and expenses incurred on and after the Carve-Out Trigger Date shall be reduced, dollar-for-dollar, by the aggregate amount of payments made on and after the Carve-Out Trigger Date on account of fees and expenses incurred on and after the Carve-Out Trigger Date to Retained Professionals and with respect to Committee Member Expenses (whether from Cash Collateral, any proceeds of the DIP Financing, or otherwise).

(d)    Reservation of Rights.  The DIP Lender reserves its rights to object to the allowance of any fees and expenses, including any fees and expenses sought that are not provided for in the DIP Budget.  The payment of any fees or expenses of the Retained Professionals and Committee Member Expenses pursuant to the Carve-Out shall not, and shall not be deemed to (i) reduce any Debtor's obligations owed to any of the DIP Lender, Prepetition Secured Parties, or to any holder of a Permitted Prior Senior Lien, or (ii) modify, alter, or

AmericasActive:13694729.8

otherwise affect any of the liens and security interests of such parties in the DIP Collateral or Prepetition Collateral (or their respective claims against the Debtors). The DIP Lender and Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Retained Professionals, Committee Member Expenses, the U.S. Trustee or Clerk of the Bankruptcy Court (or of any other entity) incurred in connection with the Chapter 11 Cases or any successor case, and nothing in this Interim Order or otherwise shall be construed to obligate such parties in any way to pay such compensation to or to reimburse such expenses.

14. <u>Waiver of Right to Surcharge</u>. Subject to entry of the Final Order, in light of (i) the consent of the DIP Lender to the current payment of administrative expenses of the Debtors' estates in accordance with the DIP Budget, (ii) the agreement of the DIP Lender to subordinate its Superpriority Claims to the Carve-Out, and (iii) the agreement of the DIP Lender to subordinate its DIP Liens to the Carve-Out and Permitted Prior Senior Liens, the DIP Lender and Prepetition Secured Parties are each entitled to a waiver of (a) the provisions of section 506(c) of the Bankruptcy Code and (b) any "equities of the case" claims or other claims under sections 105(a) or 552(b) of the Bankruptcy Code. Upon entry of the Final Order, no costs or expenses of administration or other charge, lien, assessment, or claim incurred at any time (including, without limitation, any expenses set forth in the DIP Budget) by any Debtor or any other person or entity shall be imposed or charged against any or all of the DIP Collateral, the DIP Lender, the Prepetition Collateral, and the Prepetition Secured Parties, or their respective claims or recoveries under the Bankruptcy Code, including sections 105(a), 506(c), 552(b) thereof, or otherwise, and the Debtors, on behalf of their estates, waive any such rights. It is expressly understood by all parties that in making all such undertakings and proceeding in compliance with

AmericasActive:13694729.8

the DIP Budget, this Interim Order, and the DIP Loan Documents, the DIP Lender and Prepetition Secured Parties have each relied on the foregoing provisions of this Paragraph. Notwithstanding any approval of or consent to the DIP Budget, nothing in this Interim Order shall constitute or be deemed to constitute the consent by any of the DIP Lender and the Prepetition Secured Parties to the imposition of any costs or expense of administration or other charge, lien, assessment, or claim (including, without limitation, any amounts set forth in the DIP Budget) against such party, its claims, or its collateral under sections 105(a), 506(c), or 552(b) of the Bankruptcy Code or otherwise and no such consent shall be implied from any other action or inaction by such parties.

15.    <u>Automatic Perfection</u>.

(a)    The (i) DIP Liens granted to the DIP Lender pursuant to this Interim Order and the DIP Loan Documents and (ii) Adequate Protection Liens granted pursuant to this Interim Order to the Prepetition Secured Parties shall be valid, enforceable, and perfected by operation of law upon entry of this Interim Order by this Court without any further action by any party. Neither the DIP Lender in respect of the DIP Liens, nor the Prepetition Secured Parties in respect of the Adequate Protection Liens, shall be required to enter into or to obtain any control agreements, landlord waivers (unless required by law or contract), mortgagee waivers, bailee waivers, or warehouseman waivers or to give, file, or record any UCC-1 financing statements, mortgages, deeds of trust, leasehold mortgages, notices to account debtors or other third parties, notices of lien, or similar instruments in any jurisdiction (including filings with the United States Patent and Trademark Office, the United States Copyright Office, or any similar agency in respect of trademarks, copyrights, trade names, or patents with respect to intellectual property) (collectively, the "<u>Perfection Documents</u>"), or obtain consents from any licensor or similarly

situated party in interest, or take any other action to validate, record, or perfect the DIP Liens granted under the DIP Loan Documents and this Interim Order and the Adequate Protection Liens granted under this Interim Order and approved hereby, all of which are automatically and immediately perfected by the entry of this Interim Order.  If the DIP Lender or Prepetition Secured Parties, independently or collectively, in each of their respective sole discretion , choose to obtain, enter into, give, record, or file any Perfection Documents, (x) all such Perfection Documents shall be deemed to have been obtained, entered into, given, recorded, or filed, as the case may be, as of the Petition Date, (y) no defect in any such act shall affect or impair the validity, perfection, priority, or enforceability of the DIP Liens and Adequate Protection Liens, and (z) such liens shall have the relative priority set forth herein notwithstanding the timing of filing of any such Perfection Documents.  In lieu of optional recording or filing any Perfection Documents, the DIP Lender and the Agent may, in each of their sole discretion, choose to record or file a true and complete copy of this Interim Order in any place that any Perfection Document would or could be recorded or filed (which may include a description of the collateral appropriate to be indicated in a recording or filing at such place of recording or filing), and such recording or filing by the DIP Lender and the Agent shall have the same effect as if such Perfection Document had been filed or recorded as of the Petition Date.  In addition, the DIP Lender may, in its reasonable discretion, require the Debtors to file or record any Perfection Document.  The Debtors are authorized to execute and deliver promptly upon demand to the DIP Lender all Perfection Documents as the DIP Lender may reasonably request.

(b)     Until the indefeasible payment in full in cash of the DIP Obligations, DIP Collateral and Perfection Documents evidencing liens subordinate to the DIP Liens in the possession, custody, or control of the Agent (or in the possession, custody, or control of agents or

bailees of the Agent) shall be deemed to be sufficient for the purposes of perfecting the security interests granted in such DIP Collateral and Agent (or their agents or bailees, as applicable) shall, to the extent applicable, be an agent or bailee, as the case may be, on behalf of and for the benefit of the DIP Lender for the purposes of perfecting the security interests granted in such DIP Collateral.  Upon an Event of Default and the request of the DIP Lender or the Agent (or their agents or bailees, as applicable) shall transfer, assign, and otherwise convey, as applicable, any DIP Collateral and Perfection Documents in its possession, custody, or control to the DIP Lender for the enforcement of rights and remedies under the DIP Loan Documents, and, upon the indefeasible payment in full in cash of all DIP Obligations, the DIP Lender (or its agents or bailees, as applicable) shall transfer, assign, and otherwise convey any Prepetition Collateral and Perfection Documents to the Agent.  The authorization, grant, perfection, scope, and vesting of the DIP Liens, the DIP Superpriority Claims, and the DIP Obligations are fully effectuated by this Interim Order and any security agreements, collateral agreements, or other Perfection Documents executed as part of the DIP Loan Documents shall supplement the authorization, grant, perfection, scope, and vesting set forth herein as well as the powers and protections accorded to the DIP Lender, but in no event shall any such security agreement, collateral agreement, or other Perfection Document be interpreted as a limitation of such provisions of this Interim Order.

16.    <u>Stipulations and Waivers</u>:  Subject to and without prejudice to the rights of any Committee and any other party with standing as set forth in Paragraph 17 below, the Debtors admit, stipulate, and agree to the following, and make the releases and waivers set forth below, on and as of the Petition Date:

AmericasActive:13694729.8

(a)     All Prepetition Financing Documents are valid and enforceable by the Prepetition Secured Parties against each of the Debtors in accordance with their respective priorities.  With respect to the Prepetition Collateral, the Prepetition Secured Parties have valid, duly-authorized, perfected, enforceable, non-voidable, and binding security interests in, and liens on, substantially all of the Prepetition Collateral as of the Petition Date (with the Prepetition Secured Parties holding junior liens on all Collateral), including the Cash Collateral.   The Debtors further admit, acknowledge, and agree that (i) the Prepetition Secured Obligations constitute legal, valid, and binding obligations of each of the Debtors, (ii) no offsets, defenses, or counterclaims to the Prepetition Secured Obligations exist, and (iii) no portion of the Prepetition Secured Obligations is subject to avoidance, disallowance, reduction, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(b)     The Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Secured Parties with respect to the Prepetition Financing Documents, whether arising at law, in contract, or at equity, including any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553, inclusive, of the Bankruptcy Code or applicable non-bankruptcy law.

(c)     As of the Petition Date, the Prepetition Secured Obligations for which the Debtors, without defense, counterclaim, or offset of any kind, were truly and justly indebted to the Prepetition Secured Parties, not less than the amount set forth in paragraph C(1) of this Interim Order  plus, in each case, all accrued or hereafter accruing and unpaid interest thereon and any additional amounts, charges, fees, and expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under

AmericasActive:13694729.8

the Prepetition Financing Documents) now or hereafter due under the Prepetition Financing Documents.

(d)     Subject to the entry of the Final Order, the Debtors do not have, and hereby forever release and waive, any claims, objections, challenges, counterclaims, causes of action, defenses, setoff rights, obligations, rights to subordination, or any other liabilities, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees from the beginning of time through the Petition Date; provided that the Debtors do not waive any rights set forth in Paragraph 23.

(e)     [Reserved].

17.     Effect of Stipulations on Third Parties.

(a)     Generally.   The admissions, stipulations, agreements, releases, and waivers set forth in the immediately preceding Paragraph 16 and Paragraph C above of this Interim Order (collectively, the "Prepetition Lien and Claim Matters") are and shall be binding on the Debtors, any subsequent trustee (including any Chapter 7 trustee), responsible person, examiner with expanded powers, any other estate representative, and all parties-in-interest and all of their successors-in-interest and assigns, including, without limitation, the Committee, if any, unless, and solely to the extent that, a party-in-interest with standing and requisite authority, (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in Paragraph 18 of this Interim Order) challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested

AmericasActive:13694729.8

matter, a "Challenge") by the later of 75 days from entry of this Interim Order and 60 days from formation of a Committee (the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Agent (with respect to the Prepetition Collateral) or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline; provided, however, if the Chapter 11 Cases convert to Chapter 7 prior to the Challenge Deadline, the Challenge Deadline shall be extended for the Chapter 7 trustee to 10 days after the appointment of such trustee, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.  For the avoidance of doubt, any trustee appointed or elected in these Chapter 11 Cases shall, until the expiration of the period provided herein for asserting Challenges, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph  (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations, and stipulations of the Debtors in this Interim Order.

(b)     Binding Effect.  To the extent any Prepetition Lien and Claim Matters are not subject to a Challenge timely and properly commenced by the Challenge Deadline, or to the extent any Challenge does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Matters shall pursuant to

AmericasActive:13694729.8

this Interim Order become binding, conclusive, and final on any person, entity or party-in-interest in the Chapter 11 Cases, and their successors and assigns, and in any successor case for all purposes and shall not be subject to challenge or objection by any party-in-interest, including, without limitation, a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates.  Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding unless such Challenge is successful pursuant to an order or judgment that is final and no longer subject to appeal or further review.  To the extent any such Challenge proceeding is timely and properly commenced, the Prepetition Secured Parties shall be entitled to include the related costs and expenses, including but not limited to reasonable attorneys' fees, incurred in defending themselves in any such proceeding, pursuant to the Prepetition Financing Documents.

18.    <u>Limitation on Use of Proceeds</u>.  Notwithstanding anything in this Interim Order to the contrary, no portion or proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, or the Carve-Out, and no disbursements set forth in the DIP Budget shall be used for the payment of professional fees, disbursements, costs, or expenses incurred in connection with: (a) objecting, contesting, or raising any defense to the validity, perfection, priority, or enforceability of, or any amount due under, the DIP Loan Documents or the Prepetition Financing Documents or any security interests, liens, or claims granted under this Interim Order, the DIP Loan Documents, or the Prepetition Financing Documents to secure such amounts; (b) asserting any Challenges, claims, actions, or causes of action against any of the DIP Lender, the Prepetition Secured Parties, or any of their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys, or advisors; or (c) contesting the Prepetition Lien

AmericasActive:13694729.8

and Claim Matters; <u>provided</u> that no more than $25,000 in the aggregate of the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve-Out may be used by the Committee, if any, to investigate (but not prosecute or Challenge) Prepetition Lien and Claim Matters.

19.     <u>Avoidance Action Proceeds</u>.  Subject to entry of the Final Order, (i) Avoidance Action Proceeds shall be DIP Collateral and shall be subject to the DIP Liens and DIP Superpriority Claims, and (ii) subject and subordinate to the DIP Liens and DIP Superpriority Claims, Avoidance Action Proceeds shall be subject to the Adequate Protection Liens and Section 507(b) Claims of the Prepetition Secured Parties.

20.     <u>Adequate Protection</u>.  The Prepetition Secured Parties agree, and this Court finds, that the adequate protection provided in this Interim Order (the "<u>Adequate Protection</u>"), including, without limitation, in this Paragraph, is reasonable and calculated to protect the interests of the Prepetition Secured Parties.  Notwithstanding any other provision hereof, the grant of Adequate Protection to the Prepetition Secured Parties pursuant hereto is without prejudice to the right of the Prepetition Secured Parties to seek adequate protection or to seek modification of a grant of Adequate Protection provided in this Interim Order so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest any such request.

(a)     <u>Adequate Protection Liens</u>.  As adequate protection, the Agent, in accordance with sections 361, 363(e), and 364(d) of the Bankruptcy Code, is hereby granted, for the benefit of the Prepetition Secured Parties, valid, binding, enforceable, and perfected junior security interests and replacement liens (the "<u>Adequate Protection Liens</u>") upon all property of the Debtors whether arising prepetition or postpetition of any nature whatsoever, wherever

located, in each case to secure the Prepetition Secured Obligations against, without duplication, the aggregate diminution, if any, subsequent to the Petition Date, in the value of the Prepetition Collateral by:  (i) the reduction in Prepetition Collateral available to satisfy Prepetition Secured Obligations as a consequence of the priming of the Prepetition Secured Obligations by the DIP Obligations;  (ii) depreciation, use, sale, loss, decline in market price, or otherwise of the Prepetition Collateral as a consequence of the use, sale, or lease of the Prepetition Collateral by the Debtors or as a result of the imposition of the automatic stay; and (iii) the sum of the aggregate amount of all Cash Collateral and the aggregate value of all non-cash Prepetition Collateral that is applied in payment of the DIP Obligations or any other obligations or expenses of the Debtors other than Prepetition Secured Obligations, but only to the extent of any decrease in the value of the Prepetition Collateral on account of subsections (i), (ii), and (iii) above, all to the extent authorized by the Bankruptcy Code.  The Adequate Protection Liens are subject and subordinate to (A) the Carve-Out, (B) the DIP Obligations, the DIP Liens, and the DIP Superpriority Claims, and (C) the Permitted Prior Senior Liens.  The Adequate Protection Liens shall not (x) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, (y) subject to any inter-company claim, whether secured or unsecured, of any Debtor or any domestic or foreign subsidiary or affiliate of any Debtor, or (z) hereafter be subordinated to or made *pari passu* with any other lien or security interest under sections 361, 363, or 364 of the Bankruptcy Code or otherwise except as expressly provided in this Interim Order and the DIP Loan Documents, including, without limitation, with respect to the Carve-Out, Permitted Prior Senior Liens, DIP Obligations, DIP Liens, and DIP Superpriority Claims.

AmericasActive:13694729.8

(b)      Section 507(b) Claims.  To the extent that the Agent shall hold claims allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code, notwithstanding the provision of Adequate Protection hereunder, the Agent for the benefit of the Prepetition Secured Parties are hereby each granted an administrative expense claim pursuant to section 507(b) of the Bankruptcy Code (each, a "Section 507(b) Claim") with priority over all other administrative expenses, but in all cases subject and subordinate to the Carve-Out, the Permitted Prior Senior Liens, DIP Obligations, DIP Liens, and DIP Superpriority Claims.

21.    Milestones.  As a condition to the DIP Facility and the use of Cash Collateral, the Debtors shall comply with the milestones attached hereto as Exhibit C (the "Milestones").  For the avoidance of doubt, the failure of the Debtors to comply with any of the Milestones (a) shall constitute an Event of Default under the DIP Facility and this Interim Order, (b) subject to the expiration of the Remedies Notice Period (defined below), result in the automatic termination of the Debtors' authority to use Cash Collateral under this Interim Order, and (c) permit the DIP Agents, subject to Paragraph 23, to exercise the rights and remedies provided for in this Interim Order and the DIP Facility.

22.    Indemnification.  The Debtors shall indemnify the DIP Lender and its affiliates, successors, and assigns and the officers, directors, employees, agents, advisors, controlling persons, and members of each of the foregoing (each, an "Indemnified Person") and hold each of them harmless from and against all costs, expenses (including reasonable fees, disbursements, and other charges of counsel), and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Debtors or any of their affiliates or shareholders) that relates to the DIP Facility or this

Interim Order, including the financing contemplated hereby, the Chapter 11 Cases, or any transactions in connection therewith; provided that no Indemnified Person will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from such Person's gross negligence, willful misconduct, fraud, or violations of this Order.  Other than with respect to the proviso at the end of the immediately preceding sentence, nothing herein is meant to limit the scope of any indemnity provided for the benefit of the DIP Lender in the DIP Loan Documents.

23.    <u>Remedies</u>.  Upon the occurrence of an Event of Default under the DIP Loan Documents or upon the Maturity Date, and in each case without further notice, motion or application to, order of, or hearing before, this Court (other than such notice required by this Paragraph), subject to the full funding of the Carve-Out, the DIP Lender is granted leave to cease making financial accommodations to the Debtors, accelerate any or all of the DIP Obligations, and declare such DIP Obligations to be immediately due and payable in full, in cash.  Upon the Maturity Date, and after providing five (5) Business Days' prior written notice to this Court (the "<u>Remedies Notice Period</u>"), the Agent, the U.S. Trustee, and counsel to the Committee, if any, the DIP Lender shall be entitled to exercise all of its rights and remedies under this Interim Order and the DIP Loan Documents, including, without limitation, foreclose upon the DIP Collateral or otherwise enforce the DIP Obligations, the DIP Liens, and the DIP Superpriority Claims on any or all of the DIP Collateral and to exercise any other default-related remedies under the DIP Loan Documents, this Interim Order, or applicable law in seeking to recover payment of the DIP Obligations.  With respect to Permitted Prior Senior Liens, any exercise of such rights and remedies shall be in accordance with applicable non-bankruptcy law.  During the Remedies Notice Period, any party in interest may seek an order of the Court staying the DIP Lender's

exercise of such remedies against the DIP Collateral and, if no such stay is obtained, then the DIP Lender may exercise any and all such rights and remedies and the Debtors' authority to use Cash Collateral under this Interim Order shall terminate, in each case, without further order of the Court or notice to any party.

24.     <u>Access to DIP Collateral</u>.  Subject to appropriate notice and entry of the Final Order, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Lender contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon written notice to the landlord of any leased premises that an Event of Default or the Maturity Date has occurred and is continuing under the DIP Loan Documents, the DIP Lender may, subject to the applicable notice provisions, if any, in this Interim Order and any separate agreement by and between such landlord and the DIP Lender, enter upon any leased premises of the Debtors or any other party for the purpose of exercising any remedy with respect to DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords thereunder.  Nothing herein shall require the DIP Lender to assume any lease as a condition to the rights afforded to the DIP Lender in this Paragraph.

25.     <u>Insurance Policies</u>.  Effective as of entry of this Interim Order, the Debtors consent to, and the DIP Lender and the Prepetition Secured Parties shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to DIP Collateral or Prepetition Collateral, as applicable.

AmericasActive:13694729.8

26. <u>Successors and Assigns</u>.  This Interim Order, the DIP Note, and the other DIP Loan Documents shall be binding upon all parties in interest in these Chapter 11 Cases, including any subsequently appointed trustee, responsible individual, examiner with expanded powers, or other estate representative.

27. <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any subsequent order (other than entry of any subsequent Final Order which shall supersede this Interim Order), and the rights, remedies, powers, privileges, liens, and priorities of the DIP Lender and the Prepetition Secured Parties provided for in this Interim Order, in any DIP Loan Document and any Prepetition Financing Document shall not be modified, altered, or impaired in any manner without their consent (which consent shall not be unreasonably withheld) by any order, including any order (i) confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases (and, to the extent not indefeasibly paid in full in cash, the DIP Obligations shall not be discharged by the entry of any such order, each of the Debtors having hereby waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code), (ii) converting any of the Chapter 11 Cases to a Chapter 7 case, (iii) dismissing any of the Chapter 11 Cases, or (iv) any superseding cases under the Bankruptcy Code.  The terms and provisions of this Interim Order as well as the DIP Obligations, the DIP Liens, the DIP Superpriority Claim, the DIP Loan Documents, and the Adequate Protection Liens shall continue in full force and effect notwithstanding the entry of any such order, and such rights, claims, and liens shall maintain their priority as provided by this Interim Order and the DIP Loan Documents to the maximum extent permitted by law until all of the DIP Obligations are indefeasibly paid in full, in cash.

AmericasActive:13694729.8

28.     <u>Good Faith</u>.  The DIP Facility, the use of Cash Collateral, and the other provisions of this Interim Order, the DIP Note, and the other DIP Loan Documents have been negotiated in good faith and at arm's length among the Debtors, the DIP Lender, and the Agent, and the extension of the financial accommodations to the Debtors by the DIP Lender and Prepetition Secured Parties pursuant to this Interim Order and the DIP Loan Documents have been and are deemed to be extended in good faith, as that term is used in section 364(e) of the Bankruptcy Code.  The DIP Lender and the Prepetition Secured Parties are entitled to, and are hereby granted, the full protections of section 364(e) of the Bankruptcy Code.

29.     <u>Subsequent Reversal or Modification</u>.  Subject to Paragraphs 27 and 28, if any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability under this Interim Order and the DIP Loan Documents by the Debtors prior to the date of receipt of written notice to the DIP Lender and Agent of the effective date of such action or (ii) the validity and enforceability of any lien, administrative expense, right, or priority authorized or created hereby or pursuant to this Interim Order and the DIP Loan Documents, including, without limitation, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Obligations, the Adequate Protection Liens, and the Section 507(b) Claims.

30.     <u>No Waiver</u>.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender and Prepetition Secured Parties may have to bring or be heard on any matter brought before this Court.  Any consent, modification, declaration of default, exercise of remedies, or non-exercise of remedies under or in connection with this Interim Order or the DIP Loan Documents shall require the approval of the DIP Lender and shall not be deemed a waiver or relinquishment of any of the rights of the DIP Lender.

AmericasActive:13694729.8

Except as expressly set forth herein, nothing contained in this Interim Order (including without limitation, the authorization to use any Cash Collateral) shall impair, prejudice, or modify any rights, claims, or defenses available in law or equity to the DIP Lender or the Prepetition Secured Parties, including, without limitation, the right (a) to request conversion of any of the Debtor's Chapter 11 Case to Chapter 7, (b) to seek to terminate the exclusive rights of the Debtors to file, and solicit acceptances of, a plan of reorganization under section 1121 of the Bankruptcy Code or propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans, (c) to object to the fees and expenses of any Retained Professionals, and (d) to seek relief from the automatic stay.  All such rights, claims, and defenses, and the rights, objections, and defenses of all parties in connection therewith, are hereby reserved.

31.    _Additional Defaults_.  In addition, and without limitation of the Events of Default set forth in and defined in the DIP Loan Documents or this Interim Order, it shall be a default hereunder (and constitute an "Event of Default" under the DIP Loan Documents) if an order is entered dismissing or converting any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or appointing a Chapter 11 trustee or an examiner or other estate representative with expanded powers.  Any order for dismissal or conversion shall be automatically deemed to preserve the rights of the DIP Lender and the Prepetition Secured Parties under this Interim Order and shall preserve the Carve-Out.  It shall be an Event of Default for the sale of substantially all of the assets of the Debtors, unless, upon the closing of such transaction, all liens securing the DIP Obligations and the Prepetition Secured Obligations (in their respective priority) are transferred to the proceeds of such sale.  If an order dismissing any of these Chapter 11 Cases under section 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall be deemed to provide that (a) the DIP Liens and the DIP Superiority Claims

36

granted to the DIP Lender hereunder and in the DIP Loan Documents, as the case may be, and the Carve-Out shall continue in full force and effect, shall remain binding on all parties in interest and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and indebtedness owing to the DIP Lender under the DIP Loan Documents shall have been indefeasibly paid in full in cash and the DIP Lender's obligations and commitments under the DIP Loan Documents shall have been terminated, and this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Obligations, DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Section 507(b) Claims, and the Carve-Out.

32.     <u>Order Governs</u>.  In the event of any conflict between or among, as applicable, the provisions of this Interim Order and the DIP Loan Documents, the Motion, or any supporting documents, the provisions of this Interim Order shall control and govern to the extent of such conflicts.

33.     <u>Right to Credit Bid</u>.  Pursuant to section 363(k) of the Bankruptcy Code, (i) the DIP Lender shall have the exclusive right to use the DIP Obligations, DIP Liens, and DIP Superpriority Claim to credit bid with respect to any bulk or piecemeal sale of all or any portion of the DIP Collateral, (ii) subject to entry of the Final Order and the rights of any Committee under paragraph 17, the Term Loan B Prepetition Lender shall have the exclusive right to use the Obligations under Term Loan  B (subject to satisfaction of the Obligations under Term Loan A, which may be in the form of assumption of such debt in a purchase under a Sale Order by the DIP Lender and Term Loan B Prepetition Lender in its capacity as Stalking Horse Bidder (each as defined on Exhibit C hereto)) and the Adequate Protection Liens and Section 507(b) Claims to

AmericasActive:13694729.8

credit bid with respect to any bulk or piecemeal sale of all or any portion of the Prepetition Collateral.

34.     <u>No Marshaling</u>.  Subject to entry of the Final Order, none of the DIP Lender, DIP Collateral, Prepetition Secured Parties, or Prepetition Collateral shall be subject to the doctrine of marshaling or any similar doctrine or law of any jurisdiction requiring the recovery upon or application to any indebtedness of any collateral or proceeds in any particular order or action.

35.     <u>Waiver of Requirement to File Proofs of Claim</u>.

(a)     The DIP Lender shall not be required to file proofs of claim in the Chapter 11 Cases or, subject to the entry of the Final Order, any successor Chapter 7 cases, in order to maintain its claims for payment of the DIP Obligations under the applicable DIP Loan Documents.  The statements of claim in respect of the DIP Obligations set forth in this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

(b)     The Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases or, subject to the entry of the Final Order, any successor Chapter 7 cases, in order to maintain their respective claims for payment of the Prepetition Secured Obligations under the applicable Prepetition Financing Documents or for performance of the Adequate Protection.  The statements of claim in respect of the Prepetition Secured Obligations and the Adequate Protection set forth in this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

(c)    <u>Master Proof of Claim</u>.  Notwithstanding any order to the contrary entered by this Court in relation to the establishment of a bar date in the Chapter 11 Cases or, subject to the entry of the Final Order, any successor Chapter 7 cases, the Agent on behalf of itself and the Prepetition Secured Parties shall be authorized (but not required) in its sole discretion to file a master proof of claim against the Debtors (each a "<u>Master Proof of Claim</u>") on account of their prepetition claims arising under the Prepetition Financing Documents, as applicable.  Upon the filing of a Master Proof of Claim against the Debtors, the applicable Prepetition Secured Party and each of its respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against the Debtors arising under the Prepetition Financing Documents, and the claims of the Prepetition Secured Party (and its respective successors and assigns) named in the Master Proof of Claim shall be allowed or disallowed as if such entity had filed a separate proof of claim in each Chapter 11 Case or any successor cases in the amount set forth opposite each name listed in the Master Proof of Claim.  The Agent shall further be authorized to amend its respective Master Proof of Claim from time to time to, among other things, reflect a change in the holders of the claims set forth therein, or a reallocation among such holders of the claims asserted therein resulting from any transfer of such claims.    The provisions set forth in this Paragraph and any Master Proof of Claim filed pursuant to the terms hereof are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party in interest or their respective successors in interest, including, without limitation, the rights of each Prepetition Secured Party as the holder of a claim against the Debtors under applicable law, and the numerosity requirements set forth in section 1126 of the Bankruptcy Code.

AmericasActive:13694729.8

36. <u>Headings</u>. The headings in this Interim Order are for reference purposes only and will not in any way affect the meaning and interpretation of the terms of this Interim Order.

37. <u>Immediate Effect of Order</u>. This Interim Order shall take effect immediately upon execution hereof, and, notwithstanding anything to the contrary contained in Bankruptcy Rules, including Bankruptcy Rule 4001(a)(3), there shall be no stay of execution of effectiveness of this Order. All objections to the entry of this Interim Order have been withdrawn or overruled and the Motion is approved on an interim basis on the terms and conditions set forth herein. The Debtors shall promptly mail copies of this Interim Order to the Notice Parties and to counsel to the Committee, if any.

38. <u>Jurisdiction</u>. The Bankruptcy Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facility or the DIP Loan Documents.

39. <u>Final Hearing</u>. The Final Hearing is scheduled for [_____], 2019, at [_____] a.m. (prevailing Eastern Time) before this Court. Any objections by creditors or other parties in interest to any provisions of this Interim Order shall be deemed waived unless timely filed and served in accordance with this Paragraph. The Debtors shall promptly serve a notice of entry of this Interim Order and the Final Hearing, together with a copy of this Interim Order, by first class mail, postage prepaid, or overnight mail upon the Notice Parties. The notice of the entry of this Interim Order and the Final Hearing shall state that objections to the entry of the Final Order shall be filed with this Court by no later than [_____] p.m. (prevailing Eastern Time) on [____] 2019 (the "<u>Objection Deadline</u>"), with copies to: (i) counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, 2000 North King Street, Wilmington, Delaware 19801, Attn: Sean Greecher (sgreecher@ycst.com); (ii) counsel for the DIP Lender, Winston & Strawn LLP,

200 Park Avenue, New York, NY 10166, Attn. Carey D. Schreiber (cschreiber@winston.com) and Robinson & Cole LLP, 1000 N. West Street Suite 1200 Wilmington, DE 19801, Attn. Jamie Edmonson (JEdmonson@rc.com); (iii) counsel for the Prepetition Secured Parties and the Agent, Perkins Coie LLP, 2901 North Central Avenue, Suite 2000, Phoenix, AZ 85012-2788, Attn. Jordan Kroop (JKroop@perkinscoie.com); (iv) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Linda Casey (Linda.Casey@usdoj.gov); and (v) counsel to the Committee, if any.

Dated:   June ___, 2019
         Wilmington, Delaware

_____
Mary F. Walrath
United States Bankruptcy Judge

41

Exhibit A

DIP Note

## DEBTOR-IN-POSSESSION
## DELAYED DRAW TERM LOAN PROMISSORY NOTE

New York, New York

$6,000,000                                                                                         Dated as of June [___], 2019

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, Schramm, Inc., a Pennsylvania corporation (the "Borrower"),[1] as borrower, HDR Holding, Inc., a Delaware corporation, as a guarantor (the "Guarantor", and together with the Borrower, each a "Debtor" and, collectively, the "Debtors"), hereby unconditionally promise to pay to the order of Schramm II Inc., a Delaware corporation (together with its successors and assigns, collectively, the "Lender"), the aggregate of any and all amounts the Lender has disbursed to the Borrower pursuant to this Debtor-in-Possession Delayed Draw Term Loan Promissory Note (as the same may be amended, modified, renewed, restated, or supplemented from time to time, this "Note"), not to exceed the aggregate principal amount at any time outstanding of six million dollars ($6,000,000), together with all accrued and unpaid interest (including all interest added to the outstanding principal amount hereof pursuant to Section 4(a) below) and fees thereon, as provided in this Note.  On June 23, 2019 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization ("Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code").  The Chapter 11 Cases are being jointly administered.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Borrower has requested that the Lender make loans from time to time on the terms, and subject to the conditions set forth, in this Note and the Interim Order or Final Order (as applicable), which are incorporated herein upon entry by the Bankruptcy Court.  The Borrower intends to utilize such loans to fund working capital requirements, costs, and expenses of administration of the Chapter 11 Cases, and fees and expenses relating to the DIP Facility during the pendency of the Chapter 11 Cases.

1.    Loans.

(a)    Subject to the terms and conditions hereof, the Lender shall make available to the Borrower, from time to time until the Maturity Date, loans (each, a "Loan") in an aggregate principal amount not to exceed the Commitment.  The aggregate principal amount of all Loans made hereunder shall not exceed at any time the amount of the Commitment, plus all interest added to the outstanding principal amount hereof pursuant to Section 4(a) below (the "Maximum Amount").  Until the Maturity Date, the Borrower may, subject to the satisfaction of the conditions as set forth in Section 2 herein, from time to time borrow Loans under this Section 1, provided that (i) the aggregate principal amount of Loans made hereunder shall not exceed the Commitment, (ii) each disbursement of Loans shall be in a minimum amount of

---

[1]    Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed thereto in Section 20 of this Note, in the DIP Motion or in the Interim Order.

$1,000,000, (iii) the initial disbursement of Loans shall be made no sooner than one (1) Business Day after entry of the Interim Order and shall not exceed $2,000,000, unless otherwise agreed by Lender in its sole discretion, (iv) the second disbursement of Loans shall be made no sooner than July 11, 2019, and shall not exceed $1,000,000, unless otherwise agreed by Lender in its sole discretion, (v) the third disbursement of Loans shall be made no sooner than August 8, 2019, and shall not exceed $1,000,000, unless otherwise agreed by Lender in its sole discretion, and (vi) the fourth disbursement of Loans shall be made no sooner than September 26, 2019, and shall not exceed $2,000,000, unless otherwise agreed by Lender in its sole discretion.  Each Loan shall be made on notice by the Borrower to the Lender at the address specified in Section 22(a) hereof.  Any such notice must be given no later than 12:00 p.m. (New York time) on the date that is at least two (2) Business Days prior to the date of the proposed Loan; provided that the initial Loan may be made within one (1) Business Day after entry of the Interim Order.  Each such notice (a "Notice of Loan") shall be given in writing (by electronic transmission or overnight courier) specifying (i) the amount of such Loan requested, (ii) the proposed date of such Loan, which must be a Business Day, and (iii) such other information as may be reasonably required by the Lender.  Upon receipt of a Notice of Loan, subject to the satisfaction of the conditions set forth in this Note, the Lender shall make the proceeds of such Loan available to the Borrower on the applicable date of funding of such Loan by transferring immediately available funds equal to such proceeds to Borrower's Designated Account.  Any amounts of principal repaid or prepaid hereunder may not be reborrowed.  The entire unpaid balance of the Loans and all other Obligations shall be immediately due and payable in full in immediately available funds on the Maturity Date.

(b)    The Lender shall be entitled to rely upon, and shall be fully protected in relying upon, any Notice of Loan or similar notice believed by it to be genuine.  The Lender may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon has actual knowledge to the contrary.

(c)    The Borrower shall utilize the proceeds of Loans to fund working capital requirements, costs and expenses of administration of the Chapter 11 Cases, and fees and expenses relating to the DIP Facility during the pendency of the Chapter 11 Cases, in each case, in accordance with the Approved Budget, subject to Permitted Variances.

2.    Certain Conditions to Each Loan.  The Lender shall not be obligated to fund any Loan, if, as of the date thereof:

(a)    the Borrower or Guarantor has not paid any amount then payable hereunder or under any other Loan Document or shall not have performed any of their respective obligations hereunder or under any other Loan Document;

(b)    the Borrower or Guarantor has not duly executed and delivered this Note;

(c)    the Borrower or Guarantor has not delivered corporate resolutions, incumbency certificates, and similar documents, in form and substance satisfactory to Lender in its reasonable discretion, with respect to this Note and the other Loan Documents and the transactions contemplated hereby and thereby;

(d)      the Borrower and Guarantor have not (i) duly paid any and all fees, costs, and expenses then payable hereunder or under any other Loan Documents (including, without limitation, the reasonable and documented fees, costs, and expenses of counsel to the Lender) and (ii) fully performed all of their respective obligations hereunder or under any other Loan Documents;

(e)      (i) the Bankruptcy Court has not entered the Interim Order within three (3) days of the Petition Date, or (ii) the Interim Order has been stayed, vacated, reversed, modified, or amended without the Lender's consent in its sole discretion;

(f)      on any such date that is on or after the date that is thirty (30) calendar days after the Petition Date, (i) the Bankruptcy Court has not entered the Final Order, or (ii) the Final Order has been stayed, vacated, reversed, modified, or amended without the Lender's consent in its sole discretion;

(g)      the Borrower has not delivered to the Lender the Approved Budget that is in form and substance satisfactory in the Lender's sole discretion, or shall not have updated the Approved Budget in accordance with this Note;

(h)      a Bankruptcy Court order has been entered (i) authorizing the Borrower or the Guarantor to obtain financing or credit pursuant to section 364 of the Bankruptcy Code from any Person other than the Lender; or (ii) providing adequate protection to any Person under sections 361 through 364 of the Bankruptcy Code other than as authorized pursuant to the Interim Order or with the consent and approval of the Lender;

(i)      any representation or warranty by the Borrower or the Guarantor contained herein or in any other Loan Documents shall be untrue or incorrect as of such date in any material respect;

(j)      (i) any Event of Default shall have occurred and be continuing or would result after giving effect to any requested Loan; or (ii) any Default shall have occurred and be continuing or would result after giving effect to any requested Loan, and the Lender in its sole discretion shall have determined not to make any Loan so long as such Default is continuing;

(k)      except as occasioned by the commencement of the Chapter 11 Cases and the actions, proceedings, investigations, and other matters related thereto, any event or circumstance having a Material Adverse Effect shall have occurred since the date hereof and the Lender shall have determined not to make any Loan so long as such Material Adverse Effect is continuing;

(l)      the Debtors shall not have filed the Sale Motion in form and substance acceptable to the Lender;

(m)      the Sale Motion has been withdrawn or an order approving the Sale Motion (which order must be in form and substance acceptable to the Lender) has not been entered by the date set forth in the Interim Order;

3

(n)        on any date after the Sale Order has been entered, the Sale Order is stayed, vacated, reversed, modified (without Lender's consent), or on appeal; or

(o)        after giving effect to any Loan, the outstanding principal amount of all Loans would exceed the lesser of (i) the Maximum Amount, (ii) the amount then authorized by the Interim Order, and (iii) the amount permitted to be borrowed for the applicable period as set forth in the Approved Budget, subject to Permitted Variances.

The request and acceptance by the Borrower of the proceeds of any Loan shall be deemed to constitute, as of the date of such request, acceptance or incurrence, (i) a representation and warranty by the Borrower and Guarantor that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by the Borrower and Guarantor of the granting and continuance of the Lender's Liens, pursuant to the Collateral Documents.

3.        <u>Payment of Principal</u>.  FOR VALUE RECEIVED, Borrower promises to pay to the Lender, in the manner and at the place hereinafter provided, the unpaid principal amount of all Loans made by the Lender pursuant to this Note to the Borrower on the Maturity Date.

4.        <u>Payment of Interest</u>.

(a)        The unpaid principal amount of Loans shall bear interest from the date when made until paid in full at a rate equal to twelve percent (12%) per annum, payable on each applicable Interest Payment Date.  All payments of interest hereunder shall be made by adding the amount of interest payable on any Interest Payment Date to the outstanding principal amount of Loans, and such amount shall thereafter constitute principal amount of Loans bearing interest in accordance herewith.

(b)        If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the time for payment thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)        All computations of fees and interest shall be made by the Lender on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by the Lender of an interest rate hereunder shall be final, binding, and conclusive on the Borrower (absent manifest error).

(d)        So long as an Event of Default shall have occurred and be continuing, and at the election of the Lender confirmed by written notice from the Lender to the Borrower, the interest rate applicable to the Obligations shall be increased by two percentage points (2.00%); <u>per annum</u> above the rate of interest otherwise applicable hereunder (the "<u>Default Rate</u>"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations. Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(e)        Notwithstanding anything to the contrary set forth in this <u>Section 4</u>, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "<u>Maximum Lawful</u>

Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; provided that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by the Lender is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the closing date as otherwise provided in this Note.  Thereafter, interest hereunder shall be paid at the rate(s) of interest and in the manner provided in Sections 4(a) through (d), unless and until the rate of interest again exceeds the Maximum Lawful Rate, and at that time this paragraph shall again apply.  If the Maximum Lawful Rate is calculated pursuant to this paragraph, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made.  If, notwithstanding the provisions of this Section 4(e), a court of competent jurisdiction shall finally determine that the Lender have received interest hereunder in excess of the Maximum Lawful Rate, the Lender shall, to the extent permitted by applicable law, promptly apply such excess to the payment of other outstanding Obligations and thereafter shall refund any excess to Borrower or as a court of competent jurisdiction may otherwise order.

5.    Payments.  Except as expressly provided in Section 4(a), all payments of principal and interest in respect of this Note shall be made in Dollars in same day funds to the Lender to such account or accounts as shall be designated in a written notice delivered by the Lender to the Borrower.  Each payment made hereunder shall be credited first, to fees and reimbursable expenses of the Lender then due and payable pursuant to any of the Loan Documents; second, to interest then due and payable on the Loans; third, to the principal balance of the Loans until the same has been paid in full; and fourth, to all other Obligations.  Any amounts of principal repaid or prepaid hereunder may not be reborrowed.

The Borrower hereby authorizes the Lender to, and the Lender may, from time to time, upon prior notice to the Borrower, charge the Loan Account of the Borrower with any amount due and payable by the Borrower under any Loan Documents.  The Borrower agrees that the Lender shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing.  Any amount charged to the Loan Account of the Borrower shall be deemed a Loan hereunder made by the Lender to the Borrower.  The Borrower confirms that any charges that the Lender may so make to the Loan Account of the Borrower as herein provided will be made as an accommodation to Borrower and solely at the Lender's discretion.

6.    Optional Prepayments.  The Borrower shall have the right at any time and from time to time prepay the principal of the Loans in whole or in part without penalty or premium.  Any prepayment or repayment hereunder shall be accompanied by accrued interest on the principal amount of the Loans being prepaid or repaid to the date of prepayment or repayment.

7.    Mandatory Prepayments.

(a)    [Reserved].

(b)    Immediately upon receipt by the Borrower or the Guarantor (as applicable) of cash proceeds of any asset disposition, unless the Lender agrees otherwise, the Borrower or Guarantor (as applicable) shall prepay the Loans, together with accrued interest thereon, in an amount equal to 100% of such proceeds, net of (A) reasonable commissions and other reasonable and customary transaction costs, fees, and expenses properly attributable to such transaction and payable by the Borrower or Guarantor (as applicable) in connection therewith as approved by the Bankruptcy Court (in each case, paid to non-affiliates), (B) transfer or sales taxes, and (C) amounts required to be applied to the repayment of debt secured by such assets sold, to the extent such debt or such liens are senior in priority to the payment of the Obligations or the Lender's Liens securing the Obligations.  Any such prepayment shall be applied in accordance with Section 5.

(c)    Upon the receipt by the Borrower or the Guarantor of any Extraordinary Receipts, the Borrower or Guarantor (as applicable) shall prepay the outstanding principal of the Loans in an amount equal to 100% of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts.  Any such prepayment shall be applied in accordance with <u>Section 5</u>.

(d)    Borrower shall prepay the Loans to the extent the Borrower or the Guarantor has excess cash above amounts reasonably necessary or anticipated to pay all expenses and other obligations (including any mandatory prepayments under this <u>Section 7</u>) then due and payable and taking into account the prospective funding needs in the Approved Budget, with any such prepayment to be in an amount equal to such excess cash amount and to be payable within two (2) business days after any such excess cash amount is obtained by the Borrower or the Guarantor.  Any such prepayment shall be applied in accordance with Section 5.

(e)    <u>No Implied Consent</u>.  Nothing in this <u>Section 7</u> shall be construed to constitute the Lender's consent to any transaction that is not permitted by other provisions of this Note or the other Loan Documents.  For the avoidance of doubt, no reinvestment of the proceeds of any Extraordinary Receipts, asset sales or other proceeds of Collateral shall be permitted without the prior written consent of the Lender in its sole and absolute discretion.

8.    <u>Expense Reimbursement</u>.

(a)    <u>[Reserved]</u>.

(b)    <u>[Reserved]</u>.

(c)    <u>Lender's Out-of-Pocket Expenses</u>.  The Borrower and Guarantor shall reimburse the Lender for all reasonable and documented out-of-pocket expenses incurred in connection with the negotiation and preparation of the Loan Documents and the obtaining of approval of the Loan Documents by the Bankruptcy Court (including the reasonable and documented fees and expenses of Winston & Strawn LLP ("<u>W&S</u>") and Robinson & Cole LLP ("<u>R&C</u>"), counsel for the Lender, all of the Lender's special counsel, advisors, consultants, and auditors retained in connection with the preparation and negotiation of the Loan Documents and advice in connection therewith).  In addition, the Borrower and Guarantor shall reimburse the Lender for all reasonable fees, costs, and expenses, including the reasonable fees, costs, and

expenses of counsel (including W&S and R&C) or other advisors for advice, assistance, or other representation in connection with:

(1) any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the Loan Documents or advice in connection with the administration of the Loans made pursuant hereto or Lender's rights hereunder or thereunder;

(2) the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 cases, attendance at meetings or hearings related to the Chapter 11 Cases and any subsequent Chapter 7 cases, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 cases;

(3) any litigation, contest, dispute, suit, proceeding, or action (whether instituted by the Lender, the Borrower, a Guarantor, or any other Person, and whether as a party, witness, or otherwise) in any way relating to the Collateral, any of the Loan Documents, or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding, or action, and any appeal or review thereof, in connection with a case commenced by or against the Borrower, a Guarantor or any other Person that may be obligated to the Lender by virtue of the Loan Documents, including any such litigation, contest, dispute, suit, proceeding, or action arising in connection with any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

(4) any attempt to enforce any remedies of the Lender against the Borrower, a Guarantor, or any other Person that may be obligated to the Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

(5) any work-out or restructuring of the Loans during the pendency of one or more Events of Default; and

(6) any efforts to (i) monitor the Loans or any of the other Obligations, (ii) evaluate, observe or assess the Borrower, Guarantor, or their respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate, or otherwise dispose of any of the Collateral;

including, as to each of clauses (1) through (6) above, all documented and reasonable attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges, and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 8(c), all of which shall be payable, on demand, by the Borrower and Guarantor to the Lender.  Without limiting the generality of the foregoing, such documented and reasonable expenses, costs, charges, and fees may include:  fees, costs and expenses of accountants, appraisers, investment bankers, management, and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs, and

expenses; long distance telephone charges; air express charges; facsimile charges; secretarial overtime charges; and expenses for travel, lodging, and food paid or incurred in connection with the performance of such legal or other advisory services. For the avoidance of doubt, all of the foregoing fees, costs, and expenses shall be Obligations under the Note.

9.      Indemnity. The Borrower and Guarantor shall indemnify and hold harmless the Lender and its respective affiliates, members, officers, directors, employees, attorneys, agents, and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities, and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended, or terminated under this Note and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "Indemnified Liabilities"); provided that, neither the Borrower nor the Guarantor shall be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability, or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY, ANY SUCCESSOR, ASSIGNEE, OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED, OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.** For the avoidance of doubt, the Borrower's and Guarantor's obligations under this paragraph shall be an Obligation under this Note.

10.     Adjustments for Withholding, Capital Adequacy. Notwithstanding anything to the contrary contained herein, all payments to the Lender by the Borrower and Guarantor under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges, or withholdings and all related liabilities (all such taxes, duties, levies, imposts, deductions, charges, withholdings, and liabilities being referred to as "Taxes") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either), unless such Taxes are required by applicable law to be deducted or withheld and excluding taxes imposed on Lender's overall net income by the jurisdiction under the laws of which it is organized or any political subdivision thereof. If the Borrower or Guarantor shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note, then (i) the amount payable shall be increased (and for greater certainty, in the case of interest, the amount of interest shall be increased) as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) the Lender receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (ii) the Borrower or Guarantor shall

make such deductions or withholdings, and (iii) the Borrower or Guarantor shall immediately pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in, or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge, or withholding on or from payments due from the Borrower or Guarantor (but excluding taxation on the overall net income of the Lender)), or any change therein or in the interpretation or administration thereof by any governmental authority, central bank, or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Lender with respect to this Note or to increase the cost to the Lender of making or maintaining amounts available under this Note, the Borrower and Guarantor agree to pay the Lender such additional amount or amounts as will compensate the Lender on an after-tax basis for such reduction or increase.

The Borrower and Guarantor agree to immediately pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes, or similar levies (all such taxes, charges, duties, and levies being referred to as "Other Taxes") which arise from any payment made by the Borrower or Guarantor under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

The Borrower and Guarantor shall indemnify the Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid by the Lender and any liability (including penalties, interest, and expenses) arising from or with respect to such Taxes or Other Taxes, whether or not they were correctly or legally asserted, excluding taxes imposed on the Lender's overall net income.  Payment under this indemnification shall be made upon demand. A certificate as to the amount of such Taxes or Other Taxes submitted to the Borrower or Guarantor by the Lender shall be conclusive evidence, absent manifest error, of the amount due from the Borrower to the Lender.

The Borrower and Guarantor shall furnish to the Lender the original or a certified copy of a receipt evidencing payment of Taxes or Other Taxes made by the Borrower within thirty (30) days after the date of any payment of Taxes or Other Taxes.

11.    [Reserved].

12.    Priority of Obligations and the Lender's Liens.  The priority of the Lender's Liens on the Collateral and of the Obligations, including adequate protection liens and superpriority claims granted to the Lender under the Interim Order and the Final Order shall be as set forth in the Interim Order or Final Order (as applicable).  As more fully described in the Interim Order or Final Order (as applicable), to the fullest extent allowed pursuant to the Bankruptcy Code and subject to any limitations set forth in the Interim Order or the Final Order (as applicable), the Lender's Liens on the Collateral and the Obligations shall be senior to all other liens, claims, interests, and other obligations of the Borrower and Guarantor, including but not limited to all Liens provided to the Prepetition Secured Parties pursuant to the Prepetition Financing Documents.

13.     Further Assurances.    The Borrower and Guarantor represent that no other Indebtedness of the Borrower or Guarantor exists other than this Note and the Permitted Indebtedness.    The Borrower and Guarantor agree that they shall, at the Borrower's and Guarantor's expense and upon request of the Lender, duly execute and deliver or cause to be duly executed and delivered, to the Lender such further instruments and do and cause to be done such further acts as may be necessary or proper in the opinion of the Lender to carry out more effectively the provisions and purposes of this Note or any other Loan Documents, including, upon the Lender's written request and in form and substance satisfactory to the Lender, security agreements, UCC-l financing statements and other Collateral Documents granting to the Lender, first priority Liens in the Collateral to secure the Obligations.

14.     Reports and Notices.

(a)     On or before Wednesday of each calendar week commencing on the first full week after the Petition Date, the Borrower hereby agrees to deliver to the Lender (i) a report of operating disbursements, non-recurring disbursements, cash receipts and West Chester New Rig Deposits (each, on a line-item basis corresponding to the applicable line items in the Approved Budget) and (ii) a statement setting forth in reasonable detail the cash balance for each deposit account of the Debtors as of the previous Friday.

(b)     The Borrower and Guarantor will provide the Lender with the following by no later than 5:00 p.m. (New York time) on Tuesday of each calendar week, commencing on July 2, 2019: a comparison of actual total operating disbursements, total non-recurring disbursements, total cash receipts and total West Chester New Rig Deposits for the most recently ended Applicable Period to the Approved Budget for such Applicable Period and an explanation in reasonable detail of the variances between actual results and the Approved Budget for such Applicable Period and verifying whether or not such variances constitute Permitted Variances.

(c)     [Reserved].

(d)     The Borrower and Guarantor hereby agree to deliver, or cause to be delivered to the Lender, each of the following, which shall be in form and detail acceptable to the Lender in its sole discretion:

(1)     promptly (and in any event within twenty-four (24) hours) after any officer of the Borrower or the Guarantor (as applicable) obtains knowledge of the occurrence of any Default or Event of Default under any Loan Document, notice of such occurrence, together with a detailed statement by a responsible officer of the Borrower or Guarantor (as applicable) of the steps being taken by the Borrower or Guarantor (as applicable) to cure the effect of such Default or Event of Default;

(2)     promptly (and in any event within twenty-four (24) hours) upon any officer of the Borrower or the Guarantor (as applicable) obtaining knowledge thereof, notice of any material loss of or damage to any Collateral or of any material adverse change in any Collateral or the prospect of payment thereof, or of the occurrence or existence of any other event or circumstance which has had or could reasonably be expected to have a Material Adverse Effect;

10

(3)     with respect to any filings by the Borrower or Guarantors in the Chapter 11 Cases, as soon as reasonably practicable and in any event at least two (2) calendar days prior to filing, copies of any motion, pleading, or other filing by or on behalf of any Debtor that would materially and negatively impact the Collateral or, if granted, would constitute a Material Adverse Effect;

(4)     (A) promptly (and in any event within twenty-four (24) hours) after submission to any governmental authority, (I) all documents and information furnished to such governmental authority in connection with any investigation of the Borrower or the Guarantor (as applicable), other than routine inquiries by such governmental authority, and (II) copies of any periodic or special reports filed by the Borrower or the Guarantor (as applicable) with any governmental authority, other than routine reports filed in the ordinary course of business, and (B) as soon as available and in any event within three (3) days of the execution, receipt or delivery thereof, copies of notices and other communications received from or sent to any governmental authority which specifically relate to the Borrower or the Guarantor other than routine communication with the Office of the United States Trustee;

(5)     promptly (and in any event within twenty-four (24) hours) upon any officer of the Borrower or the Guarantor (as applicable) obtaining knowledge thereof, notice of the Borrower's or the Guarantor's (as applicable) violation of any law, rule or regulation which could reasonably be expected to have a Material Adverse Effect; and

(6)     promptly upon request, such other information concerning the condition or operations, financial or otherwise, of the Borrower or the Guarantor as the Lender may reasonably request.

(e)     The Borrower and Guarantor authorize the Lender to communicate directly with their independent certified public accountants, advisors, and chief restructuring officer (the "CRO"), if any, and authorizes and shall instruct those accountants, advisors, and CRO to reasonably disclose and make reasonably available to the Lender, as requested by the Lender, any and all financial statements and other supporting financial documents, schedules, and information relating to the Borrower and Guarantor or any of their respective subsidiaries (including copies of any issued management letters) with respect to the business, financial condition and other affairs of the Borrower and Guarantor or any of their respective subsidiaries.

15.     Affirmative Covenants.

The Borrower and Guarantor agree that:

(a)     The Borrower and Guarantor will keep accurate books of record and account pertaining to the Collateral and pertaining to the Borrower's and Guarantor's businesses and financial condition and such other matters as the Lender may from time to time request, in which true and complete entries will be made in accordance with GAAP and, upon request of the Lender, will permit any officer, employee, attorney, accountant, or agent of the Lender to audit, review, make extracts from, or copy, at the Borrower's and Guarantor's expense, any and all

11

corporate and financial and other books and records of the Borrower and Guarantor at all times during ordinary business hours, to send and discuss with account debtors and other obligors requests for verification of amounts owed to the Borrower and Guarantor, and to discuss the Borrower's and Guarantor's affairs with any of their directors, officers, employees, attorneys, accountants, or the CRO. The Borrower and Guarantor will permit the Lender, or any of its respective officers, employees, accountants, attorneys, or agents, to examine and inspect any Collateral or any other property of the Borrower and Guarantor at any time during ordinary business hours. The provisions of the forgoing Section 15(a) are subject, in all respects, to reasonable confidentiality restrictions the Borrower and Guarantor may deem appropriate under the circumstances and any applicable attorney-client, attorney work product, or similar privilege in favor of the Borrower or Guarantor.

(b)    (i) The Borrower and Guarantor will (A) comply with all requirements of law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (B) use and keep the Collateral, and require that others use and keep the Collateral, only for lawful purposes, without violation of any federal, state, or local law, statute, or ordinance, and (ii) the Borrower and Guarantor will obtain, maintain in effect and comply with all permits, licenses, and similar approvals necessary for the operation of their respective businesses as now or hereafter conducted.

(c)    The Borrower and Guarantor will pay or discharge, when due (except for any pre-petition taxes), (i) all taxes, assessments, and governmental charges levied or imposed upon them or upon their income or profits, upon any properties of the Borrower or Guarantor (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, (ii) all federal, state and local taxes required to be withheld by them, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of the Borrower and Guarantor.

(d)    (i) The Borrower and Guarantor will keep and maintain the Collateral and all of their other properties necessary or useful in their business in good condition, repair, and working order (normal wear and tear excepted) and will from time to time replace or repair any worn, defective, or broken parts, and (ii) the Borrower and Guarantor will defend the Collateral against all claims or demands of all Persons (other than the Lender and, if applicable and authorized by the Interim Order or Final Order, the Prepetition Secured Parties) claiming the Collateral or any interest therein.

(e)    The Borrower and Guarantor will conduct their respective businesses and affairs without knowingly infringing upon or interfering with any intellectual property of any other Person in any respect and shall comply in all respects with the terms of the written agreements governing the Borrower's and Guarantor's use of any intellectual property licenses.

(f)    The Borrower and Guarantor will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances.

(g)    The Borrower and Guarantor will obtain and at all times maintain insurance with responsible and reputable insurers, in such amounts and against such risks as may

from time to time be reasonably required by the Lender, but in all events in such amounts and against such risks as is usually carried by companies engaged in a similar business and owning similar properties in the same general areas in which the Borrower and Guarantor operate. Without limiting the generality of the foregoing, the Borrower and Guarantor will at all times keep all tangible Collateral insured against risks of fire (including so-called extended coverage), theft, collision (for Collateral consisting of motor vehicles), and such other risks and in such amounts as the Lender may reasonably request, with any loss payable to the Lender to the extent of its interest.  As provided in the Interim Order or the Final Order (as applicable), the Lender shall be named as a loss payee or an additional insured, as applicable, on each insurance policy maintained by the Debtors that in any way relates to the Collateral.  Upon request of Lender, Borrower and Guarantor shall cause all policies of insurance maintained by any Debtor to contain a loss payable endorsement or an additional insured endorsement, as applicable, in favor of the Lender, in form and substance acceptable to the Lender.

(h)     The Borrower and Guarantor will preserve and maintain their existences and all of their rights, privileges, and franchises necessary or desirable in the normal conduct of their business and shall conduct their business in an orderly, efficient, and regular manner.

(i)     The Borrower and Guarantor shall operate their business in a manner consistent with the Approved Budget subject only to Permitted Variances.

(j)     The Borrower and Guarantor shall comply with all terms, conditions, requirements and obligations set forth in the Interim Order or the Final Order (as applicable).

(k)     The Borrower and Guarantor shall maintain their cash management systems in accordance with the cash management order authorizing the Debtors' use of the cash management system entered in the Chapter 11 Cases, which order shall be in form and substance reasonably satisfactory to the Lender.

16.     <u>Negative Covenants</u>.

The Borrower and Guarantor agree that, without the prior written consent of the Lender in its sole discretion:

(a)     The Borrower and Guarantor shall not directly or indirectly merge or consolidate with, acquire all or substantially all of the assets or capital Stock of, or otherwise combine with, any Person.

(b)     The Borrower and Guarantor shall not create, incur, assume, or permit to exist any Indebtedness, except (without duplication), to the extent not prohibited by the Bankruptcy Code, Permitted Indebtedness.

(c)     The Borrower and Guarantor shall not make any changes in their capital structures or amend their organizational documents in a manner that would adversely affect the Lender.

(d)     The Borrower and Guarantor shall not create, incur, assume, or permit to exist any Lien on or with respect to any of their properties or assets (whether now owned or

hereafter acquired) except for Permitted Encumbrances.  In addition, Borrower and Guarantor shall not become a party to any agreement, note, indenture, or instrument or take any other action that would prohibit the creation of a Lien on any of their properties or other assets in favor of the Lender, as collateral for the Obligations.

(e)     The Borrower and Guarantor shall not enter into any material contractual agreement or any amendment thereto after the Petition Date, other than the Loan Documents, unless approved by the Lender.

(f)     The Borrower and Guarantor shall not maintain any deposit account or securities account that is not subject to a first priority security interest in favor of the Lender pursuant to the Interim Order and the Final Order.

(g)     The Borrower and Guarantor shall not consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, the Interim Order or the Final Order.

(h)     [Reserved].

(i)     [Reserved].

(j)     The Borrower and Guarantor shall not make any changes in any of their business objectives, purposes, or operations that could materially adversely affect the repayment of the Loans or any of the other Obligations or could reasonably be expected to have or result in a Material Adverse Effect.  The Borrower and Guarantor shall not engage in any business other than the businesses currently engaged in by them or businesses reasonably related thereto.

(k)     The Borrower and Guarantor will not assume, guarantee, endorse, or otherwise become directly or contingently liable in connection with any obligations of any other Person, except the endorsement of negotiable instruments by the Borrower and Guarantor for the deposit or collection or similar transactions in the ordinary course of business.

(l)     Except for Stock in any subsidiary of Borrower or Guarantor held on the date hereof, the Borrower and Guarantor will not purchase or hold beneficially any Stock or other securities or evidences of indebtedness of, make or permit to exist any Loans or advances to, or make any investment or acquire any interest whatsoever in, any other Person, including specifically, but without limitation, any partnership or joint venture.

(m)     The Borrower and Guarantor will not permit any breach, default, or event of default to occur under any note, loan agreement, indenture, mortgage, or other security agreement binding upon the Borrower or the Guarantor, except for breaches, defaults or events of default existing on the date of commencement of the Chapter 11 Cases or resulting therefrom.

(n)     The Borrower and Guarantor will not pay salaries, bonuses, commissions, consultant fees, or other compensation, other than as provided in the Approved Budget; or increase the salary, bonus, commissions, consultant fees, or other compensation of any directors, shareholders, or consultant, or any member of their respective families, other than as may be provided in the Approved Budget.

(o)      The Borrower and Guarantor will not convey, sell, lease, assign, transfer, or otherwise dispose of any of their property, business, or assets, whether now owned or hereinafter acquired other than in the ordinary of course of business or pursuant to the terms of the Stalking Horse APA.

(p)      The Borrower and Guarantor shall not cancel any claim or debt owing to them, except for reasonable consideration negotiated on an arm's-length basis and in the ordinary course of their business consistent with past practices.

17.      <u>Events of Default; Rights and Remedies</u>.  Notwithstanding the provisions of section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, but subject to the provisions of the Interim Order or the Final Order (as applicable), the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "<u>Event of Default</u>" hereunder:

(a)      The Borrower or the Guarantor (i) shall fail to make any payment of principal or interest on, or fees owing in respect of the Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Lender for any expense reimbursable hereunder or under any other Loan Document in accordance with the Interim Order or Final Order (as applicable).

(b)      Any representation or warranty herein or in any other Loan Document or in any written statement, report, financial statement, or certificate made or delivered to the Lender by the Borrower or the Guarantor is untrue or incorrect in any material respect as of the date when made or deemed made.

(c)      Any provision of any Loan Document shall for any reason cease to be valid, binding, and enforceable in accordance with its terms (or the Borrower or the Guarantor shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any Loan Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any Loan Document shall cease to be a valid and perfected first priority Lien (except as otherwise permitted herein or therein) in any of the Collateral purported to be covered thereby.

(d)      There shall be a change in the business, assets, operations, or financial condition of the Borrower or the Guarantor that results in a Material Adverse Effect, other than those customarily caused by commencing a case under chapter 11 of the Bankruptcy Code and other than a sale pursuant to the terms of the Stalking Horse APA which results in the indefeasible payment in full in cash of the Obligations.

(e)      A deviation during any Applicable Period in actual total operating disbursements, total non-recurring disbursements, total cash receipts or total West Chester New Rig Deposits from the Approved Budget in excess of any such item's Permitted Variance shall occur.

(f)      Any event constituting an event of default or termination event as set forth in the Interim Order or Final Order (as applicable) (each, a "<u>Termination Event</u>") shall occur.

(g)       Any of the following shall occur:

(1)       Any milestone set forth on <u>Exhibit C</u> to the Interim Order or <u>Exhibit C</u> to the Final Order, as applicable, shall not have been satisfied.

(2)       The Stalking Horse APA is terminated.

(3)       A motion or other pleading is filed in any of the Chapter 11 Cases to dismiss or convert such Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, which motion or pleading is not withdrawn within five (5) calendar days, or otherwise overruled or dismissed by the Bankruptcy Court within fourteen (14) calendar days.

(4)       A motion or other pleading is filed in any of the Chapter 11 Cases for entry of an order authorizing the appointment of an interim or permanent trustee in such Chapter 11 Case or the appointment of an examiner (other than a fee examiner) in such Chapter 11 Case, which motion or pleading is not withdrawn within five (5) calendar days, or otherwise overruled or dismissed by the Bankruptcy Court within fourteen (14) calendar days.

(5)       The Borrower or Guarantor moves in the Chapter 11 Cases (or fails to contest in good faith a motion brought by any other Person) to approve a sale or other disposition of substantially all of the Debtors' assets that does not provide for the termination of Lender's Commitment to make Loans and the indefeasible payment in full in cash of all Obligations and all indebtedness and obligations owing to the Lender or its Affiliates under the Prepetition Financing Documents, in each case, upon the consummation of such sale.

(6)       The Borrower or the Guarantor moves for (or fails to contest in good faith a motion brought by any other Person), or the Bankruptcy Court enters, an order confirming a chapter 11 plan, which plan is not in form and substance acceptable to the Lender in its sole discretion, unless such plan provides for the termination of Lender's Commitment to make Loans and the indefeasible payment in full in cash of all Obligations and all indebtedness and obligations owing to the Lender or its Affiliates under the Prepetition Financing Documents, in each case, on or prior to the effective date of such plan.

(7)       The Borrower or the Guarantor moves in the Chapter 11 Cases (or fails to contest in good faith a motion brought by any other Person or such motion succeeds): (i) to obtain financing from any Person other than the Lender or one of its wholly-owned subsidiaries under sections 364(c) or 364(d) of the Bankruptcy Code (other than any such financing that provides for the termination of Lender's Commitment to make Loans and the indefeasible payment in full in cash of all Obligations and all indebtedness and obligations owing to the Lender or its Affiliates under the Prepetition Financing Documents, in each case, on the effective date of such financing); (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral (other than any such Lien securing financing that provides for the termination of Lender's

16

Commitment to make Loans and the indefeasible payment in full in cash of all Obligations and all indebtedness and obligations owing to the Lender or its Affiliates under the Prepetition Financing Documents, in each case, on the effective date of such financing); (iii) to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code; or (iv) to authorize any other action or actions adverse to the Lender, or its rights and remedies hereunder or its interests in the Collateral, that would, individually or in the aggregate, have a Material Adverse Effect.

(8)     The allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

(9)     The Interim or Final Order is reversed, vacated, revoked, stayed, amended, supplemented, or otherwise modified in any manner without the prior written consent of the Lender in its sole discretion.

(10)     The occurrence of any post-petition judgments, liabilities or events that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(11)     The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner (other than a fee examiner) in the Chapter 11 Cases.

(12)     The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code without the consent of the Lender.

(13)     The entry of an order in the Chapter 11 Cases avoiding or requiring repayment of any portion of the payments made to the Lender on account of the Obligations owing under this Note or the other Loan Documents.

(14)     The entry of an order in the Chapter 11 Cases granting any other superpriority administrative claim or Lien equal to or superior to that granted to the Lender, unless consented to by the Lender in its sole discretion.

(15)     The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor (other than the Lender) to execute upon or enforce a Lien on any Collateral, or (ii) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority that could reasonably be expected to have a Material Adverse Effect.

(16)     There shall commence any suit or action against the Lender by or on behalf of (i) the Borrower or Guarantor or (ii) the Committee, in each case, that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Lender and, if such suit or action is commenced by any Person other than Borrower or the Guarantor, such suit or

action shall not have been dismissed or stayed within ten (10) calendar days after service thereof on the Lender, and, if stayed, such stay shall have been lifted.

(h)    The Borrower or the Guarantor shall fail or neglect to perform, keep or observe any of the provisions of this Note that is not the subject of any other clause of this Section 17, and such failure remains uncured for five (5) Business Days after notice.

If any Event of Default shall have occurred and be continuing, then the Lender may, upon written notice (the "Termination Notice") to the Borrower and Guarantor subject to the terms of the Interim Order or Final Order (as applicable): (i) terminate this Note and the DIP Facility contemplated hereby with respect to further Loans; (ii) declare all or any portion of the Obligations, including all or any portion of any Loan, to be forthwith due and payable; (iii) revoke the Borrower's and the Guarantor's rights to use cash collateral in which Lender has an interest; and (iv) exercise any rights and remedies under the Loan Documents, the Interim Order or the Final Order (as applicable), or at law or in equity.

Except as otherwise provided for in this Note or by applicable law, the Borrower and Guarantor waive:  (a) presentment, demand, protest, and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Lender on which the Borrower or Guarantor may in any way be liable, and hereby ratifies and confirms whatever the Lender may do in this regard; (b) all rights to notice and a hearing prior to the Lender's taking possession or control of, or the Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing the Lender to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

Subject to the terms of the Interim Order and Final Order (as applicable), in addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time or from time to time, without notice to the Borrower or to any other Person, any such notice being hereby expressly waived, to offset and to appropriate and to apply any and all balances held by it at any of its offices for the account of the Borrower or the Guarantor (regardless of whether such balances are then due to the Borrower or the Guarantor) and any other properties or assets at any time held or owing by the Lender to or for the credit or for the account of the Borrower or the Guarantor against and on account of any of the Obligations that are not paid when due.

To the extent permitted by law and subject in all respects to the terms of the Interim Order or the Final Order (as applicable), the Lender's sole duty with respect to the custody, safekeeping, and physical preservation of the Collateral in its possession shall be to deal with it in the same manner as the Lender deals with similar securities and property as a secured lender in other transactions.  The Lender's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if it exercises reasonable care in the selection of the bailee or other third person, and the Lender need not otherwise

preserve, protect, insure or care for any Collateral, and the Lender shall not be obligated to preserve any rights the Borrower may have against prior parties.

18.    <u>Reference Agreements</u>.  This Note evidences the Loans that may be made to the Borrower from time to time in the aggregate principal amount at any time outstanding of up to the Maximum Amount and is issued pursuant to and entitled to the benefits of the Interim Order and Final Order (as applicable) to which reference is hereby made for a more complete statement of the terms and conditions under which the Loans evidenced by this Note are made and are to be repaid.

19.    <u>The Guarantee</u>.

(a)    To induce the Lender to execute this Note and advance the Loans described herein and in consideration of benefits expected to accrue to the Borrower by reason of the Loans and for other good and valuable consideration, receipt of which is hereby acknowledged, the Guarantor hereby unconditionally and irrevocably guarantees jointly and severally to the Lender, the due and punctual payment of all present and future Obligations of the Borrower to the Lender, including, but not limited to, the due and punctual payment of principal of and interest on the Loans and the due and punctual payment of all other Obligations now or hereafter owed by the Borrower under the Loan Documents, in each case as and when the same shall become due and payable, whether at stated maturity, by acceleration, or otherwise, according to the terms hereof and thereof (including all interest, costs, fees, and charges).  In case of failure by the Borrower to punctually pay any Obligations owed to the Lender guaranteed hereby, the Guarantor hereby unconditionally agrees to make such payment or to cause such payment to be made punctually as and when the same shall become due and payable, whether at stated maturity, by acceleration, or otherwise, and as if such payment were made by the Borrower.

(b)    The obligations of the Guarantor shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged, or otherwise affected by:

(1)    any extension, renewal, settlement, compromise, waiver, or release in respect of any obligation of the Borrower or the Guarantor under this Note or any other Loan Document or by operation of law or otherwise;

(2)    any modification or amendment of or supplement to this Note or any other Loan Document;

(3)    any change in the corporate existence, structure, or ownership of the Borrower or the Guarantor, or any of their respective assets, or any resulting release or discharge of any obligation of the Borrower or of the Guarantor contained in any Loan Document;

(4)    the existence of any claim, set-off, or other rights which the Borrower or the Guarantor may have at any time against the Lender or any other Person, whether or not arising in connection herewith;

19

(5)    any failure to assert, or any assertion of, any claim or demand or any exercise of, or failure to exercise, any rights or remedies against the Borrower, the Guarantor or any other Person or property;

(6)    any application of any sums by whomsoever paid or howsoever realized to any obligation of the Borrower or the Guarantor, regardless of what obligations of the Borrower or the Guarantor remain unpaid (other than any payment of the Obligations);

(7)    any invalidity or unenforceability relating to or against the Borrower or the Guarantor for any reason of this Note or of any other Loan Document or any provision of applicable law or regulation purporting to prohibit the payment by the Borrower or the Guarantor of the principal of or interest on any Loan or any other amount payable under the Loan Documents (in each case, other than in connection with the payment in full of the Obligations); or

(8)    any other act or omission to act or delay of any kind by the Lender or any other Person or any other circumstance whatsoever that might, but for the provisions of this paragraph, constitute a legal or equitable discharge of the obligations of the Guarantor under this paragraph.

(c)    The Guarantor's obligations under this Note shall remain in full force and effect until the Commitments are terminated and the Obligations payable by the Borrower and the Guarantor under this Agreement and all other Loan Documents shall have been paid in full. If at any time any payment of the Obligations by the Borrower or the Guarantor under the Loan Documents is rescinded or must be otherwise restored or returned, the Guarantor's obligations under this Note with respect to such payment shall be reinstated at such time as though such payment had become due but had not been made at such time.

(d)    The Guarantor agrees it will not exercise any rights which it may acquire by way of subrogation by any payment made hereunder, or otherwise, until all the Obligations shall have been paid in full subsequent to or concurrently with the termination of all the Commitments.  If any amount shall be paid to a Guarantor on account of such subrogation rights at any time prior to the later of (i) the payment in full of the Obligations payable by the Borrower hereunder and the other Loan Documents and (ii) the termination of the Commitments, such amount shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Lender.

(e)    Subject to the terms of the Interim Order and Final Order (as applicable), to the fullest extent permitted by law, the Guarantor irrevocably waives acceptance hereof, presentment, demand, protest, and any notice not provided for herein, as well as any requirement that at any time any action be taken by the Lender or any other Person against the Borrower, another Guarantor, or any other Person.

(f)    Subject to the terms of the Interim Order and Final Order (as applicable), if acceleration of the time for payment of any Obligation payable by the Borrower, all such amounts otherwise subject to acceleration under the terms of this Note or the other Loan

Documents shall nonetheless be payable by the Guarantor hereunder forthwith on demand by the Lender.

(g)     Subject to the terms of the Interim Order and Final Order (as applicable), the Borrower and the Guarantor are engaged in related businesses and integrated to such an extent that the financial strength and flexibility of the Borrower has a direct impact on the success of the Guarantor.  The Guarantor will derive substantial direct and indirect benefit from the extensions of credit hereunder.

(h)     The Guarantor shall take such action as the Borrower is required by this Agreement to cause such Guarantor to take, and shall refrain from taking such action as the Borrower is required by this Agreement to prohibit such Guarantor from taking.

20.     <u>Definitions</u>.  The following terms used in this Note shall have the following meaning (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"<u>Applicable Period</u>" means each of the First Applicable Period, the Second Applicable Period, the Third Applicable Period and each Rolling Applicable Period, as applicable.

"<u>Approved Budget</u>" means a detailed budget which sets forth projected cash receipts (including a line item for projected West Chester New Rig Deposits) and cash disbursements on a weekly basis by line item for the time period from and including the Petition Date through the conclusion of the initial Approved Budget period set forth therein, in form and substance acceptable to the Lender in its sole discretion prior to the hearing to consider the authorization of the Borrower's and Guarantor's entry into this Note, a copy of which is attached hereto as <u>Exhibit A</u>, as the same may be updated, modified or supplemented from time to time with the written consent of the Lender in its sole discretion.

"<u>Bankruptcy Code</u>" shall have the meaning given such term in the recital to this Note.

"<u>Bankruptcy Court</u>" shall have the meaning given such term in the recital to this Note.

"<u>Borrower</u>" shall have the meaning given such term in the recital to this Note.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"<u>Chapter 11 Cases</u>" shall have the meaning given such term in the recital to this Note.

"<u>Collateral</u>" shall mean the assets and property covered by the Interim Order and Final Order (as applicable) and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at

any time be or become subject to a security interest or Lien in favor of the Lender, to secure the Obligations.  Without limiting the foregoing, the Collateral shall include all proceeds of any of the foregoing and all present and future assets and property of the estates of the Borrower and Guarantor under section 541(a) of the Bankruptcy Code (including, without limitation, the proceeds of claims and causes of action under chapter 5 of the Bankruptcy Code).

"Collateral Documents" shall mean any agreement entered into pursuant to Section 13 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations, including the Interim Order or the Final Order (as applicable).

"Committee" shall mean any official committee of unsecured creditors appointed in the Chapter 11 Cases.

"Commitment" means the commitment of the Lender to make the Loans to the Borrower in the aggregate principal amount not to exceed $6,000,000, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (ii) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (iii) any obligation of such Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (C) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, or (D) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"CRO" shall have the meaning given such term in Section 14(e) of this Note.

"Debtor" and "Debtors" shall have the meaning given such terms in the recital to this Note.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(d) of this Note.

"Designated Account" shall mean account number [_____], ABA routing number [____-7021] maintained by the Borrower with [_____] in [_____], [_____] or such other deposit account of the Borrower (located in the United States) that has been designated as such in writing by the Borrower to the Lender.

"DIP Facility" shall mean this Agreement and the extensions of credit made hereunder.

"DIP Motion" shall mean the Debtors' Motion for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 914, and Local Rule 4001-2: (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' use of Cash Collateral, (III) Granting Adaquate Protection to the Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Event of Default" shall have the meaning given such term in Section 17 of this Note.

"Extraordinary Receipts" means any cash received by the Borrower or a Guarantor not in the ordinary course of business (and not consisting of proceeds described Section 7(b) hereof), including, without limitation, (i) foreign, United States, state, or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements, or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments, and (vii) any purchase price adjustment received in connection with any purchase agreement.

"Final Order" shall mean an order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to the Lender in its sole discretion, together with all extensions, modifications, and amendments thereto, (i) authorizing the Borrower and Guarantor to obtain credit, incur Indebtedness, and grant Liens under this Note and the other Loan Documents, (ii) granting adequate protection, (iii) modifying the automatic stay, and (iv) granting related relief, all as set forth in such order.

"First Applicable Period" means the period from the Petition Date to the last day of the Fiscal Week that is two Fiscal Weeks after the Petition Date.

"Fiscal Week" means a calendar week commencing on Sunday and ending on the following Saturday.

23

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Guarantor" shall have the meaning given such term in the recital to this Note.

"Indebtedness" shall mean, without duplication, with respect to any Person, (i) all indebtedness of such Person for borrowed money; (ii) all obligations of such Person for the deferred purchase price of property or services (other than trade payables, payables to vendors or other account payables incurred in the ordinary course of such Person's business and not past due for more than ninety (90) days after the date such payable was created); (iii) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments or upon which interest payments are customarily made; (iv) all obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used or acquired by such Person, even though the rights and remedies of the lessor, seller, and the lender thereunder are limited to repossession or sale of such property; (v) all capitalized lease obligations of such Person; (vi) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances, and similar facilities; (vii) all obligations and liabilities, calculated on a basis reasonably satisfactory to the Lender and in accordance with accepted practice, of such Person under interest rate or currency swaps and other derivatives; (viii) all Contingent Obligations; (ix) all other items which, in accordance with GAAP, would be included as liabilities on the liability side of the balance sheet of such Person; and (x) all obligations referred to in clauses (i) through (ix) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer.

"Indemnified Person" shall have the meaning given such term in Section **Error! Reference source not found.** of this Note.

"Interest Payment Date" shall mean the first Business Day of each month to occur while any Loans are outstanding; provided that, in addition to the foregoing, each of (x) the date upon which all of the Loans have been paid in full and (y) the Maturity Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued hereunder.

"Interim Order" shall mean an order of the Bankruptcy Court entered in the Chapter 11 Cases pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to the Lender in its sole discretion, together with all extensions, modifications, and amendments thereto, (i) authorizing the Borrower and Guarantor, on an interim basis, to obtain credit, incur Indebtedness, and grant Liens under this Note and the other Loan Documents, (ii) granting adequate protection, (iii) modifying the automatic stay, (iv) setting a final hearing, and (v) granting related relief, all as set forth in such order. The Interim Order is attached hereto as Exhibit B.

"Lender" shall have the meaning given such term in the recital to this Note.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement, encumbrance, or preference, priority, or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Loan" shall have the meaning given such term in Section 1 of this Note.

"Loan Account" means an account maintained hereunder by the Lender on its books of account with respect to the Borrower, in which the Borrower will be charged with all Loans made to, and all other Obligations incurred by, the Borrower.

"Loan Documents" shall mean this Note, the Interim Order, the Final Order, the Collateral Documents, and all other agreements, instruments, documents, and certificates executed and delivered to, or in favor of, the Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of the Borrower or the Guarantor, or any employee of the Borrower or the Guarantor, and delivered to the Lender in connection with this Note or the transactions contemplated thereby.  Any reference in this Note or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements, or other modifications thereto, and shall refer to such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business assets, or properties or condition (financial or otherwise) of the Borrower or a Guarantor (other than those resulting solely from the commencement of the Chapter 11 Cases), (ii) the ability of the Borrower or a Guarantor to perform any of its obligations under any Loan Document to which it is a party (other than those resulting solely from the commencement of the Chapter 11 Cases), (iii) the legality, validity, or enforceability of this Note or any other Loan Document, (iv) the rights and remedies of the Lender under any Loan Document, or (v) the validity, perfection, or priority of a Lien in favor of the Lender on any of the Collateral.

"Maturity Date" means the earliest of: (i) Stated Maturity Date; (ii) the date on which the Obligations are declared to be, or otherwise become, due and payable in full due to the occurrence of an Event of Default; and (iii) the date of delivery of a Termination Notice.

"Maximum Amount" shall have the meaning given such term in Section 1 of this Note.

"Maximum Lawful Rate" shall have the meaning given such term in Section 4(e) of this Note.

"Note" shall have the meaning given such term in the recitals of this Note.

25

"Notice of Loan" shall have the meaning given such term in Section 1 of this Note.

"Obligations" shall mean all loans, advances, debts, liabilities, and obligations for the performance of covenants, tasks, or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by the Borrower and Guarantor to the Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under this Note or any of the other Loan Documents.  This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to the Borrower and Guarantor under this Note or any of the other Loan Documents.

"Other Taxes" shall have the meaning given such term in Section 10 of this Note.

"Permitted Encumbrances" shall mean any pre-existing liens and security interests as of the Petition Date on the Collateral, but solely to the extent that such liens and security interests were, as of the Petition Date, valid, enforceable, perfected, and non-avoidable liens, or were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

"Permitted Indebtedness" shall mean:  (a) current Indebtedness maturing in less than 90 days and incurred in the ordinary course of business for supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Note and the other Loan Documents; (c) Prepetition Indebtedness; (d) deferred taxes and other expenses incurred in the ordinary course of business; (e) other Indebtedness listed in the Approved Budget; and (f) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment.

"Permitted Variances" shall mean, for any Applicable Period, any variance that does not result in (w) the actual total operating disbursements for any Applicable Period being greater than 110% of what is projected in the Approved Budget as "Total Operating Disbursements" for such period, (x) the actual total non-recurring disbursements for any Applicable Period being greater than 110% of what is projected in the Approved Budget as "Total Non-Recurring Disbursements" for such period, (y) the actual total cash receipts for any Applicable Period being more than 10% less than what is projected in the Approved Budget as "Total Cash Receipts" for such period or (z) the actual total amount of West Chester New Rig Deposits received for any Applicable Period being more than 10% less than what is projected in the Approved Budget as "Rig Sales" for such period.  Actual total operating disbursements, total non-recurring disbursements and total cash receipts shall be determined in a manner consistent with the determination of "Total Operating Disbursements," "Total Non-Recurring Disbursements" and "Total Cash Receipts", respectively, in the Approved Budget.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body, or department thereof).

"Petition Date" shall have the meaning given such term in the recitals of this Note.

"Prepetition Financing Documents" shall have the meaning given such term in the Interim Order or the Final Order, as applicable.

"Prepetition Indebtedness" shall mean all Indebtedness of the Borrower and Guarantor incurred or assumed prior to the Petition Date, which for the avoidance of doubt shall include the Prepetition Secured Obligations.

"Prepetition Secured Obligations" shall have the meaning given such term in the Interim Order or the Final Order, as applicable.

"Prepetition Secured Parties" shall have the meaning given such term in the Interim Order or the Final Order, as applicable.

"Rolling Applicable Period" means each period of four Fiscal Weeks, beginning with the period of four Fiscal Weeks ending on the last day of the Fiscal Week immediately following the Third Applicable Period and each Fiscal Week thereafter (which shall be reported on the last day of such week), in each case, on a rolling four week basis.

"Sale Motion" means the Debtors' Motion For Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Assets, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief.

"Sale Order" means the entry by the Bankruptcy Court of an order approving a sale as requested in the Sale Motion.

"Second Applicable Period" means the period from the Petition Date to the last day of the Fiscal Week that is three Fiscal Weeks after the Petition Date.

"Stalking Horse APA" means that certain Asset Purchase Agreement by and among the Debtors and Schramm II Inc., a Delaware corporation, executed on or about the Petition Date, and submitted as an exhibit to the Sale Motion.

"Stated Maturity Date" the first Business Day that is one-hundred and twenty (120) days after the Petition Date or such later date agreed to by the Lender in its sole discretion.

"Stock" shall mean all shares, options, warrants, general or limited partnership interests or other equivalents (regardless of how designated) of or in a corporation, partnership or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and

Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act).

"Taxes" shall have the meaning given such term in <u>Section 10</u> of this Note.

"Termination Event" shall have the meaning given such term in <u>Section 17</u> of this Note.

"Termination Notice" shall have the meaning given such term in <u>Section 17</u> of this Note.

"Third Applicable Period" means the period from the Petition Date to the last day of the Fiscal Week that is four Fiscal Weeks after the Petition Date.

"West Chester New Rig Deposits" shall mean deposits received from customers of the Borrower for new rig orders to be manufactured at the Borrower's West Chester, Pennsylvania facility.  West Chester New Rig Deposits are referenced on the Approved Budget as "Rig Sales".

21.     <u>Representations and Warranties</u>.  The Borrower and Guarantor represent as follows:

(a)     the Borrower and Guarantor are corporations duly organized, validly existing and in good standing under the laws of their respective jurisdictions of incorporation;

(b)     subject to entry of the Interim Order, the execution and delivery of this Note and the other Loan Documents and the performance by the Borrower and Guarantor of the Borrower's and Guarantor's obligations hereunder and under the other Loan Documents are within their corporate powers, have been duly authorized by all necessary corporate or limited liability company action of the Borrower and Guarantor, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of the Borrower's and Guarantor's organizational documents or of any agreements binding upon or applicable to the Borrower and Guarantor or any of the Borrower's and Guarantor's properties;

(c)     the Chapter 11 Cases have been duly authorized by all necessary corporate action by or on behalf of the Borrower and the Guarantor and have been duly and properly commenced;

(d)     subject to entry of the Interim Order, this Note and each other Loan Document is a legal, valid, and binding obligation, enforceable against the Borrower and Guarantor in accordance with its terms except as limited by equitable principles relating to enforceability;

(e)     the Borrower and Guarantor have good and marketable title to, or valid leasehold interests in, all of their respective properties and assets; none of the properties and assets of the Borrower and Guarantor are subject to any Liens other than Permitted Encumbrances, and (giving effect to the protections provided by the Chapter 11 Cases) there are

no facts, circumstances or conditions that may result in any Liens other than Permitted Encumbrances;

(f)     no information contained in this Note, any of the other Loan Documents, any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of the Borrower and Guarantor to the Lender pursuant to the terms of this Note, any Loan Document or otherwise contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.  Subject to entry of the Interim Order and the Final Order (as applicable), the Liens granted to the Lender pursuant to the Collateral Documents will at all times be fully perfected first priority Liens in and to the Collateral described;

(g)     except for proceedings in the Chapter 11 Cases, no action, claim, lawsuit, demand, investigation, or proceeding is now pending or, to the knowledge of the Borrower and the Guarantor, threatened against the Borrower or the Guarantor that (i) challenges the Borrower's or the Guarantor's right or power to enter into or perform any of their respective obligations under the Loan Documents to which each is a party, or the validity or enforceability of any Loan Document or any action taken thereunder, (ii) otherwise affects this Note or any other Loan Document, or (iii) (giving effect to the protections provided by the Chapter 11 Cases) has a reasonable risk of being determined adversely to the Borrower or the Guarantor and that, if so determined, could have a Material Adverse Effect;

(h)     to the best of the Borrower's and the Guarantor's knowledge, each of their accounts, contracts, contract rights, tangible chattel paper, intangible or electronic chattel paper, documents, instruments, general intangibles, supporting obligations and other rights, remedies, obligations, or other intangibles of any kind (i) is and will be genuine, and in all respects what it purports to be, and is not and will not be evidenced by a judgment, an instrument or chattel paper (unless such judgment shall have been assigned to the Lender in such manner as the Lender shall deem necessary or appropriate to perfect and preserve its first priority security interest therein and unless, if so requested by the Lender, such instrument shall have been endorsed and delivered to or at the direction of the Lender and, in the case of tangible chattel paper, if so requested by the Lender, delivered to the Lender); (ii) represents and will represent a bona fide transaction completed or in progress in accordance with the terms and provisions contained in the invoices and purchase orders relating thereto, and the underlying transactions giving rise thereto do not and will not in any way violate any requirements of law; and (iii) is and will be in the amount shown on the Borrower's and Guarantor's records, which amount is and will be actually and absolutely owing to the Borrower and Guarantor and not contingent or subject to any rights of set-off or reduction for any reason other than regular discounts, credits or adjustments allowed by the Borrower and Guarantor in the ordinary course of their business; and

(i)     the execution, delivery and performance of this Note and the other Loan Documents will not (immediately or with the giving of notice or passage of time, or both) (i) violate the organizational documents of the Borrower or the Guarantor, or violate any law or regulation; or (ii) result in the creation or imposition of any Lien upon any of the property of the Borrower or the Guarantor, except in favor of the Lender.

22.   <u>Miscellaneous</u>.

(a)      All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, electronically mailed, or delivered as follows:

If to Borrower or Guarantor:

Schramm, Inc.
800 E. Virginia Avenue
West Chester, PA 19380
Attention:  Craig Mayman, President
Email:  CMayman@schramminc.com

With a copy (not constituting notice) to:

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Attention:  Craig D. Grear
Email:  cgrear@ycst.com

If to Lender:

Schramm II Inc.
c/o GenNx360 Capital Partners, L.P.
590 Madison Avenue, 27th Floor
New York, NY 10022
Attention:  Glen Bushery
Email:  gbushery@gennx360.biz

With a copy (not constituting notice) to:

Winston & Strawn LLP
200 Park Avenue
New York, NY 10166
Attention:  Carey D. Schreiber
Email:  cschreiber@winston.com

All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or when sent by facsimile or electronic mail be effective when confirmation is received.

(b)      No failure or delay on the part of the Lender or any other holder of this Note (or any portion thereof) to exercise any right, power or privilege under this Note and no course of dealing between the Borrower, Guarantor, and the Lender shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any

30

single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Lender would otherwise have.  No notice to or demand on the Borrower or the Guarantor in any case shall entitle the Borrower or the Guarantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Lender to any other or further action in any circumstances without notice or demand.

(c)      The Borrower, Guarantor, and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(d)      If any provision in or obligation under this Note shall be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(e)      **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF BORROWER, GUARANTOR AND THE LENDER HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.**

(f)      **THE BORROWER, GUARANTOR, AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED**.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims.  The Borrower, Guarantor, and, by their acceptance of this Note, the Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS OF THIS NOTE**.  In the event of litigation, this provision may be filed as a written consent a trial by the court.  Each party hereto hereby submits to the exclusive

31

jurisdiction of the Bankruptcy Court for purposes of all legal proceedings arising out of or relating to this Note or the transactions contemplated hereby.

(g)     The Borrower and Guarantor hereby waive the benefit of any statute or rule of law or judicial decision which would otherwise require that the provisions of this Note be construed or interpreted most strongly against the party responsible for the drafting thereof.

(h)     The Borrower and Guarantor shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of the Lender.  The Lender may assign to one or more entities all or any part of, or may grant participation's to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have it were a Lender hereunder.  The Lender shall notify the Borrower and Guarantor of any such assignment which notice shall include a description of the assignment and include customary instructions from the Lender and its assignee with respect to the making of payments and other communications with the Lender and such assignee.

(i)     No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower, the Guarantor, and the Lender.

(j)     If any provision of this Note is held invalid, illegal, or unenforceable, the parties shall negotiate in good faith so as to replace each invalid, illegal or unenforceable provision with a valid, legal, and enforceable provision which will, in effect, from an economic viewpoint, most nearly and fairly approach the effect of the invalid, illegal, or unenforceable provision and the intent of the parties in entering into this Note.

(k)     This Note, the other Loan Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other Loan Documents shall be binding upon the Borrower, the Guarantor, the estates of the Borrower and Guarantor, and any trustee or successor in interest of the Borrower and Guarantor in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to section 365 of the Bankruptcy Code.  This Note and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Lender and its respective assigns, transferees and endorsees.  The Liens created by this Note, and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any of the Chapter 11 Cases or any other bankruptcy case of the Borrower or the Guarantor to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Lender files financing statements or otherwise perfect its security interests or Liens under applicable law.

(l)     In the event of any inconsistency between the provisions of the Interim Order or Final Order (as applicable) and this Note or any other Loan Document, the provisions of the Interim Order or Final Order (as applicable) shall govern.

   (m) THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

[Signature Pages Follow]

IN WITNESS WHEREOF, the Borrower, the Guarantor and Lender have caused this Note to be executed and delivered by their duly authorized officer as of the day and year and at the place first above written.

**BORROWER:**                               **SCHRAMM, INC.**

By:_____
Name: _____
Title: _____

**GUARANTOR:**                            **HDR HOLDING, INC.**

By:_____
Name: _____
Title: _____

**LENDER:**                                        Schramm II Inc.


By:_____

Name: _____

Title: _____

## **EXHIBIT A**

**Approved Budget**

(attached)

**<u>EXHIBIT B</u>**

**Interim Order**

(attached)

<u>Exhibit B</u>

Budget

**DIP Budget**
Cash Flow Forecast

Amounts in $'000

| | Budget Weekly 28-Jun | Budget Weekly 5-Jul | Budget Weekly 12-Jul | Budget Weekly 19-Jul | Budget Weekly 26-Jul | Budget Weekly 2-Aug | Budget Weekly 9-Aug | Budget Weekly 16-Aug | Budget Weekly 23-Aug | Budget Weekly 30-Aug | Budget Weekly 6-Sep | Budget Weekly 13-Sep | Budget Weekly 20-Sep | Budget Weekly 27-Sep |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | |
| Part Sales | 100 | 100 | 100 | 135 | 135 | 135 | 135 | 135 | 135 | 135 | 135 | 135 | 135 | 135 |
| Rig Sales | | | | 385 | | | | 245 | | | | | | |
| Other | | | | | | | | | | | | | | |
| **Total Cash Receipts** | **100** | **100** | **100** | **520** | **135** | **135** | **135** | **380** | **135** | **135** | **135** | **135** | **135** | **135** |
| | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Inventory Purchases and Vendors | (1,242) | (100) | (100) | (447) | (118) | (118) | (118) | (225) | (118) | (118) | (68) | (68) | (68) | (68) |
| Salaries, Wages, Commision and Taxes | (91) | (99) | (88) | (88) | (88) | (143) | (94) | (66) | (66) | (66) | (66) | (66) | (66) | (66) |
| Health Insurance Claims/Premiums | (10) | (30) | (10) | (10) | (10) | (25) | (5) | (5) | (5) | (5) | (25) | (5) | (5) | (5) |
| Rent | | (71) | | | | (71) | | | | | (71) | | | |
| Recurring CC Expense / Travel | (10) | (10) | (10) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Directors Fees | | | | | | | | | | | | | | |
| Business Insurance Premium | (325) | | | | | (4) | | | | (4) | | | | (4) |
| Bank Fees | (3) | | | | | (3) | | | | (3) | | | | (3) |
| Sales Tax | (3) | | (5) | | | | | (5) | | | | (5) | | |
| Interest Payment | | (69) | | | | (34) | | | | | (34) | | | |
| Regulatory Fees | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |
| Purchased Service & Pass-Thru Expense | (24) | (24) | (24) | (64) | (24) | (24) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) |
| Temporary Contractor | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |
| Office expense | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |
| Utilities | | | (39) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) | (13) |
| Supplies | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| **Total Operating Disbursements** | **(1,716)** | **(411)** | **(284)** | **(635)** | **(266)** | **(448)** | **(258)** | **(342)** | **(230)** | **(237)** | **(305)** | **(185)** | **(180)** | **(187)** |
| | | | | | | | | | | | | | | |
| **Net Operating Cash Flow** | **(1,616)** | **(311)** | **(184)** | **(115)** | **(131)** | **(313)** | **(123)** | **38** | **(95)** | **(102)** | **(170)** | **(50)** | **(45)** | **(52)** |
| | | | | | | | | | | | | | | |
| **Non-Recurring Disbursements** | | | | | | | | | | | | | | |
| Employee Retention | | | | | | | | | | | | | | |
| YCST Retainer and Payment | | | | | | | | | (300) | | | | | (200) |
| GenNx Counsel | | | | | | | | | | | | | | (460) |
| FocalPoint | | | | | | | | | | | | | | (550) |
| Claims Agent | (25) | | (25) | | | | (25) | | | | (25) | | | |
| Investigative Committee | | | | | | | | | | | | | | (250) |
| Trustee Fees | | | | | | | | | | | | | | (75) |
| Lender Counsel | | | (16) | | | | (17) | | | | | (17) | | |
| PR Firm | (40) | | | | | | | | | | | | | |
| Financial Advisor | | | (125) | | | | (100) | | | | | (12) | | |
| Quarterly Director Fees | | | (32) | | | | | | | | | | | |
| Cure Payments | | | | | | | | | | | | | | (307) |
| Estate Wind-Down Expenses | | | | | | | | | | | | | | (200) |
| **Total Non-Recurring Disbursements** | **(65)** | **-** | **(198)** | **-** | **-** | **-** | **(142)** | **-** | **(300)** | **-** | **(25)** | **(29)** | **-** | **(2,042)** |
| | | | | | | | | | | | | | | |
| **Net Cash Flow** | **(1,681)** | **(311)** | **(382)** | **(115)** | **(131)** | **(313)** | **(265)** | **38** | **(395)** | **(102)** | **(195)** | **(79)** | **(45)** | **(2,094)** |
| Cash, Beginning of Period | 266 | 585 | 274 | 892 | 777 | 646 | 334 | 1,069 | 1,107 | 713 | 611 | 417 | 338 | 294 |
| **Ending Cash** | **(1,415)** | **274** | **(108)** | **777** | **646** | **334** | **69** | **1,107** | **713** | **611** | **417** | **338** | **294** | **(1,800)** |
| Pre-Petition | | | | | | | | | | | | | | (200) |
| Cash DIP Funding | 2,000 | | 1,000 | | | | 1,000 | | | | | | | 2,000 |
| **Ending Cash after DIP Funding** | **585** | **274** | **892** | **777** | **646** | **334** | **1,069** | **1,107** | **713** | **611** | **417** | **338** | **294** | **200** |
| | | | | | | | | | | | | | | |
| **DIP Funding Summary** | | | | | | | | | | | | | | |
| Beginning Cash DIP Balance | - | 2,000 | 2,000 | 3,000 | 3,000 | 3,000 | 3,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| IBAGenNx Monthly DIP Deferral | | | | | | | | | | | | | | |
| Additional Cash DIP Funding | 2,000 | - | 1,000 | - | - | - | 1,000 | - | - | - | - | - | - | 2,000 |
| **Ending DIP Balance** | **2,000** | **2,000** | **3,000** | **3,000** | **3,000** | **3,000** | **4,000** | **4,000** | **4,000** | **4,000** | **4,000** | **4,000** | **4,000** | **6,000** |

<u>Exhibit C</u>

**Milestones**

(i)  On the Petition Date, the Debtors shall have filed a motion seeking approval of the DIP Facility.

(ii)  On or before June 27, 2019, the Debtors shall have filed a motion (the "**Bid Procedures Motion**") with the Bankruptcy Court to approve bid procedures and establish the date of an auction to determine a winning bidder or bidders for the Debtor's assets (the "**Auction**"). The Bid Procedures Motion will provide for the selection of a stalking horse bidder and entry into an asset purchase agreement with the stalking horse bidder (the "**Stalking Horse Bidder**"), subject to better and higher bids as set forth therein, acceptable to the DIP Lender in its sole and absolute discretion as confirmed in writing.

(iii)  On or before June 27, 2019, the Interim Order authorizing and approving the DIP Facility and the transactions contemplated thereby on an interim basis, in form and substance satisfactory to the DIP Lender as confirmed in writing in its sole and absolute discretion, shall have been entered by the Bankruptcy Court.

(iv)  On or before July 19, 2019 (no later than twenty-five (25) days following the Petition Date), or the first business day thereafter that the Bankruptcy Court is available, an order approving the Bid Procedures Motion (the "**Bid Procedures Order**"), in form and substance satisfactory to the DIP Lender as confirmed in writing in its sole and absolute discretion, shall have been entered by the Bankruptcy Court.

(v)  On or before July 24, 2019 (no later than thirty (30) days following the Petition Date), or the first business day thereafter that the Bankruptcy Court is available, the Final Order authorizing and approving the DIP Facility and the transactions contemplated thereby on a final basis, in form and substance satisfactory to the DIP Lender as confirmed in writing in its sole and absolute discretion, shall have been entered by the Bankruptcy Court.

(vi)  On or before August 28, 2019 (no later than sixty-five (65) days following the Petition Date), or the first business day thereafter that the Bankruptcy Court is available, the Bankruptcy Court shall have convened and concluded a hearing to consider approval of a sale to the Stalking Horse Bidder or to the Successful Bidder following an Auction and an order approving the sale (the "**Sale Order**"), in form and substance satisfactory to the DIP Lender as confirmed in writing in its sole and absolute discretion, which Sale Order shall approve a sale to the Successful Bidder at any Auction conducted under the Bid Procedures Order or to the Stalking Horse Bidder if there are no other qualified bidders, shall have been entered by the Bankruptcy Court (a "**Sale**").

(vii)  On or before September 3, 2019 (no later than seventy (70) days following the Petition Date), or the first business day thereafter, the closing of the Sale shall have occurred.