# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HDR HOLDING, INC., *et al.*,[1] | Case No. 19-11396 (MFW) |
| Debtors. | (Jointly Administered) |

**Hearing Date: August 2 2019, at 10:30 a.m. (ET)**
**Objection Deadline: July 26, 2019 at 4:00 p.m. (ET)**
**Related Docket Nos. 12 and 18**

## OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' (I) MOTION FOR AUTHORIZATION TO OBTAIN POSTPETITION FINANCING (DI. NO. 12) AND (II) MOTION FOR APPROVAL OF BIDDING PROCEDURES (D.I. NO. 18)

The Official Committee of Unsecured Creditors (the "Committee") of HDR Holding, Inc. ("HDR") and Schramm, Inc. ("Schramm" and together with HDR the "Debtors"), by and through its proposed undersigned counsel, hereby files this omnibus objection (the "Objection") to the: (i) *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 363, and 507, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Bankruptcy Rule 4001-2; (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. No 12) (the "DIP Financing Motion"); and (ii) *Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Assets, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: HDR Holding, Inc. (2015) and Schramm, Inc. (0480). The Debtors' mailing address is 800 E. Virginia Ave., West Chester, PA 19380.

*Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (D.I. 18) (the "<u>Bidding Procedures Motion</u>" and together with the DIP Financing Motion, the "<u>Motions</u>").[2]  In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.     Unless substantially modified, the one-sided and self-serving relief requested by the Motions should be denied.

2.     Although conspicuously absent from the Motions, and the Declarations[3] filed in support of the Motions, the relief requested by the Motions has been engineered by, and for the exclusive benefit of, the Debtors' controlling shareholder, GenNx360 Capital Partners, L.P. ("<u>GenNx360</u>").  GenNx360 is not only the Debtors' controlling shareholder, it is also a guarantor of certain of the Debtors' alleged prepetition loan obligations, a purported prepetition junior secured creditor of the Debtors, and through Schramm II, Inc., the proposed DIP Lender and the proposed Stalking Horse Bidder.

3.     Indeed, if granted, the relief requested by the Motions will lead to the expedited transfer of the Debtors' assets to GenNX360, while providing little to no benefit to the

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in, as applicable, the Motions, the proposed orders, or any of the exhibits thereto.

[3]     The Debtors filed two (2) declarations in support of the First Day Motions and DIP Financing:  (i) the *Declaration of Craig Mayman in support of First Day Motions* (DI. No. 2) and the *Declaration of Michael Fixler in Support of DIP Financing* (D.I. No. 13).

#54494199 v3

unsatisfied claims of the Debtors' general unsecured creditors.  More importantly, the proposed transactions will likely result in administratively insolvent bankruptcy estates.

4.      There is no dispute, after years of struggling under the majority control and grip of GenNx360[4], the Debtors commenced these cases in dire need of liquidity and without the apparent ability to negotiate an arm's length value-maximizing financing facility that would provide the Debtors with the ability to implement a plan of reorganization, let alone provide a sufficient runway to conduct a comprehensive marketing process for the sale of their assets.

5.      To add insult to injury, shortly before commencing these cases, the Debtors' senior management and Board of Directors authorized and approved the payment of approximately $176,000 of certain employee retention bonuses, as well as the payment of $150,000 of prepetition director's fees.   The Debtors' approval and payment of $326,000 of bonuses and prepetition director's fees on the eve of bankruptcy raises serious questions as to the Schramm Board of Directors' business judgment, independence and the one-sided nature of the financing and sale contemplated by the Motions—*i.e.* approval of DIP Financing and approval of compressed bidding and sale procedures in favor of GenNx360/Schramm II.

6.      By all appearances, the relief requested by the Motions seeks to leverage the chapter 11 process solely for the benefit of GenNx360 and Schramm II to the detriment of the Debtors' creditor constituency .  Indeed, the lopsided nature of the relief requested by the

---

[4]      GenNX360, and its affiliate CMS/GenNx360 Capital Fund L.P. became the controlling 97% (or greater) shareholders of Schramm in June of 2012 pursuant to a plan of merger (the "2012 Merger").   The Committee is investigating the nature, extent and validity of the 2012 Merger.  Since the 2012 Merger GenNx360 has appointed the majority of the directors to the Debtors' Board of Directors and has actively been involved in the Debtors' key management and restructuring decisions.   Indeed, GenNx360 Management charged a management fee for services rendered to the Debtors.  The Debtors stopped paying the management fee sometime in 2014.   However, the unpaid management fees continued to accrue through the Petition Date and are reflected in Schramm's Schedules and Statements.  GenNx360 is also an absolute and unconditional guarantor of the "Term Loan A" obligations allegedly due and owing under the Debtors' 2016 Amended and Restated Credit Facility (as discussed more fully below).  GenNX360 has purportedly recently paid $11.0 million to the Term Loan A Lenders under the guaranty, and is arguably on-the-hook for the balance of the facility should it not be paid by the Debtors

Motions is evident in, among other provisions: (i) the Debtors' questionable stipulations as to the nature, extent, validity and priority of the alleged Prepetition Secured Lenders' liens and claims, including the alleged prepetition secured claim of GenNx360, when significant recharacterization and subordination issues exist with respect to the Debtors' prepetition credit facilities; (ii) the granting of superpriority liens and administrative claims in favor of GenNx360/Schramm II, including the granting of liens on unencumbered assets and the proceeds of avoidance actions; (iii) the improper waivers of critical rights under Bankruptcy Code sections 506(c) and 552(b), and the right to marshal the Debtors' assets; (iv) the proposed unchecked payment of over $460,000 of GenNx360/Schramm II's fees and expenses incurred in these cases;[5] (v) the unspecified and yet to be budgeted adequate protection payments to GenNx360; (vi) the granting of automatic credit bid rights to GenNx360/Schramm II; (vii) the compressed sale milestones; (viii) the limited prepetition marketing process[6] implemented by the Debtors; (ix) the favorable releases and indemnity provisions contained in the proposed DIP Financing and Bidding Procedures; (x) the overly restrictive covenants and case milestones that threaten to up-end these Cases; and (xi) the lack of sufficient funding to pay all administrative and priority claims that may be allowed in these Cases.

       7.      If GenNx360 and Schramm II want to use the chapter 11 process to liquidate the Debtors' collateral for their benefit, they must fund a process that is fair and equitable to all parties in interest, not just to themselves. Otherwise, these cases should be converted to chapter 7 cases or dismissed.

---

[5]      *i.e.* an amount that is nearly twice the amount of the fees budgeted for the Committee and its professionals.

[6]      The Motions describe the prepetition marketing process as "extensive and comprehensive." The Committee respectfully disagrees with the Debtors' characterization of the prepetition marketing process. The Committee respectfully submits that the evidence at the hearing on the Motions will show that the prepetition marketing process was limited to raising capital/equity for the Debtors, and did not include the potential marketing of the sale of all, or substantially all of the Debtors' assets.

#54494199 v3

8. To be clear, the Committee recognizes that the Debtors require post-petition financing and the use of Cash Collateral to maintain their operations and to administer these Bankruptcy Cases. Indeed, the Committee supports the relief requested by the DIP Financing Motion, provided the relief is appropriately tailored to safeguard the interests of the Debtors and the Debtors' unsecured creditors without granting GenNx360 and Schramm II any extraordinary rights or remedies, and without constraining or limiting the Debtors' reorganization efforts (whether those efforts are by way of a sale of assets, a sale as a going-concern, or confirmation of a chapter 11 plan of reorganization). The Committee also supports the potential sale of the Debtors' assets, or potential restructuring of the Debtors' liabilities, provided the extraordinary bid protections being granted to GenNX360/Schramm II (*i.e.* right to credit bid certain the "Term Loan B" facility of the alleged prepetition secured debt, releases, indemnity, compressed sale milestones) are limited and a more comprehensive marketing and restructuring process is implemented.

9. In short, the relief being offered by the Debtors to GenNx360/Schramm II through the Motions must be limited and modified to protect the interests of all parties in interest in these cases, not just GenNx360/Schramm II, and the directors and management who approved the process before the Court. **Absent substantial changes, or a resolution of the Committee's Objection, the relief requested in the Motions should be denied.**

## BACKGROUND

10. On June 24, 2019 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.

11. The Debtors continue to operate their businesses and manage their properties pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

#54494199 v3

12.     The Debtors filed the Motions on the Petition Date.

13.     On June 25, 2019, the Court authorized the DIP Financing and use of Cash Collateral on an interim basis pursuant to the *Interim Order Authorizing the DIP Financing Motion* (D.I. No. 39) (the "Interim DIP Financing Order").

14.     On July 9, 2019 (the "Committee Formation Date"), the United States Trustee (the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code. The Committee currently consists of three members.[7] On July 12, 2019 the Committee selected Pepper Hamilton to serve as counsel to the Committee pursuant to Bankruptcy Code section 1103(a).

15.     The Court has scheduled a hearing on August 2, 2019 to consider, *inter alia*, final approval of the Motions.

## NEW INFORMATION OR INFORMATION NOT DISCLOSED IN THE MOTIONS AND FIRST DAY PLEADINGS

16.     On July 16, 2019, nearly three (3) weeks after commencement of these cases, the Debtors filed a *Notice of Appointment of Independent Director and Special Committee* (the "Director and Special Committee Notice") (D.I. No. 96).  The Director and Special Committee Notice advises: (i) the Debtors have appointed Michael Logan as an Independent Director; (ii) the Debtors have established a "Special Committee" of their respective Boards to explore strategic and financial alternatives advisable for the Debtors; and (iii) the Debtors have appointed Mr. Logan as the sole member of the Special Committee.[8] Significantly, despite Schramm's proposing to pay Mr. Logan $25,000 per month,[9] the Debtors have not sought Court approval of

---

[7]     The members of the Committee are:  (i) DNOW L.P.; (ii) General Engineering Company; and (iii) Kutzner Manufacturing Industries Inc.

[8]     The Committee reserves the right to object to the purported appointment.

[9]     *i.e.* an amount far in excess of the quarterly fees payable the Debtors' other directors.

the appointment of Mr. Logan as a director." Nor have the Debtors sought authority to pay Mr. Logan the $25,000 per month director's fees.

17.     Days before the commencement of these cases,  Schramm's senior management (Craig Mayman and Jesse Glover) and Board (Oscar Groomes and Jette Campbell) authorized and approved: (i) the payment of a $176,000 employee retention and bonus plan for 30 of the Debtors' 50 employees; and (ii) the payment of $150,000 of prepetition director fees to Mr. Groomes[10] ($87,500) and Mr. Campbell ($62,500).  *See Schramm Inc's Statement of Financial Affairs,* Exhibit 4 (D.I. No. 120).

18.     The proposed DIP Budget may not include funding for the amounts due and owing for claims arising under the Debtors' self-insured employee health plan.

19.     The proposed DIP budget may not include funding for all allowed administrative expense claims incurred in these cases.

20.     From the date of its retention, through May 2018 the "extensive and comprehensive marketing process" employed by FocalPoint, the Debtors' proposed investment banker, was limited to a capital/equity raise, and not a sale of all, or substantially all, of the Debtors' assets.

21.     One of the prepetition "investment opportunities" identified in the Debtors' Declarations, included the Debtors' agreement to enter into an "exclusive – no shop – period" with the investor, thereby limiting the Debtors' ability to shop the investment, the Debtors' loans or the Debtors' assets to another potential buyer for a period of sixty (60) days, unless terminated earlier.  *See, Investment Proposal,* paragraphs 8 and 12, to be filed under seal as **Exhibit A**.

---

[10]     Mr. Groomes was appointed to the Debtors' Boards by GenNx360.  According to the Alumni Showcase page of Tougaloo College, https://www.tougaloo.edu/alumni/alumni-showcase/d-oscar-groomes, Mr. Groomes is reportedly "a retained advisor for GenNx360, a midmarket B2B private equity firm."

## THE DEBTORS' PREPETITION CREDIT FACILITIES

22.     The nature and extent of the Debtors' prepetition credit facilities (*i.e.* the 2012

Credit Agreement and the Amended (2016) Credit Agreement) are far more complicated then as

outlined in the Debtors' DIP Financing Motion.  The facilities may be summarized as follows:

**The 2012 Credit Facility:**  Schramm, as borrower, and HDR, as guarantor, entered into a $72 million credit facility (the "2012 Credit Facility") with RBS Citizens Bank N.A. ("Citizens") as administrative agent on June 29, 2012.  Citizens, Tristate Capital Bank, Fulton Bank, Brown Brothers Harriman, Sumitomo Mitsui Bank, M&T Bank and Sovereign Bank (collectively the "Original Lenders") are identified as the "Lenders" of the 2012 Credit Facility.  GenNx360 is identified as the "Sponsor" of the 2012 Credit Facility.  The 2012 Credit Facility consisted of a $20 million revolver loan, and a $52 million term loan.  The facility was to be secured on all assets of the Debtors.  On June 26, 2012, the Debtors requested to draw $52 million on the term loan, and $11.5 million on the revolver loan.

**The 2012 Junior Credit Facility:**  On June 29, 2012, Schramm as Borrower, HDR as Guarantor, and GenNx360 as the junior administrative agent entered into a Senior Subordinated Credit Agreement (the "Junior Credit Facility").  GenNx360 and CMS/GenNx360 were identified as the lenders under the facility.  The Junior Credit Facility was subordinate to the 2012 Credit Facility.  The Junior Credit Facility was  to be used to acquire Schramm per the Plan of Merger, pay fees and costs of the merger transaction and used for working capital.  Significantly, no UCC1 financing statements were filed in connection with the Junior Credit Facility.  Moreover, the Junior Credit Facility identifies the Borrower's address, and the Junior Administrative Agent's address as the business address of GenNx360.

**The 2012 Debt Subordination Agreement**:  On June 29, 2012, Schramm, as Borrower, HDR, as Guarantor, Citizens, as the senior administrative agent, and GenNx360 as the junior administrative agent, entered into a Debt Subordination Agreement.  The Debt Subordination Agreement also identifies the business address of GenNx360 as the address for Schramm and GenNx360.

**First Amendment to 2012 Credit Facility:**  On November 22, 2013, the 2012 Credit Facility was amended by the First Amendment to the Credit Agreement.  The amendment was executed, in part, in connection with Schramm's purchase of Schramm Australia and its Australian non-debtor affiliates Airdrill Pty Ltd and Airdrill Hammers and Bits Pty Ltd.

**First Forbearance Agreement:**  On August 29, 2014, Schramm, as Borrower, HDR, as Guarantor and Citizens as the senior administrative agent, entered in the Forbearance and Amendment Agreement.  Eight (8) events of default were declared in the Forbearance and Amendment Agreement.  Citizens, as the senior administrative agent and Original Lenders agreed to forbear and not exercise any remedies under the 2012 Credit Agreement through June 30, 2015.

#54494199 v3

**Notice of Termination of Forbearance**. On February 9, 2015, Citizens, as the senior administrative agent, issued a Notice of Termination of Forbearance Period. Eleven (11) events of default, and two (2) forbearance defaults, were identified in the Notice of Termination of Forbearance Period.

**Second Forbearance Agreement:** On March 19, 2015, Schramm, as Borrower, HDR, as Guarantor, GenNx360 as Sponsor, and Citizens as the senior administrative agent, and the Original Lenders entered into the Second Forbearance Agreement. The Second Forbearance Agreement required GenNx360 to make a $2.0 million equity contribution to Schramm, which was to be applied to the revolver portion of the 2012 Credit Agreement. Schramm was also required to pledge its interests in Airdrill Australia to the lenders under the Original Credit Agreement. On April 30, 2015, Citizens, as the senior administrative agent, extended the second forbearance period to May 22, 2015. On May 22, 2016, Citizens again extended the second forbearance period, this time to June 5, 2016.

**Third Forbearance Agreement:** On June 5, 2015, Schramm, as Borrower, HDR, as Guarantor, GenNx360 as Sponsor, Citizens, as senior administrative agent, and the Original Lenders, entered into the Third Forbearance and Amendment Agreement. Thirteen (13) events of default were identified in the Third Forbearance and Amendment Agreement. GenNx360 was required to extend a $4.0 million term loan to Schramm and the forbearance period was extended to June 30, 2016.

**The 2015 GenNx360 Loan:** On June 5, 2016, Schramm, as Borrower, HDR, as Guarantor, GenNx360 as Lender, entered a Loan and Security Agreement. The Loan and Security Agreement states GenNx360 lent $2.0 million per the Second Forbearance Agreement. The agreement also states that GenNx360 was to lend $4.0 million to Schramm per the Third Forbearance Agreement. Significantly, no UCC1 financing statements were filed or recorded in connection with the Loan and Security Agreement.

**The Intercreditor Agreement:** On June 5, 2016, Citizens, as senior administrative agent, Schramm, as Borrower, and GenNx360 as Sponsor and Sponsor Lender entered into an Intercreditor Agreement. Pursuant to the agreement, GenNx360 agreed to subordinate and limit its right to payment of the purported loans under the June 5, 2016 Loan and Security Agreement. Significantly, the Intercreditor Agreement identifies the Borrower and Sponsor Lender's addresses as the business address of GenNx360.

**Amended and Restated Credit Agreement - $26 million ("A&R Credit Agreement")**: On March 23, 2016, Schramm, as Borrower, HDR, as guarantor, Enhanced Credit Supported Loan Fund, L.P. ("ECSLF"), as administrative agent and Term A Lender, GenNx360, as purported Term B Lender, and the Original Lenders, as purported Term C lenders amended and restated the 2012 Credit Agreement . The Amended and Restated Credit Agreement established three (3) tranches of debt: Term A, Term B and Term C loans. Under the Term A loan, **ECSLF purchased "Original Loans" in principal amount of $20,641,071.18.** ECSLF then agreed to reduce the loans purchased to $12.3 million and make an additional term loan of $1.2 million. ECSLF purchased the $12.3 million of "Original Loans" pursuant to Term A Loan Assignment Agreements. Under the Term B loan GenNx360 agreed to: (a) cancel unsecured loans made pursuant to June 5, 2015 Loan and Security Agreement; and (b) make a

cash equity contribution to Schramm pursuant to a Contribution and Exchange Agreement. In return, GenNx360 received an alleged secured loan in the amount of $6.5 million. **Significantly, unlike the Term A and Term C loans, no reference is made to GenNx360's purchase of any "Original Loans" extended under the 2012 Credit Agreement.** Under the Term C loan, the Original Lenders agreed to exchange the balance of the "Original Loans" for Term C Loans in principal amount of $6.0 million plus warrants for 27% of HDR. The Term A loan is senior in priority to Term B and Term C loan. Annex B to the agreement lists the total amount of debt cancelled as a result of the amendment and restatements as $28,317,550 in principal and $3,634,311.08 in interest (ECSLF cancelled $8,342,071.08 of Original Loans while the Original Lenders cancelled $19,976,470 of the Original Loans).

  **Agreement Among Lenders**: As part of the March 23, 2016 Amended and Restated Credit Agreement, the Original Lenders, as senior lenders, ECSLF, as the Term A lender and Agent, GenNx360, as the purported Term B lender, and the Original Lenders, as the Term C lenders entered into an Agreement Among Lenders pursuant to which the Term B and Term C obligations were subordinated to Term A obligations.

  **GenNx360's Guaranty of the Term A Portion of the Amended and Restated Credit Agreement**: GenNx360, as guarantor guaranteed the Term A Loan obligations. GenNx360 also pledged five (5) portfolio companies as collateral for the guaranty.

  **Absolute Assignment and Sale of Mortgage, Note and Other Loan Documents**: As part of the March 23, 2016 Amended and Restated Credit Agreement, Citizen as senior administrative agent, sold and assigned certain loan documents to Enhanced Credit Supported loan Fund L.P., including the Open End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated August 28, 2012 and recorded September 10, 2012.

  **Resignation of Agent / Appointment of Successor Agent**: Following the March 23, 2016 transactions, Citizens resigned as the senior administrative agent. ECSLF was named as the successor administrative agent and all rights, powers and privileges under the 2012 Credit Agreement were assigned to ECSLF.

  **Security Agreement**: GenNx360,as Guarantor, grants a security interest to ECSLF in certain collateral pursuant to the Amended and Restated Credit Agreement.

  **Amended and Restated Pledge Agreement**: Schramm and HDR pledge collateral to ECSLF pursuant to Amended and Restated Credit Agreement. The pledges include a pledge of the equity interests in Australian entities (AirDrill and Schramm Australia), as well as the equity interests in Schramm.

  **Second Amendment to Amended and Restated Credit Agreement**: On December 17, 2018, Schramm, as Borrower, HDR, as Guarantor, Hark Capital Partners (ECSLF's successor), as administrative agent, and the Original Lenders and Hark II, as Lenders amended the Amended and Restated Credit Agreement; recognize $3.0 million was lent by GenNx360 to Schramm on an unsecured basis in 2017; recognized a $2.5 million Sponsor Realization occurred in favor of GenNx360 on December 29, 2017; recognized a $19.5 million Sponsor Realization occurred in favor of GenNx360 on November 1, 2018; required Hark and

Hark II to extend a $4.0 million secured loan net of fees to Schramm; required GenNx360 to pay $7.0 million to Hark pursuant to the 2016 Guaranty.

**Forbearance Agreement and First Amendment to Second Amended and Restated Guaranty**:  On June 7, 2019 GenNx360, as Guarantor, Schramm, as Borrower, HDR, as Guarantor and Obligor, Hark, as administrative agent; Hark I, Hark II and Hark II Parallel, as Lenders, entered into a Forbearance Agreement and Second Amended and Restated Guaranty. Pursuant to the agreement, due to several defaults (including GenNx360's failure to maintain five (5) portfolio companies pledge to Hark under the 2016 Guaranty; the entry of a stipulated judgment of $5.560 million entered against Schramm; an April 26, 2019 $15.0 million Sponsor Realization realized by GenNx360) GenNx360 was asked to increase his guaranty payment to Hark in the amount of $11.0 million, up from the previous $7 million payment.

23.     As can be seen, critical questions exist as to the nature, extent, validity and priority of GenNx360's pre-petition liens and claims (*i.e.* is the financing debt or equity?).   The Committee expects that the nature, extent, validity and priority of GenNx360's alleged prepetition liens and claims will be hotly contested.

## OBJECTION

### A.     Objection to Final DIP Financing

#### (i)     The DIP Financing Should Not Be Approved Absent Certain Modifications

24.     While approval of the proposed DIP Financing remains within the Court's "informed discretion," the Court must balance the interests of the Debtors and all creditor constituencies, including unsecured creditors.   That balance requires the Debtors to demonstrate that the proposed financing comports with basic notions of fairness and equity and that it would ultimately inure to the benefit of these estates. *See In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990).   The Debtors bear the burden to prove that the terms of the proposed financing are fair and reasonable and in the best interests of the estates and their creditors. *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

#54494199 v3

25.    A financing arrangement may not be so favorable to the lender so as to cause Bankruptcy Code protections to serve only that lender, contrary to the intent of Congress. *See In re Mid-State Raceway, Inc.*, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) ("[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender" (quoting *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992))); *In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. D. N.H. 1989) (characterizing proposed financing facility as one that would "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank and the Debtors' principals who guaranteed its debt").   For these reasons, courts typically do not approve postpetition financing if its primary purpose is to benefit or improve the position of the debtor-in-possession lender. *See, e.g., In re Aqua Assocs.*, 123 B.R. at 196 ("[C]redit should not be approved when it is sought for the benefit of a party other than the debtor . . . ."); *In re Ames Dep't Stores*, 115 B.R. at 39 ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *In re Tenney Vill. Co.*, 104 B.R. at 568.

26.    Courts have acknowledged the disparity in bargaining power inherent in negotiations leading to proposed postpetition financing, as well as the significant harm that can result to creditors if the proposed lender is enabled to exploit its position. *See In re Mid-State Raceway*, 323 B.R. at 59; *In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").   In these Bankruptcy Cases, it appears that the Debtors entered into the DIP Financing with limited negotiating leverage.   Where, as here, a debtor enters into a financing transaction with little negotiating leverage, courts are cautious not to approve financing terms that are considered harmful to the estate and its creditors.  *See In re Mid-State Raceway*, 323

-12-

B.R. at 59; *In re FCX*, 54 B.R. at 838. Given the multiple positions and insider status of

GenNx360—as controlling equity interest, guarantor of the Term A Loan obligations, alleged Term

B Lender, management company, proposed Stalking Horse Bidder and proposed DIP Lender —the

Court should exact heightened scrutiny when considering the reasonableness of the terms of the

proposed DIP Financing and their implications on all other creditors, including unsecured creditors.

27. The DIP Financing incorporates numerous provisions that (i) prejudice the

rights and powers of the Court, the Debtors, and the Committee; (ii) benefit GenNx360, the DIP

Lender and the Prepetition Secured Parties at the expense and to the detriment of the Debtors'

estates; and (iii) give GenNx360 and Schramm II undue influence and control over these chapter 11

cases. Accordingly, the proposed DIP Financing should not be approved on a final basis absent:

**Extension of the Sale Milestones**: (DIP Delayed Draw Term Note, Paras.2, 17 and Exhibit C; Interim Order para 21.) The sale milestones identified in Exhibit C to the Interim Financing Order should be extended. The sale milestones are insufficient to market and sell the Debtors' assets. The milestones must provide for a fair and efficient resolution of a Debtors' bankruptcy cases, and they must also be fair and reasonable for all parties. *See In re American Safety Razor Company, LLC*, Case No. 10-12351 (MFW) (Bankr. D. Del. September 30, 2010), Transcript, pp. 132-33 ("*I don't think, as the debtors suggest, that my consideration of bid procedures is based on the business judgment rule. I need not accept the debtors' business judgment with respect to process. The Bankruptcy Code and Rules and the process under the Bankruptcy Code are all matters for the debtor -- for the Court's determination as to what is fair and reasonable. In fact, I think that's my only role in this case: to determine what is fair for all the parties.*"). *See also, Dura Auto. Sys.*, 2007 Bankr. LEXIS 2764, *253 (Bankr. D. Del. Aug. 15, 2007) ("[t]he paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate"). Based on the Committee's initial diligence, each of the Case milestones should be extended by a period of at least six (6) weeks.

**Elimination of Sections 105(a) and 506(c) Waivers**: (Interim Financing Order paras 14 and 34.) The DIP Financing seeks a preemptive waiver of the estates' rights under section 506(c) of the Bankruptcy Code to surcharge the Prepetition Secured Parties for the cost of preserving or disposing of their prepetition collateral. The DIP Financing also seeks to waive the Court's power to exercise its equitable powers under section 105 of the Bankruptcy Code in the context of assessing surcharges against the prepetition collateral. The Committee objects to any waiver of the Debtors' rights to recover the reasonable, necessary costs and expenses of preserving or disposing of the prepetition collateral. The blanket waiver of section 506(c) and section 105(a) is not proper where, as here, insufficient funds exist to fund all administrative and priority claims incurred in these cases, the transactions before the Court benefit an allegedly

secured insider who has orchestrated the bankruptcy filing, and an insufficient Carve Out exists for the fees and expenses of the estates' professionals.

Section 506(c) is a rule of fundamental fairness for all parties in interest, providing that secured creditors share some of the burden of administrative expenses in a bankruptcy case where it is reasonable and appropriate for surcharges to be ordered. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000). This section is designed to "prevent a windfall to the secured creditor...*[Section 506(c)] understandably shifts to the secured party...the costs of preserving or disposing of the secured party's collateral*, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate." *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (emphasis added). Courts routinely reject the waiver of surcharge rights under section 506(c). *See, e.g., In re The Colad Group, Inc.,* 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005); *Hartford Fire Ins. Co. v. Norwest Bank Minn., N.A.* (*In re Lockwood Corp.*), 223 B.R. 170, 176 (8th Cir. BAP 1998); *In re Brown Bros., Inc.,* 136 B.R. 470, 474 (W.D. Mich. 1991). In addition, in *Hartford Underwriters*, 530 U.S. at 12, the United States Supreme Court ruled that only the debtor is vested with standing to seek administrative surcharges under section 506(c). Thus, if the Court were to approve the abrogation of the Debtors' section 506(c) rights, all parties in interest could lose this valuable Bankruptcy Code protection. Accordingly, the Committee requests that the waiver of the Debtors' section 506(c) rights be stricken. Alternatively, if the Court is unwilling to strike the Debtors' waiver of its section 506(c) rights, the Committee should, in the Final DIP Financing Order, be explicitly vested with standing to seek a surcharge against the DIP Collateral if the facts ultimately prove that a surcharge is appropriate.

**Elimination of the Section 552 Waiver**: (Interim Financing Order paras 14 and 34.) The Committee objects to the waiver of (i) the "equities of the case" exception under section 552(b) of the Bankruptcy Code and (ii) the equitable doctrine of "marshalling" and other similar doctrines. The Debtors have failed to demonstrate why such statutory and equitable powers should be relinquished at this early stage of the chapter 11 cases. As recoveries for unsecured creditors are uncertain at this point in time, a prospective finding that the "equities of the case" exception contained in section 552(b) is waived is wholly inappropriate, and should be stricken. *See In re Metaldyne*, No. 09-13412 (MG) 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) (holding, in the context of a proposed 552(b) waiver, that "the waiver of an equitable rule is not a finding of fact…and the Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make"); *see also In re iGPS Co. LLC*, No. 13-11459 (KG) 2013 WL 4777667, at *5 (Bankr. D. Del. July 1, 2013) (no waiver of the "equities of the case" exception with respect to creditors committee); *In re Namco, LLC*, No. 13-10610 (PJW) 2013 WL 1332581 (Bankr. D. Del. March 24, 2013) (same); *In re Chemtura Corp.,* No. 09-11233 (Bankr. S.D.N.Y. Apr. 29, 2009) (no waiver of the "equities of the case" exception); *In re Quebecor World (USA) Inc.*, No. 08-10152, [Dkt. No. 470] (Bankr. S.D.N.Y. Apr. 1, 2008) (same)*; In re Calpine Corp.*, No. 05-60200, [Dkt. No. 635] (Bankr. S.D.N.Y. Jan. 26, 2006) (same). As is the case with the other concessions demanded by GenNx360, the DIP Lender, waivers of the equities of the case and marshalling doctrines are neither warranted nor required under applicable law where, as here, the prepetition secured parties are adequately (and, in these cases, excessively) protected. Importantly, the Committee is currently only asking for the preservation of these doctrines. Given that the Committee has not yet had an opportunity to analyze the nature, extent and validity of the liens asserted by the prepetition secured parties, it

would be unfair to impose the requested waivers at this point to the extent that the Debtors have unencumbered assets or to the extent that the liens on any currently encumbered assets are later avoided. *See In re Metaldyne Corp.*, 2009 WL 2883045, at *6. Granting a section 552(b) and marshalling waiver at the outset of these proceedings would unfairly prejudice unsecured creditors and deprive the estates of important statutory and equitable rights that could yield value for all stakeholders.

      <u>**Elimination of Granting Liens on Avoidance Actions**</u>: (Interim Financing Order para 11.) The DIP Financing Motion and Final DIP Financing Order propose that upon entry of the Final DIP Financing Order, the DIP Liens shall attach to any proceeds of claims and causes of actions brought under sections 502(d), 544, 545, 547, 548, and 553 of the Bankruptcy Code. The grant of liens on the proceeds of avoidance actions, however, is fundamentally at odds with the unique purposes served by avoidance actions. Avoidance actions are distinct creatures of bankruptcy law designed to benefit, and ensure equality of distribution among, general unsecured creditors. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000), *rev'd en banc*, 330 F.3d 548 (3d Cir. 2003) (identifying underlying intent of avoidance powers to recover valuable assets for estate's benefit); *In re Tribune Co.*, 464 B.R. 126, 171 (Bankr. D. Del. 2011) (noting "that case law permits all unsecured creditors to benefit from avoidance action recoveries"); *Bethlehem Steel Corp. v. Moran Towing Corp.* (*In re Bethlehem Steel Corp.*), 390 B.R. 784, 786-87 (Bankr. S.D.N.Y. 2008) ("Avoidance actions ... never belonged to the Debtor, but rather were creditor claims that could only be brought by a trustee or debtor in possession ...."); *In re Sweetwater*, 55 B.R. 724, 731 (D. Utah 1985) ("The avoiding powers are not 'property' but a statutorily created power to recover property."), *rev'd on other grounds*, 884 F.2d 1323 (10th Cir. 1989); *In re Sapolin Paints, Inc.*, 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) (reciting "the well-settled principle that neither a trustee … nor a debtor-in-possession, can assign, sell *or otherwise transfer* the right to maintain a suit to avoid a preference" (emphasis added)). Avoidance actions and their proceeds should remain free of any encumbrances and instead should be available for distribution to all creditors. *See, e.g., In re Excel Maritime Carriers, Ltd.*, No. 13-23060 (RDD) [Dkt. No. 133] (Bankr. S.D.N.Y. Aug. 6, 2013) (excluding avoidance actions and proceeds thereof from property that could be used to pay superpriority claims under § 507(b); excluding avoidance actions and proceeds from the scope of adequate protection liens); *In re Hostess Brands, Inc.*, No. 12-22052 (RDD) [Dkt. No. 254] (Bankr. S.D.N.Y. Feb. 3, 2012) (same).

      <u>**Elimination of Granting a Lien on Unencumbered Assets**</u>: (Interim Financing Order paras 11 and 12.) Paragraph 11(c) of the Financing Order provides that the DIP Liens with respect to the DIP Collateral shall include a first priority security interest and lien on all unencumbered property of the Debtors and their estates. Given GenNx360's multiple roles in these cases— controlling equity interest, alleged prepetition lender, alleged unsecured creditor, proposed DIP Lender and proposed Stalking Horse Bidder— the Committee requests that the request to grant liens on unencumbered assets denied, thereby preserving the unencumbered assets for unsecured creditor recoveries in these chapter 11 cases.

      <u>**Granting the Committee Immediate Standing to Challenge GenNx360's Alleged Liens and Claims**</u>: (Interim Financing Order paras 16, 17.) The DIP Financing contains substantial constraints on the ability of the Committee to challenge the liens granted to

the prepetition lenders. Specifically, the terms of the Interim DIP Order limit the time during which the Committee may (i) file a motion to obtain standing *and* (ii) investigate and initiate an adversary proceeding asserting claims against the prepetition lenders to only *60 days* after the appointment of the Committee (the "Challenge Period"), unless such period is extended by written consent of the DIP Lender, or by order of the Court. In the interest of avoiding unnecessary obstacles and promoting the full investigation of potential claims, courts have approved DIP financing orders that provide creditors' committees with automatic standing to commence an adversary proceeding without the need to file a motion seeking standing to bring such an action. *See e.g., In re Urban Brands, Inc.*, No. 10-13005 (KJC) [Dkt. No. 188] (Bankr. D. Del. Oct. 13, 2010) (providing creditors' committee with automatic standing to commence an adversary proceeding); *In re American Safety Razor Co., LLC*, No. 10-12351, [Dkt. No. 174] (Bankr. D. Del. Aug. 27, 2010) (same); *In re PCAA Parent, LLC*, No. 10-10250, [Dkt. No. 179] (Bankr. D. Del. Mar. 2, 2010) (same); *In re Pliant Corp.*, No. 09-10443, [Dkt. No. 337] (Bankr. D. Del. Mar. 20, 2009) (same)*; In re Gottschalks Inc.*, No. 09-10157 (KJC) [Dkt. No. 171] (Bankr. D. Del. Feb. 13, 2009) (same); *In re Quebecor World (USA) Inc.*, No. 08-10152, [Dkt. No. 470] (Bankr. S.D.N.Y. Apr. 1, 2008) (same); *In re Dana Corp.*, No. 06-10354, [Dkt. No. 721] (Bankr. S.D.N.Y. Mar. 29, 2006); *In re DPH Holdings Corp.*, No. 05-44481, [Dkt. No. 797] (Bankr. S.D.N.Y. Oct. 28, 2005) (same). DIP orders have also provided for the tolling of the period in which an adversary proceeding must be commenced upon the filing of a standing motion. *See e.g., In re The Wet Seal, Inc.,* No. 15-10081 (CSS) [Dkt. No. 454] (Bankr. D. Del. March 19, 2015) (providing challenge period tolled as to moving party until earlier of (x) withdrawal of standing motion or (y) entry of dispositive order by the court with respect to such motion); *In re EWGS Intermediary, LLC,* No. 13-12876 (MFW) [Dkt. No. 89] (Bankr. D. Del. Nov. 20, 2013) (same); *In re Centaur, LLC,* No. 10-10799 (KJC) [Dkt. No. 39] (Bankr. D. Del. May 2, 2011) (same). The Committee respectfully submits it should be granted automatic standing to commence an adversary proceeding challenging the validity of the prepetition alleged prepetition liens. In the alternative, the Committee should be provided with at least an additional 30 days (for a total of 90 days) in which to investigate and obtain standing to prosecute any such claims, with the filing of a motion seeking standing within the 90 day period tolling the Challenge Deadline with respect to the Committee.

       **Funding of a Wind-Down Budget**: The proposed DIP Facility does not provide a wind-down budget, which is needed to confirm a liquidating plan after the sales occur. The DIP Lenders' unwillingness to fund a wind-down combined with the immediate paydown of the DIP Facility upon the closing of the sales unmasks their intent to utilize the chapter 11 cases for their sole benefit by rushing the sale of assets, scoop up the sale proceeds, and force the conversion of these Cases to cases under chapter 7 without any hope for a recovery by unsecured creditors. That is unacceptable. The DIP Budget must be increased to properly fund the wind down and exit of the chapter 11 cases through a liquidating plan prior to the turnover of cash proceeds.

       **Restriction on Section 503(b)(9) Claims:** The DIP Budget does not presently account for any payment of section 503(b)(9) claims (which are to be assumed by the Stalking Horse Bidder). The 503(b)(9) claims should be included in the DIP Budget. There is no basis for this disparity in treatment among holders of administrative expense claims. The DIP Budget should be updated to provide for payment in full of all such claims.

**Modification of Budget and Professional Fee Inequity**:  (Interim Financing Order paras 3 and 13, and Delayed Draw Term Loan Note, para 14.)  The Professional Fee line item allocated to the Committee and the Committee's investigation of Liens and Claims is inadequate.  The integrity of the bankruptcy process mandates that the Committee's professionals be permitted to advocate on behalf of unsecured creditors without being subject to the control of third parties whose interests are adverse to those of the debtor's estate.  The Budget attached to the DIP Financing Motion seeks to cap the amount of funds available to the Committee's professionals to $250,000, while the amount of funds available to the Debtors' professionals exceeds $1.3 million, while the amount of funds for GenNx360's professionals equals $460,000.  The proposed allocation of professional fees and expenses among the professionals is unequal and provides for the disparate treatment of the professionals retained by the Committee from and in violation of Local Rule 4001-2(a)(i)(F).  The Committee requests that the Committee's professionals' budget be increased to $600,000 so that the Committee may carry out its statutory duties on behalf of all unsecured creditors.  Alternatively, rather than allocate the fees of the professional's by separate line items in the Budget, the Court should simply require that the final form of the Budget contain a single line item for all fees and expenses of the professionals retained in the case, such that no professional is treated unequally or in such a disparate manner.

Further, the DIP Facility provides that not more than $25,000 may be used by the Committee to investigate the validity, enforceability, perfection, priority or extent of prepetition liens. This amount is grossly insufficient. It is critical that the Committee's professionals be equipped with the necessary resources to investigate the validity, enforceability, perfection, priority or extent of prepetition liens. The Committee respectfully submits the investigation budget should be increased to $50,000.

**Modification and Clarification of Carve-Out:**  (Interim Financing Order para 13.)  The Carve-Out should apply equally to all professionals retained in the case, and should not be limited by the line item for such professionals in the Budget.

**Modification and Clarification of Adequate Protection with Ability to Eliminate Adequate Protections Liens if Prepetition Secured Parties' Liens are Recharacterized**: (Interim Financing Order para 20.)  As adequate protection for using the Prepetition Secured Parties' alleged cash collateral, the Debtors have agreed to provide the Prepetition Secured Parties with "Adequate Protection Liens" upon all prepetition and postpetition property of the Debtors.  Any adequate protection should be limited to the extent of any diminution in the value of Prepetition Secured Parties' prepetition collateral.  The Committee requests that all amounts paid as adequate protection be subject to recharacterization (as payments in principal) or disgorgement, as applicable, in the event it is determined that the Prepetition Secured Parties are under- or unsecured. Consequently, the Adequate Protection Liens should be subject to section 551 of the Bankruptcy Code as well as any inter-company claims. The purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy." *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987). Adequate protection is, therefore, a protection for the creditor to assure its collateral is not depreciating or diminishing in value and is made on a case-by-case basis. *Id.* 1396-97; *In re WorldCom, Inc.,* 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("the purpose of providing adequate protection is to insure that the secured creditor receives the value for which the creditor

#54494199 v3

bargained for prior to the debtor's bankruptcy. However, neither the legislative history nor the Bankruptcy Code requires the Court to protect a creditor beyond what was bargained for by the parties.") (internal citations omitted); *see also United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988) (an "interest is not adequately protected if the security is depreciating during the term of the stay"). The burden of demonstrating the need for adequate protection therefore lies with the secured creditor. *In re Gunnison Ctr. Apts., LP*, 320 B.R. 391, 396 (Bankr. D. Colo. 2005) ("secured creditor 'must, therefore, prove this decline in value – or the threat of a decline -- in order to establish a *prima facie* case.'") (quoting *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994)); *Save Power Ltd v. Pursuit Athletic Footwear (In re Pursuit Athletic Footwear)*, 193 B.R. 713, 718 (Bankr. D. Del. 1996) ("[The secured creditor] has the initial burden in proving a *prima facie* case of cause[.]").To ensure a pre-petition lender receives the benefit of its prepetition bargain, the lender's interests in a debtor's use of cash collateral should be limited to a replacement lien on the lender's prepetition collateral with the same priority and perfection such liens had in the prepetition collateral. To grant anything more, on the scant record before the Court, would provide a windfall to the pre-petition lender and enhance its position at the expense of the Debtors' estates and the Debtors' unsecured creditors. *See In re Nordyke*, 43 B.R. 856, 860 (Bankr. D. Or. 1984) ("A creditor should not be rewarded for … greed in negotiating a stipulation for adequate protection that overstates entitlement.").

From the Committee's perspective, the Prepetition Secured Parties' interests in the Collateral are preserved, not diminished, by the Debtors' use of Cash Collateral. The Cash Collateral will be used to pay payroll, collect accounts receivables and sell and/or reorganize the Debtors' assets through an orderly sale or plan process. In fact, a vast majority of the categories of disbursements identified in the proposed Budget materially benefit the Prepetition Secured Lenders. *See, e.g., In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor was adequately protected when cash collateral was used to pay necessary operating expenses); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105-06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion); *In re Pine Lake Village Apartment Co.*, 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) ("The protection and maintenance of the plaintiff-mortgagee's collateral . . . clearly ensures that the plaintiff-mortgagee's investment is adequately protected."); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (granting debtor authority to use cash collateral over lienholder's objection where the creditor's "secured position can only be increased by the continued operation of the farm"). Moreover, GenNX360 and the Prepetition Secured Parties will not suffer a diminution in Collateral value when Cash Collateral is used to pay the liens or security interests that are prior to their own, or when the Debtors pay the costs of a liquidator or financial advisor hired with GenNx360's consent.

Absent proof of an actual diminution in value, the Final DIP Financing Order should make clear that any Adequate Protection Liens are limited to collateral specifically pledged and perfected under the loan documents and relevant financing statements, and only to the extent a diminution in value is proven to exist. The Court should also make clear that that the Adequate Protection Liens cannot be satisfied from any claims or causes of action arising under chapter 5 of the Bankruptcy Code or from any claims or causes of action asserted against the Prepetition Secured Parties.

-18-

**Elimination of Administrative Expense Claim**:  (Interim Financing Order para 11.)  The request to provide the Prepetition Secured Parties an administrative expense claim pursuant to section 507(b) of the Bankruptcy Code, with priority over all other administrative expenses, should similarly be limited or denied, because, among other things, there is no basis for superpriority claims where cash is being spent to maintain collateral for the secured creditor's own benefit and the Prepetition Secured Parties have failed to demonstrate any diminution in value. To the extent any Section 507(b) claims are included in the Final DIP Financing Order, the order should also make clear that the claims (whether secured, super-priority or administrative) cannot be satisfied from any claims or causes of action arising under chapter 5 of the Bankruptcy Code or from any claims or causes of action asserted against Lenders, including the cash proceeds, securities and/or property turned over by or recovered from the Lenders.   At a minimum, no Adequate Protection Liens or Adequate Protection Priority Claims should be granted (a) without proof at the end of the case that the Prepetition Secured Parties' collateral was impaired and (b) without provision for the payment of all reasonable fees and expenses, including payment of the fees and expenses of the Committee's professionals, incurred by the Debtors and their estates in the Bankruptcy Cases.

**Reporting Requirements:**  All notices and reports, including, but not limited to, any financial updates and analyses required to be provided by, or to, the Debtors, the DIP Lender or the Prepetition Secured Parties should be contemporaneously provided to the Committee.

**Clarification of Automatic Remedial Rights:**  (Interim Financing Order, Introduction and para 23.)  The DIP Lenders should not be permitted to exercise any remedial remedies automatically upon the occurrence of an Event of Default or other Specified Event. If the DIP Lenders believe they are entitled to stay relief, they should be required to file a motion and give proper notice, following which, a hearing should be held to determine whether and to what extent stay relief is appropriate.

**Elimination of the Right to Credit Bid:**  (Interim Financing Order paras 14 and 34.)  Other than bidding in the amount of the new money actually loaned under the DIP Credit Facility (only $4.0 million will be lent at the time of the Auction) GenNx360/Schramm II and the other Prepetition Secured Parties should not be granted the right to credit bid, at any auction or sale of the Debtors' assets, including not credit bidding any pre-petition obligations allegedly owed to them by the Debtors.  The nature, extent, validity and priority of GenNx360's and the Prepetition Secured Lenders' liens and claims are uncertain at this stage of the case and subject to potential challenge.  Moreover, the granting of any credit bid right, without any clarification, restrictions or limitations, is certain to chill competitive bidding to the detriment of the Debtors' estate.

Pursuant to section 363(k) of the Bankruptcy Code, a secured creditor holding an "allowed claim" is generally allowed to credit bid— unless the Court "for cause" orders otherwise.  11 U.S.C. § 363(k).  The purpose of establishing bid procedures for the sale of assets it to "facilitate an open and fair public sale designed to maximize value for the estate."  *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998).  For this reason, "cause" to deny a credit bid—or to insist on modified procedures—may exist where the credit bid as structured is likely to chill bidding.  *See, e.g.*, *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) (denying the debtors' request to establish sale and bidding procedures because "Court

approval of the bid procedures would not enhance the bid process and may in fact chill bidder interest"). Because section 363(k) authorizes the credit bidding only of "allowed" claims, cause to deny a credit bid may also exist where the validity of the lien securing the creditor's claim is subject to dispute. *See, e.g.*, *In re Daufuskie Island Props., LLC*, 441 B.R. 60, 63-64 (Bankr. D. S.C. 2010); *Nat'l Bank of Commerce v. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996). Here, the Committee disputes the nature, extent, validity and priority of the pre-petition liens and claims. Moreover, neither the Debtors nor the Prepetition Secured Parties have established cause for granting a credit bid right. The granting of the Credit Bid Right in advance of a Committee investigation risks a subsequent determination that the liens were invalid – in which case the Debtors will have received far less than fair value for its assets.[11] This is especially true here.

### Elimination of Broad Indemnification Provisions in the Delayed Draw Note/Credit Agreement

**Note/Credit Agreement**: (Interim Financing Order para 22; Delayed Draw Term Loan Promissory Note para 9.) Paragraph 9 of the proposed Delayed Draw Term Loan Promissory Note seeks to indemnify the DIP Lenders and "its respective affiliates, members, officers, directors, employees, attorney, agents, and representatives … from and against any and all suits, actions, proceedings, claims, damages .. that may be asserted against or incurred … as a result of the [DIP Financing]." The scope of the proposed indemnification is overly broad and would improperly extend to numerous, unidentified third parties. The Debtors' estates may have colorable claims and causes of action against one or more of those third parties that could yield recoveries for creditors and, therefore, any right of indemnification should not extend to them at this early stage of the case when the Committee has yet to complete, let alone begin, its investigation of estate claims and causes of action. Accordingly, the Final Order should strike any indemnification obligations under section 9 of the Delayed Draw Term Loan Promissory Note that would extend to third parties. Moreover, any indemnification should be limited solely to the proposed DIP Financing and not to the Debtors' prepetition credit facilities.

### Elimination of Waiver to File Proof of Claim

**Elimination of Waiver to File Proof of Claim**: (Interim Financing Order, paras 35 and 36.) The Prepetition Secured parties should be required to file a proof of claim in the bankruptcy cases and paragraphs 35 and 36 of the Interim Financing Order should be deleted.

## B. Objection To Bidding Procedures

28.     The purpose of bidding procedures is to facilitate the fair sale of a debtor's assets through a process that will maximize value for the benefit of all creditors. The Debtors have an affirmative obligation to develop a bid process that will maximize value. Courts have

---

[11]     At the very least, in consideration of the fact that these bankruptcy proceedings are in their nascency, the Court should condition any Credit Bid Right on GenNx360/Schramm II's posting of a letter of credit or entry into a binding commitment to pay cash in the event of subsequent invalidation of GenNx360's alleged prepetition liens and claims.

-20-

routinely held that procedures that will have a chilling effect on the bidding process should not be approved.

29.    Where a debtor seeks to sell substantially all of its assets to an insider, such transaction is subject to strict scrutiny. Transactions involving an insider require a showing that the transaction is entirely fair. *See Pepper v. Litton,* 308 U.S. 295 (1939) (holding that insider transactions in the bankruptcy context are "subject to rigorous scrutiny"); *In re Global Ocean Carriers Ltd.,* 251 B.R. 31, 48 (Bankr. D. Del. 2000) (sales to insiders are subject to special scrutiny in bankruptcy cases").

30.    Under this standard, a debtor must show that a transaction is entirely fair both in terms of "fair dealing" and "fair price". *In re Coram Healthcare Corp.,* 271 B.R. 228, 239 (Bankr. D. Del. 2001) (requiring a determination that the plan was "entirely fair" because it dealt with a transaction between a company and its controlling shareholder).

31.    Fair dealing examines the timing, initiation, negotiation and structure of a transaction, and fair price examines the economics. *In re Zenith Electrics Corp.,* 241 B.R. 92, 108 (Bankr. D. Del. 1999) (*citing Weinberger v. UOP, Inc.,* 457 A.2d 701, 711 (Del. 1983)). Evaluating an insider transaction for entire fairness requires a court to ensure that insiders do not receive "more favorable terms at the expense of impaired creditors." *Id.*

32.    By all accounts, the Debtors did not conduct a formal marketing or sale process upon the retention of FocalPoint. Rather, the Debtors, and GenNx360, simply explored, through FocalPoint, the possibility of raising additional capital/equity for the Debtors. The process was commenced in late November 2018, before the Thanksgiving Holiday. The process also lead to a 60 day lock-up/exclusive period, that prevented the Debtors from marketing the

investment or their assets to another potential buyer.  In short, the Debtors did not explore an "extensive and comprehensive" marketing process.

33.     The Committee respectfully submits that the expedited milestones fall well short of the standard required by the Bankruptcy Code and that additional time is needed to ensure that the Debtors' assets are appropriately marketed to potential buyers and that the auction is robust.

34.     The Committee further submits that an appropriate extension of time to allow for a truly comprehensive marketing and sale process is needed to strike a fair and reasonable balance under the circumstances presented.

35.     **The Sale Milestones must be Extended**.  The Sale Milestones imposed by GenNx360 and the Schramm II are compressed and do not benefit the Debtors' estates.  The milestones should be extended for an additional six (6) week period.

36.     **The Credit Bid Should Be Denied**. GenNx360 and Schramm II seek permission to credit bid up to $6.5 million of the prepetition Term B Loan <u>plus</u> the full amount ($6.0 million) of the DIP Credit Facility.  The Committee respectfully submits that any credit bid should be limited only to actual funds advanced to the Debtors  under the DIP Credit Facility at the time of the auction (*i.e.* $4.0 million). Neither of GenNx360, Schramm II or the Prepetition Secured Parties should be entitled to credit bid any any alleged prepetition liens and secured claims without a further hearing before the Court.  Moreover, none of the Prepetition Secured Parties, GenNx360 or Schramm II should be permitted to credit bid any "Adequate Protection Lien" absent proving up a diminution in value.

37.     The Stalking Horse  Bidder should also be required to post a cash component to any bid it provides that will:  (i) satisfy all chapter 11 and administrative expense

priority claims as part of a chapter 11 plan; (ii) provide sufficient funding for the plan process and the expenses that will accrue during the post-confirmation wind-down period; and (iii) provide for a recovery for unsecured creditors sufficient to fund a distribution under a confirmable and feasible plan.

38.     **The Sale of Avoidance Actions:**  Avoidance actions, which are unencumbered assets of the Debtors' bankruptcy estates should not be sold, especially given the employee bonuses and director fees paid on the eve of the bankruptcy filing.  To the extent any avoidance actions are sold, sufficient funds should be set aside from the proceeds of any sale to and for the benefit of the holders of allowed  administrative, priority and general unsecured claims in the Debtors' cases.  GenNx360 and the stalking Horse Bidder should not benefit or share in any such proceeds.

39.     **The Sale Procedures Unfairly Limit Consultation with the Committee:**  The Court should only approve Sale Procedures on terms that will allow the Committee broad participation in the sale process.  Towards that end, the Committee requests the following changes:

a.      The Debtors should be required to consult with the Committee with respect to all aspects of the Bidding Procedures and Auction Process, including, but not limited to:  (i) who is a Qualified Bidder; (ii) what constitutes a Qualified Bid; (iii) what constitutes the highest and best bid at the Auction; (iv) who may obtain due diligence access; (v) what bid should be selected as the Back-Up Bid; and (vi) what changes, if any, may be required to the Bidding Procedures and Auction Process.

#54494199 v3

b.      The Debtors should also be required to promptly provide notice to the Committee of the Debtors' determination that a Potential Bidder is a Qualified Bidder and provide the Committee with copies of all Qualified Bids.

c.      Lastly, there should be no good faith finding as part of the Bidding Procedures Order. This entire case has been orchestrated for GenNx360's sole benefit. Moreover, the Debtors have been compelled to admit, for purposes of obtaining DIP Financing, that GenNx360 holds valid and enforceable secured liens on substantially all of the Debtors' assets—a representation that the Committee believes to be inaccurate. Accordingly, acquisition of any collateral by a collusive and chilling credit bid will not be an acquisition "in good faith" under section 363(m) of the Bankruptcy Code.

40.      **No arm's length or good faith findings should be incorporated into the proposed Bidding Procedures Order**. Recital I to the proposed Bidding Procedures Order states the Bidding Procedures and Stalking Horse Purchase Agreement were negotiated by the parties at arms' length and in good faith. The Committee believes the Recital may not be accurate. The Committee further believes the Recital is not necessary for entry of the proposed Order and should be removed.

41.      **The Aggregate Consideration Offered by the Stalking Horse Bidder Should Be Clearly Identified and Disclosed.** Lastly, the aggregate consideration attributed to the Stalking Horse Bid should be clearly identified and disclosed to all potential bidders and parties in interest as part of the Bidding Procedures and the bid solicitation materials. **The disclosure should include a concise description of the cash and credit bid (if any) components of the Stalking Horse Bid, as well as the monetary value of any other consideration being offered by the Stalking Horse Bidder for the Debtors' assets. The**

-24-

**Committee believes the aggregate consideration identified in the proposed APA and Bidding procedures remains unclear.**

42.     Accordingly, for these reasons, the Committee respectfully requests that the Court:  (i) extend the Bidding Deadlines proposed by the Debtors for at least an additional six (6) week period of time; (ii) prohibit any credit bidding absent further order of the Court; and (iii) require the Debtors to consult with the Committee on all aspects of the Bidding Procedures and the Auction.

## CONCLUSION

43.     The Committee understands that the commencement of a sale process at this time may be warranted as other options are also explored.  However, if the Debtors and GenNx360 want the many benefits that can be obtained from a chapter 11 case, they must acknowledge that the Bankruptcy Code is intended to promote the collective good of all creditors and is not for the exclusive benefit of secured creditors.  Accordingly, an acceptable Final DIP Financing Order and Bidding Procedures Order must include appropriate and reasonable provisions that preserve those goals.  Absent resolution of the issues set forth above, the Court should refuse to grant the relief requested in its present form.

44.     The Committee reserves its rights to supplement this Objection prior to the Final Hearing or on the record at the Final Hearing.

WHEREFORE, the Committee respectfully requests that the Court refuse to approve the Proposed Final Order in its present form, grant entry of a final order consistent with the objections contained herein, and grant such further relief as the Court deems proper and just.

Dated: July 26, 2019                                      Respectfully submitted,
Wilmington, Delaware

                                                        Pepper Hamilton LLP

#54494199 v3

/s/ Donald J. Detweiler
Donald J. Detweiler (DE 3087)
John H. Schanne, II (DE 5260)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 421-8390
E-mail: detweilerd@pepperlaw.com
        schannej@pepperlaw.com

and

Francis J. Lawall, Esquire
Pepper Hamilton, LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2799
Telephone:    (215) 981-4451
Facsimile:    (215) 981-4750
Email:        lawallf@pepperlaw.com

*Proposed Counsel to the*
*Official Committee of Unsecured Creditors*

#54494199 v3