**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| HDR HOLDING, INC., *et al.*,[1] | Case No. 19-11396 (MFW) |
| Debtors. | Jointly Administered |
| | Hearing Date: 9/16/19 at 10:30 a.m.<br>Objections Due: 9/6/19 |

**DNOW L.P.'S (I) OBJECTION TO DEBTORS' MOTION TO SELL ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND
INTERESTS [DKT. NO. 18] AND (II) JOINDER IN THE CREDITORS'
COMMITTEE OBJECTION TO THE SALE MOTION**

DNOW L.P. ("DNOW"), for the reasons set forth below, objects (the "Objection") to entry of an order approving the sale of the assets of the above-captioned debtors and debtors in possession (the "Debtors") to GenNx, a classic insider under the Bankruptcy Code. In support of its Objection to the Debtors' pending Sale Motion [Dkt. No. 18], DNOW respectfully states as follows:[2]

**PRELIMINARY STATEMENT**

GenNx (as defined below) falls squarely within the statutory definition of "insider" under section 101(31) of the Bankruptcy Code. GenNx: (i) owns or controls over 99% of the stock of Debtor HDR Holding, Inc., the 100% owner of Debtor Schramm, Inc., which in turn is the direct and indirect 100% owner of valuable non-debtor Australian subsidiaries; (ii) historically has dominated the Debtors' boards of directors with GenNx designees; and (iii) has used its own

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: HDR Holding, Inc. (2015) and Schramm, Inc. (0480). The Debtors each list in their bankruptcy petitions an address of 800 E. Virginia Ave., West Chester, PA 19380.

[2] DNOW also joins in and adopts the filed Creditors' Committee objection to the Sale Motion.

{01478301;v5 }

members and managers as officers and directors of one or more of the Debtors to effectuate favorable transactions for the benefit of GenNx and detriment of the Debtors. The proposed "sale" is really nothing more than a GenNx devised construct to "wash" its investment through a bankruptcy sale process in which it retains its ownership stake and upside, but leaves legitimate creditors behind with nothing but a conversion to Chapter 7. The Debtors cannot meet the heightened level of review necessary to obtain approval of this proposed sale to GenNx.

Because of the myriad challenges to and bona fide disputes regarding the extent, validity, and priority of alleged Term Loan B secured claims asserted by GenNx, the facts and circumstances presented here also warrant denial of any ability of GenNx to credit bid under section 363(k) of the Bankruptcy Code any amount in excess of actual postpetition DIP Financing provided. Those challenges and disputes also mean the assets may be sold free and clear under section 363(f) of the Bankruptcy Code to a competing bidder.

Moreover, the proposed sale carries a litany of other objectionable features. For example, the Debtors have failed to prove the proposed purchase price is a fair price. And, although the Stalking Horse APA does not appear to so provide, at least not in any obvious way, the Sale Motion states that GenNx seeks to acquire the Debtors' avoidance actions in this transaction. Those valuable actions, which should be pursued for the benefit of creditors of the estates, do not constitute assets and estate property capable of being sold over the objection of creditors such as DNOW.

## PROCEDURAL AND FACTUAL BACKGROUND

1.  The Debtors filed Chapter 11 bankruptcy petitions on June 24, 2019 (the "Petition Date"). The Sale Motion was filed the same day.

2.  Debtor Schramm, Inc. ("Schramm") is a Pennsylvania corporation. Schramm is an operating company with its principal place of business located in West Chester, Pennsylvania. Schramm owns 100% of the stock of non-debtor Schramm Australia Holding Pty Limited, which Australian holding company in turn owns 100% of the stock of two Australian non-debtor operating companies, Airdrill Pty Ltd. and Airdrill Hammers and Bits Pty Ltd. (collectively, these three entities shall be referred to as the "Australian Entities".) (*See* Schramm's Schedules of Assets and Liabilities, page 16 of 118 [Dkt. No. 119]; Declaration of Craig Mayman (the "Mayman Declaration") at ¶10 [Dkt. No. 2].) The Australian Entities are not in insolvency or restructuring proceedings in Australia (or any other jurisdiction).

3.  Debtor HDR Holding, Inc. ("HDR Holding") is a Delaware corporation that owns 100% of the stock of Schramm. GenNx360 Capital Partners, L.P. (96.94%), along with affiliate CMS/GenNx 360 Capital Fund, L.P. (2.75%) (together, "GenNx"), owns over 99% of the stock of HDR Holding. (See HDR Holding Chapter 11 Petition, page 15 of 18.)

4.  On July 8, the Office of the United States Trustee for Region 3 (the "OUST") appointed a three member official committee of unsecured creditors in these cases (the "Creditors' Committee"). Those three members are DNOW L.P., General Engineering Company, and Kutzner Manufacturing Industries Inc.[3]

---

[3] As explained by DNOW at the first-day hearing in these cases held on June 25, 2019 (the "First-Day Hearing") (but nowhere disclosed by the Debtors in their first-day motions or in the Mayman Declaration), on May 22, 2019, DNOW obtained entry of a consent judgment for over $5.5 million in a breach of contract action filed by DNOW in October 2017 against Schramm in the U.S. District Court for the District of Delaware. By virtue of its final

5.  The Debtors filed their respective Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("SOFAs") on July 22, 2019.[4]

**The Section 341 Meeting**

6.  A section 341 meeting was held on July 24, 2019 (the "Section 341 Meeting"). Craig Mayman and Jessie Glover each testified under oath on behalf of the Debtors. They were examined by counsel for the OUST, counsel for the Creditors' Committee, and counsel for DNOW.

7.  Mr. Mayman testified that, among other things, the Debtors anticipate converting these cases to cases under Chapter 7 following closing of the proposed sale. The Debtors hold the view that confirmation of a chapter 11 plan is not possible in these cases.

8.  Significantly, the Debtors' witnesses disclosed at the Section 341 Meeting that just a few days before the Petition Date, the Debtors (i) paid retention bonuses to approximately 30 of their 50 employees, in an aggregate amount of between $175,000 and $200,000, with a promise of additional bonuses in a year if they remained employees with the company[5]; and (ii) paid long past-due director fees to Mr. Jette Campbell ($87,500) and Mr. Oscar Groomes ($62,500). Mr. Groomes has been and remains board chairman for each of the Debtors.[6]

---

judgment, DNOW is by far the largest unsecured creditor of Schramm, as confirmed by the Debtors' bankruptcy petitions and Schramm's Schedules. (*See* Docket No. 119.)

[4] On August 29, 2019, HDR Holding amended its SOFAs [Dkt. No. 184] and Schramm amended its Schedules and SOFAs [Dkt. No. 185].

[5] Mr. Mayman, the Debtors' president, a board member, and the Debtors' first-day declarant, apparently received a $44,213 retention bonus, plus another approximately $30,000 in "relocation expenses" in the days leading up to the bankruptcy filings. Mr. Glover, the Debtors' vice-president of finance and operations, received a $10,753 retention bonus. *See* Schramm SOFAs at pages 32-34 [Docket No. 120].

[6] Both of the Debtors' witnesses at the First-Day Hearing (Mr. Mayman and Mr. Fixler), and then Mr. Glover at the Section 341 Meeting, all testified that Mr. Groomes was "independent" and not affiliated with GenNx in any way. That testimony has been shown to be incorrect. *See e.g.* Exhibits B and C attached to DNOW L.P.'s *(I) Omnibus Objection to (A) The Debtors' DIP Financing Motion [Dkt. No. 12], (B) The Bid Procedures Portion of the Debtors' Sale and Bid Procedures Motion [Dkt. No. 18], (C) The Debtors' Critical Vendors Motion [Dkt. No. 9], and (D) The Debtors' Application to Employ FocalPoint Partners, LLC [Dkt. No. 53]; and (II) Joinder in the Official Committee*

9.  Testimony at the Section 341 Meeting indicated the full board(s) approved the employee retention bonus payments and the payments to the two directors. Mr. Mayman, Mr. Campbell, and Mr. Groomes comprised each Debtor's three member board. The explanation provided for why the payments to the two directors were made was to the effect of "[the two directors] were needed for the bankruptcy cases."

10. No prior disclosure of the retention bonus payments or the payment of director fees was made in the Mayman Declaration, the first-day Employee Compensation Motion [Dkt. No. 8], or at the First Day Hearing.

**The August 2 Hearing**

11. On August 2, 2019, the Court held a hearing (the "August 2 Hearing") to consider, among other matters, the Debtors' proposed DIP Financing Motion and the proposed bidding procedures portions of the relief requested by the Sale Motion, which matters were contested by the Creditors' Committee and DNOW.[7]

12. At the August 2 Hearing, which included direct and cross-examination of the Debtors' witnesses (Mr. Fixler and Mr. Glover), a resolution was negotiated and reached between and among the Debtors, GenNx/Schramm II, the Creditors' Committee, and DNOW, thereby ending any need for further testimony at the August 2 Hearing. The terms of the resolutions reached were to be reflected in modified proposed orders tendered to the Court after the hearing.

---

of Unsecured Creditors' Various Objections to the Foregoing [Dkt. Nos. 129, 130, 131] [Dkt. No. 132, filed on July 26, 2019]; see also August 2 Hearing Transcript at pp. 57-58.

[7] Other contested motions or applications scheduled for the August 2 Hearing included the Debtors' (i) *Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363, 1107(a), and 1108 of the Bankruptcy Code (I) Authorizing the Debtors to Pay Certain Pre-Petition Claims of Critical Vendors and (ii) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Claims* [Docket No. 9] and (ii) *Application for Entry of an Order Authorizing Employment and Retention of Focal Point Partners, LLC as Investment Banker to the Debtors, Effective as of the Petition Date* [Docket No. 53].

13. The Court entered a modified order approving bidding procedures (the "Bid Procedures Order") on August 7, 2019. [Dkt. No. 163]

14. The Court entered a modified order approving the DIP Financing Motion on a final basis (the "DIP Financing Order") on August 7, 2019. [Dkt. No. 164]

15. The Debtors have made no effort to set a claims bar date in these cases.

**The Sale Motion and Stalking Horse APA**

16. By the Sale Motion, the Debtors seek Bankruptcy Court approval under section 363(b) of the Bankruptcy Code of that certain Asset Purchase Agreement, dated as of June 24, 2019 (hereafter, the "Stalking Horse APA"), by and between Schramm as proposed Seller and Schramm II Inc. ("Schramm II") as proposed Buyer. (Sale Motion, ¶41.)

17. As the Court is aware, Schramm II is a wholly owned subsidiary of GenNx formed to purchase Schramm's assets and assume certain liabilities pursuant to the terms and provisions set forth in the Stalking Horse APA.

18. Pursuant to the Stalking Horse APA, GenNx, through Schramm II, would acquire the Acquired Assets (as that term is defined in the Stalking Horse APA) and would assume the Assumed Liabilities (as that term is defined in the Stalking Horse APA). (See Stalking Horse APA at pages 1-2; §2.1 (identifying the Acquired Assets); §2.3 ("Assumption of Assumed Liabilities").)[8]

---

[8] "Assumed Liabilities" is defined as "(a) all Liabilities under the Assumed Contracts and the Assumed Permits arising from and after the Closing Date (except for any Liabilities incurred by the Seller outside the Ordinary Course of Business and any Liabilities relating to a breach of any Assumed Contract that occurred at or prior to the Closing Date); (b) all accounts payable arising after the Petition Date in the Ordinary Course of Business and not paid by Seller; (c) all accounts payable to the extent they become allowed claims in the Seller's Chapter 11 Case under section 503(b)(9) of the Bankruptcy Code; and (d) all Liabilities consisting of amounts Buyer has agreed to pay hereunder (including all Cure Amounts)." (*See* Stalking Horse APA, page 2.)

{01478301;v5}    6

19. The Sale Motion at paragraph 23 (page 9), with a heading of "**Sale of Avoidance Actions (Stalking Horse Purchase Agreement §2.1)**" provides:

> [T]he Purchased Assets include avoidance actions arising from or related to any contract or other obligation that will be assumed and assigned to the purchaser as part of any Sale Transaction. The Stalking Horse Bidder required this provision as part of the Stalking Horse Purchase Agreement to, among other things, enable them to maintain supplier and vendor relationships after consummation of the sale. Accordingly, the Debtors submit that this aspect of the Stalking Horse Purchase Agreement is reasonable and necessary to consummate the sale.

Section 2.1 of the Stalking Horse APA, which identifies the Acquired Assets, does not appear to so provide, at least not in any obvious way.

## ARGUMENT

20. DNOW joins in, incorporates, and adopts as its own the arguments and supporting factual allegations set forth in the Creditors' Committee Sale Objection as if set forth fully herein. DNOW will endeavor not to repeat all those arguments and supporting factual allegations here.

### A. Heightened scrutiny should be applied to the proposed sale to insider GenNx.

21. Heightened scrutiny applies here to the proposed sale to GenNx through its wholly-owned affiliate, Schramm II. GenNx, the classic insider on multiple fronts, seeks to become the owner of all of the Debtors' assets (including Schramm's interests in the Australian Entities) on the strength of a bid that (i) does not appear to involve any cash payment to the estates, (ii) does not leave behind any meaningful assets for distribution to creditors of the Debtors' estates, and (iii) does not contemplate confirmation of a chapter 11 plan. These Chapter 11 cases clearly were orchestrated and structured to benefit GenNx and to ensure GenNx

retains its control over the Debtors and their non-debtor foreign subsidiaries, all at the expense of legitimate creditors of the bankruptcy estates.

22. Since acquiring HDR Holding and Schramm in 2012 in a leveraged buyout, GenNx has controlled the Debtors by installing GenNx members, managers, employees, and/or agents as officers (HDR Holding) and directors (HDR Holding and Schramm) of the Debtors. The Debtors' boards of directors were and are conflicted and interested when they approved and/or authorized (i) multiple prior transactions (that have been occurring since the 2012 leveraged buyout) and (ii) current transactions (like the DIP Financing and entry into the Stalking Horse APA), all of which involved GenNx as a key participant in one capacity or another. Then, after a few GenNx appointees resigned from the respective boards just days prior, the Debtor boards authorized the filing of these bankruptcy cases to effectuate all of it. As currently structured, the "plan" is to sell substantially all of the assets to owner GenNx and then convert to Chapter 7 cases, leaving behind the claims of general unsecured creditors like DNOW with no means of recovery.

23. Current management (along with two current directors), rather than preserve precious cash for use in the bankruptcy cases, authorized themselves to receive payment of significant money immediately before the bankruptcy filings and now management are promised jobs in the proposed GenNx stalking horse transaction. (*See* Stalking Horse APA, §6.4.)

24. The Debtors (and their current and former directors and officers, many of whom were beholden to GenNx) clearly have fostered and preferred the interests of a dominant shareholder (GenNx) over the interests of legitimate creditors of these estates, to the extreme detriment of those other disfavored creditors. *See e.g. In re Coram Healthcare Corp.*, 271 B.R. 228 (Bankr. D. Del. 2001) (denying confirmation a second time for lack of good faith involving

actual conflict of interest on part of Debtors' CEO with one of the largest creditors; noting controlling precedent affirming that senior officers of debtor in possession owe fiduciary duties of loyalty to bankruptcy estates).

25. This is not all somehow cured by the Debtors' post-hoc filing of a *Notice of Appointment of Independent Director and Special Committee* to purportedly, without limitation "[explore] the possibilities of either or both (i) seeking financing and (ii) negotiating, proposing, and undertaking a sale, restructuring, reorganization, or other recapitalization transaction and related financing…." [*See* Docket No. 96, filed on July 16, 2019.] That ship had already sailed, under a stain of irreconcilable conflicts and a GenNx-centered course plotted months and probably years before such attempted cleanse. *Id*. at 240 ("The Debtors' hiring of Goldin to 'sprinkle holy water on the situation' does not cure the conflict or evidence good faith.")

26. The deference afforded to decisions of an un-conflicted and disinterested board under the business judgment rule is not applicable here, and these facts cannot support a finding of "good faith". Moreover, the after-the-fact appointment of Mr. Logan simply comes too late (and is too cute by half). The die had already been cast in favor of GenNx, the dominant insider wearing multiple hats. The proposed sale to GenNx, along with the related DIP Financing, were fully baked prior to the appointment of Mr. Logan. Heightened scrutiny is required here. *See e.g. In re Flour City Bagels, LLC*, 557 B.R. 53, 77-82 (Bankr. W.D.N.Y. 2016) (applying heightened scrutiny to deny approval of proposed section 363(b) sale to insider); *In re Los Angeles Dodgers*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (denying approval of proposed financing offered by insider after applying heightened entire fairness standard rather than proffered business judgment standard).

    **B.**    **The Debtors have made no effort to demonstrate that the proposed purchase price set forth in the Stalking Horse APA is a fair price and is in the best interests of creditors and the bankruptcy estates**.

    27.    The Debtors bear the burden under Bankruptcy Code section 363(b) of proving fair process and that the consideration to be provided by GenNx in the proposed sale constitutes a fair price. The Debtors have failed to carry this burden.

    28.    No effort has been made in the Sale Motion to demonstrate why the proposed purchase price set forth in the Stalking Horse APA represents a fair price or is in the best interests of the estates. Schramm's direct and indirect equity interests in the non-debtor Australian Entities (including the two operating companies) are included among the Acquired Assets in the Stalking Horse APA. But there has been no effort to allocate value to the Australian Entities or any other assets (such as equipment, inventory, customer lists, accounts receivable, avoidance actions, and other causes of action). If approved, no value reaches unsecured creditors (who come ahead of GenNx in priority) and these cases will be converted to Chapter 7. No meaningful provision has been made to fund an adequate post-closing wind down, pursuit of any remaining claims and causes of action, or to provide for payment in full of all allowed administrative expense claims, let alone a recovery for general unsecured creditors. The Debtors have failed their burden of proof under section 363(b) of the Bankruptcy Code. *See e.g. Flour City Bagels*, 557 B.R. at 77-80 (denial of proposed sale due, in part, to failure of debtor to offer any direct evidence of value of various assets proposed to be sold to insider; (pages 78-80) noting that proposed sale would render debtor administratively insolvent in light of projected unpaid professional fees; (page 77) court must "expressly find from the evidence presented before him at the hearing a good business reason to grant such an application," *quoting In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *see also In re ICL Holding Co., Inc.*,

802 F.3d 547, 551 (3d. Cir. 2015) (noting bankruptcy courts' application of "sound business purpose" test to section 363(b) sales).

      C.    **GenNx/Schramm II should be denied the right to credit bid any amount in excess of the funded DIP Financing**.

29.    Section 363(k) of the Bankruptcy Code provides that at a section 363(b) sale "of property that is subject to a lien that secures <u>an allowed claim</u>, <u>unless the court for cause orders otherwise</u> the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of the property." 11 U.S.C. §363(k) (emphasis added).

30.    From the plain language of section 363(k), it is "beyond peradventure" a secured creditor does not enjoy an absolute right to credit bid its allowed claim. S*ee In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 59-60 (Bankr. D. Del. 2014) (secured creditor holding allowed claim does not have absolute right to credit bid), *citing, among other cases, In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 315-16 (3d Cir. 2010).

31.    Even though it shoulders the burden of proof, s*ee* 11 U.S.C. §363(p)(2), GenNx has done nothing to prove it even has perfected, allowed prepetition secured claims that would support credit bid rights. Just because GenNx and the Debtors say it (*see, e.g.,* Sale Motion at ¶¶19-20) does not make it so. GenNx actually is required to meet its burden. Because it has not, the Court should find as a matter of law that GenNx is not a secured creditor as to the alleged Term Loan B claims and therefore has no right to credit bid with respect thereto.[9]

32.    Even if GenNx were found somehow to have met its burden, the Creditors' Committee is expected to soon file a complaint (by the September 11 challenge deadline) that,

---

[9] Under the terms and provisions of the DIP Financing Order, GenNx/Schramm II must cash collateralize "any overbids at an Auction that include a crediting of its assumption of any portion of Term Loan B, …." (*See* DIP Financing Order at ¶32.)

among other things, will challenge on multiple grounds the validity, extent, and priority of the GenNx asserted prepetition secured claims.

33. Clearly, at a minimum a bona fide dispute exists with respect to many aspects of GenNx's alleged but thus far unproven prepetition secured claims. Therefore, any asserted credit bid rights with respect to such challenged claims should be denied based upon the plain language of section 363(k) and section 363(p)(2) of the Bankruptcy Code. *See e.g. Fisker*, 510 B.R. at 59-60 (*quoting Philadelphia Newspapers*, 599 F.3d at 315-16, n. 14) ("A court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment"); *Fisker* at page 61 ("The law leaves no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien"); *In re Daufuskie Isl. Props., LLC*, 441 B.R. 60, 64 (Bankr. D. S.C. 2010) (denying credit bid rights of alleged secured mortgage creditor whose claim had been disputed by chapter 11 trustee and by other creditor in separately filed adversary proceedings alleging preferential transfers and various causes of action, including for equitable subordination); *In re Antaeus Technical Servs., Inc.*, 345 B.R. 556, 565 (Bankr. W.D. Va. 2005) (denying right to credit bid to facilitate "fully competitive" cash auction); *In re The Free Lance-Star Publishing Co. of Fredericksburg, VA*, 512 B.R. 798, 800-01, 807-08 (Bankr. E.D. VA. 2014) (curtailing right to credit bid following evidentiary hearing; court found proposed purchaser lacked valid lien on or security interest in certain of the Debtors' assets and therefore had no right to credit bid with respect to those assets; court also found creditor/proposed purchaser "had engaged in inequitable conduct that, under the circumstances, required the Court to limit [proposed purchaser's] credit bid right in order to foster a robust auction").

34. Moreover, the existence of this bona fide dispute enables this Court to sell the Debtors' assets to a purchaser other than GenNx free and clear of any claimed interest of GenNx in such assets. *See* 11 U.S.C. §363(f)(4)(estate property may be sold "free and clear of any interest in such property of an entity other than the estate only if …(4) such interest is in bona fide dispute"); *see also In re L.L. Murphrey Co.*, 2013 WL 2451368, at *4, Case No. 12-03837-8-JRL (Bankr. E.D.N.C. June 6, 2013) (finding assets could be sold free and clear under section 363(f)(4) because trustee had established bona fide dispute as to validity of objecting creditor's asserted liens and secured claims; such dispute regarding extent and validity of asserted liens also constituted cause under section 363(k) to deny such creditor the right to credit bid at public auction) (citations omitted).

**D.    To the extent it is being asked to do so, this Court should not authorize the sale of avoidance actions, the sale of other claims against GenNx and its related entities and persons, or the sale of other claims against current or former officers and directors of the Debtors.**

35. As indicated above (infra, ¶19), there appears to be a conflict between assertions made in the Sale Motion and the definition of Acquired Assets in the Stalking Horse APA with respect to whether avoidance actions under Chapter 5 of the Bankruptcy Code are included as part of the proposed sale to GenNx.

36. To be clear, however, avoidance actions are not property of the estate and are not assets that can or should be sold or otherwise transferred by the Debtors over objections by creditors, particularly where, as here, the actions (including potential valuable causes of action against GenNx and its designees) will be "buried" by GenNx.

37. The avoidance actions are unencumbered, belong to the creditors, and should be preserved and prosecuted for the benefit of all creditors, particularly when viewed under the facts and circumstances of these cases and what the Debtors and GenNx are attempting to do here.

*See Cybergenics Corp. v. Chinery*, 226 F.3d 237, 242-45, 246 n.16 (3d Cir. 2000) ("*Cybergenics I*") (holding fraudulent transfer claims at issue in case were not assets of the Debtor and therefore were not transferred to purchaser of the Debtor's assets; a debtor in possession does not acquire its creditors' fraudulent transfer claims against third parties, but such debtor in possession, in satisfaction of its fiduciary duties, can wield the avoidance powers to recover property for the benefit of all creditors); *In re PWS Holding Corp.*, 303 F.3d 308, 315 (3d Cir. 2002) (fraudulent transfer claims under applicable state law are not assets belonging to debtor in possession, but such claims could be extinguished under terms of confirmed plan of reorganization and related confirmation order); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 580 (3d Cir. 2003) (en banc) ("*Cybergenics II*") (creditors committee may be granted derivative standing to pursue section 544(b) avoidance claims for the benefit of the bankruptcy estate); *In re Gentek Inc.*, 328 B.R. 423, 429 (Bankr. D. Del. 2005) (*Cybergenics I*, in holding that the fraudulent transfer claims at issue had not been transferred, "stated that the causes of action under section 544 were not property of the estate but instead were a power that the debtor could wield for the benefit of all creditors").[10]

38.     It is well-recognized that two primary goals of the Bankruptcy Code are: to maximize the value of the estate for the benefit of creditors and to provide for the equality of treatment of creditors. *See Cybergenics II*, 330 F.3d at 573 (emphasizing trustee's "fiduciary

---

[10] *See also Claridge Assoc., LLC v. Schepis (In re Pursuit Capital Management, LLC)*, 595 B.R. 631, 653-662, 671 (Bankr. D. Del. 2018) (after detailed analysis of *Cybergenics I* and *Cybergenics II*, court declined to rule on whether avoidance actions were property of the estate or whether they may be sold; court held that by virtue of prior entry of final sale order transferring the actions, plaintiffs had standing to bring avoidance actions on behalf of estate; public policy supported pursuit of state and federal law-based fraudulent transfer actions to achieve primary bankruptcy goals of maximizing value of estate for benefit of creditors and providing for equality of treatment of creditors; also noting on page 671: "Fraudulent transfer actions, whether brought under §544(b) or §548, do not belong to a debtor; '[t]hey are creatures of statute, available in bankruptcy solely for the benefit of creditors of the debtor, whose rights the trustee enforces.'" *quoting In re Astropower Liquidating Trust*, 335 B.R. 309 at 326 (Bankr. D. Del. 2005), which in turn was *quoting In re Oakwood Homes*, 2005 WL 670310, at *4-5 (Bankr. D. Del. March 18, 2005)).

duty to maximize the value of the bankruptcy estate"); *In re 15375 Memorial Corp.*, 589 F.3d 605, 618 (3d Cir. 2009).

39. The Debtors indisputably owe a "paramount duty … to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors." *Cybergenics I*, 226 F.3d at 243 (citations omitted). This duty, particularly under the extreme facts and circumstances of these cases, requires that available claims and causes of action be prosecuted for the benefit of creditors that GenNx seeks to leave stranded, holding the proverbial empty bag. *See, e.g.*, *Cybergenics II*, 330 F.3d at 573 ("Fraudulent avoidance actions, such as those provided for in §544(b), are intended to afford unsecured creditors peace of mind, for those creditors are usually the principal victims of managerial misfeasance.")

40. DNOW therefore objects to any term or provision set forth in any proposed sale order or the Stalking Horse APA that would result in the sale, purchase, release, reduction, or satisfaction of (i) any avoidance actions or other claims or causes of action against GenNx or any related or affiliated entity or person; (ii) any avoidance actions or other claims or causes of action against current or former officers or directors of the Debtors; and/or (iii) any avoidance claims or causes of action available under the Bankruptcy Code against any other person or entity, including current or former employees or current or former vendors or suppliers to the Debtors.

41. Based on facts such as those referenced above and as set forth in filings by the Creditors' Committee, avoidance actions and other claims and causes of action will lie, without limitation, against (a) current or former employees who received improper retention bonuses and other payments immediately before the bankruptcy filings; (b) current and former officers and directors of the Debtors who (i) authorized interested transactions that benefitted dominant stockholder GenNx and harmed the Debtors, and (ii) right before bankruptcy, approved

significant payments to themselves for long past-due director fees; and (c) GenNx and its members, managers, employees, and agents, several of whom held officer and director positions with one or more of the Debtors as the Debtors entered into transactions with and at the behest of GenNx. Any such actions and claims should be pursued for the benefit of all creditors and the bankruptcy estates, not buried for the sole benefit of insider GenNx and/or other potential defendants in such actions.

42. In addition, all challenge rights as set forth in the DIP Financing Order must be preserved in full, without prejudice or reduction of any kind, notwithstanding any approval of a sale of assets to GenNx/Schramm II.

### E. The Stalking Horse APA requires clarification in multiple respects.

43. Various statements and/or terms and provisions contained in the Sale Motion and/or the Stalking Horse APA require clarification. For example,

    a. The description of the purchase price for the assets as set forth in the Sale Motion at ¶5 and in section 2.5 of the Stalking Horse APA is vague, imprecise, incomplete, and inadequate.

        i. Paragraph 5 of the Sale Motion provides: "The Stalking Horse [APA] contemplates a value-maximizing purchase price for the Purchased Assets of not less than $10,300,000 plus the balance owing under the Debtors' postpetition secured financing facility estimated to be $6,000,000, consisting of a credit bid and the assumption of certain liabilities as set forth in the Stalking Horse [APA]."

        ii. But then Section 2.5 of the Stalking Horse APA provides: "The aggregate consideration for the sale and transfer of the Acquired Assets (the "Purchase Price") shall be not less than $10,300,000 plus the DIP as of Closing as follows: (a) credit bid or the assumption of the indebtedness outstanding as set forth on <u>Section 2.5 of the Disclosure Schedule</u>; and (b) the assumption of the Assumed Liabilities." (emphasis in original)

        However, the referenced "Section 2.5 of the Disclosure Schedule" is not included with the filings. All exhibits and schedules to the Stalking Horse APA should be filed forthwith so as to provide proper notice to creditors and parties in interest.

    b.    The definition of Assumed Liabilities provides, in relevant part, that GenNx/Schramm II is assuming "all Liabilities under the Assumed Contracts and the Assumed Permits arising from and after the Closing Date (<u>except</u> for any Liabilities incurred by the Seller outside the Ordinary Course of Business and <u>any Liabilities relating to a breach of any Assumed Contract that occurred at or prior to the Closing Date</u>).…" (Stalking Horse APA, Article I, page 2) (emphasis added). Yet, the Stalking Horse APA appears to provide that GenNx/Schramm II is responsible for and shall pay all Cure Amounts relating to Assumed Contracts. (*Id*. at §2.6(e)) The relationship between these provisions of the Stalking Horse APA should be clarified and harmonized.

    c.    Paragraph 25 of the Sale Motion states GenNx/Schramm II will not assume, among other liabilities, "liabilities of the equity in Schramm Australia at the time of closing."[11] Paragraph 26 of the Sale Motion states GenNx/Schramm II "will not assume, nor in any way be liable for or responsible for, any claim or Liability of any Debtor <u>and its Affiliates</u> other than the Assumed Obligations." (emphasis added.) With attempted inclusion of provisions like these, the Debtors and GenNx appear to be requesting relief from this Court with respect to non-debtors, and perhaps even with respect to Australian law. This is not appropriate.

    d.    Paragraph 32 of the Sale Motion states that "[GenNx] shall prepare and deliver to the Debtors an allocation schedule setting forth [GenNx]'s good faith determination of

---

[11] *See also* Stalking Horse APA at §2.4. "For the avoidance of doubt, upon the transfer of the Seller's equity in Schramm Australia at the Closing, the liabilities of Schramm Australia shall not be Assumed Liabilities of Buyer, but rather will remain liabilities only of Schramm Australia."

{01478301;v5}        17

the allocation of the Purchase Price and Assumed Obligations among the Acquired Assets within thirty (30) days of the Closing Date." Yet, section 2.9 of the Stalking Horse APA provides that "[W]ithin thirty (30) calendar days after the Closing Date, <u>Seller and Buyer shall jointly</u> and in good faith prepare an allocation of the Purchase Price (and all other capitalized costs) among the Acquired Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder.…" (emphasis added.) Any allocation of the Purchase Price should be prepared jointly among the Debtors and Buyer, with the Creditors' Committee having involvement, consultation rights, and an opportunity to raise concerns with the Court.

    e.  The Stalking Horse APA is unclear and requires clarification as to the disposition of assets or potential assets (e.g., actual or potential tax refunds or other tax attributes, security deposits, rights under contracts that are not Assumed Contracts, etc.) not specifically covered under the definition of Acquired Assets.

    f.  Paragraph 33 of the Sale Motion, addressing the issue of access to the books and records of the Debtors, appears on its face to be inconsistent with provisions of the Stalking Horse APA. (*See* Stalking Horse APA, §§2.1(g), 6.3.) The bankruptcy estates, through duly authorized representatives, require access to books and records even after any sale closing. This issue, and the inconsistencies highlighted herein, must be addressed in satisfactory fashion in connection with any approved sale.

  **F.**  **GenNx/Schramm II is not entitled to a section 363(m) good faith finding**.

44.  For the reasons stated above and in the Creditors' Committee Sale Objection, DNOW objects to a finding of good faith under section 363(m) in favor of GenNx/Schramm II.

G.  **The automatic stay provided under Bankruptcy Rules 6004(h) and 6006(d) should not be waived under the facts and circumstances of these cases**.

45. DNOW objects to the request by the Debtors for a waiver of the automatic 14 day stay afforded under Bankruptcy Rules 6004(h) and 6006(d). (Sale Motion, ¶¶62-63). The reasons proffered by the Debtors fail to justify waiver of these important protections granted with respect to entry of any sale order here.

## RESERVATION OF RIGHTS

46. DNOW reserves all rights to review and object to the terms and provisions of any proposed form of sale order tendered to the Court in connection with the scheduled September 16 sale hearing or otherwise.[12]

47. DNOW reserves the right to amend or supplement this Objection and Joinder at any time prior to any hearing held on the Sale Motion or to raise any argument at any such hearing. DNOW expressly reserves all rights, claims, causes of action, defenses, and arguments as against all persons and entities.

[Remainder of page intentionally left blank]

---

[12] Footnote 4 of the Sale Motion states that a proposed form of sale order "will be filed with the Court on the date that [is] no later than three (3) calendar days prior to the Sale Hearing." The form of proposed sale order, along with any proposed amendments and schedules to the Stalking Horse APA, could be and should be filed sooner than that so that creditors have a full and fair opportunity to review and provide comments or objections.

WHEREFORE, for the reasons stated above and in the Creditors' Committee Sale Objection, DNOW respectfully requests (i) that the Sale Motion be denied, or (ii) in the alternative, that any order entered with respect to the remaining relief requested by the Sale Motion be consistent with the above and the Creditors' Committee Sale Objection, and (iii) such other and further relief as this Court deems just and proper.

Dated: September 6, 2019

**ASHBY & GEDDES, P.A.**

*/s/ Michael D. DeBaecke*

Michael D. DeBaecke (DE #3186)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19801
Tel: 302-654-1888
Fax: 302-654-2067
Email: mdebaecke@ashbygeddes.com

*Attorneys for DNOW L.P.*