## IN THE UNITED STATES BANKUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HDR HOLDING, INC., *et al.*,[1] | Case No. 19-11396 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:  September 16, 2019, at 10:30 a.m. (ET)**<br>**Objection Deadline:  August 30, 2019 at 4:00 p.m. (ET)**<br>**(extended for the Committee)**<br>**Related Docket No. 18** |

### PRELIMINARY OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (the "Debtors"), submits this preliminary objection (the "Objection") to Debtors' proposed sale of assets (the "Sale") to Schramm II Inc. (the "Stalking Horse") pursuant to the *Debtors' Motion for Entry of Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (Docket No. 18) (the "Sale Motion").[2]  In support of this Objection, the Committee respectfully states as follows:

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  HDR Holding, Inc. (2015) and Schramm, Inc. (0480).  The Debtors' mailing address is 800 E. Virginia Ave., West Chester, PA 19380.

[2]      On August 7, 2019 the Court entered an Order approving Bidding Procedures (Docket No. 163) (the "Bidding Procedures Order").  The Bidding Procedures Order set the following deadlines in connection with the proposed sale: (a) "Qualified Bid," September 6, 2019; (b) "Committee Sale Objection," September 6, 2019; (c) "Auction," September 12, 2019; (d) "Auction Objection," September 13, 2019 and (e) "Sale Hearing," September 16, 2019.  The Committee is compelled to file this Objection in advance of the Qualified Bid, Auction, Auction Objection and Sale Hearing deadlines, and reserves the right to supplement or amend the Objection, as may be

## PRELIMINARY STATEMENT[3]

1.      The Committee remains optimistic that the Auction scheduled for September 12th will generate greater value for the Debtors' estates than the proposed Sale to the Stalking Horse Bidder (an entity owned and controlled by an insider of the Debtors).  To the extent the Auction fails to yield a higher and better bid, or some other value maximizing transaction, the proposed Sale to the Stalking Horse Bidder must be denied, or substantially modified, to protect and preserve value for the Debtors' estates.

2.      More specifically, the Sale to the Stalking Horse Bidder must be denied because, among other reasons: (a) the sale price is neither fair nor reasonable; (b) no sound business purpose exists for a sale that unfairly favors a few while leaving the Debtors' estates administratively insolvent; (c) the Sale violates the Bankruptcy Code and applicable law by, among other things, transferring certain estate claims and causes of action, including avoidance actions to the Stalking Horse Bidder, and, seemingly, looking to limit or cut back any potential liabilities that may arise by virtue of the Stalking Horse Bidder's proposed purchase of the Schramm Australia Equity Interests; (d) the Sale is not in the best interests of the Debtors' estates; and (e) the Sale was not negotiated or proposed in good faith.

3.      As noted in the Committee's objection to the Bidding Procedures Order (Docket No. 129), the relief requested by the Sale Motion has been engineered by, and for the exclusive benefit of, the Debtors' controlling shareholder, GenNx360 Capital Partners, L.P. ("GenNx360").  If the Sale is approved, GenNx360 (the controlling shareholder, the guarantor of the Debtors' Term A Lender Loan obligations, the holder of the alleged Term B Lender Loan

---

necessary.  Capitalized terms used in this Objection have the meaning ascribed to them in the Bidding Procedures Order, the Sale Motion or the Asset Purchase Agreement (the "Stalking Horse APA") attached to the Sale Motion.

[3]      The Committee reserves all rights and objections to the Auction and any modified or alternative sale transaction that may be presented to the Court.

#55059445 v4

obligations, the holder of 50% of the Term C Lender Loan obligations, and - through its wholly owned subsidiary Schramm II –the DIP Lender and Stalking Horse Bidder) will walk away with substantially all of the Debtors' assets (including, potentially, unencumbered assets) for nothing more than the cost of its (x) guaranty to the Term A Loan Lenders and (y) the committed DIP financing. While the Sale may represent a sound business decision for GenNx360 and the Stalking Horse Bidder – *i.e.* washing the Debtors assets through a bankruptcy sale; avoiding state court foreclosure proceedings; potentially obtaining assets free and clear of liens – the Sale does not represent a sound business purpose for the Debtors. Indeed, the proposed Sale of the Schramm Australia Equity Interests for an unknown value, when Schramm Australia owes the Debtors' a considerable $11 million plus payable to the Debtors seems to have no business purpose, other than ceding control of Schramm Australia to GenNx360, while the payable remains unpaid and outstanding. (From the Committee's perspective, at a minimum, the Schramm Australia Equity Interests should not be sold or transferred to the Stalking Horse Bidder, until the liabilities owed by Schramm Australia to the Debtors are paid in full.)

4.     The Sale to the Stalking Horse Bidder also fails to provide any benefit to the unsecured claims left behind after the Sale. More importantly, the proposed transactions will likely result in administratively insolvent bankruptcy estates, while stripping the estates of potentially valuable claims and causes of action the estates may hold against GenNx360, the Debtors' former directors, officers, employees, and past and present shareholders.

5.     There is no dispute, the Debtors have struggled under the majority control and grip of GenNx360 since GenNx360's leveraged buyout of the Debtors in 2012.[4] For example,

---

[4]     GenNX360, and its affiliate CMS/GenNx360 Capital Fund L.P. became the controlling 97% (or greater) shareholders of Schramm in June of 2012 pursuant to a plan of merger (the "2012 Merger"). The Committee continues to investigate the nature, extent and validity of the 2012 Merger. Since the 2012 Merger GenNx360 has appointed the majority of the directors to the Debtors' Board of Directors and has actively been involved in the

what was reportedly a $150 million plus enterprise in 2012, drastically fell to a $22.4 million or less enterprise by the end of 2017.   In an attempt to right the ship, in late 2018, the Debtors launched, under the control and direction of GenNx360, a limited and ultimately unsuccessful process to raise capital/equity.  The "capital/equity raise," which serves as the very foundation and bedrock for the sale process currently before the Court, was not "extensive and comprehensive" despite Debtors' representations in the various First Day Pleadings and the Declarations in Support of the First Day Pleadings.

6.      For reasons not yet known to the Committee, the capital/equity raise failed.  The Debtors subsequently limped into this Court in dire need of liquidity, with the Stalking Horse APA in hand, and no exit strategy other than to convert their cases to cases under Chapter 7 of the Bankruptcy Code after consummation of the Sale to Schramm II.

7.      By all accounts, prior to the Petition Date, the Debtors' Boards of Directors (which consisted of identical directors, the majority of which were beholden to, or controlled by GenNx360) were conflicted and lacked the ability to negotiate an arm's length asset purchase agreement.[5]  The conflicted Boards' approval of the transaction before the Court raises substantial questions, which the Debtors and GenNx360 must answer to carry their heavy burden before the Court, as to: (a) whether the sale price is fair and reasonable; (b) whether the Sale is in the best interest of creditors; (c) whether a sound business purpose exists for the Sale; (d)

---

Debtors' key management and restructuring decisions.  Indeed, GenNx360 Management charged a management fee for services rendered to the Debtors.  The Debtors stopped paying the management fee sometime in 2014.  However, the unpaid management fees continued to accrue through the Petition Date and are reflected in Schramm's Schedules and Statements.  GenNx360 is also an absolute and unconditional guarantor of the "Term Loan A" obligations allegedly due and owing under the Debtors' 2016 Amended and Restated Credit Facility (as discussed more fully below).  GenNx360 has purportedly recently paid $11.0 million to the Term Loan A Lenders under the guaranty, and is arguably on-the-hook for the balance of the facility should it not be paid by the Debtors

[5]      The fact that the Debtors appointed an independent director, after-the-fact, does not cure the problems with the proposed Stalking Horse APA.  Rather, it highlights the flawed and fatal process initiated by a Board controlled by the GenNx360.

whether the Sale has been proposed in good faith; (e) what assets are being sold to the Stalking Horse Bidder; and (f) what value is being ascribed to those assets.

8.      In the end, regardless of how the Debtors may have found their way to this Court, the Debtors' restructuring and sale options are extremely limited, if not dire.  **The limited options, however, do not justify the Sale to the Stalking Horse Bidder at a cost that provides no benefit to the Debtors' estates.  Nor do the limited options lessen the Debtors' heightened burden before the Court.**  Because the Debtors are unable to sustain their heightened burden before the Court, the Sale to the Stalking Horse Bidder must be denied.

## OBJECTION

### I.      Legal Standards Applicable to the Sale

9.      Depending upon the results of the Auction, various standards may apply to the Court's analysis of the proposed Sale.  These standards include:

### (a)      Approval of a Sale under Section 363(b)

10.      Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

11.      The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See*, *e.g.*, *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997); *see also In re Cybergenics Corp.*, 330 F.3d 548, 573 (3d Cir. 2003) (*en banc*) (debtor has a fiduciary duty to maximize the value of the bankruptcy estate).

12.      To accomplish this goal, bankruptcy courts are necessarily given discretion and latitude in conducting a sale of a debtor's assets.  *In re Wintz Co.*, 219 F.3d 807, 812 (8th Cir. 2000) (stating that in structuring the sale of assets, the courts "have ample latitude to strike a

#55059445 v4

satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets").

13.     In determining whether to authorize the use, sale or lease of property of the estate under § 363(b), courts require the debtor to show that a sound business purpose justifies such actions.  *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991); *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983).

14.     As discussed more fully below, the Stalking Horse APA fails to meet the paramount goal of maximizing the proceeds received by the estates, and the Debtors have not shown that a sound business purpose justifies a sale pursuant to the terms of the Stalking Horse APA.

### (b)     Approval of a Sale to an Insider is Subject to Strict Scrutiny

15.     Where a debtor seeks to sell substantially all of its assets to an insider, such transaction is subject to strict scrutiny.  Transactions involving an insider require a showing that the transaction is entirely fair.  *See Pepper v. Litton,* 308 U.S. 295 (1939) (holding that insider transactions in the bankruptcy context are "subject to rigorous scrutiny"); *In re Global Ocean Carriers Ltd.,* 251 B.R. 31, 48 (Bankr. D. Del. 2000) (sales to insiders are subject to special scrutiny in bankruptcy cases").  *See* S.Rep. No. 95-989, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 5787, 5810 (recognizing where a sale has been orchestrated between insiders, the transaction must be subjected to heightened scrutiny).

16.     Under this standard, a debtor must show that a transaction is entirely fair both in terms of "fair dealing" and "fair price".  *In re Coram Healthcare Corp.,* 271 B.R. 228, 239 (Bankr. D. Del. 2001) (requiring a determination that the plan was "entirely fair" because it dealt with a transaction between a company and its controlling shareholder).

6

17.     Fair dealing examines the timing, initiation, negotiation and structure of a

transaction. *In re Zenith Electrics Corp.,* 241 B.R. 92, 108 (Bankr. D. Del. 1999) (citing

*Weinberger v. UOP, Inc.,* 457 A.2d 701, 711 (Del. 1983)).  Fair price examines the economics.

*Id*.  Evaluating an insider transaction for entire fairness requires a court to ensure that insiders do

not receive "more favorable terms at the expense of impaired creditors."  *Id.*

18.     Here, the proposed Sale fails both prongs of the entire fairness review.  By all

accounts, the Debtors did not conduct a formal marketing or sale process upon the retention of

FocalPoint.  Rather, the Debtors, and GenNx360, simply explored, through FocalPoint, the

possibility of raising additional capital/equity in late 2018.  The process also lead to a 60 day

lock-up/exclusive period, that prevented the Debtors from marketing the investment or their

assets to another potential buyer.  The deficient process resulted in a proposed Sale process that

provides no value to these estates while stripping the estates of valuable causes of action.

**(c)     Approval of a Sale Outside of a Plan and Disclosure Statement Must be
Supported by a Sound Business Reason for Conducting Such Sale, and a
<u>Strong Showing that the Sale is in the Best Interest of Creditors</u>**

19.     "[I]n the absence of the protection and finality offered by a disclosure statement

and plan, . . . [a] sale [pursuant to Section 363(b)] must be closely scrutinized, and the proponent

bears a heightened burden of proving the elements necessary for authorization."  *In re George*

*Walsh Chevrolet, Inc.*, 118 B.R. 99, 101 (Bankr. E.D. Mo. 1990); *see also In re Industrial Valley*

*Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).  A pre-

confirmation sale must "further the diverse interests of the debtor, creditors and equity holders

alike."  *Id.* at 1071.  Appeasement of major creditors, including a debtor's secured creditor, is not

a sound business reason for conducting a sale.  *In re Crutcher Resources Corp.*, 72 B.R. 628, 631

(Bankr. N.D. Tex. 1987).

#55059445 v4

20.     When a debtor proposes to sell substantially all of its assets, without affording its creditors the protections of the disclosure statement and plan confirmation process, it must both articulate a sound business reason for conducting such a sale, and make a strong showing that the sale is in the best interests of its estate. *In re Industrial Valley*, 77 B.R. at 21 (reconciling *In re Abbotts Dairies of Pa., Inc.*, 788 F. 2d 143 (3d Cir. 1986) with *In re Solar Mfg. Corp.*, 176 F.2d 493 (3d Cir. 1949)); *Stephens Indus., Inc. v. McClung*, 789 F. 2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F. 2d 1063 (2d Cir. 1983).

21.     To demonstrate that the sale is in the best interests of the estate, the debtor must show that the sale is fair and reasonable, that it has been given adequate marketing, that it was negotiated and proposed in good faith, and that the purchaser has acted in good faith throughout the sale process. *See In re Abbotts Dairies of Pa., Inc.*, 788 F. 2d 143 (3d Cir. 1986); *Industrial Valley*, 77 B.R. at 21; *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 842-43 (Bankr. C.D. Cal. 1991); *Matter of Phoenix Steel Corp.,* 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176-77 (D. Del. 1991). The Debtors have not demonstrated that the Sale is in the best interests of the estates on the record before this Court.

**(d)     A Section 363(m) Finding is Not Appropriate if the Sale is Not Proposed in Good Faith**

22.     The Third Circuit set forth the standard for determining whether a purchaser acted in good faith in *In re Abbotts Dairies,* 788 F.2d at 148-49. Good faith speaks to the integrity of the purchaser's conduct during the course of the sale proceedings. *Id.* Conduct that destroys good faith includes fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders. *Id.* The *Abbotts Dairies* Court held that insider dealings may destroy the good faith of the purchaser. *Id.* (employment agreement with management of debtor, and "hope" that personal guaranties would be waived);

8

*Industrial Valley,* 77 B.R. at 22 (five-year employment agreement with principal of debtor and commercial lease with family member of principal improperly chilled bidding).

23.        In both *Abbotts Dairies* and *Industrial Valley*, the proposed purchaser was not an insider of the debtor, but the courts nevertheless found that perks provided by the purchaser to the insiders improperly influenced the auction.  The Debtors and Purchaser have not provided evidence sufficient to support a good faith finding on the record before this Court.

**(e)        Approval of the Sale or Transfer of Estate Claims and Causes of Action, Including Avoidance Actions**

24.        Certain estate claims and causes of action, such as fraudulent transfer clams are not property of the Debtors' estates and, therefore, cannot be sold under section 363.  *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 245 (3d Cir. 2000) (holding that the power to avoid fraudulent transfers is not a personal asset of the bankruptcy estate and is akin to the power of a public official to carry out specific duties which may not be delegated); *In re PWS Holding Corp.,* 303 F.3d 308 (3d Cir. 2002) (fraudulent transfer claims under applicable state law are not assets belonging to the debtor in possession, but such claims could be extinguished under terms of a confirmed plan of reorganization and related confirmation order); *see also In re Jalal Parirokh*, Case No. DG 11-05409 (Bankr. W.D. Mich., May 2, 2013) (holding that "Avoidance Actions are not property of the estate which the Trustee can sell under § 363(b)."); *In re Metro. Elec. Mfg. Co.*, 295 B.R. 7, 13 (Bankr. E.D.N.Y. 2003) (stating that because the "authority to bring avoidance actions under the various sections of the Bankruptcy Code is specific to the trustee or debtor in possession, cases entertaining a request for a 'transfer' of such right are rare, and are rarely granted.").

25.        It does not appear that the Third Circuit  has definitively addressed whether avoidance actions are property of a debtor's estate, or whether such claims or a trustee's right to

pursue avoidance actions can be sold.   *See*, *Claridge Assocs. LLC v. Schepis (In re Pursuit Capital Management, LLC)* 595 B.R. 631, 653-662, 671 (Bankr. D. Del. 2018) (Court stating "[c]ontrary to Defendants' position, the Third Circuit has not determined whether avoidance actions are property of the estate or whether such claims or a trustee's right to pursue avoidance actions can be sold. As set forth above, *Cybergenics I* did not decide either of these matters as the agreement at issue did not purport to sell either. But, in *dicta*, the Court does posit that if property of the estate were at issue, the Court would not change its conclusion.  The Court recognized that, with a few exceptions, property of the estate contains only a debtor's interest in property as of the bankruptcy filing. Citing to § 541, the Court also recognized that 'property of the estate' is a term of art under the Bankruptcy Code. Thus, if the question were squarely before it, it is certainly possible that the Third Circuit might conclude that state-law based avoidance actions are not property of the estate, though that might not answer the question whether avoidance actions, or some aspect of them, may be sold.") (internal citations omitted).  The Debtors have not carried their burden of demonstrating that the claims and causes of action can be sold.

26.     Applying the above standards to the proposed Sale to the Stalking Horse Bidder[6] should be denied.

**II.     The Sale Price is Not Fair and Reasonable and Not in the Best Interest of the Debtors' Estates**

    **(a)     The Stalking Horse Seeks to Purchase Assets Not Identified in the Stalking Horse APA**

27.     The Debtors have the burden to prove the sale price is fair and reasonable.   The Debtors fail to satisfy their burden.  Indeed, material differences exist between the Stalking

---

[6]      The Committee reserves the right to supplement this Objection in the event a Successful Bidder is announced as a result of the Auction.

Horse APA and the Sale Motion.  The differences include inconsistent descriptions of the assets to be acquired (identified as "Acquired Assets" under the Stalking Horse APA and "Purchased Assets" under the Sale Motion) as well as the Purchase Price to be paid for the assets.

28.    Unless modified and clarified, the differences militate against approval of the Sale to the Stalking Horse Bidder.

29.    **The Uncertainty around What Assets are being Acquired under the Stalking Horse APA.**  Section 2.1(a)-(q) of the Stalking Horse APA identifies the assets to be acquired, the "Acquired Assets," by the Stalking Horse Bidder.  ***Section 2.1(a)-(q) fails to identify estate claims or causes of action, including fraudulent transfer claims and claims against the Debtors' directors, officers and employees, as an Acquired Asset.***  Yet paragraph 23 of the Sale Motion identifies the assets to be purchased as "[t]he Purchased Assets include avoidance actions arising from or related to any contract or other obligation that will be assumed and assigned to the purchaser as part of any Sale Transaction."

30.    Given the material differences as to what assets are being purchased, the Court cannot determine whether the sale price is fair and reasonable.

31.    **The Sale and Transfer of Estate Claims and Causes of Action.**  A fair and reasonable price cannot be determined to the extent the Stalking Horse Bidder seeks to purchase any estate claims or causes of action, including avoidance actions (all of which the Committee believes haves significant value).

32.    No value is attributed to the estate claims and causes of action to be sold or transferred to the Stalking Horse Bidder.  More importantly, the claims, causes of action are not property of the Debtors' estates and, therefore, cannot be sold under section 363.  *In re Cybergenics Corp.*, 226 F.3d at 245 (holding that the power to avoid fraudulent transfers is not a personal asset of the bankruptcy estate and is akin to the power of a public official to carry out

11

specific duties which may not be delegated); *see also In re Jalal Parirokh*, Case No. DG 11-05409 (Bankr. W.D. Mich., May 2, 2013) (holding that "Avoidance Actions are not property of the estate which the Trustee can sell under § 363(b)."); *In re Metro. Elec. Mfg. Co.*, 295 B.R. at 13 (stating that because the "authority to bring avoidance actions under the various sections of the Bankruptcy Code is specific to the trustee or debtor in possession, cases entertaining a request for a 'transfer' of such right are rare, and are rarely granted.").

33.    The proposed sale of such claims and causes of action to the Stalking Horse Bidder, for no identifiable consideration, evidences the sale price is not fair and reasonable.

34.    To the extent the Stalking Horse, or Successful Bidder, desires to "maintain supplier and vendor relationships after consummation of the sale," the Stalking Horse, or Successful Bidder, can simply designate the supplier and vendor's agreement as an agreement to be assumed and assigned and cured as part of the Sale.

35.    Under no circumstance should the Debtors be authorized to sell or transfer any estate claims or causes of action to the Stalking Horse, or Successful Bidder, especially without the payment of adequate consideration to the Debtors' estates for the transfer of such claims.

36.    **The Modulating Purchase Price.**  Paragraph 6 of the Bidding Procedures Order identifies the Purchase Price for the Acquired Assets at $11,347,722.47.   In contrast, Section 2.5 of the Stalking Horse APA identifies the Purchase Price for the Acquired Assets as "[t]he aggregate consideration for the sale and transfer of the Acquired Assets shall not be less than $10,300,000 **plus** the DIP as of the Closing as follows: (a) credit bid or the assumption of the Indebtedness outstanding as set forth on Schedule 2.5 of the Disclosure Schedule; and (b) the assumption of Assumed Liabilities," while paragraph 5 of the Sale Motion identifies the Purchase Price at "not less than $10,300,000 plus the balance owing under the Debtors'

#55059445 v4

postpetition secured financing facility estimated to be $6,000,000, consisting of a credit bid and the assumption of certain liabilities as set forth in the Stalking Horse APA."

37.     Assuming no competing bids are received at the Auction, the Committee understands that the Stalking Horse is to pay: (a) $11,347,722.47 for the Acquired Assets **plus** (b) any amounts due under the Assumed Liabilities identified in the Stalking Horse APA.  (The amounts due and payable for any Assumed Liabilities is separate and distinct from (and in addition to) the proposed $11,347,722.47 Purchase Price.)  The amounts due and payable for any Assumed Liabilities should be disclosed, and sufficient funds should be deposited to insure payment of such liabilities.  In the absence of identifying the amounts of the Assumed Liabilities, the sale price is not fair and reasonable.  Nor is it in the best interests of the Debtors' estates, and the Sale to Schramm II should not be approved.

38.     **The Need to Post Cash for Unencumbered Assets.**  More importantly, paragraph 32 of the Procedures Order, the Stalking Horse is authorized to credit bid at the Auction the "DIP Obligations, DIP Liens and DIP Superpriority Claim."   The DIP Obligations, DIP Liens and DIP Superpriority Claim do not include Avoidance Actions and the rents, offspring, profits and proceeds of any Avoidance Actions.  (Bidding Procedures Order, Docket No. 163, at 32.)  Thus, to the extent the Court would allow the sale or transfer of estate claims and causes of action to the Stalking Horse Bidder, the Stalking Horse Bidder must bid cash for such assets at the Auction.  The failure to pay cash for unencumbered assets also evidences the sale price is not fair and reasonable.  Nor is it in the best interests of the Debtors' estates.

39.     Similarly, the Stalking Horse Bidder should also be required to identify and pay cash for any other unencumbered assets (*i.e.* such as amounts being paid for the unencumbered portion of the Schramm Australia Equity Interests and any other unencumbered assets) it seeks to

purchase.   Failure to do so evidences the sale price is not fair and reasonable, and not in the best interests of the Debtors' estates.

40.    **The Need to Fund Administrative Expense Claims, Including Section 503(b)(9) Claims and Assumed Liabilities**.  The Stalking Horse APA does not adequately address the administrative expenses the estates that may accrue up to the Closing of the Sale. The Committee's concerns are magnified by several factors.

41.    The Stalking Horse APA identifies "Assumed Liabilities" as:

 "Assumed Liabilities"   means (a) all Liabilities under the Assumed Contracts and the Assumed Permits arising from and after the Closing Date (except for any Liabilities incurred by the Seller outside the Ordinary Course of Business and any Liabilities relating to a breach of any Assumed Contract that occurred at or prior to the Closing Date); (b) all accounts payable arising after the petition Date in the Ordinary Course of Business and not paid by Seller; (c) all accounts payable to the extent they become allowed claims in the Seller's Chapter 11 Case under section 503(b)(9) of the Bankruptcy Code; and (d) all Liabilities consisting of amounts Buyer has agreed to pay hereunder (including all Cure Amounts).

42.    The Stalking Horse Bidder has yet to identify the contracts it wishes to have assumed and assigned to it under the Stalking Horse APA.   Accounts payable, cure amounts, section 503(b)(9) claims and liabilities the Stalking Horse Bidder have also not been identified.

43.    The Committee remains concerned that the Stalking Horse APA contemplates the transfer of substantially all of the Debtors' assets, but does not provide for the assumption of all liabilities incurred in connection with running the business through the Closing Date. Consequently, the Committee believes a serious risk exists that certain liabilities which relate to running the business will be left behind without an adequate payment source.  **Stated differently, the Debtors are essentially running their business for the benefit of GenNx360, the prepetition Term A Loan Lenders and the Stalking Horse Bidder.**  These parties directly benefit from the Debtors' bankruptcy filings by, *inter alia*, using the Bankruptcy Court and

14

Auction process to implement a sale of assets in lieu of state court foreclosure proceedings or a secured party sale. They also are realizing a higher recovery than they might otherwise obtain outside of the Bankruptcy Court. Yet, the estates may be left administratively insolvent following the Sale to the Stalking Horse Bidder. A failure to pay the freight evidences that the sale price is not fair and reasonable and not in the best interests of the Debtors' estates. As such, the Sale to the Stalking Horse Bidder should not be approved.

44.     To this end, the Stalking Horse APA should be modified to either specifically provide that all post-petition administrative expenses are being assumed, provide for sufficient funds to cover unassumed post-petition administrative expenses, or provide for the proration of post-petition expenses such that the Debtors' estates are not forced to pay expenses which only benefit GenNx360, the Stalking Horse Bidder or the Term A Loan Lender. The Court should also specifically reserve the issue of how funds received from the Stalking Horse Bidder are to be disbursed post-closing.

45.     In short, the Stalking Horse APA does not provide the Court with the clarity needed to determine whether the sale price is fair and reasonable, or if the Sale is in the best interest of the Debtors' estates. Unable to satisfy its burden, the Sale to the Stalking Horse Bidder should be denied.

**III.     No Sound Business Purpose Exists for the Sale to the Stalking Horse Bidder**

46.     The Debtors have the burden to prove a sound business purpose exists for the Sale to the Stalking Horse Bidder.

47.     Each of the items noted above (the uncertainty around the assets to be acquired; the sale and transfer of estate claims and causes of action; the modulating purchase price; the need to post cash for unencumbered assets; and the need to fund administrative liabilities and

15

assumed liabilities) evidence the lack of a sound business purpose supporting the Sale to the Stalking Horse Bidder.

## IV.    The Sale Violates the Bankruptcy Code and Applicable Law

48.    The proposed sale or transfer of certain of the estates' claims and causes of action to the Stalking Horse Bidder violates the Bankruptcy Code.  *In re Cybergenics Corp.*, 226 F.3d at 245 (holding that the power to avoid fraudulent transfers is not a personal asset of the bankruptcy estate and is akin to the power of a public official to carry out specific duties which may not be delegated); *In re PWS Holding Corp.,* 303 F.3d 308 (3d Cir. 2002) (fraudulent transfer claims under applicable state law are not assets belonging to the debtor in possession, but such claims could be extinguished under terms of a confirmed plan of reorganization and related confirmation order); *see also In re Jalal Parirokh*, Case No. DG 11-05409 (Bankr. W.D. Mich., May 2, 2013) (holding that "Avoidance Actions are not property of the estate which the Trustee can sell under § 363(b)."); *In re Metro. Elec. Mfg. Co.*, 295 B.R. at 13 (stating that because the "authority to bring avoidance actions under the various sections of the Bankruptcy Code is specific to the trustee or debtor in possession, cases entertaining a request for a 'transfer' of such right are rare, and are rarely granted.")

49.    In addition to the inappropriate transfer and sale of certain of the estates' claims and causes of action to the Stalking Horse Bidder, Section 2.4 of the Stalking Horse APA appears to request the insulate the liabilities of Schramm Australia from the Schramm Australia Equity Interests being purchased by the Stalking Horse Bidder.  Specifically , the last paragraph of Section 2.4 states: "[f]or the avoidance of doubt, upon the transfer of the Seller's equity in Schramm Australia at the Closing, the liabilities of Schramm Australia shall not be Assumed Liabilities of Buyer, but rather remain liabilities of Schramm Australia."   Schramm Australia is not a debtor in these cases, and the Court lacks authority over Schramm Australia, including any

16

authority to alter or impair the liabilities of Schramm Australia or the liabilities that may be owed by a holder of an equity interest in Schramm Australia. As such, the paragraph should be stricken from the Stalking Horse APA.

## V.    The Sale has Not been Proposed in Good Faith

50.    The Stalking Horse Bidder is an affiliate of GenNx360 (the majority shareholder, alleged prepetition lender and now DIP Lender). The Stalking Horse Bidder is clearly an insider of the Debtors within the meaning of section 101(25) of the Bankruptcy Code. *See In re Missionary Baptist Foundation, Inc*., 712 F. 2d 206, 210 (5th Cir. 1983) (an insider of an affiliate of a debtor is an insider of a debtor). Where a sale has been orchestrated between insiders, the transaction must be subjected to heightened scrutiny. *See* S.Rep. No. 95-989, 95th Cong., 2d Sess., *reprinted in* [1978] U.S. Code Cong. & Admin. News, pp. 5787, 5810.

51.    When an insider plays the role of stalking horse, there is a grave danger that other prospective buyers may suspect that the "fix is in." This is particularly true here.

52.    Good faith speaks to the integrity of the purchaser's conduct during the course of the sale proceedings. *In re Abbotts Dairies,* 788 F.2d at 148-49. Conduct that destroys good faith includes fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders. *Id.* **Insider dealings may destroy the good faith of the purchaser.** *Id.* (employment agreement with management of debtor, and "hope" that personal guaranties would be waived); *Industrial Valley,* 77 B.R. at 22 (five-year employment agreement with principal of debtor and commercial lease with family member of principal improperly chilled bidding).

53.    Perks provided by a purchaser to insiders may improperly influence the Auction. In the present case, the Court may recall the testimony presented at the Bidding Procedures Hearing that days before commencing these cases, the Debtors' senior management

and Board of Directors authorized and approved the payment of approximately $176,000 of

certain employee retention bonuses, as well as the payment of $150,000 of prepetition Director's

fees.   Upon information and belief, substantial bonus payments may have been paid out to the

Debtors' employees in early to mid-2016 following the Debtors' sale of its West Chester,

Pennsylvania headquarters to a third party buyer.  The Debtors' approval and payment of the

bonuses and prepetition Director's fees at a time of insolvency and on the precipice of filing for

bankruptcy protection, raises serious questions as to the Schramm Board of Directors' business

judgment and independence.  It also raises serious questions as to the Directors, Officers and

employees' disinterestedness and independence in the outcome of the Sale transaction before the

Court, especially if the Sale to the Stalking Horse Bidder is not approved, and the Debtors'

estates proceed forward with claims against such Directors, Officers or employees.  Stated

simply, the various claims the Debtors' estates may hold against the Debtors' Directors, Officers

and employees, including substantial potentially fraudulent transfers and conveyances claims

casts a dark shadow over the proposed Sale to the Stalking Horse Bidder.

      54.      The pall over the Sale expands exponentially when the Court considers the

inequitable prepetition conduct of GenNx360 including, but not limited to: (a) controlling the

limited prepetition capital/equity raise that serves as the foundation for the sale process before

the Court; (b) saddling Schramm with over $80 million of debt to fund GenNx360's purchase of

Schramm from Schramm's former shareholders; (c) failing to fund a $7.5 million equity

contribution as required by certain loan documents; (d) forcing Schramm to convert a $2 Million

Equity Contribution, which GenNx360 was required to fund pursuant to certain other loan

documents, into a purportedly secured debt obligation; and (e) forcing Schramm to exchange

$6.0 million of equity and/or unperfected and unsecured debt purportedly owed to GenNx360 for

$6.5 million of secured debt purportedly owed to GenNx360.

18

55.     The Committee has been granted standing to challenge the prepetition lenders' Prepetition Liens and Claim Matters pursuant to paragraph 16 of the Bidding Procedures Order. The Committee anticipates filing its complaint on or before the Challenge Deadline, September 11, 2019.  The complaint will include Counts for fraudulent transfer, equitable subordination, recharacterization, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. The Complaint and Counts therein provide further support for the lack of good faith in proposing the Sale to the Stalking Horse Bidder.

## CONCLUSION

The Committee remains hopeful that the issues raised herein may be mooted by a competitive Auction.   However, the Committee will not and cannot support a sale of substantially all of the Debtors' assets under the terms of the existing Stalking Horse APA, which would strip the estates of valuable assets while leaving the estates administratively insolvent.  The Committee reserves its rights to supplement this Objection pending the results of the Auction.

**WHEREFORE,** the Committee requests that the Court enter an order denying the Sale to the Stalking Horse Bidder and grant such further relief as is just and appropriate.

*[Signature Page Follows]*

19

Dated:  September 6, 2019
Wilmington, Delaware

Respectfully submitted,

Pepper Hamilton LLP


/s/ *Donald J. Detweiler*
Donald J. Detweiler (DE 3087)
John H. Schanne, II (DE 5260)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile:  (302) 421-8390
E-mail:  detweilerd@pepperlaw.com
              schannej@pepperlaw.com

and

Francis J. Lawall, Esquire
Pepper Hamilton, LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2799
Telephone:     (215) 981-4451
Facsimile:     (215) 981-4750
Email:          lawallf@pepperlaw.com

*Counsel to the Official Committee of*
*Unsecured Creditors*