## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>HDR HOLDING, INC., *et al.*[1]<br><br>             Debtors. | Chapter 11<br><br>Case No. 19-11396 (MFW)<br><br>(Jointly Administered)<br><br>**Ref. Docket Nos. 18, 193 & 194** |

### DEBTORS' OMNIBUS REPLY IN SUPPORT OF THE SALE MOTION AND IN RESPONSE TO THE SALE OBJECTIONS FILED BY THE COMMITTEE AND DNOW

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby submit this omnibus reply (the "Reply") in support of the proposed sale of substantially

all of their assets (the "Sale") to Schramm II Inc. (the "Purchaser")[2] and in response to the

objections to the Sale raised by the Official Committee of Unsecured Creditors (the

"Committee") and DNOW L.P. ("DNOW").[3]

### PRELIMINARY STATEMENT

1.     As part of the resolution of the objections to the Debtors' proposed bidding

procedures and DIP financing, the Debtors, the Committee, and DNOW agreed to a robust

postpetition sales process to be overseen by an independent director.  That process confirmed

that, unfortunately, there is no value achievable beyond the stalking-horse bid provided by the

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: HDR Holding, Inc. (2015) and Schramm, Inc. (0480).  The Debtors' mailing address is 800 E. Virginia Ave., West Chester, PA 19380.

[2]  As set forth in the Debtors' motion for entry of a sale order [Docket No. 18] (the "Sale Motion"), the Purchaser is an acquisition vehicle created by GenNx360 Capital Partners, L.P. ("GenNx"), to serve as a stalking-horse bidder and to provide debtor-in-possession financing.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion.

[3]  DNOW's objection appears at Docket No. 193 (the "DNOW Objection"), and the Committee's objection appears at Docket No. 194 (the "Committee Objection" and, together with the DNOW Objection, the "Objections").  DNOW is also one of the three members of the Committee.  *See, e.g.*, DNOW Obj. ¶ 4.

Purchaser.  The Committee and DNOW are understandably disappointed that the agreed sales process did not generate additional value, as are the Debtors.  But the market has spoken.

## REPLY

I.  **The Court should approve the Sale.**

    A.  **The Sale is necessary for the Debtors to continue as a going concern.**

2.      The fundamental purpose of chapter 11 is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.  *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984).  The Sale represents a transaction of last resort for the Debtors and likely the only remaining opportunity to maintain the operations of a more than 100-year-old company.  The DIP budget shows that the Debtors' liquidity is at an end.  Absent approval of the Sale, the Debtors would be forced to immediately convert to chapter 7 for purposes of liquidating their business.

3.      A liquidation of the business would be devastating to the Debtors' employees, many of whom have worked for the company for many years.  In addition, liquidation would be highly damaging to customers, who rely on the Debtors to provide them with continued service and warranties on their products, and to the Debtors' vendors, who are often small, specialized suppliers for whom the Debtors are a key customer.

4.      In light of the Debtors' liquidity constraints, a § 363 sale is the only viable option for preserving the Debtors' going-concern value for the benefit of all constituents.

    B.  **The Debtors' postpetition sale process was agreed to by the Committee and DNOW and approved by the Court.**

5.      The Committee and DNOW objected to the Debtors' initial bidding procedures, raising concerns about the Debtors' prepetition marketing process and the disinterestedness of the Debtors' prepetition directors.  Even so, the Committee stated that it would "support[] the

potential sale of the Debtors' assets . . . provided the extraordinary bid protections . . . are limited and a more comprehensive marketing and restructuring process is implemented."[4]

6.      The Debtors made significant modifications to the proposed bidding procedures in response to the Committee's and DNOW's criticisms.  Among other things, the Debtors agreed that they would accept piecemeal bids for any and all assets.  The Debtors also agreed to extend the bidding process by more than three weeks, despite the pressures imposed by the Debtors' significant liquidity constraints, for an overall process of more than 75 days.[5]  This provided potential bidders with additional time to consider the opportunity to purchase the Debtors' assets and allowed the Debtors and their investment banker, under the supervision of the Court, and in consultation with the Committee, to run a process that was more than sufficient to attract any interested parties.  Perhaps most significantly, given the criticisms from the Committee and DNOW, the Debtors appointed an independent director to oversee the sale process and to ensure that all potential bidders had full and fair opportunity to conduct diligence and purchase the Debtors' assets.

7.      The Purchaser also made significant concessions in response to the concerns raised by the Committee and DNOW.  For instance, the Purchaser agreed to reduce—by almost one-third—the minimum Qualified Bid from potential competing bidders.  The Purchaser also agreed that, under the order approving postpetition financing [Docket No. 164] (the "DIP Order"), it would not obtain any liens on the Avoidance Actions (as defined in the DIP Order).

---

[4] *Omnibus Objection of the Official Committee of Unsecured Creditors to Debtors' (I) Motion for Authorization to Obtain Postpetition Financing (DI. No. 12) and (II) Motion for Approval of Bidding Procedures (D.I. No. 18)* ¶ 4 [Docket No. 129].

[5] *Cf. In re Vestis Retail Grp., LLC,* Case No. 16-10971 (LSS) (Bankr. D. Del. June 20, 2016) [Docket No. 590] (approving sale to an insider within 63 days of the petition date); *In re Karmaloop, Inc.*, Case No. 15-10635 (MFW) (Bankr. D. Del. May 21, 2015) [Docket No. 234] (approving sale to insider within 52 days of petition date); *In re Coda Holdings, Inc.*, Case No. 13-11153 (CSS) (Bankr. D. Del. June 11, 2013) [Docket No. 252] (approving sale to insider within 42 days of petition date); *In re Questex Media Grp., Inc.*, Case No. 09-13423 (MFW) (Bankr. D. Del. Nov. 24, 2009) [Docket No. 240] (approving sale to insider within 51 days of petition date).

As a further part of the parties' resolution, the Committee and DNOW agreed that the Purchaser would be able to credit bid the committed debtor-in-possession financing (the "DIP Facility") and the amount of the Term A Loan and Term B Loan obligations assumed by the Purchaser.[6]

8.      With these modifications and concessions, the Committee and DNOW agreed that their objections to Debtors' proposed sale process were resolved, and the Court entered an order under certification of counsel approving the agreed sale process.

### C.  The Debtors' postpetition sales process was robust.

9.      Pursuant to the agreed sale process approved by the Court, the Debtors and their investment banker, FocalPoint Partners LLC ("FocalPoint"), conducted an extensive and comprehensive marketing process.  More specifically, starting immediately after the Petition Date, the Debtors, through FocalPoint, contacted 161 potential interested parties with respect to the opportunity to acquire the Debtors' assets.  The Debtors entered into non-disclosure agreements with 15 parties who, together with the parties who had executed non-disclosure agreements during the prepetition marketing process, were provided access to the Debtors' confidential data room.  Of those, two strategic bidders conducted purposeful due diligence, which included multiple discussions with FocalPoint, the Debtors' counsel, and the Debtors' business people.  One potential bidder conducted multiple-day on-site meetings with the Debtors' management team both in West Chester, Pennsylvania, as well as in Australia, to thoroughly investigate the acquisition opportunity and potentially make a bid for some or all of

---

[6] DIP Order ¶ 32 ("Notwithstanding anything herein to the contrary, including Paragraph 16 above, pursuant to, among other things, section 363(k) of the Bankruptcy Code, (i) the DIP Lender in its capacity as Stalking Horse Bidder (as defined on Exhibit C) shall have the exclusive right to use the DIP Obligations, DIP Liens, and DIP Superpriority Claim to credit bid at the Auction, (ii) the DIP Lender in its capacity as Stalking Horse Bidder shall have the right to include as part of its Stalking Horse Bid an assumption of the Obligations under Term Loan A in the amount not less than $5,347,722.47 plus any other accrued and accruing unpaid Obligations thereunder, including interest, fees and expenses (including legal fees and expenses), as part of its Stalking Horse Bid and (iii) the DIP Lender in its capacity as Stalking Horse Bidder shall have the right to include as part of its Stalking Horse Bid the assumption of the Obligations under Term Loan B (subject to satisfaction of the Obligations under Term Loan A) at the Auction.").

the Debtors' assets.  Given that this potential interest may have included only a subset of the

Debtors' assets, the Debtors also solicited six liquidation firms, and obtained proposals from

three of these firms, to acquire the assets that the potential bidder indicated it may exclude from

its bid.

10.     Throughout the marketing process, the Debtors and their professionals consulted

regularly with the Committee.  FocalPoint also had frequent communications with, and accepted

the input provided by, the Committee's financial advisor, PricewaterhouseCoopers LLP.  For

instance, the Debtors requested the Committee's input regarding other potential bidders to

contact.  The Committee provided six additional names; each was contacted by the Debtors and

invited to participate in the sale process.  In sum, the Committee and its professionals were

involved in the postpetition marketing and bidding processes every step of the way, and the

Debtors believe that the postpetition process provided sufficient time and opportunity for any

likely bidder to make a bid.

### D.  The Purchaser's stalking-horse bid was the highest and best offer.

11.     After a full and fair marketing process, the stalking-horse bid submitted by the

Purchaser was highest and best offer for the Debtors' assets (and, indeed, the only offer aside

from three offers from liquidation firms to acquire the Debtors' hard assets and one conditional

offer to acquire certain of the Debtors' intellectual property, which, even if combined with a

liquidation bid, would have yielded less value than the amount of the DIP obligations).  While

the Committee and DNOW are understandably disappointed that the agreed postpetition

marketing process did not generate more bids, the value that the proposed Sale to the Purchaser

provides to the Debtors' estates is substantial.

12.     For instance, the assumed liabilities under the Sale will significantly reduce the claims against the estate.  Among other things, the Purchaser is assuming many of the Debtors' executory contracts and leases, including the lease of the Debtors' headquarters in West Chester, Pennsylvania, thereby significantly reducing the rejection damages claims that would otherwise be asserted against the estates.  The Purchaser is also taking on the Debtors' employees and related obligations, reducing the priority and unsecured claims against the estates that would otherwise arise on account of unpaid vacation time and other obligations.  The Sale will allow for the satisfaction of all administrative expense claims, including all § 503(b)(9) claims.[7] Finally, in addition to the contract, employee, and trade claims, the Purchaser is providing $15 million in value on the financial side by satisfying the DIP Facility, the Term A Loan, and $5 million of the Term B Loan.

13.     Thus, the proposed Sale to the Purchaser is the highest and best offer for the Debtors' assets and provides substantial value to the Debtors' estates.  It is unfortunate that the these chapter 11 cases could not deliver a significant recovery to unsecured creditors, but most of the unsecured creditors—the Debtors' employees, landlords, suppliers, and vendors—will, as a result of the Sale, benefit from the continuation of the Debtors' business as a going concern.

### E.  The Sale easily meets the standard for approval under § 363(b) of the Bankruptcy Code.

14.     The standard for approval of a sale outside the ordinary course of business is well settled.  Under § 363(b) of the Bankruptcy Code, courts will require a debtor to show that "a sound business reason" justifies the sale.  *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.

---

[7]  The Committee and DNOW imply throughout their objections that the proposed Sale would leave administrative claims unsatisfied.  *See* Committee Obj. ¶¶ 2, 4, 43; DNOW Obj. ¶ 28.  That is emphatically **not** the case.  As the DIP budget shows, all administrative expenses accrued during the cases will be paid by the DIP Facility.  The Committee's objection itself (¶ 41) cites the definition of Assumed Liabilities that will be paid by the Purchaser, which includes all accounts payable arising after the Petition Date in the ordinary course of business and not paid by the Seller, as well as all of the § 503(b)(9) claims.

Del. 1991). A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve and enhance the value of the assets for the debtor's estate, its creditors, or interest holders. *See, e.g.*, *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

15.     Once a court determines that a valid business justification exists for a sale outside of the ordinary course of business, the court must determine whether (i) the debtor has provided adequate and reasonable notice, (ii) the sale will produce a fair and reasonable price, and (iii) the parties have acted in good faith. *See, e.g.*, *In re Pursuit Capital Mgmt., LLC*, Civ. No. 15-801-RGA, 2016 WL 5402735, at *4 n.10 (D. Del. Sept. 26, 2016); *Del. & Hudson Ry. Co.*, 124 B.R. at 176; *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014); *In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012).

16.     "Generally, 'where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.'" *Filene's Basement*, 2014 WL 1713416, at *12 (quoting *In re MF Global, Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012)); *see also In re Johns–Manville Corp.*, 60 B.R. 612, 616 (Bankr.S.D.N.Y.1986). "'If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate; the burden of rebutting that presumption

falls to parties opposing the transaction.'" *Filene's Basement*, 2014 WL 1713416, at *12

(quoting *MF Global*, 467 B.R. at 730).

17.    Here, the proposed Sale to the Purchaser easily satisfies the § 363(b) standard.  In

light of the Debtors' liquidity constraints, a § 363 sale is the only viable option for preserving the

Debtors' going-concern value for the benefit of all constituents, and the Purchaser's stalking-

horse bid is the only best offer on the table to preserve that value.  Absent approval of the Sale,

the Debtors would be forced to convert to chapter 7 and undergo a liquidation of their assets.

The proposed range of value of the Debtors' hard assets, based on proposals received from

liquidators, would be less than $2 million, which would not be enough to pay off the DIP Facility

(even if combined with the contingent offer for the Debtors' intellectual property), let alone pay

off the Term A and Term B Loans, which are satisfied, in whole or in part, pursuant to the

proposed Sale.  Accordingly, the Debtors' decision to accept the (one and only) offer that will

preserve going-concern value is a sound business decision and is a considerably better outcome

than chapter 7 liquidation, which would be highly destructive of value.

18.    The Debtors conducted an extensive postpetition marketing campaign designed to

elicit the highest and best offers for the Debtors' assets.  The postpetition process was overseen

by the Debtors' independent director, Michael Logan, who will testify at the hearing on the Sale

Motion that he actively sought to elicit bids higher and better than the Purchaser's stalking-horse

bid.  Mr. Logan will further testify that the bid process was free from GenNx's influence and that

all potential bidders had a full and fair opportunity to conduct diligence and bid on some or all of

the Debtors' assets.  Despite their concerns about the Debtors' prepetition directors, the

Committee and DNOW signed on to the sale process to be overseen by Mr. Logan, and the

Committee and its professionals were involved every step of the way.

19.     In sum, a sound business purpose justifies the Sale of the Debtors' assets to the Purchaser, and the Court should not permit the Committee and DNOW to derail the agreed sale process simply because they are disappointed with the results.

## II.     The Court should overrule the Objections.

20.     Most of the Committee's and DNOW's arguments against approval of the Sale were previously raised in connection with the bid procedures and resolved through the agreed postpetition sale process. None of the arguments raised in the Objections change the simple fact that, at the conclusion of that agreed process, the stalking-horse bid from the Purchaser was the highest and best offer (indeed, the only offer) to acquire the Debtors' assets and preserve going-concern value. Nevertheless, a few of the Committee's and DNOW's erroneous arguments are worth highlighting.

### A.     There is no basis for the Court to find a lack of good faith in the postpetition sale process.

21.     "It is well established that a party's status as an insider does not automatically prevent it from being a purchaser in good faith." *In re Old Cold, LLC*, 558 B.R. 500, 516 (B.A.P. 1st Cir. 2016), *aff'd*, 879 F.3d 376 (1st Cir. 2018); *see also U.S. Small Business Admin. v. Xact Telesolutions, Inc. (In re Xact Telesolutions, Inc.)*, No. DKC 2005–1230, 2006 WL 66665, at *6 (D. Md. Jan. 10, 2006) (collecting cases).[8]

---

[8] Case law in this district also provides ample support for this proposition. *See, e.g.*, *In re Vestis Retail Grp., LLC*, Case No. 16-10971 (LSS) (Bankr. D. Del. June 20, 2016) [Docket No. 590] (finding good faith finding when transaction with insider was "proposed, negotiated and entered into . . . without collusion or fraud or any kind"); *In re Karmaloop, Inc.*, Case No. 15-10635 (MFW) (Bankr. D. Del. May 21, 2015) [Docket No. 234] (finding insider was "a good faith purchaser entitled to the benefits and protections afforded by Section 363(m) of the Bankruptcy Code"); *In re Coda Holdings, Inc.*, Case No. 13-11153 (CSS) (Bankr. D. Del. June 11, 2013) [Docket No. 252] ("The [insider] is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby."); *In re Questex Media Grp., Inc.*, Case No. 09-13423 (MFW) (Bankr. D. Del. Nov. 24, 2009) [Docket No. 240] (same).

22.     As the Seventh Circuit noted in *Hower v. Molding Systems Engineering Corp.*,
"there is good reason for allowing such transactions [to insiders]."  445 F.3d 935, 939 (7th Cir.
2006).[9]  "That is, the failure of a company may be due to adverse market conditions—rather than
flagrant mismanagement—and the former officers may be in the best position to make use of the
assets and formulate a successful future business model."  *Id.*  "As a result, there may be
circumstances where an effective repurchase of assets is the most efficient business outcome."
*Id.*  Thus, in order to encourage insolvent debtors to continue operating and generating revenue
for creditors, they are permitted to sell property to insiders, as long as the insider status is
disclosed and there is no evidence of collusion.  *Id.*

23.     Here, as in *Hower*, GenNx's status as an insider was fully disclosed from the
beginning of the chapter 11 cases, and there has been no allegation that the Debtors or GenNx
committed fraud or colluded in the course of the postpetition sale proceedings.  Moreover, as
was the case in *Hower*, the industry in which the Debtors operate has been experiencing a long-
term downturn, and service providers like the Debtors are the first to bear the brunt of such
downturn.[10]  Finally, the fact that the Debtors' independent director supports the sale to GenNx

---

[9]  In *Hower*, the debtor ("Molding Systems Engineering Corporation" or "Molding") sought to sell its assets to
Molding Services of Illinois ("MSI") free and clear of liens and claims, including the claim of John Hower
("Hower") who was a judgment creditor (like DNOW here).  Hower objected to the sale, arguing that MSI was not a
good-faith purchaser because it was "an insider corporation formed by the same two individuals who controlled
Molding."  According to the Court of Appeals, "[s]uperficially, this argument has appeal . . . . [T]he facts in this
case could be interpreted as allowing the former president and shareholder of Molding to shed undesired debt and
repurchase core assets at a discount."  However, "the failure of a company may be due to adverse market
conditions—rather than flagrant mismanagement—and the former officers may be in the best position to make use
of the assets and formulate a successful future business model."  Thus, "there may be circumstances where an
effective repurchase of assets is the most efficient business outcome."  And the approval of the trustee and secured
creditors in *Hower*—like the approval of the independent director here—suggested that the case presented just such
circumstances.

[10]  *Cf.* Committee Obj. ¶ 5 ("There is no dispute, the Debtors have struggled under the majority control and grip of
GenNx360 since GenNx360's leveraged buyout of the Debtors in 2012.").

suggests that this case, like *Hower*, presents "circumstances where an effective repurchase of assets is the most efficient business outcome." *Id.*[11]

24.    The cases that the Committee and DNOW rely on to support their arguments about the Purchaser's supposed bad faith are a far cry from the facts here.  In *Abbotts Dairies*, for instance, the parties objecting to the sale claimed that, in exchange for a lucrative employment agreement for the debtor's chairman and CEO, the debtor had permitted its proposed purchaser to manipulate the timing of the bankruptcy filing such that the bankruptcy court would have no choice but to approve an interim sale agreement that precluded competitive bidding for the debtor's assets.  *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 148 (3d Cir. 1986).

25.    Here, by contrast, the Debtors' financial distress was plainly not contrived to effectuate a sale to the Purchaser.  As the Committee itself states, "[t]here is no dispute, the Debtors have struggled under the majority control and grip of GenNx360 since GenNx360's leveraged buyout of the Debtors in 2012."[12]  In contrast to the purchaser in *Abbotts Dairies*, GenNx has done everything possible to keep the Debtors out of bankruptcy.  For instance, when the Debtors were struggling in 2017 and 2018, GenNx infused nearly $3.6 million into the company on an unsecured basis.[13]  And in 2019, GenNx funded more than $1.4 million on an unsecured basis to allow the Debtors to satisfy payroll and working-capital obligations.[14]  GenNx funded these amounts despite the fact that, during this period of time, the Debtors paid nothing to GenNx, whether on account of the cash infusions, the Term B obligations, or any management or

---

[11]  In *Hower*, the Seventh Circuit explained that "[t]he approval of the trustee and secured creditors" suggested that the case was one in which the proposed sale to insiders was "the most efficient business outcome."  *Hower*, 445 F.3d at 939.

[12]  Committee Obj. ¶ 5 ("For example, what was reportedly a $150 million plus enterprise in 2012, drastically fell to a $22.4 million or less enterprise by the end of 2017.").

[13]  *Declaration of Jesse Glover in Support of Entry of Final Order Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing* ¶ 13 [Docket No. 136] (the "Glover Declaration").

[14]  Glover Decl. ¶ 15.

other fees.[15]  The collusive and manipulative behavior that weighed against a good-faith finding in *Abbotts Dairies* is thus plainly not implicated here.  The Debtors assiduously followed the Bid Procedures, under the oversight of their professionals and designated director, and did so without any influence or interference from the Purchaser that in any way limited the Debtors' efforts to improve on the Purchaser's baseline bid.  *See Abbotts Dairies*, 788 F.2d at 147 ("The requirement that a purchaser act in good faith speaks to the integrity of his conduct *in the course of the sale proceedings.*" (emphasis added) (internal quotation marks omitted).

26.    The other case cited by the Committee, *Industrial Valley*, is similarly inapposite. In that case, the court found good faith to be lacking when the purchaser entered into "sweetheart" employment contracts and leases with the debtor's principals at the same time that it entered into an agreement to purchase the debtor's assets for a price 25% lower than what the purchaser had offered three weeks previously.  Here, not even the Committee argues that the Debtors and the Purchaser colluded in a similar *quid pro quo*.  Rather, the Committee contends only that the prepetition retention bonuses paid to the Debtors' directors and officers raise concerns about the independence of the prepetition board and that GenNx allegedly engaged in "inequitable prepetition conduct."[16]

27.    But even if these actions were suggestive of bad faith (which they are not), they are irrelevant to whether the Sale should be approved.  The Committee already raised these concerns in connection with the bidding procedures and, despite those concerns, agreed to the sale process overseen by the Debtors' independent director.

---

[15]  Glover Decl. ¶ 19.

[16]  Committee Obj. ¶¶ 53, 54.  As the Committee notes, however, "[g]ood faith speaks to the integrity of the purchaser's conduct *during the course of the sale proceedings*."  Committee Obj. ¶¶ 22, 52 (emphasis added); *see also Abbotts Dairies*, 788 F.2d at 147 (focusing on conduct during the sale proceedings).

28.     Accordingly, neither the Committee nor DNOW provides any basis for the Court to find that the agreed postpetition sale process lacked good faith.  Their objections are simply not a reason to derail the transaction that presents the only option to continue the Debtors' business as a going concern, save jobs, reduce liabilities, and maximize the value of the estates. The Court should thus approve the Sale as a good-faith transaction.

**B.  There is no basis for subjecting the Sale to heightened scrutiny.**

29.     The Committee and DNOW devote considerable energy to arguing that the Sale should be subject to heightened scrutiny.  These arguments are nothing more than an attempt to relitigate their opposition to the bidding procedures and DIP Facility.  Indeed, the Committee and DNOW raised this same argument (*i.e.*, that the Debtors' prepetition directors were conflicted) at the bid-procedures stage and, despite this, agreed to the postpetition sale process (approved by the Court) that would be overseen, not by the allegedly conflicted prepetition directors, but by the Debtors' independent director.  Where a sale process is overseen by an independent director, entire-fairness review is inapplicable.  *See, e.g.*, *Pereira v. Cogan*, 267 B.R. 500, 508 (S.D.N.Y. 2001) (under Delaware law, entire fairness must be shown "[w]hen a controlling shareholder or other insider engages in a self-dealing transaction *that is not approved by an independent board*" (emphasis added)); *In re MFW Shareholders Litig.*, 67 A.3d 496, 526–27 (Del. Ch. 2013) ("Outside the controlling stockholder merger context, it has long been the law that even when a transaction is an interested one but not requiring a stockholder vote, Delaware law has invoked the protections of the business judgment rule when the transaction was approved by disinterested directors acting with due care."), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

30.     Even if the Court were to evaluate the Sale under an entire-fairness standard, however, the proposed Sale should be approved.  The price is fair because it was market-tested,

and no other bidders emerged to offer a higher and better price. *Cf. In re Tempo Tech. Corp.*, 202 B.R. 363, 370 (D. Del. 1996) ("Without a sizable pool of potential buyers, with only one buyer willing to negotiate terms of a purchase, and the Debtor's severe cash flow predicament, the bankruptcy court did not err when it approved [the § 363 sale.]"). The process is fair because an independent director oversaw a comprehensive marketing and bidding process over a period of more than 75 days. *Cf. Puma v. Marriott*, 283 A.2d 693, 696 (Del. Ch. 1971) ("[S]ince the transaction complained of was accomplished as a result of the exercise of independent business judgment of the outside, independent directors . . . the court is precluded from substituting its uninformed opinion for that of the experienced, independent board members[.]"). Indeed, the process here was agreed to by the Committee and DNOW and approved by the Court. There is thus no basis to argue that the postpetition process was unfair or that the price generated by that Court-approved process was not the highest and best price available in the market.

### C. The Committee's and DNOW's arguments about the Avoidance Actions do not support denial of the Sale Motion.

31. The transfer of the Debtors' Avoidance Actions to the Purchaser does not violate the Bankruptcy Code and is not a basis for denial of the Sale Motion. To the contrary, the sale of avoidance actions is customary and appropriate. *See, e.g.*, *Cedar Rapids Lodge & Suites, LLC v. Seibert*, No. 14-CV-04839 SRN/KMM, 2018 WL 747408, at *8 (D. Minn. Feb. 7, 2018) ("The cases strongly favor finding that the fraudulent transfer claims here were property of the estate . . . . [A]llowing a trustee to sell § 544(b) rights of action is in accord with the trustee's existing powers . . . ." (internal quotation marks omitted)); *see also In re Moore*, 608 F.3d 253, 262 (5th Cir. 2010) ("We conclude, therefore, that the fraudulent-transfer claims are property of the estate . . . . and—like other estate property—may be sold pursuant to § 363(b)."); *In re Ontos, Inc.*, 478 F.3d 427, 431 (1st Cir. 2007) ("The Bankruptcy Code broadly defines the property of the estate

to be comprised of all 'legal or equitable interests of the debtor in property as of the commencement of the case.' It is well established that a claim for fraudulent conveyance is included within this type of property." (citation omitted)); *Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 708–09 (7th Cir. 1994) (stating that the right to "recoup a fraudulent conveyance, which outside of bankruptcy may be invoked by a creditor, is property of the estate").[17]

32.    Buyers often purchase the estate's right to pursue such causes of action because it does not make good business sense for the acquirer to subject its employees, customers, and vendors to potential suit.[18] For this reason, ensuring that litigation does not upend the Purchaser's working relationships with its employees, customers, and vendors is an essential component of the Sale. As Judge Shannon noted in *Real Mex Restaurants*, "the sale or release of these types of claims is not unusual as it relates to general Chapter 5 causes of action and including fraudulent conveyance claims for business reasons."[19] There is nothing extraordinary about the sale of avoidance actions, and there is no reason to disapprove the sale of such actions here. In fact, many of the Committee's constituents will benefit from this provision.

---

[17] The Committee concedes, as it must, that the Third Circuit has not held that a debtor is unable to sell avoidance actions. *See* Committee Obj. ¶ 25.

[18] *See, e.g.*, *In re Real Mex Rests., Inc.*, Case No. 11-13122 (BLS) (Bankr. D. Del. Feb. 22, 2012) [Docket No. 923]; *In re F & H Acquisition Corp.*, Case No. 13-13220 (KG) (Bankr. D. Del. Feb. 28, 2014) [Docket No. 447]; *In re OCZ Tech. Grp., Inc.*, Case No. 13-13126 (PJW) (Bankr. D. Del. Jan. 16, 2014) [Docket No. 241]; *In re Landauer Healthcare Holdings, Inc.*, Case No. 13-12098 (CSS) (Bankr. D. Del. Jan. 6, 2014) [Docket No. 477]; *In re Allen Family Foods, Inc.*, Case No. 11-11764 (KJC) (Bankr. D. Del. July 29, 2011) [Docket No. 220].

[19] Hr'g Tr. at 191:6–11, *In re Real Mex Rests., Inc.*, Case No. 11-13122 (BLS) (Bankr. D. Del. Feb. 10, 2012) ("I will also approve the sale or transfer of the avoidance actions, including the claim versus the noteholder, pursuant to the terms of the APA. The sale or release of these types of claims is not unusual as it relates to general Chapter 5 causes of action and including fraudulent conveyance claims for business reasons.").

### D. None of the Committee's or DNOW's other arguments provide a basis to deny the Sale Motion.

33.    The Committee's and DNOW's last few arguments can be dispensed with briefly. First, the Committee argues that the Sale should not go forward because Schramm Australia allegedly owes the Debtors an $11 million payable.[20]  This argument is, essentially, a restatement of the argument that the Debtors have not received a fair price for their assets.  Schramm was available for purchase, as was the receivable itself and all the equity in Schramm Australia. Potential bidders had all of the necessary information and could (and did) perform due diligence into Schramm Australia and the payable allegedly owed to the Debtors.  None of these potential bidders determined that Schramm, even with the receivable, was worthy of a bid.  Again, the market has spoken.  The receivable allegedly owing from Schramm Australia is thus not a basis to delay or deny the Sale.

34.    Second, the Committee and DNOW are troubled by language in the Stalking Horse Asset Purchase Agreement that "the liabilities of Schramm Australia shall not be Assumed Liabilities of Buyer . . . ."[21]  To be clear, this clause simply means that the Sale preserves the existing corporate structure of the Debtors and their affiliates and, more specifically, that Schramm Australia's liabilities are not being assumed up the chain of ownership.

35.    Third, the Committee and DNOW urge that the Court should deny the Sale Motion because the purchase price is unclear.[22]  For the avoidance of doubt, the purchase price (as set forth in paragraph 6 of the Bid Procedures Order) is in excess of $11,347,722.47, which reflects the value of the DIP Facility ($6,000,000, plus PIK interest that continues to accrue through closing of the Sale) and the Term A Loan ($5,347,722.47, plus PIK interest that

---

[20]  *See* Committee Obj. ¶ 3.

[21]  *See* Committee Obj. ¶ 49; DNOW Obj. ¶ 43.

[22]  *See* Committee Obj. ¶¶ 36, 37; DNOW Obj. ¶ 43.

Case 19-11396-MFW    Doc 196    Filed 09/11/19    Page 17 of 18

continues to accrue through closing of the Sale), <u>plus</u> the $5,000,000 portion of the Term B Loan that the Purchaser is satisfying under the Sale.[23]  This, of course, does not include the value attendant to the assumption of various contract obligations and other claims, as well as mitigation of potential claims that would be asserted against the Debtors in the absence of a Sale.

36.     Finally, DNOW offers a conclusory objection that the Court should not waive the 14-day stay of the order approving the Sale under Bankruptcy Rules 6004(h) and 6006(d). DNOW provides no support for this contention, however.  As noted in the Sale Motion, a waiver of the stay is appropriate because the Sale was extensively marketed to potential bidders and all interested parties received proper notice of the Sale.  Moreover, as noted above, the Debtors have already extended the sale process by more than three weeks, at the request of the Committee and DNOW, and the DIP budget shows that the Debtors' liquidity is at an end.  There is thus good cause for the Court to waive the 14-day stay under the Bankruptcy Rules to allow the Debtors to consummate, as soon as possible, the sale transaction that represents the only path forward that preserves the Debtors' going-concern value for the benefit of all constituents.

## CONCLUSION

37.     At the conclusion of the comprehensive sales process overseen by an independent director, the stalking-horse bid from the Purchaser was the highest and best offer to acquire the Debtors' assets (and, indeed, the only offer to acquire those assets as a going concern).  The Committee and DNOW are understandably disappointed that the agreed, Court-approved sales process did not generate additional value, as are the Debtors, but the market has spoken.  The proposed Sale to the Purchaser is the only option available that avoids a value-destructive

---

[23]  The Debtors acknowledge that the Committee has challenged the Term B Loan.  For purposes of calculating the purchase price, however, assumption of the Term B Loan by the Purchaser can only inure to the benefit of unsecured creditors because it satisfies potentially higher priority claims.

01:25152446.5

17

liquidation and preserves the Debtors' business as a going concern, saving jobs and maximizing the value of the estates.  The Court should thus approve the Sale.

Accordingly, for all of the foregoing reasons, as well as those set forth in the Sale Motion, the Debtors urge the Court to overrule the Objections and grant the Sale Motion.

Dated:  September 11, 2019        */s/ Sean T. Greecher*
                  Pauline K. Morgan (Bar No. 3650)
                  Sean T. Greecher (Bar No. 4484)
                  Joseph M. Mulvihill (Bar No. 6061)
                  Jared W. Kochenash (Bar No. 6557)
                  **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
                  Rodney Square
                  1000 North King Street
                  Wilmington, Delaware 19801
                  Tel:    (302) 571-6600
                  Fax:    (302) 571-1253

                  *Counsel to Debtors and Debtors in Possession*