# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>HDR HOLDING, INC., *et al.*,[1]<br><br>                  Debtors. | Chapter 11<br><br>Case No. 19-11396 (MFW)<br><br>(Jointly Administered)<br><br>Re:  D.I. 18, 193, 194 & 196 |

### GENNX360 CAPITAL PARTNERS, L.P.'S AND SCHRAMM II INC.'S (I) OMNIBUS RESPONSE TO THE OBJECTIONS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND DNOW, L.P. TO MOTION FOR AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND (II) JOINDER IN THE DEBTORS' REPLY TO THE SAME

GenNx360 Capital Partners, L.P. ("GenNx360") and Schramm II Inc. ("SII", the "Stalking Horse Bidder" or "DIP Lender") respectfully submit this response in opposition to the *Preliminary Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for an Order Approving the Sale of Substantially All of the Debtors' Assets* [Docket No. 194] filed by the Official Committee of Unsecured Creditors (the "Committee") (the "Committee Objection") and *DNOW L.P.'S (I) Objection to Debtors' Motion to Sell Assets Free and Clear of All Liens, Claims, Encumbrances, and Interest [Dkt. No. 18] And (II) Joinder in the Creditors' Committee Objection to the Sale Motion* [Dkt. No. 193] filed by DNOW L.P., an alleged unsecured creditor and member of the Committee ("DNOW") (the "DNOW Objection" and collectively, the "Objections")[2] and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  HDR Holding, Inc. (2015) and Schramm, Inc. (0480).  The Debtors' mailing address is 800 E. Virginia Ave., West Chester, PA 19380.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the *Debtors' Motion for Entry of Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Dkt. No. 18] or *Final Order Pursuant to 11 U.S.C. §§*

join in the Debtors' response to the Objections. In support thereof, GenNx360 and SII respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The market has spoken. After a lengthy, comprehensive marketing process, no Qualifying Bids for the Debtors' assets were submitted other than the Stalking Horse Bid that the Committee and DNOW approved in connection with the DIP Order and Bidding Procedures Order. Accordingly, the Stalking Horse Bid is the Successful Bid and the Objections are moot and should be overruled.[3]

2.      Despite the Committee's and DNOW's baseless, conclusory contentions, the Sale Transaction does not provide for one-sided, self-serving relief that leaves the estate administratively insolvent. The Stalking Horse Purchase Agreement includes not only a $6 million credit bid of new dollars lent post-petition, but also the assumption of liabilities including post-petition payables accrued in the ordinary course of business and all section 503(b)(9) claims. In addition, the DIP Lender agreed to fully fund the remaining amounts under the DIP Budget, including certain costs associated with the Chapter 11 Cases, including $200,000 to complete a wind down of the Debtors' estates, be it through a confirmed plan, conversion to chapter 7, or dismissal.

---

*105, 361, 362, 363, 364 and 507, Bankruptcy Rule 2002, 4001, 6004 and 9014 and Local Bankruptcy Rule 4001-2 (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties, and (IV) Granting Related Relief* (the "Final DIP Order") [Docket No. 164], as applicable.

[3] The Committee filed its objection at 8:09 p.m., *over 3 hours after* the September 6, 2019, 5:00 p.m. bid deadline (i.e., the due date for bids set forth in the Bidding Procedures Order (the "Bid Deadline")), with full knowledge that the Bid Deadline had passed and that no Qualified Bid other than the Stalking Horse Bid had been submitted. Yet, incredibly, the Committee fails to address this in its filing.

3. The Sale Transaction is simply the best option available in these Chapter 11 Cases. Moreover, it preserves the Debtors' employees jobs going forward, provides for the assumption of certain contracts and other material liabilities, and provides for administrative solvency.

4. For many years, in addition to the funding provided by the Prepetition Secured Parties, GenNx360 has financially supported the Debtors. Most recently, in early 2019, the Debtors were under immense liquidity pressure. The Debtors retained FocalPoint Partners, LLC ("FocalPoint") as their investment banker to conduct a marketing process in an attempt to find a purchaser, and GenNx360 provided material liquidity for the Debtors to conduct that process. After no viable purchaser was found, rather than allowing the Debtors to crash land into a chapter 7 liquidation, SII as DIP Lender agreed to provide the $6 million *new money* DIP Facility to provide for a smooth transition into chapter 11 and SII agreed to act as the Stalking Horse Bidder to purchase all of the Debtors' assets (other than certain specified excluded assets) to allow for a continued marketing process. The Committee and DNOW approved the Stalking Horse Bid in connection with the DIP Order and the Bidding Procedures Order.

5. In addition, GenNx360 and the DIP Lender consented to the request of the Committee and DNOW, among other things, to further extend the sale timeline by more than three weeks (to more than 75 days) to allow FocalPoint, under the guidance of Michael Logan, the Debtors' designated independent director, to further extend a traditional marketing process in pursuit of competing bids.

6. Further, the Stalking Horse Bidder, at the request of the Committee and DNOW, agreed to reduce the threshold for competing bids by $5 million and agreed to increase the Committee's professional fee line item in the DIP Budget by hundreds of thousands of dollars to fund its oversight of, and consultation with the Debtors on, the sale process.

7. In short, the DIP Lender and the Stalking Horse Bidder provided the Debtors with the traditional items needed to complete a smooth, successful chapter 11 case: time to run a sale process; DIP financing to cover administrative claims as and when they come due; and a stalking horse bid that provides administrative solvency through the sale closing and leaves behind funds to complete a wind down thereafter.

8. The assets being acquired and the Stalking Horse Bid were all approved by the Court as part of the Bidding Procedures Order and Final DIP Order, after agreement was reached with the Committee and DNOW to resolve the disputes regarding the entry of such orders. There have been no changes to the Stalking Horse Purchase Agreement that was before the Committee and DNOW when they signed off on the Stalking Horse Bid at the time of entry of the Final DIP Order and the Bidding Procedures Order. The Committee and DNOW should now be precluded from rearguing the issues, especially where, as here, the DIP Lender has already lent millions of dollars in reliance on the Bidding Procedures Order and Final DIP Order and the agreements of the Committee and DNOW with respect thereto.

9. However, unhappy with the results, after agreeing (following an extensive, heavily contested evidentiary hearing and arms' length negotiations) to the post-petition marketing and sale process and Stalking Horse Purchase Agreement that has brought us to today, the Committee and DNOW are attempting to argue with the market, to dispute the express terms of the Stalking Horse Purchase Agreement (despite the fact that it always provided for the purchase of all of the Debtors' assets) and to reargue issues that were previously settled, as reflected in the Bid Procedures and in the Final DIP Order. Nor do the Committee or DNOW offer any alternative – simply that the assets should not be sold to the Stalking Horse Purchaser. The only conclusion that can be drawn from the Objections is that the Committee's and DNOW's goal is to disrupt the

Debtors' sale process (unfortunately leading to delay and further professional fees) in a transparent effort to gain unwarranted leverage in these Chapter 11 Cases, all in the hope of extracting funds from GenNx360 (and SII) in addition to those agreed to in the DIP Budget. GenNx360 and SII deserve to proceed with the process and Stalking Horse Purchase Agreement that have been agreed and in reliance on which they advanced material sums. The Committee's and DNOW's quest for a second bite at the apple should be denied and the Objections should be overruled.

## ARGUMENT

**A.     Joinder**

10.     GenNx360 and SII join in, incorporate, and adopt, as if set forth herein the arguments and supporting factual allegations set forth in the *Debtors' Omnibus Reply in Support of the Sale Motion and in Response to the Sale Objections Filed by the Committee and DNOW* [Docket No. 196]. In the interests of time and efficiency, GenNx360 and SII will not repeat all of the arguments and supporting facts asserted by the Debtors.

**B.     The Objections Should Be Overruled Because They Are Mere Attempts to Re-Trade Agreements Reflected in the Final DIP Order, DIP Budget and Bidding Procedures Order.**

11.     Effectively, the Objections are settlers' remorse. The Committee and DNOW negotiated with GenNx360 and SII for, among other things, additional time and additional funding to pay for an extended marketing process, as well as additional time and funding for the Committee's investigation process. The sale process apparently did not turn out the way that the Committee and DNOW wanted (presumably they were hoping for better and higher bids, as well as bids that would exclude some Avoidance Actions or other assets). So, as a result, the Committee and DNOW are raising the Objections in an attempt to take away GenNx360's and SII's benefit of the bargain – a $6 million loan, credit bid and debt and liability assumption in exchange for the Acquired Assets -- to which the Committee and DNOW agreed, and the Court approved.

5

12. The DIP Lender's agreement to advance $6 million of *new money* was conditioned upon certain things, including, but not limited to, the form of Final DIP Order and the Bidding Procedures Order that were agreed to by the Committee and DNOW and approved by the Court. The Final DIP Order included a good faith finding in connection with the DIP Facility. *See* Final DIP Order ¶¶ K, 27. Without the DIP Facility, the Debtors would have been immediately forced to terminate operations and liquidate, causing the loss of numerous jobs and significantly decreasing (and likely completely eliminating) the going-concern value of the business to the detriment of the very unsecured creditors whose interests the Committee purports to represent. The Committee's and DNOW's position appears to be that the Stalking Horse Bid, the only Qualified Bidder for the Debtors' assets, at an amount, and subject to terms, that the Committee and DNOW agreed could be credit bid for all of the Debtors' assets as set forth in the Stalking Horse Purchase Agreement, should now be denied (or materially modified to exclude material assets), after the DIP Lender has performed its side of the bargain, full funding for a bankruptcy, including funding administrative expenses, the sale process and committee professional fees for investigation and oversight of the sale process. For example, the Committee and DNOW continue to raise unsupported allegations regarding prepetition conduct that they knew about and raised at the Bid Procedures Hearing and Final DIP Hearing where the Committee and DNOW agreed to not challenge the credit bid of the DIP Obligations. Nothing new has been proposed by GenNx360 and SII since that time; the Stalking Horse Purchase Agreement has not changed. Accordingly, GenNx360 and SII are entitled to the finality that they negotiated and that the Court approved.

C. **The Sale Transaction is Supported by The Debtors' and Their Independent Board Member's Sound Business Judgment, Is In The Best Interest Of The Debtors' Estates, And Represents A Fair And Reasonable Price.**

13. The Objections are simply a rehash of asserted applicable law, with zero evidence as to why the standards to approve the Sale Transaction have not been met. The Sale Transaction

sale will preserve jobs, provide for administrative solvency, and provides for certain contracts and liabilities to be assumed and is a proper exercise of the Debtors' business judgment.

14. If the Objections are sustained, the outcome would be detrimental to all parties in interest. Failure to close on the agreed terms will not result in a plan, or in funding payments to unsecured creditors, but in a liquidation. This result will be worse, not better for creditors. It bears noting that the Committee and DNOW offer no alternative.

15. In terms of valuation, the market has spoken. There is no requirement that the assets being purchased be valued for purposes of approving the Sale Transaction. Perhaps, had there been competing Qualified Bids (which could have included pools of assets), the Debtors may have had to value the assets being purchased at an auction. However, given that no Qualified Bids were received and no auction is being held, the point is moot. As the Committee (and presumably DNOW, who is a member of the Committee and, upon information and belief, also the Committee chair) is well aware having been consulted throughout the process, other than the Stalking Horse Bidder, no entity (including DNOW) has offered to purchase any of the purportedly "unencumbered assets" (e.g., no one offered to purchase any of the equity in Schramm Australia,[4] or any estate claims or cause of action, including fraudulent transfer claims and claims against the Debtors' directors, officers and employees, and avoidance actions). The Stalking Horse Bid is the only, the best and the highest offer.

---

[4] For the avoidance of doubt, the Stalking Horse Bidder is not seeking approval of an order transferring the assets of Schramm Australia. All that Section 2.4 of the Stalking Horse Agreement does is confirm that all that is sold to the Stalking Horse Bidder upon the closing is the Seller's equity in Schramm Australia and makes clear that the liabilities of Schramm Australia are not Assumed Liabilities.

7

16. The Committee's and DNOW's argument that the Stalking Horse Purchaser needs to post cash for allegedly unencumbered assets (assets that were always included as part of the Stalking Horse Bid) and for assumed liabilities (a perplexing thought in itself) similarly fails. While the Stalking Horse Bidder agreed (as part of its settlement with the Committee and DNOW) that it would cash collateralize any part of its Term Loan B that it sought to credit bid at any Auction (no Term Loan B was credit bid), it did not agree to cash collateralize unencumbered assets or assumed liabilities. Further, to the extent that the Debtors' previously unencumbered assets are no longer unencumbered given the DIP Lender's first priority security interest and lien pursuant to Bankruptcy Code section 364(c)(2) on all unencumbered assets of the Debtors, the argument is moot. *See, e.g.,* Final DIP Order at ¶ 10(c).[5] Contrary to the Committee's and DNOW's assertions, real consideration was offered and is being paid by the Stalking Horse Bidder for the purchase of the Acquired Assets, including the funding and credit bid of $6 million of new money which was used by the Debtors with the oversight and at the request of the Committee and DNOW to fund a sale process.

17. Further, the validity of GenNx360's liens with respect to the Term Loan B is similarly moot, given that credit bidding of the Term Loan B is not an issue (as noted, the Term Loan B was not part of the credit bid). The Stalking Horse Purchaser is only credit bidding the DIP Obligations as expressly permitted by the Court, and agreed by the Committee and DNOW. *See* Final DIP Order at ¶ 32.

**D.    The Sale Process and DIP Funding Were Agreed To By The Committee And DNOW.**

18. As previously stated, the Committee and DNOW were actively involved in the negotiation of the timing of the sale process and the DIP Budget, both of which were interrelated

---

[5] At a minimum, this would include the interests in Schramm Australia and any of the estate claims and causes of action.

and negotiated to provide for sufficient liquidity through the agreed process and the upcoming Sale Hearing. GenNx360 and SII made multiple concessions to accommodate the requests of the Committee and DNOW for more time and for DIP Budget modifications and reached the agreement set forth in the Bidding Procedures Order and Final DIP Order. For example, concessions were made at the hearing with respect to lowering amounts available for critical vendor payments, capping FocalPoint's success fee, reallocating funds under the DIP Budget and increasing the budget to pay various creditors. The line item in the DIP Budget for the Committee's professionals which includes PwC Corporate Finance LLC, the Committee's financial advisor, and Pepper Hamilton LLP, the Committee's counsel, was materially increased by hundreds of thousands of dollars and the Committee was confirmed to have consultation rights with respect to the sale process and was provided with the right to oversee the DIP Budget. With the consent of the Committee and DNOW, an independent director was retained (funded under the DIP Budget) and ran the agreed upon sale process. [*See* Dkt. No. 96.]

19. Without any evidence, despite receiving regular reporting from the Debtors including the DIP Budget variance reports, the Committee asserts that administrative expenses of some unknown variety have arisen that should preclude the Sale Transaction. The Committee avers that, without funding all administrative expenses, that the Purchase Price is not fair. This argument does not stand. The parties agreed to a DIP Budget that provides for the administrative solvency of these Chapter 11 Cases, when taken together with the timing in the Bidding Procedures Order. The Committee and DNOW had ample time and opportunity to review and address the DIP Budget, and they agreed to the DIP Budget pursuant to the Final DIP Order. The Committee Objection is a veiled attempt to get GenNx360 or SII to pay more through an increase of the DIP Facility.

**E.     The Proposed Sale Order Clarifies All Purported Ambiguity In The Stalking Horse Purchase Agreement, Particularly The Fact That The Sale Transaction Is For The Purchase of All Assets, Including the Avoidance Actions.**

20.     The Objections asserting ambiguity in the Stalking Horse Purchase Agreement are simply incorrect. With respect to the Objections to the description of what is being sold/purchased, it is clear that all of the Seller's assets, other than specifically enumerated "Excluded Assets" are being purchased. The Stalking Horse Purchase Agreement expressly provides that the Stalking Horse Bidder is buying:

> **all of the Seller's right, title, and interest in and to all of the properties, rights, interests and other tangible and intangible assets of the Seller (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), including any assets acquired by the Seller after the date hereof but prior to the Closing (collectively, the "Acquired Assets")**, free and clear of all Liens (other than Permitted Liens expressly identified in the Sale Order), for the consideration specified in Section 2.5; **provided, however, that the Acquired Assets shall not include any Excluded Assets**.

Stalking Horse Purchase Agreement, Section 2.1 (emphasis added).

Excluded Assets are specifically enumerated, as follows:

> "Excluded Assets" means, collectively, the following assets of Seller: (a) all of Seller's certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to the organization, maintenance, and existence of Seller as a corporation; (b) all Records related to Taxes paid or payable by Seller; (c) all equity securities of Seller; (d) all Contracts, in each case, other than the Assumed Contracts; (e) all of Seller's bank accounts and lock-boxes; (f) any (i) confidential personnel and medical Records pertaining to any employee to the extent the disclosure of such information is prohibited by applicable Law and (ii) other Records that Seller is required by Law to retain; provided that Buyer shall have the right to make copies of any portions of such retained Records to the extent that such portions relate to the Business or any Acquired Asset; (g) any documents and agreements of Seller relating to the Seller's Chapter 11 Case or to

10

>> the sale or other disposition of the Business or the Acquired Assets or the sale or other disposition of any Excluded Assets; (h) all Permits other than the Assumed Permits; and (i) all assets maintained pursuant to or in connection with any Employee Benefit Plan.

Stalking Horse Purchase Agreement, Article I.  The Committee and DNOW certainly reviewed these provisions in connection with their objections to the entry of the Final DIP Order and the Bidding Procedures Order and when they signed off on the Stalking Horse Bid.  In any event, the language in the Stalking Horse Purchase Agreement remains as clear as it was when the agreement was signed and there can be no question that all estate claims or cause of action, including fraudulent transfer claims other avoidance actions and claims against the Debtors' directors, officers and employees, and avoidance actions, are included in the Acquired Assets (i.e., all assets other than the specifically enumerated Excluded Assets).

21.  In addition, the Stalking Horse Purchase Agreement enumerates, at Section 2.1(a) through (q), without limiting the Acquired Assets, the following Acquired Asset: "(d) all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.6."  The Acquired Assets would necessarily include avoidance actions arising from or related to those Contracts or obligations that are being assumed and assigned to the Stalking Horse Bidder as part of the Sales Transaction.  Moreover, Avoidance Actions can be, and are, regularly sold by Debtors.  Indeed, the Committee Objection acknowledges that the Third Circuit does not preclude this result.  *See* Committee Objection ¶ 25 (although DNOW incorrectly insists that the Third Circuit ruled otherwise.  *See* DNOW Objection ¶ 37.)

## **CONCLUSION**

WHEREFORE, GenNx360 and SII respectfully request that the Court enter an order granting the relief requested in the Debtors' Motion, overruling all other objections thereto, including the Objections and granting such other and further relief as may be just and proper.

Dated: September 11, 2019
      Wilmington, Delaware

Respectfully Submitted,

*/s/ Jamie L. Edmonson*
Jamie L. Edmonson (DE No. 4247)
ROBINSON & COLE LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 516-6705
Facsimile: (302) 295-5046
jedmonson@rc.com

WINSTON & STRAWN LLP
Carey D. Schreiber (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

Justin E. Rawlins
333 S. Grand Avenue, 38th Floor
Los Angeles, California 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

*Counsel for GenNx360 Capital Partners, L.P. and Schramm II Inc.*