## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| HDR HOLDING, INC., *et al.* [1] | Case No. 19-11396 (MFW) |
| Debtors. | Jointly Administered |
| | Re: Docket Nos. 18, 163 and 164 |

**ORDER: (A) AUTHORIZING THE SALE OF ALL OF THE
SCHRAMM INC. DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS, (B) AUTHORIZING AND
APPROVING THE SCHRAMM INC. DEBTOR'S PERFORMANCE UNDER THE
STALKING HORSE PURCHASE AGREEMENT, (C) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE SCHRAMM INC.
DEBTOR'S EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED
THERETO AND (D) GRANTING RELATED RELIEF**

Upon consideration of the motion [Docket No. 18] (the "Motion")[2] of the above-

captioned debtors and debtors in possession (the "Debtors") for the entry of an order pursuant to

sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"),

Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure

of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), among

other things, (a) authorizing the sale of the Acquired Assets free and clear of liens, claims,

encumbrances, and other interests, except as provided by that Asset Purchase Agreement, dated

June 24, 2019, by and between Schramm II Inc., a Delaware corporation and the Stalking Horse

Bidder  (the "Purchaser"), and the Schramm Inc. Debtor (the "Seller") (in the form attached

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: HDR Holding, Inc. (2015); and Schramm, Inc. (0480).  The Debtors' mailing address is 800 E. Virginia Ave., West Chester, PA 19380.

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in either the Motion or the Stalking Horse Purchase Agreement (as defined herein), as applicable.

hereto as <u>Exhibit 1</u>, as the same may be amended, supplemented or otherwise modified in accordance with its terms, together with all exhibits and annexes thereto, the "<u>Stalking Horse Purchase Agreement</u>"), (b) authorizing the Seller's performance under the Stalking Horse Purchase Agreement, (c) approving the assumption and assignment of certain of the Seller's Executory Contracts and Unexpired Leases related thereto (any such Executory Contract or Unexpired Lease designated to be assumed and assigned pursuant to the Sale Transaction), and (d) granting related relief; the Court having entered an order approving the Bidding Procedures and granting certain related relief on August 7, 2019 [Docket No. 163] (the "<u>Bidding Procedures Order</u>") after a hearing on the same (the "<u>Bidding Procedures Hearing</u>"); no auction (the "<u>Auction</u>") having been held because no additional Qualified Bids (as defined in the Bidding Procedures Order) on the Acquired Assets were received by the Debtors other than the Stalking Horse Bid and the Stalking Horse Purchase Agreement; the Purchaser having been deemed the Successful Bidder (as defined in the Bidding Procedures) by the Debtors pursuant to the Bidding Procedures Order; the Debtors having filed a notice on September 10, 2019 [Docket No. 195] of the cancellation of the Auction and intent to seek approval of the Successful Bidder and of approval of the Sale Transaction;  the Court having conducted a hearing on the Motion on September 16, 2019 (the "<u>Sale Hearing</u>") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion and other evidence submitted in support of the Motion, the Final DIP Order, the Stalking Horse Purchase Agreement, and the Bidding Procedures Order; upon the record of the hearing on the Final DIP Order[3] (the "<u>Final DIP Hearing</u>"), the Bidding Procedures

---

[3]  As used herein, "Final DIP Order" shall mean that certain *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, Bankruptcy Rule 2002, 4001, 6004 and 9014 and Local Bankruptcy Rule 4001-2 (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited*

2

Hearing and the Sale Hearing;  the Court having heard statements and arguments of counsel and

the evidence presented with respect to the relief requested in the Motion at the Sale Hearing; due

notice of the Motion, the Stalking Horse Purchase Agreement, the Bidding Procedures Hearing,

Bidding Procedures Order and the cancellation of the Auction having been provided; the Court

having reviewed the Motion and the objections thereto raised by, among others, the Official

Committee of Unsecured Creditors (the "Committee") and DNOW L.P. ("DNOW")

(collectively, including Docket Nos. 193 and 194, the "Objections") and the Debtors' omnibus

reply thereto [Docket No. 196] (the "Debtors' Reply") and the Purchaser's joinder therein

[Docket No. 199]; having determined that a sound business purpose exists for the Sale

Transaction, the relief requested in the Motion is in the best interests of the Debtors, their estates,

their stakeholders, and all other parties in interest, the Sale Transaction was negotiated and

proposed in good faith and the Purchase Price is fair and reasonable and in the best interest of the

Debtors' estates; the Court having jurisdiction over this matter; the legal and factual bases set

forth in the Motion and at the Sale Hearing establishing just cause for the relief granted herein;

and after due deliberation thereon,

### THE COURT HEREBY FURTHER FINDS AND DETERMINES THAT:

**I.      Jurisdiction, Final Order and Statutory Predicates**

        A.      The Court has jurisdiction to hear and determine the Motion pursuant to

28 U.S.C. §§ 157(b)(1) and 1334(a) and the Amended Standing Order.  This is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in this District and in the

Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

*Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties, and (IV) Granting Related Relief* [Docket No. 164].

B.     This order (this "Sale Order") constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

C.     The statutory predicates for the relief requested in the Motion are sections 105(a), 363(b), (f), and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), and (f), 6006(a) and (c), 9007, and 9014.

D.     The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

E.     To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are hereby adopted as such.  Any findings of fact or conclusions of law stated by the Court on the record at the Sale Hearing are hereby incorporated.

## II.     Notice of the Sale Transaction, Auction and the Cure Amounts

A.     Actual written notice of the Bidding Procedures Hearing, the Sale Hearing, the Auction, the Motion, the Sale Transaction, the assumption, assignment, and sale of the Executory Contracts and Unexpired Leases to be assigned to the Purchaser pursuant to the Stalking Horse Purchase Agreement (which are identified on Exhibit 2 hereto; such executory contracts and such unexpired leases (the "Assumed Contracts")) has been provided to, and a fair and reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to, all known interested persons and entities, including, but not limited to the following parties:  (a) the Office of the United States Trustee for the District of Delaware; (b) holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (c) counsel to the Debtors' pre-petition and post-petition lenders; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) the Office of the United

4

States Attorney for the District of Delaware; (g) the Banks; and (h) all parties that had filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002; (i) the U.S. Department of Justice; (j) the offices of the attorneys general for the states in which the Debtors operate; (k) the Stalking Horse Bidder; and (l) all parties that had expressed an interest in purchasing the Debtors' assets.

B.    In accordance with the provisions of the Bidding Procedures Order, the Debtors caused the Cure Notice (as defined in the Bidding Procedures Order) to be served, in compliance with the requirements of due process and the Bankruptcy Code, upon the Purchaser and the non-Debtor counterparties to the Executory Contracts or Unexpired Leases (the "Contract Counterparties"), noticing such parties:  (i) that the Seller seeks to assume and assign the Assumed Contracts on the Closing Date; and (ii) of the relevant Cure Amounts.  The Court finds that (i) the Purchaser and the Contract Counterparties have had an opportunity to object to the Cure Amounts set forth in the Cure Notice, (ii) the Cure Notice provided the Purchaser and the Contract Counterparties with proper notice of the potential assumption and assignment of the Assumed Contracts and any Cure Amount relating thereto, (iii) the service of such Cure Notice was good, sufficient, and appropriate under the circumstances, (iv) no further notice need be given in respect of establishing Cure Amounts for the Assumed Contracts, and (v) the procedures set forth in the Bidding Procedures Order with regard to objecting to any such Cure Amount satisfy the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

C.    The Debtors' Auction and Sale Notice (as defined in the Bidding Procedures Order) provided all interested parties with timely and proper notice of the Sale Transaction, the Sale Hearing, and the Auction.

5

D.      As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Bidding Procedures, the Auction, the cancellation of the Auction, the Sale Hearing, and the Sale Transaction has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.  The Debtors also have complied with all obligations to provide notice of the Auction, the cancellation of the Auction, the Sale Hearing, and the Sale Transaction required by the Bidding Procedures Order.  The notices described in this Section II were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, Auction, cancellation of the Auction, Sale Hearing, Sale Transaction, or assumption, assignment, and sale of the Assumed Contracts is required.

E.      The disclosures made by the Debtors concerning the Motion, the Bidding Procedures, the Stalking Horse Purchase Agreement, the cancellation of the Auction, the Sale Transaction, and the Sale Hearing, were good, complete, and adequate.

## III.     Good Faith of the Purchaser

A.      The Purchaser is purchasing the Acquired Assets, including all the properties, rights, interests, and other tangible and intangible assets of the Seller acquired by the Seller before Closing, including all of the Seller's estate's claims and causes of action, including the Seller's Prepetition Lien and Claim Matters (as defined in the Final DIP Order), including the Seller's fraudulent transfer claims, claims of the Seller against the Debtors' directors, officers and employees, and claims and causes of action relating to or arising under Chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, and 550, or any other similar state or federal law and any and all products, rents, offspring, profits, and proceeds of same (collectively, the "Avoidance Actions"), and excluding the Excluded Assets (as modified pursuant to paragraphs 9 and 11 below), and not including direct claims or direct causes of action of any

6

third party creditors.  The Purchaser is not acquiring any assets, properties, rights, interests, tangible or intangible asset, claims or causes of action of HDR Holding, Inc.  The Purchaser is making such purchase in good faith and is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, in that among other things:  (1) the Purchaser's Qualified Bid contained no break-up fee or expense reimbursement requirement; (2) the Purchaser's Qualified Bid was subject to a marketing process in an extended time frame  approved by the Court through the Bidding Procedures Order; (3) the Debtors conducted the marketing process in consultation with the Committee and contacted all potential bidders suggested by the Committee; (4) the Purchaser did not attempt to limit the Debtors' freedom to deal with any other party interested in acquiring the Acquired Assets; and (5) all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale Transaction have been disclosed.  There was no evidence of insider influence or improper conduct by the Purchaser in connection with the negotiation of the Stalking Horse Purchase Agreement with the Debtors, no evidence of fraud, collusion, or bad faith on the part of the Purchaser, no evidence of the Purchaser doing anything to control or otherwise influence the marketing or sale process, including anything to control or otherwise influence the purchase price paid for the Acquired Assets, and no evidence that the Purchaser violated section 363(n) of the Bankruptcy Code.  Accordingly, the Purchaser is entitled to the full protections of section 363(m) of the Bankruptcy Code.

## IV.    Highest and Best Offer

A.    The Debtors implemented the Bidding Procedures and provided cancellation of the Auction in accordance with the provisions of the Bidding Procedures Order, and the Debtors have otherwise complied with the Bidding Procedures Order in all respects.  The Bidding Procedures, which were followed by the Debtors, afforded a full, fair, and reasonable

AmericasActive:13923059.13

opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets.  Such process was duly noticed and conducted in a noncollusive, fair, and good faith manner, in consultation with the Committee (including contacting all potential bidders suggested by the Committee), and a reasonable opportunity, in an extended time frame agreed to by the Committee and DNOW, has been given to any interested party to make a higher and better offer for the Acquired Assets.

B.       The Stalking Horse Purchase Agreement represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of the Chapter 11 Cases.  No other Qualified Bids were received.  The consideration provided by the Purchaser under the Stalking Horse Purchase Agreement, including the assumption of the Assumed Liabilities, provides the highest economic value to the Debtors' estates, is fair and adequate, represents the highest and best available offer, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  Accordingly, the Stalking Horse Purchase Agreement constitutes the highest and best offer for the Acquired Assets and a valid, reasonable, and sound exercise of the Debtors' business judgment consistent with their fiduciary duties.

C.       Approval of the Motion and the Stalking Horse Purchase Agreement and the consummation of the Sale Transaction contemplated thereby is in the best interests of the Debtors, their creditors, their estates and other parties in interest.

**V.       Credit Bid/Assumption of Debt**

A.       Pursuant to the Bidding Procedures, applicable law, including section 363(k) of the Bankruptcy Code, and in accordance with the Final DIP Order, Purchaser is authorized to (i) use the DIP Obligations, DIP Liens, and DIP Superpriority Claim (each as defined in the Final DIP Order) to credit bid, (ii) to include as part of its Stalking Horse Bid an assumption of the Obligations under Term Loan A in the amount not less than $5,347,722.47

8

plus any other accrued and accruing unpaid Obligations thereunder, including interest, fees and expenses (including legal fees and expenses), and (iii) to include as part of its Stalking Horse Bid the assumption of the Obligations under Term Loan B in an amount not less than $5,000,000.00. Pursuant to the Stalking Horse Purchase Agreement, Purchaser credit bid an amount of DIP Obligations of $6,000,000 in principal amount and all accrued and unpaid interest thereon, assumed the Term Loan A in the amount of $5,347,722.47, assumed $5,000,000.00 of Term Loan B and assumed other liabilities comprising the Purchase Price as set forth in schedule 2.5 to the Stalking Horse Purchase Agreement. The Purchase Price is a valid and proper offer pursuant to the Bidding Procedures Order and sections 363(b) and 363(k) of the Bankruptcy Code. The DIP Lender remains committed to fund the DIP Facility to the extent required to fund amounts required to be paid under the DIP Budget (as defined in the Final DIP Order).

**VI.    No *Sub Rosa* Plan**

A.    The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction with the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates, and the Sale Transaction will provide the means for the Debtors to maximize distributions to creditors.

B.    The Sale Transaction does not constitute a *sub rosa* or *de facto* plan of reorganization or liquidation as it does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtors, (ii) impair or circumvent voting rights with respect to any plan that may be proposed by the Debtors, (iii) circumvent Chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests or extend debt maturities. Accordingly, the Sale Transaction neither impermissibly

restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating chapter 11 plan for the Debtors.

VII.    **No Fraudulent Transfer; Successor Liability Matters**

A.      The Stalking Horse Purchase Agreement was not entered into by the Purchaser and the Seller for the purpose of hindering, delaying, or defrauding creditors under either the Bankruptcy Code or the laws of the United States, any state, territory, possession, or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).  The consideration provided by the Purchaser pursuant to the Stalking Horse Purchase Agreement is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).  For the purposes of statutory and common law fraudulent conveyance and fraudulent transfer claims, neither the Seller nor the Purchaser are entering into the transactions contemplated by the Stalking Horse Purchase Agreement fraudulently.

B.      By virtue of the consummation of the Sale Transaction, (i) the Purchaser is not a continuation of the Debtors or their respective estates, there is no continuity between the Purchaser and the Debtors, there is no common identity between the Debtors and the Purchaser, there is no continuity of enterprise between the Debtors and the Purchaser, and the Purchaser is not a mere continuation of the Debtors or their estates, (ii) the Purchaser is not holding itself out to the public as a continuation of the Debtors or their respective estates, and (iii) the Sale Transaction does not amount to a consolidation, merger, or *de facto* consolidation or merger of the Purchaser and either or both the Debtors and the Debtors' estates.  Accordingly, the

10

Purchaser is not and shall not be deemed a successor to the Debtors as a result of the

consummation of the Sale Transaction contemplated by the Stalking Horse Purchase Agreement.

## VIII.    Validity of Transfer

A.    The Seller and the Purchaser have full corporate power and authority to

execute and deliver the Stalking Horse Purchase Agreement and all other documents

contemplated thereby, and no further consents or approvals are required for the Seller or the

Purchaser to consummate the transactions contemplated by the Stalking Horse Purchase

Agreement, except as otherwise set forth in the Stalking Horse Purchase Agreement.

B.    The transfer of each of the Acquired Assets to the Purchaser will be as of

the Closing Date and shall be a legal, valid, and effective transfer of such assets that shall vest

the Purchaser with all right, title, and interest of the Seller to the Acquired Assets free and clear

of all charges, liens, interests, security interests, claims, mortgages, leases, subleases,

hypothecations, deeds of trust, pledges, options, rights of use or possession, rights of first offer or

first refusal, easements, servitudes, restrictive covenants, encroachments, encumbrances, transfer

restrictions, or other similar restrictions of any kind, including those of the HDR Holding, Inc.

Debtor and any Challenge (as defined in the Final DIP Order) rights of any party (collectively,

"Adverse Interests"), except for any Permitted Liens and Assumed Liabilities.

## IX.    Section 363(f) Is Satisfied

A.    The Purchaser would not have entered into the Stalking Horse Purchase

Agreement and would not consummate the transactions contemplated thereby if the sale of the

Acquired Assets to the Purchaser and the assumption, assignment, and sale of the Assumed

Contracts to the Purchaser were not, except as otherwise provided in the Stalking Horse Purchase

Agreement with respect to the Permitted Liens and Assumed Liabilities, free and clear of all

Adverse Interests of any kind or nature whatsoever of the Seller, or if the Purchaser would, or in

11

the future could (except and only to the extent expressly provided in the Stalking Horse Purchase

Agreement and with respect to the Permitted Liens and Assumed Liabilities), be liable for any of

such Adverse Interests, including, but not limited to, Adverse Interests in respect of the

following:  (i) all mortgages, deeds of trust, and security interests; (ii) any pension, welfare,

compensation, or other employee benefit plans, agreements, practices, and programs, including,

without limitation, any pension plan of the Seller; (iii) any other employee, worker's

compensation, occupational disease, unemployment, or temporary disability related claim,

including, without limitation, claims that might otherwise arise under or pursuant to (a) the

Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards

Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973,

(e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Notification Act

of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in

Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the

Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state

unemployment compensation laws or any other similar state laws, or (l) any other state or federal

benefits or claims relating to any employment with the Seller or any of its predecessors; (iv) any

bulk sales or similar law; (v) any tax statutes or ordinances, including, without limitation, the

Internal Revenue Code of 1986, as amended; (vi) any Environmental Law(s); and (vii) any

theories of successor or transferee liability.

      B.     The Seller may sell the Acquired Assets free and clear of all Adverse

Interests against the Seller, its estate, or any of the Acquired Assets (except for any Assumed

Liabilities and Permitted Liens under the Stalking Horse Purchase Agreement) because, in each

case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has

AmericasActive:13923059.13

been satisfied.  Holders of such Adverse Interests fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Adverse Interests attach to the net cash proceeds of the Sale Transaction, if any, ultimately attributable to the Acquired Assets in which such creditor or interest holder alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor or interest holder had prior to the Sale Transaction, subject to any claims and defenses the Seller and its estate may possess with respect thereto.  Those holders of Adverse Interests against or in the Seller, its estate, or any of the Acquired Assets who did not object or who withdrew their objections to the Sale Transaction or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

**X.      Assumption and Assignment of the Assumed Contracts**

A.      The assumption and assignment of the Assumed Contracts pursuant to the terms of this Sale Order is integral to the Stalking Horse Purchase Agreement and is in the best interests of the Debtors and their estates, creditors, interest holders, and other parties in interest and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

B.      The amounts set forth on Exhibit 2 annexed hereto are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the Assumed Contracts (the "Cure Amounts").

C.      Pursuant to the terms of the Stalking Horse Purchase Agreement, the Purchaser shall have: (i) either or both cured and provided adequate assurance of cure of any defaults existing prior to the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting

13

from a default prior to the Closing Date under any of the Assumed Contracts, within the meaning

of section 365(b)(1)(B) of the Bankruptcy Code.  After the payment of the relevant Cure

Amounts by the Purchaser and as required by the Stalking Horse Purchase Agreement, the Seller

shall not have any further liabilities to the Contract Counterparties on or after the Closing Date.

The Purchaser provided adequate assurance of its future performance under the relevant

Assumed Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent

applicable) and 365(f)(2)(B) of the Bankruptcy Code.  Any non-Debtor counterparty to an

Assumed Contract who did not timely file an objection to the assumption of its Assumed

Contract shall be deemed to have consented to its assumption and assignment to the Purchaser

pursuant to section 365 of the Bankruptcy Code.

   D.  No default exists in the Seller's performance under the Assumed Contracts

as of the Closing Date other than the failure to pay Cure Amounts or defaults that are not

required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.

## XI.  Compelling Circumstances for an Immediate Sale

   A.  To maximize the value of the Debtors' assets and preserve the viability of

the business to which the Acquired Assets relate, it is essential that the Sale Transaction occur

promptly within the time constraints set forth in the Stalking Horse Purchase Agreement.

Therefore, time is of the essence in effectuating the Stalking Horse Purchase Agreement and

consummating the Sale Transaction, both to preserve and maximize the value of the Debtors'

assets for the benefit of the Debtors, their estates, their creditors, interest holders, and all other

parties in interest in the Chapter 11 Cases and to provide the means for the Debtors to maximize

creditor and interest holder recoveries.  As such, the Debtors and the Purchaser intend to close

the Sale of the Acquired Assets as soon as reasonably practicable.  The Debtors have

demonstrated compelling circumstances and a good, sufficient, and sound business purpose and

justification for immediate approval and consummation of the Stalking Horse Purchase Agreement.

    B.  The consummation of the transactions set forth in the Stalking Horse Purchase Agreement is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f), and all of the applicable requirements of such sections have been complied with in respect of such transactions.

    **NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**General Provisions**

    1.  The relief requested in the Motion is granted and the transactions contemplated thereby and by the Stalking Horse Purchase Agreement are approved for the reasons set forth in this Sale Order and on the record of the Sale Hearing, which is incorporated fully herein as if fully set forth in this Sale Order.

    2.  All objections, statements, and reservations of rights to the Sale Motion and the relief requested therein and to the entry of this Sale Order or the relief granted herein (including the Objections), that have not been withdrawn, waived, settled as announced to the Court at any prior hearing, at the Sale Hearing, or by stipulation filed with the Court, or previously overruled, including, without limitation, all reservations of rights included therein or otherwise, are hereby overruled and denied on the merits with prejudice, except as expressly set forth herein.  Those parties who did not object, or withdrew their objections, to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

    3.  This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order and the Final DIP Order are incorporated herein by reference.

**Approval of the Stalking Horse Purchase Agreement**

4.        The Stalking Horse Purchase Agreement and all of the respective terms and conditions thereof, the Sale Transaction contemplated thereby, and the Purchase Price are hereby approved, the Seller is authorized to enter into the Stalking Horse Purchase Agreement, and the Debtors are authorized to enter into all other ancillary documents to be executed in connection with the Stalking Horse Purchase Agreement as may be necessary.

5.        Pursuant to sections 363 and 365 of the Bankruptcy Code, entry by the Seller into the Stalking Horse Purchase Agreement is hereby authorized and approved.  The Seller and Purchaser acting by and through their existing agents, representatives, and officers are authorized, empowered and directed, without further order of this Court, to use their reasonable best efforts to take any and all actions necessary or appropriate to (i) consummate and close the Sale Transaction in accordance with the terms and conditions of the Stalking Horse Purchase Agreement and this Sale Order, (ii)  transfer and assign all rights, title, and interest to all assets, property, licenses, and rights of the Seller to be conveyed in accordance with the terms and conditions of the Stalking Horse Purchase Agreement, and (iii) execute and deliver, perform under, consummate, implement, and close fully the Stalking Horse Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse Purchase Agreement and the Sale Transaction, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Stalking Horse Purchase Agreement and such other ancillary documents.  The Seller is hereby authorized to perform its covenants and undertakings as provided in the Stalking Horse Purchase Agreement and any ancillary documents prior to or after the Closing Date without further order of the Court.  Neither the Purchaser nor the Seller shall have any obligation to proceed with a Closing under the Stalking

Horse Purchase Agreement until all conditions precedent to its obligations to do so have been met, satisfied, or waived, except as otherwise contemplated and provided for in the Stalking Horse Purchase Agreement.

6.      This Sale Order and the Stalking Horse Purchase Agreement shall be binding in all respects upon the Debtors, including the Debtors' estates, all holders of equity interests in any Debtor, all holders of any Claim(s) (whether known or unknown) against any Debtor, including the Committee and DNOW, any holders of Adverse Interests against or on all or any portion of the Acquired Assets, all Contract Counterparties, the Purchaser and all successors and assigns of the Purchaser, the Acquired Assets, all successors and assigns of the Debtors, any party in interest with standing to commence a Challenge, and any subsequent trustees appointed in any of the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Chapter 11 Cases, and shall not be subject to rejection or unwinding.  This Sale Order and the Stalking Horse Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser, and their respective successors and assigns.  Nothing in any chapter 11 plan confirmed in the Chapter 11 Cases, the confirmation order confirming any such chapter 11 plan, any order approving the wind down or dismissal of the Chapter 11 Cases, or any order entered upon the conversion of the Chapter 11 Cases to one or more cases under chapter 7 of the Bankruptcy Code or otherwise shall conflict with or derogate from the provisions of the Stalking Horse Purchase Agreement or this Sale Order.

7.      The Purchaser shall perform all obligations under the Stalking Horse Purchase Agreement.

**Transfer of the Acquired Assets**

8.      Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Seller is authorized and directed to transfer the Acquired Assets on the Closing Date.

17

The transfer of the Seller's rights, title, and interest in Acquired Assets to Purchaser pursuant to the Stalking Horse Purchase Agreement shall be transferred to the Purchaser upon and as of the Closing Date, and such transfer of the Acquired Assets and the consummation of the Sale Transaction and any related actions contemplated thereby constitute a legal, valid, binding, and effective transfer of the Seller's right, title, and interest in the Acquired Assets and shall vest Purchaser with all the rights, title and interest of the Seller in and to the Acquired Assets as set forth in the Stalking Horse Purchase Agreement, free and clear of all Adverse Interests (except Assumed Liabilities and Permitted Liens).  Upon the Closing, the Purchaser shall take title to and possession of the Acquired Assets subject only to the Assumed Liabilities and Permitted Liens.  Pursuant to section 363(f) of the Bankruptcy Code, the transfer of title to the Acquired Assets and the Assumed Contracts shall be free and clear of all Adverse Interests except for Assumed Liabilities and Permitted Liens, all including, without limitation, all claims pursuant to any successor or successor-in-interest liability theory.

9.      The sale of the Avoidance Actions pursuant to the Stalking Horse Purchase Agreement is hereby approved.  To the extent any such Avoidance Action is not assignable to Purchaser or any one or more of its designees, assignees, and successors, the Seller, and any chapter 11 or chapter 7 trustee (or any successor or other designee) of the Seller and its estates, shall be prohibited from bringing any such actions.  Notwithstanding anything to the contrary in the Stalking Horse Purchase Agreement, the following Avoidance Actions shall be Excluded Assets:  (i) Avoidance Actions against suppliers and vendors of the Seller who, in the sole discretion of the Purchaser are not going to be continuing suppliers and vendors; and (ii) Avoidance Actions against any Person who, in the sole discretion of the Purchaser and GenNx 360, is not going to be continuing with the Purchaser or GenNx 360 following the

18

Closing, other than any Person formerly or presently affiliated with the Purchaser or GenNx 360 (other than any such Person employed solely by the Seller).

10.     The consideration provided by Purchaser for the Seller's rights, title, and interest in the Acquired Assets under the Stalking Horse Purchase Agreement shall be deemed for all purposes to constitute fair consideration for the Acquired Assets.

11.     On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Seller's rights, title, and interest in the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to Purchaser on the Closing Date pursuant to the terms of the Stalking Horse Purchase Agreement and this Sale Order, free and clear of all Adverse Interests (other than Assumed Liabilities and Permitted Exceptions).  For the avoidance of doubt, the Excluded Assets set forth in the Stalking Horse Purchase Agreement (subject to paragraph 9 above) are not included in the Acquired Assets, and the Excluded Liabilities set forth in the Stalking Horse Purchase Agreement are not Assumed Liabilities.

12.     The Purchaser is not acquiring any assets, properties, rights, interests, tangible or intangible asset, claims or causes of action of HDR Holding, Inc.

13.     Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Seller constituting Acquired Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date as provided by the Stalking Horse Purchase Agreement. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Acquired Assets sold,

transferred, assigned, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction.

14.     Except as expressly provided by the Stalking Horse Purchase Agreement with respect to Assumed Liabilities and Permitted Liens, all persons and entities holding Adverse Interests in all or any portion of the Acquired Assets arising under or out of, in connection with or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' business prior to the Closing Date, or the transfer of the Acquired Assets to the Purchaser, are hereby forever barred, estopped, and permanently enjoined from asserting against the Purchaser or its successors or assigns, their property, or the Acquired Assets such persons' or entities' Adverse Interests in and to the Acquired Assets.  On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be deemed by the Purchaser to be necessary or desirable to release liens or claims on the Acquired Assets, if any, as provided for herein, as such liens or claim may have been recorded or may otherwise exist.

15.     All persons and entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets to be sold, transferred, or conveyed (wherever located) to Purchaser pursuant to the Stalking Horse Purchase Agreement are hereby directed to surrender possession of such Acquired Assets to the Purchaser on the Closing Date.  To the extent that any such person or entity fails or refuses to surrender possession of such Acquired Assets on or after the Closing Date, the Purchaser has the right to commence a turnover action and have it considered on an expedited basis.  All persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with, or which would be inconsistent with, the ability of the Seller to sell and transfer the Acquired Assets to the

20

Purchaser in accordance with the terms of the Stalking Horse Purchase Agreement and this Sale Order.

16.     This Sale Order is and shall be effective as a determination that, on the Closing Date, all Adverse Interests of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing, other than Permitted Liens and Assumed Liabilities, or as otherwise provided in this Sale Order, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been affected, with all such Adverse Interests to attach to any net proceeds received by the Seller ultimately attributable to the Acquired Assets against, or in, which such Adverse Interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such Adverse Interests now have against the Acquired Assets, subject to any rights, claims, and defenses that the Seller or its estate, as applicable, may possess with respect thereto.  This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby authorized and directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse Purchase Agreement.

AmericasActive:13923059.13

17.     Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse Purchase Agreement.  A certified copy of this Sale Order may be:  (a) filed with the appropriate clerk; (b) recorded with the recorder; or (c) filed or recorded with any other governmental agency to act to cancel any of the Adverse Interests and other encumbrances of record.

18.     If any person or entity that has filed statements or other documents or agreements evidencing Adverse Interests in all or any portion of the Acquired Assets has not delivered to the Seller prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements and any other documents necessary or desirable to the Purchaser for the purpose of documenting the release of all Adverse Interests (other than Assumed Liabilities or Permitted Liens), which the person or entity has or may assert with respect to all or any portion of the Acquired Assets, then the Purchaser and the Seller are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets; *provided* that, notwithstanding anything in this Sale Order or the Stalking Horse Purchase Agreement to the contrary, the provisions of this Sale Order shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.

**DIP Facility Obligations; Continuing Lien**

19.     On the Closing Date, subject only to retaining cash sufficient to fund the DIP Budget, the Debtors shall pay directly to the Purchaser all remaining Cash Collateral and all cash

in immediately available funds, without deduction or setoff, which payment shall be indefeasible once made, and not subject to recovery, diminution, reduction, or reversal on any basis, free and clear of all liens, claims, interests, and encumbrances, including those of the Prepetition Secured Parties under the DIP Order.  Notwithstanding anything to the contrary contained in this Sale Order or otherwise, the liens and claims of the DIP Lender (as defined in the Final DIP Order) pursuant to the Final DIP Order and DIP Note (as defined in the Final DIP Order) shall continue to attach to all cash and Cash Collateral remaining at the Debtors with the same priority, validity, extent, force, and effect as they now have to secure the obligations owed by the Debtors to the Purchaser to pay to the Purchaser any funds remaining in the Debtors' accounts after payment of the amounts set forth in the DIP Budget.  Until such time as all funds remaining at the Debtors that are no longer necessary to fund the DIP Budget are indefeasibly paid to the Purchaser, the Final DIP Order and all the rights, claims, and interests of the DIP Lender pursuant thereto shall remain in full force and effect. The DIP Lender remains committed to fund the DIP Facility to the extent required to fund amounts required to be paid under the DIP Budget (as defined in the Final DIP Order).

20.     Without limitation to the other provisions of this Sale Order, at the Closing, the Prepetition Secured Parties (as such term is defined in the DIP Order), shall execute such documents and take such other actions as may be reasonably necessary to release their Adverse Interests in and to the Cash and Cash Equivalents of the Debtors as of the Closing; provided, however, any failure to do so shall not in any way affect the validity of such transfer pursuant to this Sale Order.

**Assumed Contracts**

21.     Upon the Closing of the Sale Transaction, the Seller is authorized and directed to assume and assign the Assumed Contracts to the Purchaser free and clear of all Adverse

Interests, subject to the terms of this Sale Order, as of the Closing Date.  The payment of the applicable Cure Amounts (if any) by the Purchaser as required by the Stalking Horse Purchase Agreement shall (a) effect a cure of all defaults existing thereunder as of the Closing Date, (b) compensate for any actual pecuniary loss to the applicable Contract Counterparty resulting from such default, and (c) together with the assignment by the Seller to and the assumption of the Assumed Contracts by the Purchaser, constitute adequate assurance of future performance thereof.  The Seller shall then have assumed the Assumed Contracts and shall have assigned the Assumed Contracts to the Purchaser.  Pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Seller of the Assumed Contracts shall not be a default thereunder.  After the payment of the relevant Cure Amounts as required by the Stalking Horse Purchase Agreement, the Seller shall not have any further liabilities to the Contract Counterparties, and the counterparties shall be estopped from asserting any and all claims, whether known or unknown, against the Seller on account of the Assumed Contract.

22.     Any provisions in any Assumed Contract that prohibits or conditions the assignment of such Assumed Contract to the Purchaser or allows the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract to the Purchaser, constitute unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Seller and assignment to the Purchaser of the Assumed Contracts have been satisfied.  Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Seller under the Assumed Contracts.

24

23.     Any Contract Counterparty who did not timely file an objection to the assumption of its Assumed Contract shall be deemed to have consented to its assumption and assignment to the Purchaser pursuant to section 365 of the Bankruptcy Code.

24.     Upon the Closing and the payment of the relevant Cure Amounts, if any, the Purchaser shall be deemed to be substituted for the Seller as a party to the applicable Assumed Contracts and the Seller shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assumed Contracts.

25.     Upon the payment of the applicable Cure Amount, if any, the Assumed Contracts will remain in full force and effect, and no default shall exist under the Assumed Contracts.

26.     There shall be no rent accelerations, assignment fees, increases (including advertising rates), or any other fees charged to the Purchaser or the Seller as a result of the assumption and assignment of the Assumed Contracts.

27.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, other than the right to payment of any Cure Amount, all Contract Counterparties are forever barred and permanently enjoined from raising or asserting against either the Seller or the Purchaser any assignment fee, default, breach, claim, pecuniary loss, or condition to assignment arising under or related to the Assumed Contracts existing as of the Closing Date or arising by reason of the Closing.

28.     Notwithstanding the Cure Payment (as defined in the Notice of Potential Assumption and Assignment of Contracts [Docket No. 168]) of $0.00,  to the extent any employee benefit plan ("Employee Benefit Plan") administered or provided by Meritain Health, Inc. ("Meritain") or the Administrative Services Agreement between Debtor Schramm, Inc. and Meritain (the "ASA") is assumed, Meritain shall be entitled to all amounts under the Employee

25

Benefits Plan and/or ASA which have been accrued but not yet submitted to or processed by

Meritain, without regard to whether the dates of service for such benefits were prior to or after

the cure objection deadline, plus all amounts that become due and owing under the Employee

Benefits Plan and/or the ASA after the cure objection deadline, in each case in the ordinary

course of business and subject to the terms of the Employee Benefits Plan and/or the ASA.

**Other Provisions**

29.     If and to the extent the Debtors' Chapter 11 Cases are converted to cases under

chapter 7 of the Bankruptcy Code, any cash or Cash Collateral held by the Debtors for which no

potential expense exists under the DIP Budget shall be remitted to the Purchaser prior to such

conversion; provided that funds for "Estate Wind-Down Expenses" as set forth in the budget

shall be left in the estates subject to reconciliation with the chapter 7 trustee.

30.     Effective upon the Closing Date, except as set forth in the Stalking Horse

Purchase Agreement with respect to Permitted Liens and Assumed Liabilities, all persons and

entities are forever prohibited and permanently enjoined from commencing or continuing in any

manner any action or other proceeding, whether in law or equity, in any judicial, administrative,

arbitral, or other proceeding against the Purchaser, its successors and assigns, or the Acquired

Assets, with respect to any (i) Adverse Interests arising under, out of, in connection with or in

any way relating to the Seller, the Purchaser, the Acquired Assets, or the operation of the

Acquired Assets prior to the Closing of the Sale Transaction or (ii) successor liability based, in

whole or in part, directly or indirectly, on any theory of successor or vicarious liability of any

kind of character, or based upon any theory of antitrust, environmental, successor or transferee

liability, *de facto* merger or substantial continuity, labor and employment, or products liability,

whether known or unknown as of the Closing, now existing or hereafter arising, asserted or

unasserted, fixed or contingent, or liquidated or unliquidated, including, without limitation, the

AmericasActive:13923059.13

following actions: (a) commencing or continuing in any manner any action or other proceeding against the Purchaser, its successors or assigns, assets, or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Purchaser, its successors or assigns, assets, or properties; (c) creating, perfecting, or enforcing any Adverse Interests against the Purchaser, its successors or assigns, assets, or properties; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Purchaser or its successors or assigns; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to renew any license, permit, or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets.

31.     Except for the Assumed Liabilities and Permitted Liens, the Purchaser shall not have any liability or other obligation of the Debtors arising under or related to any of the Acquired Assets or the Stalking Horse Purchase Agreement or the transactions related thereto. Without limiting the generality of the foregoing, and except for the Assumed Liabilities or Permitted Liens provided in the Stalking Horse Purchase Agreement, the Purchaser shall not be liable for any Claims or any other Adverse Interests against the Debtors or any of its predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger or substantial continuity, labor and employment, or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, or liquidated or unliquidated, with

27

respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date,
including, but not limited to, liabilities on account of any taxes arising, accruing, or payable
under, out of, in connection with, or in any way relating to the operation of any of the Acquired
Assets prior to the Closing.

32.     The transactions contemplated by the Stalking Horse Purchase Agreement are
undertaken by the Purchaser without collusion and in good faith, as that term is defined in
section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal
of the authorization provided herein to consummate the Sale Transaction shall not affect the
validity of the Sale Transaction (including the assumption and assignment of the Assumed
Contracts), unless such authorization and such Sale Transaction are duly stayed pending such
appeal.  The Purchaser is a good faith buyer within the meaning of section 363(m) of the
Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the
Bankruptcy Code.

33.     No bulk sales law or any similar law of any state or other jurisdiction applies in
any way to the Sale Transaction.

34.     The failure specifically to include any particular provision of the Stalking Horse
Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such
provision, it being the intent of the Court that the Stalking Horse Purchase Agreement be
authorized and approved in its entirety.

35.     The Stalking Horse Purchase Agreement and any related or ancillary agreements,
documents or other instruments may be modified, amended, or supplemented by the parties
thereto and in accordance with the terms thereof, without further order of the Court; provided
any such modification, amendment or supplement does not have a material adverse effect on the

Debtors' estates.  All modifications of the Stalking Horse Purchase Agreement shall be filed with

the Court and served on the Committee and the U.S. Trustee.

36.     To the extent that this Sale Order is inconsistent with any prior order or pleading

with respect to the Motion in these Chapter 11 Cases, the terms of this Sale Order shall govern.

To the extent there are any inconsistencies between the terms of this Sale Order and the Stalking

Horse Purchase Agreement (including any ancillary documents executed in connection

therewith), the terms of this Sale Order shall govern.

37.     The provisions of this Sale Order are nonseverable and mutually dependent.

38.     The rights of the Committee to bring a Challenge (as defined in the Final DIP

Order) pursuant to the Final DIP Order, including paragraphs 16 and 32 therein, solely with

respect to any Excluded Assets are not affected by this Sale Order.

39.     All time periods set forth in this Sale Order shall be calculated in accordance with

Bankruptcy Rule 9006(a).

40.     Notwithstanding anything to the contrary in the Sale Motion, the Seller's books

and records shall be treated as set forth in the Stalking Horse Purchase Agreement, including the

definition of Excluded Assets and Sections 2.1 and 6.3.

41.     The transactions authorized herein shall be of full force and effect, regardless of

any Debtors' lack of good standing in any jurisdiction in which such Debtor is formed or

authorized to transact business.

42.     Notwithstanding anything to the contrary in the Sale Motion, the allocation of the

Purchase Price shall be prepared as set forth in Section 2.9 of the Stalking Horse Purchase

Agreement.

43.     From time to time, as and when requested, all parties shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the requesting party may reasonably deem necessary or desirable to consummate the Sale Transaction, including such actions as may be necessary to vest, perfect, or confirm or record or otherwise in the Purchaser its right, title, and interest in and to the Acquired Assets.

44.     Neither the Debtors nor any of their affiliates shall use, license, or permit any third party to use, any name, slogan, logo, or trademark which is confusingly or deceptively similar to any of the names, trademarks, or service marks included in the Intellectual Property in the Acquired Assets, and the Seller is directed to change its corporate name to a name which (i) does not use the name "Schramm" or any other name that references or reflects any of the foregoing in any manner whatsoever, (ii) is otherwise substantially dissimilar to its present name, and (iii) is approved in writing by the Purchaser.  Within a reasonable time after the Closing Date, the Debtors shall file a separate motion consistent with Local Rule 9004-1(c) seeking to modify the case caption to reflect the Seller's new corporate name and serve the same in accordance with Local Rule 9006-1.

45.     The Debtors are authorized to take all actions necessary to effect the relief granted pursuant to this Sale Order in accordance with the Sale Motion.

46.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified, lifted, and annulled with respect to the Debtors and the Purchaser to the extent necessary, without further order of this Court, to (a) allow the Purchaser to deliver any notice provided for in the Stalking Horse Purchase Agreement and (b) allow the Purchaser to take any and all actions permitted under the Stalking Horse Purchase Agreement in accordance with the

30

terms and conditions thereof.  The Purchaser shall not be required to seek or obtain relief from

the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies

under the Stalking Horse Purchase Agreement or any other Sale Transaction-related document.

The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the

extent necessary to implement the preceding sentence.

47.   This Court shall retain jurisdiction to, among other things, interpret, implement,

and enforce the terms and provisions of this Sale Order and the Stalking Horse Purchase

Agreement, all amendments thereto as well as any waivers and consents thereunder and each of

the agreements executed in connection therewith to which the Debtors are a party and adjudicate,

if necessary, any and all disputes concerning or relating in any way to the Sale Transaction.

**Dated: September 17th, 2019**
**Wilmington, Delaware**

31

**MARY F. WALRATH**
**UNITED STATES BANKRUPTCY JUDGE**

AmericasActive:13923059.13