# Exhibit A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| HDR HOLDING, INC., *et al.* [1] | Case No. 19-11396 (MFW) |
| Debtors. | Jointly Administered |
| | Re: Docket Nos. 18, 163 and 164 |

**ORDER: (A) AUTHORIZING THE SALE OF ALL OF THE
SCHRAMM INC. DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS, (B) AUTHORIZING AND
APPROVING THE SCHRAMM INC. DEBTOR'S PERFORMANCE UNDER THE
STALKING HORSE PURCHASE AGREEMENT, (C) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE SCHRAMM INC.
DEBTOR'S EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED
THERETO AND (D) GRANTING RELATED RELIEF**

Upon consideration of the motion [Docket No. 18] (the "Motion")[2] of the above-

captioned debtors and debtors in possession (the "Debtors") for the entry of an order pursuant to

sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"),

Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure

of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), among

other things, (a) authorizing the sale of the Acquired Assets free and clear of liens, claims,

encumbrances, and other interests, except as provided by that Asset Purchase Agreement, dated

June 24, 2019, by and between Schramm II Inc., a Delaware corporation and the Stalking Horse

Bidder  (the "Purchaser"), and the Schramm Inc. Debtor (the "Seller") (in the form attached

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: HDR Holding, Inc. (2015); and Schramm, Inc. (0480).  The Debtors' mailing address is 800 E. Virginia Ave., West Chester, PA 19380.

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in either the Motion or the Stalking Horse Purchase Agreement (as defined herein), as applicable.

hereto as <u>Exhibit 1</u>, as the same may be amended, supplemented or otherwise modified in

accordance with its terms, together with all exhibits and annexes thereto, the "<u>Stalking Horse</u>

<u>Purchase Agreement</u>"), (b) authorizing the Seller's performance under the Stalking Horse

Purchase Agreement, (c) approving the assumption and assignment of certain of the Seller's

Executory Contracts and Unexpired Leases related thereto (any such Executory Contract or

Unexpired Lease designated to be assumed and assigned pursuant to the Sale Transaction), and

(d) granting related relief; the Court having entered an order approving the Bidding Procedures

and granting certain related relief on August 7, 2019 [Docket No. 163] (the "<u>Bidding Procedures</u>

<u>Order</u>") after a hearing on the same (the "<u>Bidding Procedures Hearing</u>"); no auction (the

"<u>Auction</u>") having been held because no additional Qualified Bids (as defined in the Bidding

Procedures Order) on the Acquired Assets were received by the Debtors other than the Stalking

Horse Bid and the Stalking Horse Purchase Agreement; the Purchaser having been deemed the

Successful Bidder (as defined in the Bidding Procedures) by the Debtors pursuant to the Bidding

Procedures Order; the Debtors having filed a notice on September 10, 2019 [Docket No. 195] of

the cancellation of the Auction and intent to seek approval of the Successful Bidder and of

approval of the Sale Transaction;  the Court having conducted a hearing on the Motion on

September 16, 2019 (the "<u>Sale Hearing</u>") at which time all interested parties were offered an

opportunity to be heard with respect to the Motion; and the Court having reviewed and

considered the Motion and other evidence submitted in support of the Motion, the Final DIP

Order, the Stalking Horse Purchase Agreement, and the Bidding Procedures Order; upon the

record of the hearing on the Final DIP Order[3] (the "<u>Final DIP Hearing</u>"), the Bidding Procedures

---

[3]   As used herein, "Final DIP Order" shall mean that certain *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362,*
*363, 364 and 507, Bankruptcy Rule 2002, 4001, 6004 and 9014 and Local Bankruptcy Rule 4001-2 (I) Authorizing*
*the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited*

Hearing and the Sale Hearing;  the Court having heard statements and arguments of counsel and the evidence presented with respect to the relief requested in the Motion at the Sale Hearing; due notice of the Motion, the Stalking Horse Purchase Agreement, the Bidding Procedures Hearing, Bidding Procedures Order and the cancellation of the Auction having been provided; the Court having reviewed the Motion and the objections thereto raised by, among others, the Official Committee of Unsecured Creditors (the "Committee") and DNOW L.P. ("DNOW") (collectively, including Docket Nos. 193 and 194, the "Objections") and the Debtors' omnibus reply thereto [Docket No. 196] (the "Debtors' Reply") and the Purchaser's joinder therein [Docket No. 199]; having determined that a sound business purpose exists for the Sale Transaction, the relief requested in the Motion is in the best interests of the Debtors, their estates, their stakeholders, and all other parties in interest, the Sale Transaction was negotiated and proposed in good faith and the Purchase Price is fair and reasonable and in the best interest of the Debtors' estates; the Court having jurisdiction over this matter; the legal and factual bases set forth in the Motion and at the Sale Hearing establishing just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT HEREBY FURTHER FINDS AND DETERMINES THAT:**

**I.      Jurisdiction, Final Order and Statutory Predicates**

A.      The Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a) and the Amended Standing Order.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

*Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties, and (IV) Granting Related Relief* [Docket No. 164].

AmericasActive:13923059.13

B.     This order (this "Sale Order") constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

C.     The statutory predicates for the relief requested in the Motion are sections 105(a), 363(b), (f), and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), and (f), 6006(a) and (c), 9007, and 9014.

D.     The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

E.     To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are hereby adopted as such. Any findings of fact or conclusions of law stated by the Court on the record at the Sale Hearing are hereby incorporated.

## II.    Notice of the Sale Transaction, Auction and the Cure Amounts

A.     Actual written notice of the Bidding Procedures Hearing, the Sale Hearing, the Auction, the Motion, the Sale Transaction, the assumption, assignment, and sale of the Executory Contracts and Unexpired Leases to be assigned to the Purchaser pursuant to the Stalking Horse Purchase Agreement (which are identified on Exhibit 2 hereto; such executory contracts and such unexpired leases (the "Assumed Contracts")) has been provided to, and a fair and reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to, all known interested persons and entities, including, but not limited to the following parties: (a) the Office of the United States Trustee for the District of Delaware; (b) holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (c) counsel to the Debtors' pre-petition and post-petition lenders; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) the Office of the United

4

States Attorney for the District of Delaware; (g) the Banks; and (h) all parties that had filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002; (i) the U.S. Department of Justice; (j) the offices of the attorneys general for the states in which the Debtors operate; (k) the Stalking Horse Bidder; and (l) all parties that had expressed an interest in purchasing the Debtors' assets.

B.     In accordance with the provisions of the Bidding Procedures Order, the Debtors caused the Cure Notice (as defined in the Bidding Procedures Order) to be served, in compliance with the requirements of due process and the Bankruptcy Code, upon the Purchaser and the non-Debtor counterparties to the Executory Contracts or Unexpired Leases (the "Contract Counterparties"), noticing such parties:  (i) that the Seller seeks to assume and assign the Assumed Contracts on the Closing Date; and (ii) of the relevant Cure Amounts.  The Court finds that (i) the Purchaser and the Contract Counterparties have had an opportunity to object to the Cure Amounts set forth in the Cure Notice, (ii) the Cure Notice provided the Purchaser and the Contract Counterparties with proper notice of the potential assumption and assignment of the Assumed Contracts and any Cure Amount relating thereto, (iii) the service of such Cure Notice was good, sufficient, and appropriate under the circumstances, (iv) no further notice need be given in respect of establishing Cure Amounts for the Assumed Contracts, and (v) the procedures set forth in the Bidding Procedures Order with regard to objecting to any such Cure Amount satisfy the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

C.     The Debtors' Auction and Sale Notice (as defined in the Bidding Procedures Order) provided all interested parties with timely and proper notice of the Sale Transaction, the Sale Hearing, and the Auction.

AmericasActive:13923059.13

D.      As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Bidding Procedures, the Auction, the cancellation of the Auction, the Sale Hearing, and the Sale Transaction has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.  The Debtors also have complied with all obligations to provide notice of the Auction, the cancellation of the Auction, the Sale Hearing, and the Sale Transaction required by the Bidding Procedures Order.  The notices described in this Section II were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, Auction, cancellation of the Auction, Sale Hearing, Sale Transaction, or assumption, assignment, and sale of the Assumed Contracts is required.

E.      The disclosures made by the Debtors concerning the Motion, the Bidding Procedures, the Stalking Horse Purchase Agreement, the cancellation of the Auction, the Sale Transaction, and the Sale Hearing, were good, complete, and adequate.

III.    **Good Faith of the Purchaser**

A.      The Purchaser is purchasing the Acquired Assets, including all the properties, rights, interests, and other tangible and intangible assets of the Seller acquired by the Seller before Closing, including all of the Seller's estate's claims and causes of action, including the Seller's Prepetition Lien and Claim Matters (as defined in the Final DIP Order), including the Seller's fraudulent transfer claims, claims of the Seller against the Debtors' directors, officers and employees, and claims and causes of action relating to or arising under Chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, and 550, or any other similar state or federal law and any and all products, rents, offspring, profits, and proceeds of same (collectively, the "Avoidance Actions"), and excluding the Excluded Assets (as modified pursuant to paragraphs 9 and 11 below), and not including direct claims or direct causes of action of any

6

third party creditors.  The Purchaser is not acquiring any assets, properties, rights, interests,

tangible or intangible asset, claims or causes of action of HDR Holding, Inc.  The Purchaser is

making such purchase in good faith and is a good-faith purchaser within the meaning of section

363(m) of the Bankruptcy Code, in that among other things:  (1) the Purchaser's Qualified Bid

contained no break-up fee or expense reimbursement requirement; (2) the Purchaser's Qualified

Bid was subject to a marketing process in an extended time frame  approved by the Court

through the Bidding Procedures Order; (3) the Debtors conducted the marketing process in

consultation with the Committee and contacted all potential bidders suggested by the Committee;

(4) the Purchaser did not attempt to limit the Debtors' freedom to deal with any other party

interested in acquiring the Acquired Assets; and (5) all payments to be made by the Purchaser

and other agreements or arrangements entered into by the Purchaser in connection with the Sale

Transaction have been disclosed.  There was no evidence of insider influence or improper

conduct by the Purchaser in connection with the negotiation of the Stalking Horse Purchase

Agreement with the Debtors, no evidence of fraud, collusion, or bad faith on the part of the

Purchaser, no evidence of the Purchaser doing anything to control or otherwise influence the

marketing or sale process, including anything to control or otherwise influence the purchase

price paid for the Acquired Assets, and no evidence that the Purchaser violated section 363(n) of

the Bankruptcy Code.  Accordingly, the Purchaser is entitled to the full protections of section

363(m) of the Bankruptcy Code.

## IV.    Highest and Best Offer

A.    The Debtors implemented the Bidding Procedures and provided

cancellation of the Auction in accordance with the provisions of the Bidding Procedures Order,

and the Debtors have otherwise complied with the Bidding Procedures Order in all respects.  The

Bidding Procedures, which were followed by the Debtors, afforded a full, fair, and reasonable

7

opportunity for any person or entity to make a higher or otherwise better offer to purchase the

Acquired Assets.  Such process was duly noticed and conducted in a noncollusive, fair, and good

faith manner, in consultation with the Committee (including contacting all potential bidders

suggested by the Committee), and a reasonable opportunity, in an extended time frame agreed to

by the Committee and DNOW, has been given to any interested party to make a higher and better

offer for the Acquired Assets.

B.      The Stalking Horse Purchase Agreement represents a fair and reasonable

offer to purchase the Acquired Assets under the circumstances of the Chapter 11 Cases.  No

other Qualified Bids were received.  The consideration provided by the Purchaser under the

Stalking Horse Purchase Agreement, including the assumption of the Assumed Liabilities,

provides the highest economic value to the Debtors' estates, is fair and adequate, represents the

highest and best available offer, and will provide a greater recovery for the Debtors' estates than

would be provided by any other available alternative.  Accordingly, the Stalking Horse Purchase

Agreement constitutes the highest and best offer for the Acquired Assets and a valid, reasonable,

and sound exercise of the Debtors' business judgment consistent with their fiduciary duties.

C.      Approval of the Motion and the Stalking Horse Purchase Agreement and

the consummation of the Sale Transaction contemplated thereby is in the best interests of the

Debtors, their creditors, their estates and other parties in interest.

**V.      Credit Bid/Assumption of Debt**

A.      Pursuant to the Bidding Procedures, applicable law, including section

363(k) of the Bankruptcy Code, and in accordance with the Final DIP Order, Purchaser is

authorized to (i) use the DIP Obligations, DIP Liens, and DIP Superpriority Claim (each as

defined in the Final DIP Order) to credit bid, (ii) to include as part of its Stalking Horse Bid an

assumption of the Obligations under Term Loan A in the amount not less than $5,347,722.47

8

plus any other accrued and accruing unpaid Obligations thereunder, including interest, fees and expenses (including legal fees and expenses), and (iii) to include as part of its Stalking Horse Bid the assumption of the Obligations under Term Loan B in an amount not less than $5,000,000.00. Pursuant to the Stalking Horse Purchase Agreement, Purchaser credit bid an amount of DIP Obligations of $6,000,000 in principal amount and all accrued and unpaid interest thereon, assumed the Term Loan A in the amount of $5,347,722.47, assumed $5,000,000.00 of Term Loan B and assumed other liabilities comprising the Purchase Price as set forth in schedule 2.5 to the Stalking Horse Purchase Agreement. The Purchase Price is a valid and proper offer pursuant to the Bidding Procedures Order and sections 363(b) and 363(k) of the Bankruptcy Code. The DIP Lender remains committed to fund the DIP Facility to the extent required to fund amounts required to be paid under the DIP Budget (as defined in the Final DIP Order).

## VI.     No *Sub Rosa* Plan

A.      The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction with the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates, and the Sale Transaction will provide the means for the Debtors to maximize distributions to creditors.

B.      The Sale Transaction does not constitute a *sub rosa* or *de facto* plan of reorganization or liquidation as it does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtors, (ii) impair or circumvent voting rights with respect to any plan that may be proposed by the Debtors, (iii) circumvent Chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests or extend debt maturities. Accordingly, the Sale Transaction neither impermissibly

9

restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating chapter 11 plan for the Debtors.

**VII.    No Fraudulent Transfer; Successor Liability Matters**

A.    The Stalking Horse Purchase Agreement was not entered into by the Purchaser and the Seller for the purpose of hindering, delaying, or defrauding creditors under either the Bankruptcy Code or the laws of the United States, any state, territory, possession, or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).  The consideration provided by the Purchaser pursuant to the Stalking Horse Purchase Agreement is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).  For the purposes of statutory and common law fraudulent conveyance and fraudulent transfer claims, neither the Seller nor the Purchaser are entering into the transactions contemplated by the Stalking Horse Purchase Agreement fraudulently.

B.    By virtue of the consummation of the Sale Transaction, (i) the Purchaser is not a continuation of the Debtors or their respective estates, there is no continuity between the Purchaser and the Debtors, there is no common identity between the Debtors and the Purchaser, there is no continuity of enterprise between the Debtors and the Purchaser, and the Purchaser is not a mere continuation of the Debtors or their estates, (ii) the Purchaser is not holding itself out to the public as a continuation of the Debtors or their respective estates, and (iii) the Sale Transaction does not amount to a consolidation, merger, or *de facto* consolidation or merger of the Purchaser and either or both the Debtors and the Debtors' estates.  Accordingly, the

10

Purchaser is not and shall not be deemed a successor to the Debtors as a result of the

consummation of the Sale Transaction contemplated by the Stalking Horse Purchase Agreement.

## VIII.   Validity of Transfer

A.     The Seller and the Purchaser have full corporate power and authority to

execute and deliver the Stalking Horse Purchase Agreement and all other documents

contemplated thereby, and no further consents or approvals are required for the Seller or the

Purchaser to consummate the transactions contemplated by the Stalking Horse Purchase

Agreement, except as otherwise set forth in the Stalking Horse Purchase Agreement.

B.     The transfer of each of the Acquired Assets to the Purchaser will be as of

the Closing Date and shall be a legal, valid, and effective transfer of such assets that shall vest

the Purchaser with all right, title, and interest of the Seller to the Acquired Assets free and clear

of all charges, liens, interests, security interests, claims, mortgages, leases, subleases,

hypothecations, deeds of trust, pledges, options, rights of use or possession, rights of first offer or

first refusal, easements, servitudes, restrictive covenants, encroachments, encumbrances, transfer

restrictions, or other similar restrictions of any kind, including those of the HDR Holding, Inc.

Debtor and any Challenge (as defined in the Final DIP Order) rights of any party (collectively,

"Adverse Interests"), except for any Permitted Liens and Assumed Liabilities.

## IX.     Section 363(f) Is Satisfied

A.     The Purchaser would not have entered into the Stalking Horse Purchase

Agreement and would not consummate the transactions contemplated thereby if the sale of the

Acquired Assets to the Purchaser and the assumption, assignment, and sale of the Assumed

Contracts to the Purchaser were not, except as otherwise provided in the Stalking Horse Purchase

Agreement with respect to the Permitted Liens and Assumed Liabilities, free and clear of all

Adverse Interests of any kind or nature whatsoever of the Seller, or if the Purchaser would, or in

11

the future could (except and only to the extent expressly provided in the Stalking Horse Purchase Agreement and with respect to the Permitted Liens and Assumed Liabilities), be liable for any of such Adverse Interests, including, but not limited to, Adverse Interests in respect of the following:  (i) all mortgages, deeds of trust, and security interests; (ii) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Seller; (iii) any other employee, worker's compensation, occupational disease, unemployment, or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Notification Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (l) any other state or federal benefits or claims relating to any employment with the Seller or any of its predecessors; (iv) any bulk sales or similar law; (v) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (vi) any Environmental Law(s); and (vii) any theories of successor or transferee liability.

> B.    The Seller may sell the Acquired Assets free and clear of all Adverse Interests against the Seller, its estate, or any of the Acquired Assets (except for any Assumed Liabilities and Permitted Liens under the Stalking Horse Purchase Agreement) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has

AmericasActive:13923059.13

been satisfied.  Holders of such Adverse Interests fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Adverse Interests attach to the net cash proceeds of the Sale Transaction, if any, ultimately attributable to the Acquired Assets in which such creditor or interest holder alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor or interest holder had prior to the Sale Transaction, subject to any claims and defenses the Seller and its estate may possess with respect thereto.  Those holders of Adverse Interests against or in the Seller, its estate, or any of the Acquired Assets who did not object or who withdrew their objections to the Sale Transaction or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

### X.    Assumption and Assignment of the Assumed Contracts

A.    The assumption and assignment of the Assumed Contracts pursuant to the terms of this Sale Order is integral to the Stalking Horse Purchase Agreement and is in the best interests of the Debtors and their estates, creditors, interest holders, and other parties in interest and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

B.    The amounts set forth on Exhibit 2 annexed hereto are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the Assumed Contracts (the "Cure Amounts").

C.    Pursuant to the terms of the Stalking Horse Purchase Agreement, the Purchaser shall have: (i) either or both cured and provided adequate assurance of cure of any defaults existing prior to the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting

13

from a default prior to the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. After the payment of the relevant Cure Amounts by the Purchaser and as required by the Stalking Horse Purchase Agreement, the Seller shall not have any further liabilities to the Contract Counterparties on or after the Closing Date. The Purchaser provided adequate assurance of its future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code. Any non-Debtor counterparty to an Assumed Contract who did not timely file an objection to the assumption of its Assumed Contract shall be deemed to have consented to its assumption and assignment to the Purchaser pursuant to section 365 of the Bankruptcy Code.

D. No default exists in the Seller's performance under the Assumed Contracts as of the Closing Date other than the failure to pay Cure Amounts or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.

**XI.    Compelling Circumstances for an Immediate Sale**

A. To maximize the value of the Debtors' assets and preserve the viability of the business to which the Acquired Assets relate, it is essential that the Sale Transaction occur promptly within the time constraints set forth in the Stalking Horse Purchase Agreement. Therefore, time is of the essence in effectuating the Stalking Horse Purchase Agreement and consummating the Sale Transaction, both to preserve and maximize the value of the Debtors' assets for the benefit of the Debtors, their estates, their creditors, interest holders, and all other parties in interest in the Chapter 11 Cases and to provide the means for the Debtors to maximize creditor and interest holder recoveries. As such, the Debtors and the Purchaser intend to close the Sale of the Acquired Assets as soon as reasonably practicable. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and

14

justification for immediate approval and consummation of the Stalking Horse Purchase Agreement.

    B.  The consummation of the transactions set forth in the Stalking Horse Purchase Agreement is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f), and all of the applicable requirements of such sections have been complied with in respect of such transactions.

    **NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**<u>General Provisions</u>**

    1.  The relief requested in the Motion is granted and the transactions contemplated thereby and by the Stalking Horse Purchase Agreement are approved for the reasons set forth in this Sale Order and on the record of the Sale Hearing, which is incorporated fully herein as if fully set forth in this Sale Order.

    2.  All objections, statements, and reservations of rights to the Sale Motion and the relief requested therein and to the entry of this Sale Order or the relief granted herein (including the Objections), that have not been withdrawn, waived, settled as announced to the Court at any prior hearing, at the Sale Hearing, or by stipulation filed with the Court, or previously overruled, including, without limitation, all reservations of rights included therein or otherwise, are hereby overruled and denied on the merits with prejudice, except as expressly set forth herein.  Those parties who did not object, or withdrew their objections, to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

    3.  This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order and the Final DIP Order are incorporated herein by reference.

15

**Approval of the Stalking Horse Purchase Agreement**

4.      The Stalking Horse Purchase Agreement and all of the respective terms and conditions thereof, the Sale Transaction contemplated thereby, and the Purchase Price are hereby approved, the Seller is authorized to enter into the Stalking Horse Purchase Agreement, and the Debtors are authorized to enter into all other ancillary documents to be executed in connection with the Stalking Horse Purchase Agreement as may be necessary.

5.      Pursuant to sections 363 and 365 of the Bankruptcy Code, entry by the Seller into the Stalking Horse Purchase Agreement is hereby authorized and approved.  The Seller and Purchaser acting by and through their existing agents, representatives, and officers are authorized, empowered and directed, without further order of this Court, to use their reasonable best efforts to take any and all actions necessary or appropriate to (i) consummate and close the Sale Transaction in accordance with the terms and conditions of the Stalking Horse Purchase Agreement and this Sale Order, (ii)  transfer and assign all rights, title, and interest to all assets, property, licenses, and rights of the Seller to be conveyed in accordance with the terms and conditions of the Stalking Horse Purchase Agreement, and (iii) execute and deliver, perform under, consummate, implement, and close fully the Stalking Horse Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Stalking Horse Purchase Agreement and the Sale Transaction, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Stalking Horse Purchase Agreement and such other ancillary documents.  The Seller is hereby authorized to perform its covenants and undertakings as provided in the Stalking Horse Purchase Agreement and any ancillary documents prior to or after the Closing Date without further order of the Court.  Neither the Purchaser nor the Seller shall have any obligation to proceed with a Closing under the Stalking

16

Horse Purchase Agreement until all conditions precedent to its obligations to do so have been met, satisfied, or waived, except as otherwise contemplated and provided for in the Stalking Horse Purchase Agreement.

6.      This Sale Order and the Stalking Horse Purchase Agreement shall be binding in all respects upon the Debtors, including the Debtors' estates, all holders of equity interests in any Debtor, all holders of any Claim(s) (whether known or unknown) against any Debtor, including the Committee and DNOW, any holders of Adverse Interests against or on all or any portion of the Acquired Assets, all Contract Counterparties, the Purchaser and all successors and assigns of the Purchaser, the Acquired Assets, all successors and assigns of the Debtors, any party in interest with standing to commence a Challenge, and any subsequent trustees appointed in any of the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Chapter 11 Cases, and shall not be subject to rejection or unwinding.  This Sale Order and the Stalking Horse Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser, and their respective successors and assigns.  Nothing in any chapter 11 plan confirmed in the Chapter 11 Cases, the confirmation order confirming any such chapter 11 plan, any order approving the wind down or dismissal of the Chapter 11 Cases, or any order entered upon the conversion of the Chapter 11 Cases to one or more cases under chapter 7 of the Bankruptcy Code or otherwise shall conflict with or derogate from the provisions of the Stalking Horse Purchase Agreement or this Sale Order.

7.      The Purchaser shall perform all obligations under the Stalking Horse Purchase Agreement.

**Transfer of the Acquired Assets**

8.      Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Seller is authorized and directed to transfer the Acquired Assets on the Closing Date.

17

The transfer of the Seller's rights, title, and interest in Acquired Assets to Purchaser pursuant to the Stalking Horse Purchase Agreement shall be transferred to the Purchaser upon and as of the Closing Date, and such transfer of the Acquired Assets and the consummation of the Sale Transaction and any related actions contemplated thereby constitute a legal, valid, binding, and effective transfer of the Seller's right, title, and interest in the Acquired Assets and shall vest Purchaser with all the rights, title and interest of the Seller in and to the Acquired Assets as set forth in the Stalking Horse Purchase Agreement, free and clear of all Adverse Interests (except Assumed Liabilities and Permitted Liens). Upon the Closing, the Purchaser shall take title to and possession of the Acquired Assets subject only to the Assumed Liabilities and Permitted Liens. Pursuant to section 363(f) of the Bankruptcy Code, the transfer of title to the Acquired Assets and the Assumed Contracts shall be free and clear of all Adverse Interests except for Assumed Liabilities and Permitted Liens, all including, without limitation, all claims pursuant to any successor or successor-in-interest liability theory.

9.      The sale of the Avoidance Actions pursuant to the Stalking Horse Purchase Agreement is hereby approved. To the extent any such Avoidance Action is not assignable to Purchaser or any one or more of its designees, assignees, and successors, the Seller, and any chapter 11 or chapter 7 trustee (or any successor or other designee) of the Seller and its estates, shall be prohibited from bringing any such actions. Notwithstanding anything to the contrary in the Stalking Horse Purchase Agreement, the following Avoidance Actions shall be Excluded Assets: (i) Avoidance Actions against suppliers and vendors of the Seller who, in the sole discretion of the Purchaser are not going to be continuing suppliers and vendors; and (ii) Avoidance Actions against any Person who, in the sole discretion of the Purchaser and GenNx 360, is not going to be continuing with the Purchaser or GenNx 360 following the

18

Closing, other than any Person formerly or presently affiliated with the Purchaser or GenNx 360 (other than any such Person employed solely by the Seller).

10.     The consideration provided by Purchaser for the Seller's rights, title, and interest in the Acquired Assets under the Stalking Horse Purchase Agreement shall be deemed for all purposes to constitute fair consideration for the Acquired Assets.

11.     On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Seller's rights, title, and interest in the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to Purchaser on the Closing Date pursuant to the terms of the Stalking Horse Purchase Agreement and this Sale Order, free and clear of all Adverse Interests (other than Assumed Liabilities and Permitted Exceptions).  For the avoidance of doubt, the Excluded Assets set forth in the Stalking Horse Purchase Agreement (subject to paragraph 9 above) are not included in the Acquired Assets, and the Excluded Liabilities set forth in the Stalking Horse Purchase Agreement are not Assumed Liabilities.

12.     The Purchaser is not acquiring any assets, properties, rights, interests, tangible or intangible asset, claims or causes of action of HDR Holding, Inc.

13.     Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Seller constituting Acquired Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date as provided by the Stalking Horse Purchase Agreement. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Acquired Assets sold,

AmericasActive:13923059.13

transferred, assigned, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction.

14.     Except as expressly provided by the Stalking Horse Purchase Agreement with respect to Assumed Liabilities and Permitted Liens, all persons and entities holding Adverse Interests in all or any portion of the Acquired Assets arising under or out of, in connection with or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' business prior to the Closing Date, or the transfer of the Acquired Assets to the Purchaser, are hereby forever barred, estopped, and permanently enjoined from asserting against the Purchaser or its successors or assigns, their property, or the Acquired Assets such persons' or entities' Adverse Interests in and to the Acquired Assets.  On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be deemed by the Purchaser to be necessary or desirable to release liens or claims on the Acquired Assets, if any, as provided for herein, as such liens or claim may have been recorded or may otherwise exist.

15.     All persons and entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets to be sold, transferred, or conveyed (wherever located) to Purchaser pursuant to the Stalking Horse Purchase Agreement are hereby directed to surrender possession of such Acquired Assets to the Purchaser on the Closing Date.  To the extent that any such person or entity fails or refuses to surrender possession of such Acquired Assets on or after the Closing Date, the Purchaser has the right to commence a turnover action and have it considered on an expedited basis.  All persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with, or which would be inconsistent with, the ability of the Seller to sell and transfer the Acquired Assets to the

20

Purchaser in accordance with the terms of the Stalking Horse Purchase Agreement and this Sale Order.

16.      This Sale Order is and shall be effective as a determination that, on the Closing Date, all Adverse Interests of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing, other than Permitted Liens and Assumed Liabilities, or as otherwise provided in this Sale Order, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been affected, with all such Adverse Interests to attach to any net proceeds received by the Seller ultimately attributable to the Acquired Assets against, or in, which such Adverse Interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such Adverse Interests now have against the Acquired Assets, subject to any rights, claims, and defenses that the Seller or its estate, as applicable, may possess with respect thereto.  This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby authorized and directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse Purchase Agreement.

17.     Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse Purchase Agreement.  A certified copy of this Sale Order may be:  (a) filed with the appropriate clerk; (b) recorded with the recorder; or (c) filed or recorded with any other governmental agency to act to cancel any of the Adverse Interests and other encumbrances of record.

18.     If any person or entity that has filed statements or other documents or agreements evidencing Adverse Interests in all or any portion of the Acquired Assets has not delivered to the Seller prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements and any other documents necessary or desirable to the Purchaser for the purpose of documenting the release of all Adverse Interests (other than Assumed Liabilities or Permitted Liens), which the person or entity has or may assert with respect to all or any portion of the Acquired Assets, then the Purchaser and the Seller are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets; *provided* that, notwithstanding anything in this Sale Order or the Stalking Horse Purchase Agreement to the contrary, the provisions of this Sale Order shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.

**DIP Facility Obligations; Continuing Lien**

19.     On the Closing Date, subject only to retaining cash sufficient to fund the DIP Budget, the Debtors shall pay directly to the Purchaser all remaining Cash Collateral and all cash

22

in immediately available funds, without deduction or setoff, which payment shall be indefeasible once made, and not subject to recovery, diminution, reduction, or reversal on any basis, free and clear of all liens, claims, interests, and encumbrances, including those of the Prepetition Secured Parties under the DIP Order.  Notwithstanding anything to the contrary contained in this Sale Order or otherwise, the liens and claims of the DIP Lender (as defined in the Final DIP Order) pursuant to the Final DIP Order and DIP Note (as defined in the Final DIP Order) shall continue to attach to all cash and Cash Collateral remaining at the Debtors with the same priority, validity, extent, force, and effect as they now have to secure the obligations owed by the Debtors to the Purchaser to pay to the Purchaser any funds remaining in the Debtors' accounts after payment of the amounts set forth in the DIP Budget.  Until such time as all funds remaining at the Debtors that are no longer necessary to fund the DIP Budget are indefeasibly paid to the Purchaser, the Final DIP Order and all the rights, claims, and interests of the DIP Lender pursuant thereto shall remain in full force and effect. The DIP Lender remains committed to fund the DIP Facility to the extent required to fund amounts required to be paid under the DIP Budget (as defined in the Final DIP Order).

20.     Without limitation to the other provisions of this Sale Order, at the Closing, the Prepetition Secured Parties (as such term is defined in the DIP Order), shall execute such documents and take such other actions as may be reasonably necessary to release their Adverse Interests in and to the Cash and Cash Equivalents of the Debtors as of the Closing; provided, however, any failure to do so shall not in any way affect the validity of such transfer pursuant to this Sale Order.

**Assumed Contracts**

21.     Upon the Closing of the Sale Transaction, the Seller is authorized and directed to assume and assign the Assumed Contracts to the Purchaser free and clear of all Adverse

23

Interests, subject to the terms of this Sale Order, as of the Closing Date. The payment of the

applicable Cure Amounts (if any) by the Purchaser as required by the Stalking Horse Purchase

Agreement shall (a) effect a cure of all defaults existing thereunder as of the Closing Date,

(b) compensate for any actual pecuniary loss to the applicable Contract Counterparty resulting

from such default, and (c) together with the assignment by the Seller to and the assumption of the

Assumed Contracts by the Purchaser, constitute adequate assurance of future performance

thereof. The Seller shall then have assumed the Assumed Contracts and shall have assigned the

Assumed Contracts to the Purchaser. Pursuant to section 365(f) of the Bankruptcy Code, the

assignment by the Seller of the Assumed Contracts shall not be a default thereunder. After the

payment of the relevant Cure Amounts as required by the Stalking Horse Purchase Agreement,

the Seller shall not have any further liabilities to the Contract Counterparties, and the

counterparties shall be estopped from asserting any and all claims, whether known or unknown,

against the Seller on account of the Assumed Contract.

      22.      Any provisions in any Assumed Contract that prohibits or conditions the

assignment of such Assumed Contract to the Purchaser or allows the party to such Assumed

Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or

modify any term or condition upon the assignment of such Assumed Contract to the Purchaser,

constitute unenforceable anti-assignment provisions that are void and of no force and effect. All

other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the

assumption by the Seller and assignment to the Purchaser of the Assumed Contracts have been

satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code,

the Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Seller

under the Assumed Contracts.

24

23. Any Contract Counterparty who did not timely file an objection to the assumption of its Assumed Contract shall be deemed to have consented to its assumption and assignment to the Purchaser pursuant to section 365 of the Bankruptcy Code.

24. Upon the Closing and the payment of the relevant Cure Amounts, if any, the Purchaser shall be deemed to be substituted for the Seller as a party to the applicable Assumed Contracts and the Seller shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assumed Contracts.

25. Upon the payment of the applicable Cure Amount, if any, the Assumed Contracts will remain in full force and effect, and no default shall exist under the Assumed Contracts.

26. There shall be no rent accelerations, assignment fees, increases (including advertising rates), or any other fees charged to the Purchaser or the Seller as a result of the assumption and assignment of the Assumed Contracts.

27. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, other than the right to payment of any Cure Amount, all Contract Counterparties are forever barred and permanently enjoined from raising or asserting against either the Seller or the Purchaser any assignment fee, default, breach, claim, pecuniary loss, or condition to assignment arising under or related to the Assumed Contracts existing as of the Closing Date or arising by reason of the Closing.

28. Notwithstanding the Cure Payment (as defined in the Notice of Potential Assumption and Assignment of Contracts [Docket No. 168]) of $0.00, to the extent any employee benefit plan ("Employee Benefit Plan") administered or provided by Meritain Health, Inc. ("Meritain") or the Administrative Services Agreement between Debtor Schramm, Inc. and Meritain (the "ASA") is assumed, Meritain shall be entitled to all amounts under the Employee

25

Benefits Plan and/or ASA which have been accrued but not yet submitted to or processed by

Meritain, without regard to whether the dates of service for such benefits were prior to or after

the cure objection deadline, plus all amounts that become due and owing under the Employee

Benefits Plan and/or the ASA after the cure objection deadline, in each case in the ordinary

course of business and subject to the terms of the Employee Benefits Plan and/or the ASA.

**Other Provisions**

29.     If and to the extent the Debtors' Chapter 11 Cases are converted to cases under

chapter 7 of the Bankruptcy Code, any cash or Cash Collateral held by the Debtors for which no

potential expense exists under the DIP Budget shall be remitted to the Purchaser prior to such

conversion; provided that funds for "Estate Wind-Down Expenses" as set forth in the budget

shall be left in the estates subject to reconciliation with the chapter 7 trustee.

30.     Effective upon the Closing Date, except as set forth in the Stalking Horse

Purchase Agreement with respect to Permitted Liens and Assumed Liabilities, all persons and

entities are forever prohibited and permanently enjoined from commencing or continuing in any

manner any action or other proceeding, whether in law or equity, in any judicial, administrative,

arbitral, or other proceeding against the Purchaser, its successors and assigns, or the Acquired

Assets, with respect to any (i) Adverse Interests arising under, out of, in connection with or in

any way relating to the Seller, the Purchaser, the Acquired Assets, or the operation of the

Acquired Assets prior to the Closing of the Sale Transaction or (ii) successor liability based, in

whole or in part, directly or indirectly, on any theory of successor or vicarious liability of any

kind of character, or based upon any theory of antitrust, environmental, successor or transferee

liability, *de facto* merger or substantial continuity, labor and employment, or products liability,

whether known or unknown as of the Closing, now existing or hereafter arising, asserted or

unasserted, fixed or contingent, or liquidated or unliquidated, including, without limitation, the

AmericasActive:13923059.13

following actions: (a) commencing or continuing in any manner any action or other proceeding against the Purchaser, its successors or assigns, assets, or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Purchaser, its successors or assigns, assets, or properties; (c) creating, perfecting, or enforcing any Adverse Interests against the Purchaser, its successors or assigns, assets, or properties; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Purchaser or its successors or assigns; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to renew any license, permit, or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets.

31.     Except for the Assumed Liabilities and Permitted Liens, the Purchaser shall not have any liability or other obligation of the Debtors arising under or related to any of the Acquired Assets or the Stalking Horse Purchase Agreement or the transactions related thereto. Without limiting the generality of the foregoing, and except for the Assumed Liabilities or Permitted Liens provided in the Stalking Horse Purchase Agreement, the Purchaser shall not be liable for any Claims or any other Adverse Interests against the Debtors or any of its predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger or substantial continuity, labor and employment, or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, or liquidated or unliquidated, with

27

respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date,
including, but not limited to, liabilities on account of any taxes arising, accruing, or payable
under, out of, in connection with, or in any way relating to the operation of any of the Acquired
Assets prior to the Closing.

32.     The transactions contemplated by the Stalking Horse Purchase Agreement are
undertaken by the Purchaser without collusion and in good faith, as that term is defined in
section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal
of the authorization provided herein to consummate the Sale Transaction shall not affect the
validity of the Sale Transaction (including the assumption and assignment of the Assumed
Contracts), unless such authorization and such Sale Transaction are duly stayed pending such
appeal.  The Purchaser is a good faith buyer within the meaning of section 363(m) of the
Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the
Bankruptcy Code.

33.     No bulk sales law or any similar law of any state or other jurisdiction applies in
any way to the Sale Transaction.

34.     The failure specifically to include any particular provision of the Stalking Horse
Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such
provision, it being the intent of the Court that the Stalking Horse Purchase Agreement be
authorized and approved in its entirety.

35.     The Stalking Horse Purchase Agreement and any related or ancillary agreements,
documents or other instruments may be modified, amended, or supplemented by the parties
thereto and in accordance with the terms thereof, without further order of the Court; provided
any such modification, amendment or supplement does not have a material adverse effect on the

Debtors' estates.  All modifications of the Stalking Horse Purchase Agreement shall be filed with the Court and served on the Committee and the U.S. Trustee.

36. To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Sale Order shall govern. To the extent there are any inconsistencies between the terms of this Sale Order and the Stalking Horse Purchase Agreement (including any ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

37. The provisions of this Sale Order are nonseverable and mutually dependent.

38. The rights of the Committee to bring a Challenge (as defined in the Final DIP Order) pursuant to the Final DIP Order, including paragraphs 16 and 32 therein, solely with respect to any Excluded Assets are not affected by this Sale Order.

39. All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

40. Notwithstanding anything to the contrary in the Sale Motion, the Seller's books and records shall be treated as set forth in the Stalking Horse Purchase Agreement, including the definition of Excluded Assets and Sections 2.1 and 6.3.

41. The transactions authorized herein shall be of full force and effect, regardless of any Debtors' lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

42. Notwithstanding anything to the contrary in the Sale Motion, the allocation of the Purchase Price shall be prepared as set forth in Section 2.9 of the Stalking Horse Purchase Agreement.

43.     From time to time, as and when requested, all parties shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the requesting party may reasonably deem necessary or desirable to consummate the Sale Transaction, including such actions as may be necessary to vest, perfect, or confirm or record or otherwise in the Purchaser its right, title, and interest in and to the Acquired Assets.

44.     Neither the Debtors nor any of their affiliates shall use, license, or permit any third party to use, any name, slogan, logo, or trademark which is confusingly or deceptively similar to any of the names, trademarks, or service marks included in the Intellectual Property in the Acquired Assets, and the Seller is directed to change its corporate name to a name which (i) does not use the name "Schramm" or any other name that references or reflects any of the foregoing in any manner whatsoever, (ii) is otherwise substantially dissimilar to its present name, and (iii) is approved in writing by the Purchaser.  Within a reasonable time after the Closing Date, the Debtors shall file a separate motion consistent with Local Rule 9004-1(c) seeking to modify the case caption to reflect the Seller's new corporate name and serve the same in accordance with Local Rule 9006-1.

45.     The Debtors are authorized to take all actions necessary to effect the relief granted pursuant to this Sale Order in accordance with the Sale Motion.

46.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified, lifted, and annulled with respect to the Debtors and the Purchaser to the extent necessary, without further order of this Court, to (a) allow the Purchaser to deliver any notice provided for in the Stalking Horse Purchase Agreement and (b) allow the Purchaser to take any and all actions permitted under the Stalking Horse Purchase Agreement in accordance with the

30

terms and conditions thereof.  The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Stalking Horse Purchase Agreement or any other Sale Transaction-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence.

47.    This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Stalking Horse Purchase Agreement, all amendments thereto as well as any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party and adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction.

**Dated: September 17th, 2019**
**Wilmington, Delaware**

31

MARY F. WALRATH
**UNITED STATES BANKRUPTCY JUDGE**

# **EXHIBIT 1**

Stalking Horse Purchase Agreement

Case 19-11396-MFW    Doc 208-1    Filed 09/17/19    Page 2 of 100

**ASSET PURCHASE AGREEMENT**

**by and between**

**SCHRAMM INC.**

**Seller**

**and**

**SCHRAMM II INC.**

**Buyer**

**June 24, 2019**

# TABLE OF CONTENTS

**Page**

**ARTICLE I** DEFINITIONS ................................................................................................................ 1

**ARTICLE II** PURCHASE AND SALE ........................................................................................ 10
   **Section 2.1**   Purchase and Sale of Acquired Assets .............................................. 10
   **Section 2.2**   Excluded Assets ..................................................................................... 12
   **Section 2.3**   Assumption of Assumed Liabilities .................................................. 12
   **Section 2.4**   Excluded Liabilities .............................................................................. 12
   **Section 2.5**   Consideration .......................................................................................... 13
   **Section 2.6**   Assumption and Assignment of Contracts ..................................... 13
   **Section 2.7**   Closing ..................................................................................................... 15
   **Section 2.8**   Deliveries at Closing ............................................................................ 15
   **Section 2.9**   Allocation ................................................................................................ 16
   **Section 2.10**  Proration of Taxes ................................................................................ 16

**ARTICLE III** REPRESENTATIONS AND WARRANTIES OF SELLER. ........................... 17
   **Section 3.1**   Organization of Seller: Good Standing ............................................ 17
   **Section 3.2**   Authorization of Transaction ............................................................. 17
   **Section 3.3**   Noncontravention; Consents and Approvals .................................. 18
   **Section 3.4**   Title to Acquired Assets ...................................................................... 19
   **Section 3.5**   Contracts ................................................................................................. 19
   **Section 3.6**   Legal Compliance ................................................................................. 20
   **Section 3.7**   Litigation ................................................................................................. 20
   **Section 3.8**   Environmental, Health and Safety Matters .................................... 20
   **Section 3.9**   Employees and Employment Matters ............................................... 21
   **Section 3.10**  Employee Benefit Plans ....................................................................... 21
   **Section 3.11**  Leased Real Property ............................................................................ 22
   **Section 3.12**  Permits .................................................................................................... 22
   **Section 3.13**  Insurance ................................................................................................. 22
   **Section 3.14**  [Reserved] ............................................................................................... 23
   **Section 3.15**  Intellectual Property ............................................................................. 23
   **Section 3.16**  Absence of Changes ............................................................................. 23
   **Section 3.17**  Brokers' Fees ......................................................................................... 23
   **Section 3.18**  No Other Representations or Warranties ........................................ 23

**ARTICLE IV** BUYER'S REPRESENTATIONS AND WARRANTIES ................................ 24
   **Section 4.1**   Organization of Buyer ......................................................................... 24
   **Section 4.2**   Authorization of Transaction ............................................................. 24
   **Section 4.3**   Noncontravention .................................................................................. 24
   **Section 4.4**   Litigation ................................................................................................. 25
   **Section 4.5**   Brokers' Fees ......................................................................................... 25
   **Section 4.6**   Financial Capacity ................................................................................ 25
   **Section 4.7**   Condition of the Business .................................................................... 25

i

**Section 4.8**   Adequate Assurances Regarding Executory Contracts.................................. 26
**Section 4.9**   Good Faith Purchaser ................................................................................ 26

**ARTICLE V** PRE-CLOSING COVENANTS .......................................................... 26
**Section 5.1**   Certain Efforts; Cooperation .................................................................... 26
**Section 5.2**   Notices and Consents ............................................................................... 26
**Section 5.3**   Bankruptcy Actions .................................................................................. 26
**Section 5.4**   Conduct of Business ................................................................................. 27
**Section 5.5**   Notice of Developments ........................................................................... 27
**Section 5.6**   Access ....................................................................................................... 28
**Section 5.7**   Press Releases and Public Announcements .............................................. 28
**Section 5.8**   Bulk Transfer Laws .................................................................................. 28
**Section 5.9**   Post-Closing Operation of the Seller ....................................................... 28
**Section 5.10**  Competing Transaction ............................................................................. 29

**ARTICLE VI** OTHER COVENANTS .................................................................... 29
**Section 6.1**   Cooperation .............................................................................................. 29
**Section 6.2**   Further Assurances ................................................................................... 29
**Section 6.3**   Availability of Business Records .............................................................. 29
**Section 6.4**   Employee Matters. .................................................................................... 30
**Section 6.5**   Transfer Taxes ......................................................................................... 30
**Section 6.6**   Wage Reporting ....................................................................................... 31
**Section 6.7**   Insurance Policies .................................................................................... 31
**Section 6.8**   Collection of Accounts Receivable .......................................................... 31

**ARTICLE VII** CONDITIONS TO OBLIGATION TO CLOSING ......................... 32
**Section 7.1**   Conditions to Buyer's Obligations ........................................................... 32
**Section 7.2**   Conditions to Seller's Obligations ........................................................... 33
**Section 7.3**   No Frustration of Closing Conditions ....................................................... 33

**ARTICLE VIII** TERMINATION ........................................................................... 34
**Section 8.1**   Termination of Agreement ........................................................................ 34
**Section 8.2**   Procedure Upon Termination .................................................................... 34
**Section 8.3**   Effect of Termination ............................................................................... 35
**Section 8.4**   Acknowledgement .................................................................................... 35
**Section 8.5**   Liquidated Damages ................................................................................ 35

**ARTICLE IX** MISCELLANEOUS ......................................................................... 35
**Section 9.1**   Expenses .................................................................................................. 35
**Section 9.2**   Entire Agreement ..................................................................................... 36
**Section 9.3**   Incorporation of Annexes, Exhibits and Disclosure Schedule.................. 36
**Section 9.4**   Amendments and Waivers ........................................................................ 36
**Section 9.5**   Succession and Assignment ...................................................................... 36
**Section 9.6**   Notices ..................................................................................................... 36
**Section 9.7**   Governing Law: Jurisdiction.................................................................... 37
**Section 9.8**   Consent to Service of Process ................................................................... 38
**Section 9.9**   WAIVERS OF JURY TRIAL .................................................................. 38

**Section 9.10**   Specific Performance ........................................................................ 38
**Section 9.11**   Severability ...................................................................................... 38
**Section 9.12**   No Third Party Beneficiaries ........................................................... 39
**Section 9.13**   No Survival of Representations, Warranties and Agreements........................ 39
**Section 9.14**   Construction...................................................................................... 39
**Section 9.15**   Computation of Time........................................................................ 39
**Section 9.16**   Mutual Drafting ................................................................................ 39
**Section 9.17**   Disclosure Schedule.......................................................................... 39
**Section 9.18**   Headings; Table of Contents............................................................. 40
**Section 9.19**   Counterparts: Facsimile and Email Signatures ................................. 40
**Section 9.20**   Time of Essence ................................................................................ 40

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>") is entered into as of June 24, 2019, by and between Schramm Inc., a Pennsylvania corporation ("<u>Seller</u>") and Schramm II Inc., a Delaware corporation ("<u>Buyer</u>").  Seller and Buyer are referred to collectively herein as the "<u>Parties</u>."  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in <u>Article I</u>.

WHEREAS, Seller is a debtor-in-possession having commenced Seller's case (the "<u>Seller's Chapter 11 Case</u>") under title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "<u>Bankruptcy Code</u>"), through the filing of their voluntary petition(s) for relief under Chapter 11 of the Bankruptcy Code on June 24, 2019 (the "<u>Petition Date</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

WHEREAS, Seller conducts, among other things, the business of manufacturing and supplying hydraulic drilling equipment, which includes operations conducted at the facilities identified as "<u>Existing Facilities</u>" on Schedule A-1 to this Agreement (the above-described business, as conducted from such facilities is hereinafter referred to as the "<u>Business</u>");

WHEREAS, (i) Seller wishes to sell, transfer and assign to Buyer, and Buyer wishes to purchase, acquire and assume from Seller, the Acquired Assets as of the Closing, and (ii) Buyer wishes to assume from Seller the Assumed Liabilities as of the Closing, on the terms and subject to the conditions set forth herein and in accordance with sections 105, 363 and 365 and other applicable provisions of title 11 of the Bankruptcy Code; and

WHEREAS, Seller has agreed to file the Sale Motion (as defined below) with the Bankruptcy Court to implement the transactions contemplated hereby upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

# ARTICLE I
# DEFINITIONS

For purposes of this Agreement, capitalized terms set forth in this Agreement shall have the meaning ascribed to such terms in this Article I.

"<u>Accounts Receivable</u>" means (a) all trade accounts receivable and other rights to payment from customers of Seller, (b) all other accounts receivable, notes receivable, and other receivables of Seller (whether current or non-current), (c) other amounts due to the Seller that Seller has historically classified as accounts receivable in the consolidated balance sheet of the Seller, including any intercompany receivables from Schramm Australia or any Affiliates of the Seller or Schramm Australia to the extent not canceled pursuant to the terms hereof, and (d) any

security interest, claim, remedy, or other right related to any of the foregoing, in each case, arising out of the operation of the Business prior to the Closing.

"Affiliate" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person.

"Agreement" has the meaning set forth in the preamble.

"Auction" has the meaning set forth in Section 5.10.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.8(a)(ii).

"Assumed Contracts" means those Leases and other Contracts that have been assigned to and assumed by Buyer pursuant to Section 2.6 and section 365 of the Bankruptcy Code.

"Assumed Liabilities" means (a) all Liabilities under the Assumed Contracts and the Assumed Permits arising from and after the Closing Date (except for any Liabilities incurred by the Seller outside the Ordinary Course of Business and any Liabilities relating to a breach of any Assumed Contract that occurred at or prior to the Closing Date); (b) all accounts payable arising after the Petition Date in the Ordinary Course of Business and not paid by Seller; (c) all accounts payable to the extent they become allowed claims in the Seller's Chapter 11 Case under section 503(b)(9) of the Bankruptcy Code; and (d) all Liabilities consisting of amounts Buyer has agreed to pay hereunder (including all Cure Amounts).

"Assumed Permits" means all Permits relating to the Business that are transferable in accordance with their terms, but excluding all Permits to the extent related to any Excluded Asset (including any Lease that is not an Assumed Contract).

"Assumption Approval" has the meaning set forth in Section 2.6(f).

"Bankruptcy Code" has the meaning set forth in the recitals

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, each a "Bankruptcy Rule."

"Bidding Procedures" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, substantially in the form of Exhibit B attached hereto.

"Bidding Procedures Order" means an order of the Bankruptcy Court approving the Bidding Procedures.

"Bill of Sale" has the meaning set forth in Section 2.8(a)(i).

"Business Day" means any day other than a Saturday, a Sunday, or a day on which banks located in Wilmington, Delaware shall be authorized or required by Law to close.

"Business" has the meaning set forth in the recitals.

"Buyer" has the meaning set forth in the preamble.

"Cash" means cash (including all cash located in Seller's bank accounts, lock-boxes, and cash in transit), cash equivalents, and liquid investments.

"Closing" has the meaning set forth in Section 2.7.

"Closing Assumed Contract List" has the meaning set forth in Section 2.6(c).

"Closing Date" has the meaning set forth in Section 2.7.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state Law.

"Competing Transaction" has the meaning set forth in Section 5.10.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver, or authorization, or an order of the Bankruptcy Court that deems or renders unnecessary the same.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, license agreement, contribution agreement, partnership agreement, or other arrangement, understanding, permission, or commitment that, in each case, is legally-binding.

"Control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Covered Employee" means any officer or employee of Seller whose duties relate to the operation of the Business.

"Cure Amounts" has the meaning set forth in Section 2.6(e).

"Cure Notice" has the meaning set forth in Section 5.3(c).

"Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order, or any other order of any Governmental Entity.

"Designation Deadline" means the date that is set forth in the Sale Order.

"DIP" means the balance owing to Buyer under the Seller's postpetition secured financing facility estimated to be $6,000,000.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and any other benefit or compensation plan, program, agreement or arrangement of any kind, in each case, maintained or contributed to by Seller, in which Seller participates or participated, in which Seller have any Liability (contingent or otherwise), or through which current or former employees or independent contractors of the Business are eligible to receive benefits or compensation.

"End Date" means the close of business no later than thirty (30) days following the entry of the Sale Order.

"Enforcing Parties" has the meaning set forth in Section 9.10(a).

"Environmental, Health and Safety Requirements" means, as enacted and in effect on or prior to the Closing Date, all applicable Laws concerning worker health and safety, pollution, or the protection of the environment.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"Excluded Assets" means, collectively, the following assets of Seller: (a) all of Seller's certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to the organization, maintenance, and existence of Seller as a corporation; (b) all Records related to Taxes paid or payable by Seller; (c) all equity securities of Seller; (d) all Contracts, in each case, other than the Assumed Contracts; (e) all of Seller's bank accounts and lock-boxes; (f) any (i) confidential personnel and medical Records pertaining to any employee to the extent the disclosure of such information is prohibited by applicable Law and (ii) other Records that Seller is required by Law to retain; provided that Buyer shall have the right to make copies of any portions of such retained Records to the extent that such portions relate to the Business or any Acquired Asset; (g) any documents and agreements of Seller relating to the Seller's Chapter 11 Case or to the sale or other disposition of the Business or the Acquired Assets or the sale or other disposition of any Excluded Assets; (h) all Permits other than the Assumed Permits; and (i) all assets maintained pursuant to or in connection with any Employee Benefit Plan.

"Excluded Leased Real Property" means any real property location relating to any Lease that is not an Assumed Contract.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Final Order" means an order, judgment, or other decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended, or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review, or rehearing having been filed or sought.

"Furnishings and Equipment" means tangible personal property (other than Inventory and Intellectual Property) that is used or held for use in the operation of the Business.

"Governmental Entity" means any United States federal, state, or local or non-United States governmental or regulatory authority, agency, commission, court, body, or other governmental entity.

"Hazardous Substance" means any substance that is listed, defined, designated, or classified as hazardous, toxic, or otherwise harmful under applicable Laws or is otherwise regulated by a Governmental Entity, including petroleum products and byproducts, asbestos-containing material, polychlorinated biphenyls, lead-containing products, and mold.

"Indebtedness" of any Person means, without duplication, (a) the principal of and premium (if any) in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds, or other similar instruments for the payment of which such Person is responsible or liable, (b) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person, and all obligations of such Person under any title retention agreement (but excluding trade accounts payable for goods and services and other accrued current liabilities arising in the Ordinary Course of Business), (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance, or similar credit transaction, (e) the liquidation value of all redeemable preferred stock of such Person, (f) all obligations of the type referred to in clauses (a) through (e) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety, or otherwise, including guarantees of such obligations, and (g) all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Insurance Policy" has the meaning set forth in Section 3.13.

"Intellectual Property" means any and all rights, title, and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, provisionals, continuations, continuations-in-part, divisionals, renewals, extensions, and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, internet domain names, social media accounts, and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations, and renewals and extensions in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including software, databases, websites, exclusive exploitation rights, mask work rights, copyrights, database, and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof and all moral rights associated with any of the foregoing; and (d) trade secrets, know-how, and other proprietary and confidential information, including inventions (whether or not patentable), invention disclosures, improvements, algorithms, source code, data analytics, methods, processes, designs, drawings, customer lists, supplier lists;

together with all embodiments and fixations of any of the foregoing and all related documentation.

"Intellectual Property Assets" has the meaning set forth in Section 2.1(m).

"Inventory" means all inventory (including raw materials, component parts, products in-process and finished products) owned by any of the Seller, whether in transit to or from the Seller and whether in the Seller's warehouses, distribution facilities, held by any third parties, or otherwise.

"IRC" means the United States Internal Revenue Code of 1986.

"Knowledge" of a Person (and other words of similar import) means the actual knowledge of, (a) with respect to Seller, Craig Mayman and Jesse Glover, and (b) with respect to Buyer, Pratik Rajeevan or Otis Spencer.

"Law" means any federal, state, provincial, local, municipal, foreign, or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation, or Decree of any Governmental Entity.

"Leased Real Property" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures, or other interest in real property of Seller which is used in the Business.

"Leases" means all leases, subleases, licenses, concessions, and other Contracts, including all amendments, extensions, renewals, guaranties, and other agreements with respect thereto, in each case pursuant to which Seller holds any Leased Real Property.

"Liability" means any liability, Indebtedness, guaranty, claim, loss, damage, deficiency, assessment, responsibility or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, whether determined or determinable, whether choate or inchoate, whether secured or unsecured, and whether matured or not yet matured).

"Lien" means any mortgage, deed of trust, hypothecation, contractual restriction, pledge, lien, encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, security agreement, or other encumbrance or restriction on the use, transfer, or ownership of any property of any type (including real property, tangible property, and intangible property).  For the avoidance of doubt, the definition of Lien shall not be deemed to include the grant of any non-exclusive license or sublicense of Intellectual Property by Seller.

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing, or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity, and whether before any Governmental Entity or arbitrator.

"Material Adverse Effect" means any state of facts, change, event, effect, development, condition, circumstance, or occurrence (when taken together with all other states of fact, changes, events, effects, developments, conditions, circumstances, or occurrences), that (a) is materially adverse to the financial condition or results of operations of the Business (taken as a whole) or (b) would reasonably be expected to prevent, materially delay, or materially impair the ability of Seller to consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein; provided, however, that no state of facts, change, event, effect, development, condition, circumstance, or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political, or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment, or personnel of the United States of America, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (ii) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), except to the extent that such change has a materially disproportionate adverse effect on Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) any change in GAAP or Law; (iv) except for any requirement to operate in the Ordinary Course of Business, compliance with this Agreement or any Related Agreement, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (v) any changes directly attributable to the announcement of this Agreement or any Related Agreement, including by reason of the identity of Buyer or any of its Affiliates or any communication by Buyer or any of its Affiliates of their plans or intentions regarding the operation of the Business; (vi) resulting from any act of God or other force majeure event; or (vii) in the case of Seller or the Business, (A) the failure to meet or exceed any projection or forecast, or (B) changes in the business or operations of Seller (including changes in credit terms offered by suppliers or financing sources) resulting from the announcement or the filing of the Seller's Chapter 11 Case and Seller's financial condition or Seller's status as debtors under Chapter 11 of the Bankruptcy Code.

"Necessary Consents" has the meaning set forth in Section 2.6(f).

"Non-Real Property Contracts" means the Contracts to which Seller is a party other than the Leases.

"Operational Expenses" means, to the extent incurred in the Ordinary Course of Business, all operating costs and expenses of the Business, including, but not limited to, employee and occupancy expenses, all costs and expenses associated with any Lease or Non-

Real Property Contract, including rent, ground lease rent, common area maintenance, utilities, real estate Taxes, insurance, security, and other actual out-of-pocket costs.

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice, subject to the orders of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code.

"Party" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance, Consent, exemption, or similar right issued, granted, given, or otherwise obtained from or by any Governmental Entity, under the authority thereof, or pursuant to any applicable Law.

"Permitted Liens" means (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings; and (b) with respect to leased or licensed personal property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assumed Contract.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Petition Date" has the meaning set forth in the recitals.

"Professional Services" has the meaning set forth in Section 2.4(b).

"Purchase Price" has the meaning set forth in Section 2.5.

"Records" means, with respect to the Business, the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists, and mailing lists), plans (whether written, electronic, or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data, and similar materials related to the Business and specifically excluding Seller's corporate minutes book and related corporate records and books records, files, and papers not otherwise relating exclusively to the conduct of the Business.

"Registered" means issued by, registered with, renewed by, or the subject of a pending application before any Governmental Entity or domain name registrar.

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement, and the Intellectual Property Assignment.

"Related Party" means any officer, director, manager, or equity holder of Seller, or any member of the immediate family of the foregoing.

"Representative" of a Person means such Person's officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants), and agents of such Person.

"Sale Motion" means that motion filed in the Seller's Chapter 11 Case requesting that the Bankruptcy Court (a) schedule the hearing for approving the Bidding Procedures, (b) enter the Bidding Procedures Order, and (c) enter the Sale Order at the final hearing on the Sale Motion.

"Sale Order" means an order of the Bankruptcy Court entered in the Seller's Chapter 11 Case pursuant to sections 105, 363, and 365 of the Bankruptcy Code, approving this Agreement and the transactions contemplated hereby, in such form as shall be reasonably acceptable to Seller and Buyer (i) approving the sale and transfer of the Acquired Assets to Buyer free and clear of all liens, claims, and interests other than Permitted Encumbrances, pursuant to section 363(f) of the Bankruptcy Code, (iii) approving the assumption and assignment to Buyer of the Assumed Contracts and establishing the Cure Claims; (iv) finding that Buyer is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (v) finding that due and adequate notice of the approval of the Sale Order and an opportunity to be heard were provided to all Persons entitled thereto, including but not limited to, federal, state and local taxing and regulatory authorities; (vi) confirming that Buyer is acquiring the Acquired Assets free and clear of all Liabilities, other than the Assumed Liabilities; and (vii) providing that the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) are waived and there will be no stay of execution of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure.

"Schramm Australia" means Schramm Australia Holding Pty Limited, a wholly-owned subsidiary of Schramm

"Schramm Australia Equity Interests" means Schramm's equity and other ownership interest in Schramm Australia, representing 100% of the fully diluted equity interests of Schramm Australia.

"Schramm" has the meaning set forth in the preamble.

"Seller" has the meaning set forth in the preamble.

"Seller's Chapter 11 Case" has the meaning set forth in the recitals.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a

corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Superior Bid" means (i) a Successful Bid by a Successful Bidder (as such terms are defined in the Bidding Procedures) that the board of director of Seller has determined in the exercise of their fiduciary duties is superior to the bid represented by this Agreement or (ii) any conversion of Seller's Chapter 11 Case to a Chapter 7 Bankruptcy Case, or any other liquidation or equivalent event with respect to Seller.

"Tax" or "Taxes" means any United States federal, state, or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, escheat, sales, use, transfer, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary, or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Tax" has the meaning set forth in Section 6.5.

"WARN Act" has the meaning set forth in Section 3.9(a).

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Acquired Assets.**  On the terms and subject to the conditions of this Agreement, at the Closing, Buyer shall purchase, acquire, and accept from Seller, and Seller shall sell, transfer, assign, convey, and deliver to Buyer, all of the Seller's right, title, and interest in and to all of the properties, rights, interests and other tangible and intangible assets of the Seller (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any assets acquired by the Seller after the date hereof but prior to the Closing (collectively, the "Acquired Assets"), free and clear of all Liens (other than Permitted Liens expressly identified in the Sale Order), for the consideration specified in Section 2.5; provided, however, that the Acquired Assets shall not include any Excluded Assets.  Without limiting the generality of the foregoing, the Acquired Assets shall include the following (but excluding in each case, for the avoidance of doubt, any Excluded Asset):

(a)    all Accounts Receivable of Seller as of the Closing;

(b)    all customer lists, customer files, and customer accounts of the Business (the "Covered Accounts");

10

(c)     all vehicles used in the Business;

(d)     all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.6;

(e)     all machinery, fixtures, furniture, equipment, leasehold improvements (to the extent of Seller's rights to any leasehold improvements under Leases that are Assumed Contracts), materials, parts, supplies, tools, and other tangible property owned by Seller and all other Furnishings and Equipment as of the Closing;

(f)     to the extent assignable, all of Seller's rights under all third-party manufacturing warranties relating to the Acquired Assets;

(g)     Seller's Records;

(h)     all goodwill associated with the Business or the Acquired Assets, including all goodwill associated with the Intellectual Property owned by Seller and all rights under any confidentiality agreements executed by any third party for the benefit of Seller to the extent relating to the Acquired Assets;

(i)     all goodwill associated with the Business or the Acquired Assets, including all rights of Seller under non-disclosure or confidentiality, work-for-hire, intellectual property assignment, noncompete, or nonsolicitation agreements with current or former employees, directors, consultants, independent contractors, and agents of Seller or with third parties to the extent relating to the Acquired Assets (or any portion thereof);

(j)     subject to Section 2.6(h), all of the Assumed Permits, or, to the extent provided in Section 2.6(h) all of the rights and benefits accruing under any Permits relating to the Business;

(k)     the amount of, and all rights to any, insurance proceeds received by Seller after the date hereof in respect of (i) the loss, destruction, or condemnation of any Acquired Assets, occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(l)     to the extent transferable, all Insurance Policies (except to the extent of any Insurance Policy or Policies relating to claims or causes of action against Seller's current or former officers, directors, and management) that, on or prior to the Closing, Buyer designates in writing to Seller as Acquired Assets hereunder, and all rights and benefits of Seller of any nature (except for any rights to insurance recoveries thereunder required to be paid,

(m)     all of the Intellectual Property owned by Seller; or used or held for use by Sellers in the conduct of the Business, including the Intellectual Property set forth on Section 3.12 of the Disclosure Schedule, together with all claims, demands, income, damages, royalties, payments, accounts, and accounts receivable now or hereafter due and payable, and rights to causes of action and remedies, related to any of the foregoing, including without limitation, all proceeds to infringement suits, the right to sue and

11

prosecute for past, present, and future infringement, misappropriation, or other violation of rights related to any of the foregoing (collectively, the "Intellectual Property Assets");

(n)     all Inventory, supplies, materials, and spare parts of the Seller as of the Closing (including all rights of the Seller to receive such Inventory, supplies, materials, and spare parts that are on order) and all open purchase orders with suppliers;

(o)     the Schramm Australia Equity Interests;

(p)     all Cash of Seller as of the Closing; and

(q)     all other assets that are related to or used in connection with the Business and that are owned or leased by the Seller as of the Closing.

**Section 2.2     Excluded Assets**.  Nothing contained herein shall be deemed to sell, transfer, assign, or convey the Excluded Assets to Buyer, and Seller shall retain all of its right, title, and interest to, in, and under the Excluded Assets.

**Section 2.3     Assumption of Assumed Liabilities**.  On the terms and subject to the conditions of this Agreement, at the Closing (or, with respect to assumed liabilities under Assumed Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Sections 2.6 and 2.10), Buyer shall assume and become responsible for the Assumed Liabilities and no other Liabilities of Seller and from and after the Closing agrees to timely pay, honor and discharge, or cause to be timely paid, honored, and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof.

**Section 2.4     Excluded Liabilities**.  Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform, or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Seller, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities").  Without limiting the foregoing, Buyer shall not be obligated to assume, does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities of Seller whether incurred or accrued before or after the Petition Date or the Closing:

(a)     all Taxes of Seller, including Taxes imposed on Seller under Treasury Regulations Section 1.1502-6 and similar provisions of state, local, or foreign Tax Law accruing prior to the Closing; provided that Seller's Taxes shall be prorated as of the Closing between the Buyer and Seller as set forth in Section 2.10;

(b)     all Liabilities of Seller relating to legal services, accounting services, financial advisory services, investment banking services, or any other professional services ("Professional Services") performed in connection with this Agreement and any of the transactions contemplated, hereby, and any claims for such Professional Services, whether arising before or after the Petition Date;

12

(c)    all Liabilities of Seller in respect of Indebtedness (except to the extent of any Cure Amounts under any Assumed Contracts, and except with respect to any capitalized leases that are Assumed Contracts and except as set forth on <u>Schedule 2.4(c)</u>);

(d)    all Liabilities arising in connection with any violation of any applicable Law relating to the period prior to the Closing by Seller, including any Environmental, Health and Safety Requirements and the items set forth on <u>Section 3.7 of the Disclosure Schedule</u>; and

(e)    all Liabilities of Seller under this Agreement and the Related Agreements and the transactions contemplated hereby or thereby (excluding all the Assumed Liabilities).

For the avoidance of doubt, upon the transfer of the Seller's equity in Schramm Australia at the Closing, the liabilities of Schramm Australia shall not be Assumed Liabilities of Buyer, but rather will remain liabilities only of Schramm Australia.

**Section 2.5    <u>Consideration</u>**.  The aggregate consideration for the sale and transfer of the Acquired Assets (the "<u>Purchase Price</u>") shall be not less than $10,300,000 plus the DIP as of Closing as follows: (a) credit bid or the assumption of the Indebtedness outstanding as set forth on <u>Section 2.5 of the Disclosure Schedule</u>; and (b) the assumption of Assumed Liabilities.

**Section 2.6    <u>Assumption and Assignment of Contracts</u>**.

(a)    The Sale Order shall provide for the assumption by Seller, and the assignment to the extent legally capable of being assigned by Seller to Buyer, of the Assumed Contracts on the terms and conditions set forth in the remainder of this <u>Section 2.6</u>, and shall provide for the Designation Deadline.

(b)    At Buyer's request, and at Buyer's cost and expense, Seller shall reasonably cooperate from the date hereof forward with Buyer as reasonably requested by Buyer (i) to allow Buyer to enter into an amendment of any Lease upon assumption of such Lease by Buyer (and Seller shall reasonably cooperate with Buyer to the extent reasonably requested with Buyer in negotiations with the landlords thereof), or (ii) to otherwise amend any Lease to the extent such amendments would not adversely affect Seller; provided that Seller shall not be required to enter into any such amendment if such amendment would result in an assumption by Seller of such Lease, unless such Lease will be assigned to Buyer at the time of such assumption.

(c)    Buyer shall, no later than two (2) days prior to the Auction, identify the Non-Real Property Contracts and Leases that Buyer has decided will be Assumed Contracts to be assumed and assigned to Buyer on the Closing Date by providing a list thereof to Seller (as updated in accordance with this Agreement, the "<u>Closing Assumed Contract List</u>"). In advance of the Closing Date, Buyer may, in its sole discretion, designate a Non-Real Property Contract or Lease for exclusion and rejection by delivering written notice to Seller.

13

(d)     As part of the Sale Motion (or as necessary in one or more separate motions), Seller shall request that, by virtue of Seller providing ten (10) Business Days' prior notice of its intent to assume and assign any Contract, the Bankruptcy Court deem any non-debtor party to such Contract that does not file an objection with the Bankruptcy Court during such notice period to have given any required Consent to the assumption of the Contract by the relevant Seller and assignment to Buyer.

(e)     In connection with the assumption and assignment to Buyer of any Assumed Contract that is executory pursuant to this Section 2.6, the cure amounts, as determined by the Bankruptcy Court, if any (such amounts, the "Cure Amounts") necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts, including any amounts payable to any landlord under any Lease that is an Assumed Contract that relates to the period prior to the Assumption Approval, shall be paid by Buyer, on or before the Assumption Approval, and not by Seller and Seller shall have no liability therefor, and neither the Cure Amounts paid by nor the expense of any other obligation set forth in this Section 2.6(e) shall reduce, directly or indirectly, any consideration received by Seller hereunder; provided that any applicable Cure Amounts with regard to Assumed Contracts listed in the Closing Assumed Contract List shall be paid by Buyer at the Closing.

(f)     Seller shall use its commercially reasonable efforts to obtain an order of the Bankruptcy Court to assign the Assumed Contracts to Buyer (the "Assumption Approval") on the terms set forth in this Section 2.6.  In the event Seller is unable to assign any such Assumed Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts until the Designation Deadline to obtain, and to cooperate in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Assumed Contracts to Buyer (the "Necessary Consents"), including, in the case of Buyer, paying any applicable Cure Amounts.

(g)     To the extent that any Consent that is required to assign to Buyer any Assumed Contract is not obtained by the Closing Date, Seller shall, with respect to each such Assumed Contract, from and after the Closing and until the earliest to occur of (x) the date on which such applicable Consent is obtained (which Consents the Parties shall use their commercially reasonable efforts, and cooperate with each other, to obtain promptly; provided, however, that none of the Parties or any of their respective Affiliates shall be required to pay any consideration therefor other than filing, recordation, or similar fees, which shall be borne by Buyer), and (y) for a period of ninety (90) days after Closing, use commercially reasonable efforts to (i) provide to Buyer the benefits under such Assumed Contract, (ii) cooperate in any reasonable and lawful arrangement (including holding such Contract in trust for Buyer pending receipt of the required Consent) designed to provide such benefits to Buyer, and (iii) use its commercially reasonable efforts to enforce for the account of Buyer any rights of Seller under such Assumed Contract (including the right to elect to terminate such Assumed Contract in accordance with the terms thereof upon the written direction of Buyer).  Buyer shall reasonably cooperate with Seller in order to enable Seller to provide to Buyer the benefits contemplated by this Section 2.6(g).

14

(h)     Notwithstanding the foregoing, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by Seller or terminated by Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Closing Date and is not continued or otherwise extended upon assumption, or (ii) requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Seller's rights under such Contract, and no such Consent has been obtained prior to the Designation Deadline.  In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Seller's rights under such Permit, and no such Consent has been obtained prior to the Closing.

**Section 2.7**     **Closing**.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 (or such other location as shall be mutually agreed upon by Seller and Buyer) commencing at 10:00 a.m. local time on the date (the "Closing Date") that is the third Business Day after the date on which all conditions to the obligations of Seller and Buyer to consummate the transactions contemplated hereby set forth in Article VII (other than conditions with respect to actions  that either or both Seller and Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or at such other time or on such other date as shall be mutually agreed upon by Seller and Buyer prior thereto.  The Closing shall be deemed to have occurred at 11:59 p.m. (prevailing Eastern time) on the Business Day prior to the Closing Date.

**Section 2.8**     **Deliveries at Closing**.

(a)     At the Closing, Seller shall deliver to Buyer the following documents and other items, duly executed by Seller, as applicable:

(i)     a Bill of Sale substantially in the form of Exhibit D attached hereto (the "Bill of Sale");

(ii)     an Assignment and Assumption Agreement substantially in the form of Exhibit E attached hereto (the "Assignment and Assumption Agreement");

(iii)     an Intellectual Property Assignment substantially in the form of Exhibit F attached hereto together with any short form assignments requested by Buyer for recordation with the U.S. Patent and Trademark Office, the U.S. Copyright Office or any other Governmental Entity or domain name registrar (collectively, the "Intellectual Property Assignment");

(iv)     copies of the Bidding Procedures Order and the Sale Order entered by the Bankruptcy Court;

15

(v)    a certificate signed by an authorized officer of the Company to the effect that each of the conditions specified in Section 7.1(a) and Section 7.1(b) is satisfied in accordance with the terms thereof; and

(vi)    to the extent applicable, a non-foreign affidavit dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the IRC stating that Seller is not a "foreign person" as defined in Section 1445 of the IRC.

(b)    At the Closing, Buyer shall deliver to Seller, or the designated third-party recipients pursuant to Section 2.5, the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

(i)    the Assignment and Assumption Agreement;

(ii)    the Intellectual Property Assignment;

(iii)    a certificate to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) is satisfied in accordance with the terms thereof; and

(iv)    a copy of Buyer's certificate of incorporation or other organizational document certified as of a date on or soon before the Closing Date by the Secretary of State (or comparable governmental officer) of the respective jurisdictions of Buyer's incorporation or organization.

**Section 2.9    Allocation**.  Within thirty (30) calendar days after the Closing Date, Seller and Buyer shall jointly and in good faith prepare an allocation of the Purchase Price (and all other capitalized costs) among the Acquired Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate), which allocation shall be binding upon Seller and Buyer.  Buyer and Seller shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation.  Neither Buyer nor Seller shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation unless required to do so by applicable Law.

**Section 2.10    Proration of Taxes**.  Any Taxes required to be paid by Seller shall be prorated as of the Closing Date between Buyer and Seller.  The tax proration payment shall be made by Seller to Buyer at Closing based on a reasonable estimate taking into account the prior periods taxes and any publicly announced tax rate increase or decrease or change in the law governing such taxes, and Buyer shall pay such taxes for such period when due, and any adjustments shall be made as soon thereafter as the tax statement or appropriate information is received.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLER.**

Seller represents and warrants to Buyer that except as set forth in the disclosure schedule accompanying this Agreement as of the date hereof and as of Closing (the "Disclosure Schedule"):

**Section 3.1    Organization of Seller: Good Standing**.

(a)    Seller is a corporation duly organized, validly existing and in good standing under the Laws of the Commonwealth of Pennsylvania.

(b)    Seller has all requisite corporate or similar power and authority to own, lease, and operate its assets and to carry on the Business as currently conducted.

(c)    Seller is duly authorized to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Acquired Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

(d)    Other than Schramm Australia, Seller has no Subsidiaries. All outstanding equity interests of each Subsidiary of Seller are held of record by Seller or Schramm Australia[1] and beneficially owned by Seller, and at the Closing will be conveyed free and clear of all Liens (other than Permitted Liens). All outstanding equity interests of each Subsidiary of the Seller have been duly authorized and are fully paid and non-assessable. There are no outstanding or authorized, and there is no obligation of any Subsidiary of Seller to issue or grant, any options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, preemptive rights, redemption rights, repurchase rights, rights of first refusal or other rights, or Contracts that could require any Subsidiary of Seller to issue, sell or otherwise cause to become outstanding or that otherwise relate to the equity interests of any Subsidiary of Seller or to redeem or otherwise acquire any of its outstanding equity interests, or obligate any Subsidiary of Seller to grant, extend or enter into any such agreements.

**Section 3.2    Authorization of Transaction**.  Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)    Seller has all requisite corporate power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery, and performance of this Agreement and all Related Agreements to which Seller is a party have been duly authorized by Seller, and no other corporate action on the part of Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the transactions contemplated hereby or thereby; and

(b)     This Agreement has been duly and validly executed and delivered by Seller, and, upon execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Seller is a party will have been duly and validly executed and delivered by Seller.  Assuming that this Agreement constitutes a valid and legally-binding obligation of Buyer, this Agreement constitutes the valid and legally-binding obligations of Seller, enforceable against Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.  Assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer, each Related Agreement to which Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Seller, as applicable, enforceable against Seller in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3**     **Noncontravention; Consents and Approvals**.

(a)     Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II), will, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) conflict with or result in a breach of the certificate of incorporation, by-laws, or other organizational documents of Seller, (ii) violate any Law to which Seller is, or its respective assets or properties are, subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel or require any notice under any Contract to which Seller is a party or by which it is bound or to which any of the Acquired Assets is subject, except as set forth on Section 3.3(a) of the Disclosure Schedule and, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights, or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect.

(b)     Subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing) and except as set forth on Section 3.3(b) of the Disclosure Schedule, no Consent, notice or filing is required to be obtained by Seller from, or to be given by Seller to, or made by Seller with, any Governmental Entity in connection with the execution, delivery, and performance by Seller of this Agreement or any Related Agreement.  Subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing) and except as set forth on Section 3.3(b) of the Disclosure Schedule, no Consent, notice, or filing is required to be obtained by Seller from, or to be given by Seller to, or made by Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery, and performance by Seller of this Agreement or any Related Agreement, and except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, have a Material Adverse Effect.

Section 3.4    **Title to Acquired Assets**.  Seller have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Acquired Assets, and at the Closing will convey the Acquired Assets free and clear of all Liens (except for Permitted Liens). At the Closing or such time as title is conveyed under Section 2.6, Seller will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Acquired Assets, free and clear of all Liens (except for Permitted Liens), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

Section 3.5    **Contracts**.

(a)    Section 3.5 of the Disclosure Schedule sets forth a true, correct, and complete list of the following Contracts related to the Business to which Seller or Schramm Australia is a party with respect to the Business as of the date hereof or by which the Business is bound:

(i)    any Contract for the lease of personal property to or from any Person providing for lease payments in excess of $50,000 per annum;

(ii)    any Contract for the purchase or sale of equipment, supplies, products or other personal property, the performance of which will extend over a period of more than six months after the Closing Date or involves consideration in excess of $50,000 per annum;

(iii)    any Contract for services, including services performed by independent contractors, consultants, or temporary employees, involving consideration in excess of $75,000 per annum;

(iv)    any Contract that is a collective bargaining agreement;

(v)    any material licenses of Intellectual Property to or from any Person (other than licenses for commercially-available, off-the-shelf, or click-wrap software);

(vi)    any employment Contract as to which an employee is entitled to receive an annual salary in excess of $150,000;

(vii)    any material Contract prohibiting the Company from freely engaging in any material business (other than pursuant to any radius restriction contained in any lease, reciprocal easement or development, construction, operating or similar agreement);

(viii)    any Contract relating to Indebtedness;

(ix)    any Contract granting any Person a Lien on all or any part of any of the Acquired Assets;

19

(x)     any Contract (including the Leases) that involves the lease of real property or that obligate the Company to purchase real property;

(xi)     any Contract granting to any Person an option or a first refusal, first-offer, or similar preferential right to purchase or acquire any of the Acquired Assets;

(xii)     any Contract that create or govern a partnership, joint venture, strategic alliance, or similar arrangement;

(xiii)     any Contract (other than purchase orders accepted or confirmed in the Ordinary Course of Business) with the ten (10) largest customers of the Business, based on revenues during the twelve (12) month period ended December 31, 2018;

(xiv)     any Contract (other than purchase or equipment orders entered into in the Ordinary Course of Business) with the ten (10) largest suppliers of the Business, based on expenditures during the twelve (12) month period ended December 31, 2018; and

(xv)     any Contract with any Related Party.

(b)     With respect to each Contract listed on <u>Section 3.5 of the Disclosure Schedule</u>, such Contract is in full force and effect and constitutes the valid and legally-binding obligation of Seller and, to the Knowledge of Seller, the counterparty thereto, enforceable against Seller and, to the Knowledge of Seller, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.6     Legal Compliance**.   Seller is in compliance with all material Laws applicable to the Business or the Acquired Assets, except in any such case where the failure to be in compliance would not have a Material Adverse Effect, and Seller has not received any written notice within the past twelve months relating to violations or alleged violations or material defaults under any Decree or any Permit, in each case, with respect to the Business.

**Section 3.7     Litigation**.   As of the date of this Agreement, except as set forth on <u>Section 3.7 of the Disclosure Schedule</u>, there is no litigation pending or, to the Knowledge of Seller, threatened in writing, before any Governmental Entity brought by or against Seller that, if adversely determined, would be material to the Business or materially impair Seller's ability to consummate the transactions contemplated hereby or by the Related Agreements.

**Section 3.8     Environmental, Health and Safety Matters**.

(a)     Except as set forth on <u>Section 3.8 of the Disclosure Schedule</u>, Seller is, and since January 1, 2016, has been, in compliance with all applicable Environmental, Health and Safety Requirements with respect to the Leased Real Property, except in any such case where the failure to be in compliance would not have a Material Adverse

Effect, and there are no Liabilities under any Environmental, Health and Safety Requirements with respect to the Business which would have a Material Adverse Effect.

(b)    Except as set forth on <u>Section 3.8 of the Disclosure Schedule</u>, since January 1, 2016, Seller has not received any written notice or report regarding any violation of Environmental, Health and Safety Requirements or any Liabilities relating to the Business or any Leased Real Property arising under Environmental, Health and Safety Requirements.  There are no Decrees outstanding, or any Litigations pending or, to the Knowledge of Seller, threatened, relating to compliance with or Liability under any Environmental, Health and Safety Requirements affecting the Business or any Leased Real Property.

(c)    Seller has made available to Buyer such environmental reports, documents, studies, analyses, investigations, audits, and reviews in Seller's possession as necessary to reasonably disclose to Buyer any environmental, health, or safety liability known to Seller with respect to the Leased Real Property which would have a Material Adverse Effect.

**Section 3.9**    **Employees and Employment Matters**.

(a)    Seller is not a party to or bound by any collective bargaining agreement covering the Covered Employees (as determined as of the date of this Agreement), nor has any of them experienced any strike, walkout, work stoppage, or other material collective bargaining dispute with respect to the Business within the twelve (12) months prior to the date hereof.  Seller has not committed any material unfair labor practice within the twelve (12) months prior to the date hereof.  Within the twelve (12) months prior to the date hereof, Seller has not implemented any plant closing or layoff of the Covered Employees (as determined as of the date of this Agreement) in violation of the United States Worker Adjustment and Retraining Notification Act, or any similar applicable Law (collectively, the "<u>WARN Act</u>"). Seller is not a party to any pending, or, to the Knowledge of Seller, threatened employment-related matters, and is in material compliance with all employment Laws.

(b)    Except as set forth on <u>Section 3.9(b) of the Disclosure Schedules</u>, there are no written employment contracts or severance agreements with any Covered Employees (as determined as of the date of this Agreement).

**Section 3.10**    **Employee Benefit Plans**.

(a)    <u>Section 3.10 of the Disclosure Schedule</u> lists each material Employee Benefit Plan that Seller maintains with respect to the Covered Employees (as determined as of the date of this Agreement).  With respect to each such Employee Benefit Plan:

(i)    such plan, if intended to meet the requirements of a "qualified plan" under Section 401(a) of the IRC, has received a favorable determination letter from the United States Internal Revenue Service or may rely on a favorable opinion letter issued by the Unites States Internal Revenue Service; and

(ii)     Seller has made available to Buyer summaries of all such Employee Benefit Plans.

(b)     Each Employee Benefit Plan has been established, funded, maintained, and administered, in each case, in all material respects, in accordance with its terms and all applicable Laws.  As of the date hereof, there is no material pending or, to the Knowledge of Seller, threatened, Litigation relating to the Employee Benefit Plans. Seller do not maintain, sponsor, or contribute to, and have not maintained, sponsored or contributed to, (i) any plan subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the IRC, (ii) any "multiemployer plan" (as defined in Section 3(37) of ERISA), (iii) any "multiple employer plan" (as defined in Section 413(c) of the IRC), or (iv) any "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA).

**Section 3.11    Leased Real Property**.  Section 3.11 of the Disclosure Schedule sets forth the address of each Leased Real Property, and a true and complete list of all Leases for such Leased Real Property.  Seller has made available to Buyer true and complete copies of such Leases and all other material Contracts or instruments entered into or delivered in connection therewith, as amended through the date hereof.  With respect to each of the Leases:

(a)     such Lease is legal, valid, binding, enforceable, and, to the Knowledge of Seller, in full force and effect against Seller subject to proper authorization and execution of such Lease by the other party thereto and the application of any bankruptcy or other creditor's rights Laws, and

(b)     except as to the pendency of Seller's Chapter 11 Case, Seller is not in breach or default under such Lease and, to the Knowledge of Seller, no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, except to the extent such breach or default would not, individually or in the aggregate, materially impair, the continued use and operation of the Leased Real Property to which it relates in the conduct of the Business as presently conducted.

**Section 3.12    Permits**.  Section 3.12 of the Disclosure Schedule contains a list, as of the date hereof, of all material Permits that Seller holds in connection with the operations of the Business.  As of the date hereof, there is no Litigation pending, nor to the Knowledge of Seller, threatened in writing, that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits, except where a failure of this representation and warranty to be so true and correct would not reasonably be expected to have a Material Adverse Effect.

**Section 3.13    Insurance**.  Section 3.13 of the Disclosure Schedule contains a list, as of the date hereof, of all material, primary, excess and umbrella insurance policies, bond and other forms of material insurance owned or held by or on behalf, or providing insurance coverage to the Business, Seller and its operations, properties, and assets (collectively, the "Insurance Policies"), excluding director and officer, fiduciary, or executive liability policies.  The term "Insurance Policies" does not include policies of insurance that fund or relate to any Employee

Benefit Plan.  To the Knowledge of Seller, all of the Insurance Policies are in full force and effect and no written notice of cancellation or termination has been received by Seller with respect to any of the Insurance Policies.

**Section 3.14    [Reserved]**.

**Section 3.15    Intellectual Property**.  Section 3.15 of the Disclosure Schedule sets forth a true and complete list of all Intellectual Property owned by Seller that is an issued patent, a registration, or an application for a patent or registration and all material unregistered trademarks and software owned by Seller.  All such Intellectual Property is, to the Knowledge of Seller, valid and enforceable.  To the Knowledge of Seller, the use and commercial exploitation of the Intellectual Property Assets as currently used in the Business has not infringed or otherwise violated, and does not infringe or otherwise violate, any Intellectual Property of any other Person.

**Section 3.16    Absence of Changes**.  Except as set forth on Section 3.16 of the Disclosure Schedule, and except with respect to the Seller's Chapter 11 Case, since December 31, 2018, the Business has been conducted only in the Ordinary Course of Business, and there is no state of facts, change, event, effect, development, condition, circumstance, or occurrence that has occurred or, to the Knowledge of Seller, been threatened that (when taken together with all other states of fact, changes, events, effects, developments, conditions, circumstances or occurrences) has had or is reasonably likely to have, a Material Adverse Effect.

**Section 3.17    Brokers' Fees**.  Seller is seeking to retain Focal Point Partners, LLC to serve as the Seller's investment banker in connection with, *inter alia*, the marketing and sale of the Seller's assets and, as such, upon approval, will be entitled to certain fees and/or other compensation as and to the extent set forth in the order of the Bankruptcy Court authorizing such retention.  Seller has not otherwise entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated to pay.

**Section 3.18    No Other Representations or Warranties**.  Except for the representations and warranties contained in this Article III (as qualified, amended, supplemented, and modified by the Disclosure Schedule), neither Seller nor any other Person makes (and Buyer is not relying upon) any other express or implied representation or warranty with respect to Seller, the Business, the Acquired Assets (including the value, condition, or use of any Acquired Asset), the Assumed Liabilities or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of their respective officers, directors, employees, agents, or Representatives.  Except for the representations and warranties contained in this Article III (as qualified, amended, supplemented, and modified by the Disclosure Schedule), Seller (i) expressly disclaims and negates any representation or warranty, express or implied, at common law, by statute or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of title, merchantability or fitness for a particular purpose, or of the probable success or profitability of the ownership, use or operation of the Business or the Acquired Assets by Buyer after the Closing), and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished

(orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant or Representative of Seller. The disclosure of any matter or item in the Disclosure Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

### ARTICLE IV
### BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller as of the date hereof and as of Closing as follows:

**Section 4.1    Organization of Buyer**. Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2    Authorization of Transaction**.

(a)    Buyer has full power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other corporate action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the transactions contemplated hereby or thereby.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon execution and delivery or the Related Agreements in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. Assuming that this Agreement constitutes a valid and legally-binding obligation of Seller, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity. Assuming that each Related Agreement constitutes a valid and legally-binding obligation of Seller, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with the respective terms and conditions or the Related Agreements, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3    Noncontravention**. Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II) will (i) conflict with or result in a breach of the certificate of incorporation, or bylaws, or other organizational documents of Buyer, (ii)

subject to any consents required to be obtained from any Governmental Entity, violate any Law to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights, or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay, or materially impair the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.  Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement or any of the Related Agreement, and except where the failure to give notice, file, or obtain such authorization, consent, or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay, or materially impair the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.

Section 4.4    **Litigation**.  As of the date hereof, (i) Buyer is not subject to any outstanding Decree and (ii) Buyer is not a party or, to the Knowledge of Buyer, threatened to be made a party to any Litigation, in either case, which would be reasonably likely to (A) result in any material Liability to Buyer with respect to the Business or (B) materially prevent, restrict, or delay the consummation of the transactions contemplated hereby or by any Related Agreement.

Section 4.5    **Brokers' Fees**.  Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Seller could become liable or obligated to pay.

Section 4.6    **Financial Capacity**.  Buyer (a) has the resources (including sufficient funds available to pay the Purchase Price and any other expenses and payments incurred by Buyer in connection with the transactions contemplated by this Agreement) and capabilities (financial or otherwise) to perform its obligations hereunder, and (b) has not incurred any obligation, commitment, restriction, or Liability of any kind, that would impair or adversely affect such resources and capabilities.

Section 4.7    **Condition of the Business**.  Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly set forth in Article III (as amended, supplemented and modified by the Disclosure Schedule), and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Acquired Assets and the Business are being transferred on a "where is" and, as to condition, "as is" basis.  Any claims Buyer or any of its Affiliates may have for breach of representation or warranty shall be based solely on the representations and warranties set forth in Article III (as amended, supplemented, and modified by the Disclosure Schedule).  Buyer further represents that neither Seller nor any other Person has made, and Buyer is not relying upon, any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller, the Business or the transactions contemplated by this Agreement not expressly set forth in Article III, and none of Seller, or any other Person will have or be

subject to any liability to Buyer or any other Person resulting from the distribution to Buyer or any of its Representatives or Buyer's use of, any such information.  Buyer represents that it is a sophisticated entity that was advised by knowledgeable counsel and financial and other advisors and hereby acknowledges that it has conducted to its satisfaction, its own independent investigation and analysis of the Business (including its financial condition), the Acquired Assets and the Assumed Liabilities and, in making the determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely on the results of its own independent investigation and the express representations and warranties set forth in Article III.

**Section 4.8    Adequate Assurances Regarding Executory Contracts**.  Buyer as of the Closing will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

**Section 4.9    Good Faith Purchaser**.  Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder.  Buyer is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to all of the Acquired Assets. Buyer has negotiated and entered into this Agreement in good faith and without collusion or fraud of any kind.

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1    Certain Efforts; Cooperation**.  Subject to Seller's right to solicit and consummate a Competing Transaction in accordance with Section 5.10, each of the Parties shall use commercially reasonable efforts, subject to the orders of the Bankruptcy Court, to make effective the transactions contemplated by this Agreement on or prior to the End Date (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the transactions contemplated hereby set forth in Article VII), except as otherwise provided in Section 5.2.  Without limiting the generality of the foregoing, each of the Parties shall use commercially reasonable efforts not to take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any other Party to consummate, or materially delay any other Party's ability to consummate, the transactions contemplated hereby, including taking any action that is intended or would reasonably be expected to result in any of the conditions to any other Party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied.

**Section 5.2    Notices and Consents**. To the extent required by the Bankruptcy Code or the Bankruptcy Court, Seller shall give any notices to third parties, and Seller shall use its reasonable best efforts to obtain any third party consents or sublicenses, in connection with the matters referred to in Section 5.2(a) of the Disclosure Schedule.

**Section 5.3    Bankruptcy Actions**.

(a)      Seller shall take all actions as may be reasonably necessary to cause each of Bidding Procedures Order and Sale Order to be issued, entered and become a Final

Order (it being acknowledged and agreed that Seller shall have no obligation to seek expedited or special hearing dates for the Sale Motion), including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.

(b)     Seller shall provide appropriate notice of the hearings on the Bidding Procedures and Sale Motion, as is required by the Bankruptcy Code and the Bankruptcy Rules to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens in the Acquired Assets, all parties to the Assumed Contracts and all Taxing and environmental authorities in jurisdictions applicable to Seller.  Seller shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted, to the extent practicable, to Buyer prior to their filing with the Bankruptcy Court for Buyer's prior review.

(c)     Following entry of the Bidding Procedures Order, Seller shall serve a cure notice (the "Cure Notice") by first class mail on all non-debtor counterparties to all Non-Real Property Contracts and Leases and provide a copy of the same to Buyer.  The Cure Notice shall inform each recipient that its respective Non-Real Property Contract or Lease may be designated by Buyer as either assumed or rejected, and the timing and procedures relating to such designation, and, to the extent applicable (i) the title of the Non-Real Property Contract or Lease, (ii) the name of the counterparty to the Non-Real Property Contract or Lease, (iii) Seller's good faith estimates of the Cure Amounts required in connection with such Non-Real Property Contract or Lease, (iv) the identity of Buyer, and (v) the deadline by which any such Non-Real Property Contract or Lease counterparty may file an objection to the proposed assumption and assignment and/or cure, and the procedures relating thereto.

(d)     Seller shall consult with Buyer regarding pleadings it intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, as applicable, the Bidding Procedures Order and the Sale Order.  Seller shall promptly provide Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that Seller has in its possession (or receives) pertaining to the motion for approval of the Bidding Procedures Order, Sale Order, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Buyer and its counsel.  Seller shall not seek any modification to the Bidding Procedures Order or the Sale Order by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to the Seller's Chapter 11 Case has been appealed, in each case, without the prior written consent of Buyer.

**Section 5.4    Conduct of Business**.  Except as may be required by the Bankruptcy Court or as agreed to in writing by Buyer, from the date hereof until the Closing, Seller shall use commercially reasonable efforts to operate the Business in the Ordinary Course of Business.

**Section 5.5    Notice of Developments**.  From the date hereof until the Closing Date, Seller shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Seller, on the other hand, in writing (in the form of an updated Disclosure Schedule, if

applicable) after attaining Knowledge of any material failure of any of Seller or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; <u>provided</u>, <u>however</u>, that the delivery of any notice pursuant to this <u>Section 5.5</u> shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement.

**Section 5.6**    **Access**. Upon reasonable advance written request by Buyer, Seller shall permit Buyer and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Seller, to all premises, properties, personnel, Records and Contracts related to the Business, in each case, for the sole purpose of evaluating the Business; <u>provided</u>, <u>however</u>, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.

**Section 5.7**    **Press Releases and Public Announcements**. Prior to the Closing, neither of Buyer or Seller shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of each of Buyer and Seller; <u>provided</u>, <u>however</u>, that each of Buyer and Seller may make any public disclosure in connection with obtaining entry of the Bidding Procedures Order and Sale Order or that it believes in good faith is required by applicable Law or court process (in which case the disclosing Party shall use its reasonable best efforts to advise the other prior to making the disclosure).

**Section 5.8**    **Bulk Transfer Laws**. Buyer acknowledges that Seller will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the non-compliance therewith. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Liens other than Permitted Liens in the Acquired Assets, including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 5.9**    **Post-Closing Operation of the Seller.** The Seller hereby acknowledges and agrees that upon the consummation of the transactions contemplated hereby, the Buyer shall have the sole right to the use of the name "Schramm," or similar or other relevant names or any service marks, trademarks, trade names, identifying symbols, logos, emblems or signs containing or comprising the foregoing, including any name or mark confusingly similar thereto. After the Closing Date, neither the Seller nor any of its respective Affiliates shall use the name or mark "Schramm," or any derivatives thereof or other relevant names or service marks for commercial purposes and shall only use the same for administrative purposes while subject to the jurisdiction of the Bankruptcy Court. The Sale Order shall provide for the modification of the caption in the proceedings before the Bankruptcy Court to reflect the change in the name of the Seller, except that during the pendency of such proceedings, Seller shall be permitted to use the name "Schramm" as its corporate name in connection with matters relating to the Bankruptcy Case and as a former name for legal and noticing purposes, but for no other commercial purpose. Within thirty (30) days after the Closing, the Seller and its Affiliates under their control shall promptly

file with the applicable Governmental Entities all documents reasonably necessary to delete from their names the words "Schramm," or any derivatives thereof other relevant names or service markets and shall do or cause to be done all other acts, including the payment of any fees required in connection therewith, to cause such documents to become effective as promptly as reasonably practicable.

**Section 5.10    Competing Transaction**.  From and after the date of this Agreement until the entry of the Sale Order, Seller is permitted, and is permitted to cause its Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals, or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Buyer and its Affiliates, agents and Representatives) in connection with any sale or other disposition of all or any portion of the Business or the Acquired Assets, or any other similar transaction with respect to Seller or the Business, including any liquidation of the Business (each, a "Competing Transaction") only pursuant to an auction (an "Auction") conducted in accordance with the Bidding Procedures Order.

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

**Section 6.1    Cooperation**.  Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Acquired Assets and Assumed Liabilities from Seller to Buyer and to minimize the disruption to the Business resulting from the transactions contemplated hereby.

**Section 6.2    Further Assurances**.  In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's 's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption, or confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Acquired Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Seller's retention of the Excluded Assets and Excluded Liabilities.  Without limiting the generality of this Section 6.2, to the extent that either Buyer or Seller discovers any additional assets or properties which should have been transferred or assigned to Buyer as Acquired Assets but were not so transferred or assigned, Buyer and Seller shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer.

**Section 6.3    Availability of Business Records**.  From and after the Closing, Buyer shall promptly provide to Seller and its Representatives (after reasonable notice and during normal business hours and without charge to Seller) access to all Records included in the Acquired Assets for periods prior to the Closing to the extent such access is necessary in order

for Seller to comply with its obligations to administer Seller's Chapter 11 Case or applicable Law or any contract to which it is a party, and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) seven years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Seller's Chapter 11 Case, and (iv) in the case of Records related to Taxes, the expiration of the statute of limitation applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Seller have the right to retain originals or copies of all of Records included in the Acquired Assets for periods prior to the Closing. Prior to destroying any Records included in the Acquired Assets for periods prior to the Closing, Buyer shall notify Seller thirty days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Seller to retain such Records. With respect to any litigation and claims that are Excluded Liabilities, Buyer shall render, at Seller's expense, all reasonable assistance that Seller may request in defending such litigation or claim and shall make available to Seller's 's personnel most knowledgeable about the matter in question.

**Section 6.4    <u>Employee Matters</u>**.

(a)    Buyer shall offer employment as of the Closing Date to all active employees of the Business as of the date hereof. Such offers of employment made by Buyer shall include at least the same base salary or hourly wage rate that such employees received immediately prior to the Closing Date and such other terms and conditions so that the transactions contemplated by this Agreement do not trigger the WARN Act or similar state and local Laws. Seller shall have no liability or obligation to any such employee who becomes an employee of Buyer on and after the Closing Date. Buyer shall be responsible for all liabilities incurred pursuant to the WARN Act and any similar state or local Laws, including the provision of notice or payment in lieu of notice for any termination that occur on or after the Closing.

(b)    Notwithstanding anything in this Agreement to the contrary:

(i)    Seller shall be liable for the base wages and base salary that accrued on or prior to the Closing Date with respect to all employees of Seller; and

(ii)    Nothing in this Agreement is intended to (x) prevent Buyer from terminating the employment of any employee who becomes an employee of Buyer or one of its Affiliates on or following the Closing, or (y) create any third-party beneficiary rights in any employee of the Company or any of its Subsidiaries, any beneficiary or dependent thereof, or any collective bargaining agreement representative.

**Section 6.5    <u>Transfer Taxes</u>**. Buyer shall pay all stamp, documentary, registration, transfer, added-value, or similar Tax (each, a "<u>Transfer Tax</u>") imposed under any applicable Law in connection with the transactions contemplated by <u>Article II</u> of this Agreement. Seller and

Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

**Section 6.6    Wage Reporting**.    Buyer and Seller agree to utilize, or cause their respective Affiliates to utilize, the standard procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to wage reporting.

**Section 6.7    Insurance Policies**.

(a)    To the extent that any current or prior Insurance Policy is not transferable to Buyer at the Closing in accordance with the terms thereof, Seller shall hold such Insurance Policy for the benefit of Buyer, shall reasonably cooperate with Buyer (at Buyer's cost and expense) in pursuing any claims thereunder, and shall pay over to Buyer promptly any insurance proceeds paid or recovered thereunder with respect to the Acquired Assets or the Assumed Liabilities.  In the event Buyer determines to purchase replacement coverage with respect to any such Insurance Policy, Seller shall reasonably cooperate with Buyer to terminate such Insurance Policy to the extent only applicable to the Acquired Assets.

(b)    To the extent that any current or prior Insurance Policy of Seller relate to the Acquired Assets or Assumed Liabilities and the Excluded Assets or the Excluded Liabilities, and such Insurance Policy is transferred to Buyer at the Closing, Buyer shall hold such Insurance Policy with respect to the Excluded Assets or Excluded Liabilities, as applicable, for the benefit of Seller, shall reasonably cooperate with Seller in pursuing any claims thereunder, and shall pay over to Seller promptly any insurance proceeds paid or recovered thereunder with respect to the Excluded Assets or the Excluded Liabilities.

**Section 6.8    Collection of Accounts Receivable**.

(a)    As of the Closing Date, Seller hereby (i) authorizes Buyer to open any and all mail addressed to Seller relating to the Business or the Acquired Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash, and deposit any monies, checks, or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Acquired Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to Seller or Seller's order, for Buyer's own account.

(b)    As of the Closing Date, Seller agrees that any monies, checks, or negotiable instruments received by Seller after the Closing Date with respect to Accounts Receivable (including, without limitation, credit card receivables) that are Acquired Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by Seller for Buyer's benefit and account, and promptly upon receipt by Seller of any such payment (but in any event within five (5) Business Days of such receipt), Seller shall pay over to Buyer or Buyer's designee the amount of such payments.  In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Seller, from time to time as and when received

31

by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Seller hereunder, including any Excluded Assets.

(c)    As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Acquired Assets and accounts receivable relating to work performed by Buyer after the Closing.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSING

**Section 7.1    Conditions to Buyer's Obligations**.    Subject to Section 7.3, Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), all representations or warranties shall be true and correct in all material respects;

(b)    Seller shall have materially performed and complied with Seller's covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects;

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced, or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    the Sale Order shall have been entered by the Bankruptcy Court and shall not be stayed or materially different than the form of Sale Order set forth on Exhibit C attached hereto;

(e)    from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect;

(f)    Seller shall have delivered a certificate from an authorized officer of Seller to the effect that each of the conditions specified in Section 7.1(a) and Section 7.1(b) has been satisfied;

(g)    Seller shall have delivered certificates representing all of the Schramm Australia Equity Interests, duly endorsed (or accompanied by duly executed stock or similar powers) by the Seller in blank or for transfer to Buyer, if such Schramm Australia Equity Interests are certificated, and all other appropriate instruments, resolutions, filings, certificates and confirmations necessary to transfer such Schramm Australia Equity Interests to Buyer;

32

(h)     Seller shall have delivered copies of the certificate of incorporation and bylaws (or equivalent governance documents) of Schramm Australia; and

(i)     to the extent necessary pursuant to applicable Law, Seller shall have delivered certified copies of the resolutions duly adopted by Schramm Australia and any other required Consents authorizing the sale of the Schramm Australia Equity Interests and the other transactions contemplated hereby.

**Section 7.2    Conditions to Seller's Obligations**.    Subject to Section 7.3, Seller's obligation to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)     as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) any representation or warranty contained in Section 4.1. Section 4.2, or Section 4.3 shall be true and correct in all material respects, and (ii) any other representation or warranty set forth in Article IV shall be true and correct in all material respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the transactions contemplated hereby or by any Related Agreement;

(b)     Buyer shall have materially performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects;

(c)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)     the Sale Order shall have been entered by the Bankruptcy Court and shall not be stayed or materially different than the form of Sale Order set forth on Exhibit C attached hereto except to the extent that Buyer has waived any deviation from the Sale Order attached as Exhibit C;

(e)     Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

**Section 7.3    No Frustration of Closing Conditions**.    Neither Buyer nor Seller may rely on the failure of any condition to its obligation to consummate the transactions contemplated hereby set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its reasonable best efforts or commercially reasonable efforts, as applicable, with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the transactions contemplated hereby or other breach of a representation, warranty or covenant hereunder.

## ARTICLE VIII
## TERMINATION

**Section 8.1**    **Termination of Agreement**.  This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    by the mutual written consent of Buyer, on the one hand, and Seller, on the other hand;

(b)    by Buyer by giving written notice to Seller at any time prior to Closing (i) in the event Seller has breached any material covenant contained in this Agreement in any material respect, Buyer has notified Seller of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.1 shall become incapable of being satisfied by the Closing, unless, in each instance, such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

(c)    by Seller by giving written notice to Buyer at any time prior to Closing (i) in the event Buyer has breached any material covenant contained in this Agreement in any material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period often (10) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.2 shall become incapable of being satisfied by the Closing, unless, in each instance, such failure shall be due to the failure of Seller to perform or comply with any of the covenants hereof to be performed or complied with by Seller prior to the Closing, and such condition is not waived by Seller;

(d)    by Seller, upon written notice to Buyer within forty-eight (48) hours following the Bankruptcy Court approval of any definitive agreement with respect to a Competing Transaction; or

(e)    by Buyer, on the one hand, or Seller, on the other hand, on any date that is after the End Date if the Closing shall not have occurred by the End Date; provided, however, that (i) Buyer shall not have the right to terminate this Agreement under this Section 8.1(e) if, at the time of such termination, Seller would then be entitled to terminate this agreement pursuant to Section 8.1(c) (subject only to delivery of notice and the opportunity to cure, if curable, required by Section 8.1(c)), and (ii) Seller shall not have the right to terminate this Agreement under this Section 8.1(e) if, at the time of such termination, Buyer would then be entitled to terminate any agreement pursuant to Section 8.1(b) (subject only to delivery of notice and the opportunity to cure, if curable, required by Section 8.1(b)).

**Section 8.2**    **Procedure Upon Termination**.    In the event of termination and abandonment by Buyer, on the one hand, or Seller, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this

Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by either Party.

**Section 8.3**  **Effect of Termination.**

(a)     If any Party terminates this Agreement pursuant to <u>Section 8.1(a)</u>, <u>Section 8.1(b)</u> (other than as set forth in <u>Section 8.3(b)</u>), <u>Section 8.1(c)</u>, or <u>Section 8.1(e)</u>, then all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that <u>Article I</u> (Definitions), <u>Section 3.20</u> (No Other Representations or Warranties), <u>Section 4.7</u> (Condition of the Business), <u>Article IX</u> (Miscellaneous), and this <u>Article VIII</u> (Termination) shall survive any such termination) and no Party shall have any Liability to any other Party hereunder except as otherwise expressly set forth in this Agreement).

(b)     Nothing in this <u>Section 8.3</u> shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

**Section 8.4**  **Acknowledgement**.    Each of the Parties acknowledges that (i) the agreements contained in this Article VIII are an integral part of the transactions contemplated by this Agreement and (ii) without the agreements contained in this <u>Section 8.4</u>, Buyer would not have entered into this Agreement. In no event shall Seller have any liability to Buyer or any other Person for any special, incidental, exemplary, indirect, consequential, or punitive damages, and any such claim, right or cause of action for any damages that are special, incidental, exemplary, indirect, consequential, or punitive is hereby fully waived, released, and forever discharged.

**Section 8.5**  **Liquidated Damages**.    In the event that the Parties shall be entitled to receive any fees or other damages pursuant to this Agreement, the receipt of such amounts shall be deemed to be liquidated damages for any and all losses or damages suffered or incurred by such Party or any of its Affiliates or any other Person in connection with this Agreement (and the termination hereof), the transactions contemplated hereby (and the abandonment thereof) or any matter forming the basis for such termination, and neither Party nor any of its Affiliates or any other Person shall be entitled to bring or maintain any other claim, action, or proceeding against the other Party arising out of this Agreement, any of the transactions contemplated hereby or any matters forming the basis for such termination.

**ARTICLE IX**
**MISCELLANEOUS**

**Section 9.1**  **Expenses**.    Except as otherwise provided in this Agreement or a Related Agreement, Seller and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements, and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.    Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding, who, in light of the issues contested or determined in the action or proceeding, was more successful, shall be entitled to have and recover from the

non-prevailing Party such costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.

**Section 9.2    Entire Agreement**.  This Agreement constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof, except for the Related Agreements.

**Section 9.3    Incorporation of Annexes, Exhibits and Disclosure Schedule**.  The annexes and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 9.4    Amendments and Waivers**.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation, or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding, or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.4 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof.

**Section 9.5    Succession and Assignment**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  None of the Parties may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Seller; provided, further, however, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment. Notwithstanding the foregoing, the Buyer may assign any Indebtedness owed to it by the Seller to any Affiliate of the Buyer prior to the Closing.

**Section 9.6    Notices**.    All notices, requests, demands, claims, and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally or by electronic mail to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); or (iii) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:

    Schramm Inc.
    Attention:  Craig Mayman, President
    800 E. Virginia Avenue
    West Chester, PA 19380
    Email: CMayman@SchrammInc.com

    with a copy (which shall not constitute notice) to:

    Young Conaway Stargatt & Taylor, LLP
    Rodney Square
    1000 North King Street
    Wilmington, DE 19801
    Attn:   Craig D. Grear, Esq. and Sean M. Greecher, Esq.
    Email: cgrear@ycst.com and sgreecher@ycst.com

If to Buyer:

    Schramm II Inc.
    c/o GenNx360 Capital Partners, L.P.
    590 Madison Avenue, 27th Floor
    New York, NY 10022
    Attn:   Glen Bushery
    Email: gbushery@gennx360.biz

with copies (which shall not constitute notice) to:

    Winston & Strawn LLP
    200 Park Avenue
    New York, NY 10166
    Attn: Bradley C. Vaiana, Esq. and Bryan C. Goldstein, Esq.
    Email: bvaiana@winston.com; bgoldstein@winson.com

Any Party may change the address or facsimile number to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9.6.

    **Section 9.7**     **Governing Law: Jurisdiction**.  This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of laws provisions or rules (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights, and remedies of the Parties shall be determined in accordance with such Laws.  The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court; provided that if the Bankruptcy Court is unwilling or

unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, and the federal courts of the United States of America sitting in the State of Delaware shall have exclusive jurisdiction over such Litigation.

**Section 9.8    Consent to Service of Process**.  Each of the Parties hereby consents to process being served by any Party in any suit, action, or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.6.

**Section 9.9    WAIVERS OF JURY TRIAL**.    EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**Section 9.10    Specific Performance**.

(a)    Subject to Section 8.4 and Section 8.5, each of the Parties acknowledges and agrees that the other Parties (collectively, the "Enforcing Parties") would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any other remedy that each of the Parties may have under Law or equity, each of the Parties shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

(b)    Subject to Section 8.4 and Section 8.5, each of the Parties agrees that it shall not oppose the granting of specific performance or an injunction sought in accordance with this Section 9.10 on the basis that the Enforcing Parties have an adequate remedy at law or that any award of specific performance is, for any reason, not an appropriate remedy.  The Enforcing Parties shall not be required to provide any bond or other security in connection with any such injunction or other equitable remedy.  The End Date shall be tolled from the date any of the Enforcing Parties files a petition seeking specific performance or an injunction under this Section 9.10 until a final, non-appealable, decision regarding this matter is obtained from a court of competent jurisdiction.

**Section 9.11    Severability**.    The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 9.12    No Third Party Beneficiaries**.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 9.13    No Survival of Representations, Warranties and Agreements**.  None of the Parties' representations, warranties, covenants, and other agreements in this Agreement, including any rights of the other Party or any third party arising out of any breach of such representations, warranties, covenants, and other agreements, shall survive the Closing, except for (i) those covenants and agreements contained herein that by their terms apply or are to be performed in whole or in part after the Closing, (ii) the Parties' representations and warranties relating to such Party's authority with regard to the execution of this Agreement to which it is a party and the consummation of the transactions contemplated hereby and thereby, (iii) Buyer's representations and warranties in connection with the Seller's Chapter 11 Case or the Bankruptcy Code, (iv) this Article IX, and (v) all defined terms set forth in Article I that are referenced in the foregoing provisions referred to in clauses (i) through (iv) above.

**Section 9.14    Construction**.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine, or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.  The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation."  The words "herein," "hereto," "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other subdivision of this Agreement.  Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof."  Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Annexes, Exhibits, and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Annexes, Exhibits, and the Disclosure Schedule of this Agreement.  Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time.  Any reference herein to "dollars" or "$" means United States dollars.

**Section 9.15    Computation of Time**.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Seller or the Seller's Chapter 11 Case, the provisions of Bankruptcy Rule 9006(a) shall apply.

**Section 9.16    Mutual Drafting**.  Each of the Parties has participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.17    Disclosure Schedule**.  All capitalized terms not defined in the Disclosure Schedule shall have the meaning ascribed to them in this Agreement.  The representations and

warranties of Seller in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule. The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure with respect to any other sections of the Disclosure Schedule to which such disclosed matter reasonably relates, but only to the extent that such relationship is reasonably apparent on the face of the disclosure contained in the Disclosure Schedule. The listing of any matter shall expressly not be deemed to constitute an admission by Seller, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the disclosure of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Seller's representations, warranties, and covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the Disclosure Schedule in which they are directly or indirectly referenced.

      **Section 9.18    Headings; Table of Contents**.    The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

      **Section 9.19    Counterparts: Facsimile and Email Signatures**.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

      **Section 9.20    Time of Essence**.    Time is of the essence of this Agreement.

[END OF PAGE]
[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

<u>**SELLER**</u>:

**SCHRAMM, INC.**

By: _____
      Name:  Craig Mayman
      Title:    President

<u>**BUYER**</u>:

**SCHRAMM II INC.**

By: _____
      Name:
      Title:

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLER**:

**SCHRAMM INC.**

By:   _____

Name:  Craig Mayman
Title:   President

**BUYER**:

**SCHRAMM II INC.**

By:   *Lloyd Trotter*

Name:  *Lloyd Trotter*
Title:   *Managing Partner*

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

Exhibit A

[Intentionally Omitted]

<u>Exhibit B</u>

Bidding Procedures

*Attached*

# THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| HDR HOLDING, INC., *et al.* [1] | Case No.:  19-11396 (MFW) |
| Debtors. | (Jointly Administered) |

# BIDDING PROCEDURES FOR
# THE SALE OF THE DEBTORS' ASSETS

On [date], the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order Establishing Bidding Procedures and Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order"),[2] by which the Court approved the following procedures. These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "Auction") for the sale (the "Sale") of all or substantially all of the Debtors' assets (collectively, the "Assets"), in accordance with and as described in that certain agreement (the "Stalking Horse Purchase Agreement"), dated as of June 24, 2019, by and among the Debtors, and Schramm II Inc. (the "Stalking Horse Bidder"), and attached as **Schedule 1** hereto.

1.    **SUBMISSIONS TO THE DEBTORS**.

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each the following persons unless otherwise provided (collectively, the "Notice Parties"):

a.    The Debtors. 800 E. Virginia Ave., West Chester, PA 19380 (Attn: Jesse Glover; jglover@schramminc.com)

b.    Proposed Counsel to the Debtors.  Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Sean T. Greecher and Joseph M. Mulvihill;  sgreecher@ycst.com, jmulvihill@ycst.com)

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: HDR Holding, Inc. (2015) and Schramm, Inc. (0480).  The Debtors' mailing address is 800 E. Virginia Ave., West Chester, PA 19380.

[2]  All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

c.      Debtors' Investment Banker.  FocalPoint Partners LLC, 150 N. Riverside Plaza, Suite 2820, Chicago, IL 60606 (Attn. Michael Fixler; mfixler@focalpointllc.com).

## 2.      POTENTIAL BIDDERS.

The Debtors and their financial advisors have identified, and may in the future identify, parties they believe potentially may be interested in consummating (and potentially may have the financial resources necessary to consummate) a competing transaction.  To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (each, a "Potential Bidder") must deliver or have previously delivered, if determined to be necessary by the Debtors in their sole discretion:

a.      an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement"), to the extent not already executed; and

b.      the most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, and (ii) a written commitment acceptable to the Debtors and their advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale).

## 3.      QUALIFIED BIDDERS.

a.      A "Qualified Bidder" is a Potential Bidder:  (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, as determined in the Debtors' sole discretion; (ii) whose Bid (as defined below) is a Qualified Bid (as defined below); and (iii) whom the Debtors, in their sole discretion, determine should be considered a Qualified Bidder.  On the date of the Bid Deadline, by no later than 11:59 p.m., the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder, and shall provide a copy of each Qualified Bid to the Stalking Horse Bidder.  The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times for all purposes in connection with the Bidding Process, the Auction, and the Sale.  The Stalking Horse Bidder shall not be required to take any further action in order to participate in the Auction (if any) or, if the Stalking Horse Bidder is the Successful Bidder, to be named the Successful Bidder at the Sale Hearing.

b.      For the avoidance of doubt, two or more Potential Bidders may submit a Bid for any or all of the Assets, provided that such Bid(s), when taken as a whole (collectively, a "Joint Bid"), are determined by the Debtors, in accordance with Section 3(a) of these Bidding Procedures, to constitute a Qualified Bid.

c.  If any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below) and all accumulated interest thereon on or within three business days after the Bid Deadline.

d.  Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Except as otherwise set forth in the Stalking Horse Purchase Agreement, without the written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

e.  Any disputes related to these Bidding Procedures, including whether a Bid (including a Joint Bid) constitutes a Qualified Bid, shall be resolved by the Court.

4.  **DUE DILIGENCE**.

a.  **Diligence Provided to Potential Bidders.**

Only Potential Bidders approved by the Debtors shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors.  **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**.  The Debtors will provide to each approved Potential Bidder reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any Potential Bidder to the Debtors' electronic data room.  For all Potential Bidders other than the Stalking Horse Bidder, the due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Assets, the Debtors' liabilities, or the Sale ("Confidential Sale Information") to any person, *except* to an approved Potential Bidder or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement; *provided*, *however*, that nothing herein shall limit the Debtors' ability to furnish Confidential Sale Information to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases (each, an "Official Committee"), in each case on a professionals' eyes only basis.  The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Debtors also reserve the right to withhold any diligence materials that the Debtors determine, in their sole discretion, are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors as a Potential Bidder.

**All due diligence requests must be directed to FocalPoint Partners LLC, 150 N. Riverside Plaza, Suite 2820, Chicago, IL 60606 (Attn. Michael Fixler; mfixler@focalpointllc.com).**

b.      **Diligence Provided by Potential Bidders.**

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the Sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such Potential Bidder is not a Qualified Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (a) with the prior written consent of such bidder and the Debtors; (b) to the applicable bidder; (c) to the professional advisors of any Official Committee, and (d) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

**5.      BID REQUIREMENTS**.

A proposal, solicitation, or offer (each, a "Bid") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "Bid Requirements"), as determined by the Debtors in their reasonable business judgment, shall constitute a "Qualified Bid." For the avoidance of doubt, the Stalking Horse Purchase Agreement will be deemed a Qualified Bid for all purposes.

a.      Assets. Each Bid must provide for the purchase of all or substantially all of the Assets and must clearly state which assets the Qualified Bidder is agreeing to

purchase, and which liabilities of the Debtors the Qualified Bidder is agreeing to assume ("Assumed Liabilities").

b.  Purchase Price.  Each Bid must clearly set forth the purchase price to be paid, including and identifying separately any cash and non-cash components (the "Purchase Price").

c.  Minimum Bid.  The aggregate consideration proposed by each Bid must equal or exceed the sum of (i) the purchase price set forth in the Stalking Horse Purchase Agreement, and (ii) an initial overbid of $100,000 (a "Minimum Bid").

d.  Deposit.  With its Bid, each Potential Bidder, except the Stalking Horse Bidder, must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to 10 percent of the aggregate cash and non-cash Purchase Price set forth in the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit").

e.  Assumption of Obligations.  Each Bid must expressly assume all of the Assumed Obligations (as defined in the Stalking Horse Purchase Agreement) on terms no less favorable to the Debtors than the Stalking Horse Purchase Agreement, as determined in the Debtors' business judgment.

f.  Same or Better Terms.  Each Bid must be on terms that are not more burdensome than the terms of the Stalking Horse Purchase Agreement, as determined in the Debtors' sole discretion.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and shall include a schedule of assumed contracts to the extent applicable to the Bid, and a copy of the Stalking Horse Purchase Agreement clearly marked to show all changes requested by the Potential Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid (the "Qualified Bid Documents").

g.  Contingencies; No Financing or Diligence Outs.  A Bid shall not be conditioned on (i) obtaining financing, (ii) shareholder, board of directors, or other internal approval, or (iii) the outcome or completion of a due diligence review by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the Sale of specified representations and warranties, (ii) or the satisfaction at the closing of the Sale of specified conditions, which shall not be more burdensome, as determined in the Debtors' business judgment, than those set forth in the Stalking Horse Purchase Agreement.

h.  Identity.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the Sale), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any

Bid. Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid.

i.  Demonstrated Financial Capacity. A Qualified Bidder must have, in the Debtors' business judgment the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

j.  Committed Financing. To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing documented to the satisfaction of the Debtors, which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

k.  Binding and Irrevocable. A Qualified Bid must be irrevocable unless and until the Debtors accept a higher Bid and such Qualified Bidder is not selected as the Backup Bidder (as defined herein).

l.  Expenses; Disclaimer of Fees. Each Bid must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

m.  Authorization. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

n.  As-Is, Where-Is. Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

o.      Adherence to Bid Procedures.  By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

p.      Regulatory Approvals and Covenants.  A Bid must set forth each regulatory and third-party approval to consummate the Sale and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible).

q.      Consent to Jurisdiction.  Each Potential Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.

r.      Bid Deadline.  Each Bid must be transmitted via email (in .pdf or similar format) so as to be <u>actually received</u> on or before 5:00 p.m. (prevailing Eastern Time) on August 13, 2019 (the "<u>Bid Deadline</u>") by the Notice Parties. The Debtors may, in their reasonable discretion, extend the Bid Deadline.  In the event of such an extension, the Debtors shall provide notice to the Notice Parties and any Qualified Bidders of such extension.

**6.    AUCTION**.

If the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Purchase Agreement, the Debtors will conduct an Auction to determine the Successful Bidder(s). If the Debtors do not receive one or more Qualified Bids (other than the Stalking Horse Purchase Agreement), the Debtors will not conduct an Auction and shall designate the Stalking Horse Bidder's Bid as the Successful Bid.

On the date of the Bid Deadline, by no later than 11:59 p.m. (prevailing Eastern Time), the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' reasonable business judgment (the "<u>Baseline Bid</u>"), and provide copies of the applicable Qualified Bid Documents supporting the Baseline Bid to each Qualified Bidder.  The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, which may include, among other things: (a) the number, type, and nature of any changes to the applicable Stalking Horse Purchase Agreement, if any, requested by the Qualified Bidder, including the type and amount of Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the tax consequences of such

Qualified Bid (collectively, the "Bid Assessment Criteria").

The Auction shall take place at 10:00 a.m. (prevailing Eastern Time) on August 15, 2019, at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801, or such later date and time as selected by the Debtors. The Auction shall be conducted in a timely fashion according to the following procedures:

a.    **The Debtors Shall Conduct the Auction.**

The Debtors and their professionals shall direct and preside over the Auction. The Debtors may adopt rules for the Auction that, in their reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with the Bidding Procedures Order or the Bankruptcy Code. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (defined below) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only the following parties shall be entitled to attend the Auction: (a) Qualified Bidders and their legal and financial advisors, (b) the Debtors and their legal and financial advisors, (c) the Stalking Horse Bidder and their legal and financial advisors, and (d) the legal and financial advisors of any Official Committee. The Qualified Bidders and the Stalking Horse Bidder may appear at the Auction in person or through duly authorized representatives. Any other creditor or their authorized representative may attend the auction by providing the Notice Parties written notice at least three (3) days prior to the Auction.

b.    **Terms of Overbids.**

"Overbid" means any bid made at the Auction by a Qualified Bidder[3] subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

(i)    Minimum Overbid Increment. The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than the sum of $100,000 (a "Minimum Overbid Increment").

Additional consideration in excess of the amount set forth in the respective Baseline Bid may include cash and/or noncash consideration; *provided* that the value for such noncash consideration shall be determined by the Debtors in their reasonable business judgment.

(ii)    Conclusion of Each Overbid Round. Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline (as the

---

[3]  Or Qualified Bidders, in the event of a Joint Bid.

Debtors may, in their business judgment, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

(iii)    Overbid Alterations.   An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

(iv)    Announcing Highest Bid.   Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified in the initial applicable Overbid round, an Overbid as being higher or otherwise better than the Initial Minimum Overbid for such asset package, or in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid for a given asset package (for each asset package, the "Prevailing Highest Bid").   The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid.

c.    **Consideration of Overbids.**

The Debtors reserve the right, in their reasonable business judgment, to adjourn the Auction one or more times to, among other things:  (i) facilitate discussions between the Debtors and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

d.    **Closing the Auction.**

(i)    The Auction shall continue until there is only one Bid or Joint Bid, as applicable, that the Debtors determine, in their reasonable business judgment, to be the highest or otherwise best Bid.  Such Bid or Joint Bid, as applicable, shall be declared the "Successful Bid," and such Qualified Bidder (or Qualified Bidders, in the event of a Joint Bid) the "Successful Bidder(s)," at which point the Auction will be closed.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

(ii)     The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

(iii)    As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid to be filed with the Court.

e.     **No Collusion; Good-Faith Offer.**

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that:  (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the Sale if selected as the Successful Bidder(s).

## 7.     BACKUP BIDDER.

a.     Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

b.     The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder(s).  The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the Sale with the Successful Bidder(s).  The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder(s) and shall thereafter be returned within five (5) business days.

c.     If a Successful Bidder(s) fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder(s), and such Backup Bidder shall be deemed a Successful Bidder(s) for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Court or notice to any party.  In such case, the defaulting Successful Bidder(s)'s Deposit shall be forfeited to the Debtors.  The Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder(s), including with respect to specific performance.

## 8.     RESERVATION OF RIGHTS.

Without prejudice to the rights of the Stalking Horse Bidder under the terms the Stalking Horse Purchase Agreement and the DIP Lender, the Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment in any manner that will best promote

the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids or Bids.

9.     **SALE HEARING**.

A hearing to consider approval of each Sale of the Assets to the Successful Bidder(s) (or to approve the Stalking Horse Purchase Agreement, as applicable, if no Auction is held) (the "Sale Hearing") is currently scheduled to take place on or before [●] (prevailing Eastern Time) on August 19, 2019, before the [●], at the Court, 824 Market Street, [●] Floor, Courtroom No. [●], Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).**

At the Sale Hearing, the Debtors shall present the Successful Bid to the Court for approval.

The Stalking Horse Bidder shall have standing to appear and be heard on all issues related to the Auction, the Sale, and related matters, including the right to object to the sale of the Assets or any portion thereof (including the conduct of the Auction and interpretation of these Bidding Procedures).

10.     **RETURN OF DEPOSIT**.

The Deposit of the Successful Bidder(s) shall be applied to the Purchase Price of the transaction at closing. The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder(s) and the Backup Bidder) on or within five business days after the Auction.

If the Successful Bidder(s) fails to consummate the Sale because of a breach by the Successful Bidder(s), the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder(s), which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the Sale with the Backup Bidder without the need for an additional hearing or order of the Court.

11.     **FIDUCIARY OUT**.

Nothing in these Bidding Procedures shall require the Debtors' board of directors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the

Exhibit C

Sale Order

*Attached*

<u>Exhibit D</u>

Form of Bill of Sale

*Attached*

## BILL OF SALE

THIS BILL OF SALE ("Bill of Sale") is made and delivered as of [_____] [____], 2019, by Schramm Inc., a Pennsylvania corporation ( "Seller"), for the benefit of Schramm II, Inc., a Delaware corporation ("Buyer").  All capitalized terms used in this Bill of Sale and not otherwise defined herein shall have the respective meanings ascribed to them that certain Asset Purchase Agreement, dated as of June 24, 2019, by and between  Seller and Buyer (as may be further amended, modified or supplemented from time to time in accordance with its terms, the "Purchase Agreement")

## RECITALS:

A.      Seller and Buyer are parties to the Purchase Agreement, pursuant to which, among other things, Seller has agreed to sell, transfer, assign and convey to Buyer, and Buyer has agreed to purchase and acquire from Seller, all of Seller's right, title and interest in and to the assets set forth in Section 2.1 of the Purchase Agreement (collectively, the "Acquired Assets").

B.      This Bill of Sale is executed and delivered to Buyer by Seller pursuant to the terms and conditions of the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Seller hereby agrees and covenants as follows:

1.      Sale and Transfer of Acquired Assets.  Seller does hereby sell, assign, transfer, convey and deliver unto Buyer and its successors and assigns, to have and to hold forever, free and clear of all liens, claims encumbrances or other charges, all of Seller's right, title and interest in and to the Acquired Assets. Notwithstanding anything to the contrary, the Acquired Assets being transferred to the Buyer under this Bill of Sale do not include any Excluded Assets, and Seller hereby retains all right, title and interest in and to all of the Excluded Assets.

2.      Further Actions.  Seller covenants and agrees to take all steps reasonably necessary to establish the record of Buyer's title to the Acquired Assets, and, at the request of Buyer, to execute and deliver further instruments of transfer and assignment as Buyer may reasonably request to more effectively transfer title and assign to and vest in Buyer the Acquired Assets.

4.      Purchase Agreement. Nothing in this Bill of Sale, express or implied, is intended or shall be construed to expand or defeat, impair or limit in any way the rights, obligations, claims or remedies of Seller or Buyer as set forth in the Purchase Agreement.

5.      Miscellaneous.  (i) this Bill of Sale shall be binding upon and inure to the benefit of Seller and Buyer and their respective successors, assigns, heirs, executors, administrators, and personal and legal representatives (as applicable); and (ii) the headings given to the various sections of this Bill of Sale are inserted for convenience of reference only, do not form a part of this Bill of Sale and have no effect upon its interpretation.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the [_____] day of [_____], 2019.

**SCHRAMM INC.**

By: _____

<u>Exhibit E</u>

Form of Assignment and Assumption Agreement

*Attached*

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT is entered into as of [_____] [ ], 2019 (this "Agreement"), by and between Schramm Inc., a Pennsylvania corporation ("Seller") and Schramm II, Inc., a Delaware corporation ("Buyer"). Seller and Buyer collectively shall be referred to herein as the "Parties" and each, individually, as a "Party".

## RECITALS

A.      Seller and Buyer have entered into that certain Asset Purchase Agreement, dated as of June 24, 2019, (the "Purchase Agreement"), providing, subject to the terms and conditions set forth therein, for the sale, transfer, assignment, conveyance and delivery by Seller to Buyer of all right, title and interest in and to the Acquired Assets and the assumption by Buyer of the Assumed Liabilities.

B.      Seller and Buyer have concurrently herewith executed that certain Bill of Sale and Assignment and Assumption Agreement dated as of the date hereof pursuant to which Seller has sold, transferred, assigned, conveyed and delivered to Buyer all of Seller's right, title and interest in and to the Acquired Assets.

C.      The Parties desire to execute and deliver this Agreement for the purpose of effecting the assignment by Seller and assumption by Buyer of the Assumed Liabilities.

NOW, THEREFORE, in consideration of the mutual agreements and covenants contained herein and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      Definitions.  Unless otherwise defined herein, each capitalized term used herein shall have the meaning ascribed to such term in the Purchase Agreement.

2.      Assumption of Assumed Liabilities.

(a)      Seller hereby irrevocably assigns, conveys and transfers to Buyer the Assumed Liabilities.

(b)      Buyer hereby assumes and agrees to pay and perform, as and when due, the Assumed Liabilities.

(c)      Notwithstanding anything in this Agreement to the contrary, the Parties hereby agree and affirm that, other than the Assumed Liabilities, Buyer is not assuming or in any way becoming liable or responsible for any liabilities other than Assumed Liabilities, including, for the avoidance of doubt, any Excluded Liabilities.

(d)      Each of the Parties hereto covenants and agrees that it shall do, execute, acknowledge and deliver all acts, agreements, instruments, notices and assurances as may be reasonably requested by the other Party to further effect and evidence the transactions contemplated hereby.

3.    <u>Amendment; Extension; Waiver</u>.  Subject to the provisions of applicable law, the Parties may amend this Agreement at any time pursuant to an instrument in writing signed on behalf of each of the Parties.  At any time, either Party may, to the extent legally allowed, (a) extend the time for the performance of any of the obligations or other acts of the other Party, (b) waive any inaccuracies in the representations and warranties made to such Party contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions for the benefit of such Party contained herein.  Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.  Without limiting the generality or effect of the preceding sentence, no delay in exercising any right under this Agreement shall constitute a waiver of such right, and no waiver of any breach or default shall be deemed a waiver of any other breach or default of the same or any other provision in this Agreement.

4.    <u>No Third-Party Beneficiary</u>.  This Agreement is not intended to confer, and shall not be construed as conferring, upon any Person other than the Parties any rights or remedies hereunder.

5.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware without reference to such state's principles of conflict of laws.

6.    <u>Counterparts</u>.  This Agreement may be executed in counterparts (including by means of electronic or facsimile transmissions), each of which shall be deemed to be an original, but all of which together shall constitute but one and the same agreement.

7.    <u>Severability</u>.  If any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement shall continue in full force and effect and shall be interpreted so as reasonably to effect the intent of the Parties.  The Parties shall use all reasonable best efforts to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that shall achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

8.    <u>Purchase Agreement</u>.  Notwithstanding anything in this Agreement to the contrary, the assumption effectuated hereby is subject in all respects to the terms and conditions of the Purchase Agreement and nothing in this Agreement, express or implied, is intended or shall be construed to expand or defeat, impair or limit in any way the rights, obligations, claims or remedies of Seller and Buyer as set forth in the Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

[SIGNATURE PAGE FOLLOWS]

2

IN WITNESS WHEREOF, the undersigned have caused this Assumption Agreement to be duly executed as of the date first written above.

**SCHRAMM INC.**

By:_____
Name:
Title:

**SCHRAMM II, INC.**

By:_____
Name:
Title:

<u>Exhibit F</u>

Form of Intellectual Property Assignment Agreement

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

THIS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT ("Assignment Agreement"), effective as of _____, 2019 ("Effective Date"), is between Schramm II, Inc., a Delaware corporation ("Company"), and Schramm Inc., a Pennsylvania corporation ("Assignor").  Assignor and Company collectively shall be referred to herein as the "Parties" and each, individually, as a "Party".

A.      Pursuant to that certain Asset Purchase Agreement dated as of Jun3 24, 2019 (as it may be amended, restated or otherwise modified from time to time, the "Purchase Agreement"), by and between Company and Seller, Seller has agreed to sell, transfer, assign, convey and deliver to Company, all of the Seller's right, title and interest in and to all Acquired Assets (as defined in the Purchase Agreement), including all Intellectual Property (as defined in the Purchase Agreement) owned by Seller, upon the terms and subject to the conditions set forth in the Purchase Agreement.

B.      Pursuant to the Purchase Agreement, the execution and delivery of this Intellectual Property Assignment Agreement is a condition precedent to the closing of the transactions contemplated by the Purchase Agreement.

C.      Assignor is willing to assign all rights Assignor may have in and to all Intellectual Property on the terms and subject to the conditions set forth in this Assignment Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Assignor and Company, Assignor and Company agree as follows:

1.      Definitions.  Capitalized terms not otherwise defined herein shall have the meaning set forth in the Purchase Agreement.

2.      Assignment.  Effective as of the Effective Date, Assignor hereby irrevocably sells, transfers, assigns, sets over and conveys to the Company, its successors and assigns, all of Assignor's worldwide right, title and interest in and to all work and all intellectual property rights owned by Assignor, including without limitation all worldwide right, title and interest in and to all of the following:

(a)      utility patents, utility model patents, design patents and industrial designs and inventors' certificates, all applications for and inventions disclosed in any of the foregoing, including all provisionals, divisionals, continuations, continuations-in-part, reissues, reexaminations, renewals and extensions of any of the foregoing and all rights to claim priority of any of the foregoing, including] the patents and patent applications identified in Exhibit A attached hereto (the "Patents"), any related or corresponding United States provisional or non-provisional application embodying the inventions described in the Patents or any other United States application claiming priority to a provisional application under 35 U.S.C. § 119(e) or converted therefrom, or any application claiming the benefit of a non-provisional application under 35 U.S.C. §120, including all divisions, continuations, reexaminations, and reissues thereof and all patents that may be granted thereon, including any other counterparts thereto

worldwide, patents of addition, utility models, inventors' certificates, industrial property protection, patent rights and right to claim priority thereto in any country, and all extensions and renewals thereof existing now or in the future, including, without limitation, all applications for patents, utility models and designs that may hereafter be filed for in any country or countries other than the United States, together with the right to file such applications under the Patent Laws of the United States, the International Convention for the Protection of Industrial Property, or any other international agreement or the domestic laws of the country in which any such application is filed, as may be applicable, and all forms of industrial property protection, including without limitation, patents, utility models, inventors' certificates and designs, which may be granted in any country or countries foreign to the United States and all extensions, renewals and reissues therefor;

(b)     trademarks, service marks, certification marks, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names, social media accounts, and all other source or business identifiers and general intangibles of a like nature, including the trademarks, trademark registrations, trademark applications and domain names identified in Exhibit A (the "Trademarks"),  all registrations and applications for any of the foregoing, renewals and extensions thereof, the ongoing and existing business of Assignor to which the Trademarks pertain, all goodwill associated with any of the foregoing, and any other trademark, service mark or trade dress confusingly similar to any of the foregoing;

(c)     rights associated with works of authorship, including software, databases, websites, exclusive exploitation rights, mask work rights, copyrights database and design rights, whether or not registered or published, including the copyrights, mask works and registrations and applications therefor identified in Exhibit A, all registrations and applications for any of the foregoing, renewals and extensions thereof and all moral rights associated with any of the foregoing;

(d)     trade secrets, know-how and other proprietary and confidential information, including inventions (whether or not patentable), invention disclosures, improvements, algorithms, source code, data analytics, methods, processes designs, drawings, customer lists, supplier lists and financial information, including the trade secrets identified in Exhibit A;

(e)     all other intellectual property and proprietary rights in, arising out of, in connection with or in relation to any of the foregoing (collectively, the "Intellectual Property"), the same to be held and enjoyed by Company, its successors and assigns and all embodiments and fixations of any of the foregoing and all related documentation;

(f)     all of Assignor's right to file patent, trademark and copyright applications in the United States and throughout the world for the Intellectual Property in the name of the Company, its successors and assigns; and

(g)     all claims, demands, income, damages, royalties, payments, accounts and accounts receivable now or hereafter due and/or payable, and rights to causes of action and remedies, related to any of the Intellectual Property, including without limitation all proceeds to infringement suits, the right to sue and prosecute for past, present and future infringement,

misappropriation or other violation of rights related to the Intellectual Property, and all rights corresponding thereto throughout the world for the Intellectual Property rights assigned herein.

3.   <u>Authorization</u>. Assignor authorizes and requests the Commissioner of Patents and Trademarks of the United States, and the corresponding entities or agencies in any applicable foreign jurisdictions, whose duty is to issue patents or other evidence or forms of industrial property protection on applications as aforesaid, to issue the same to Company and to record Company as owner of the Patents and Trademarks, as assignee of the entire right, title and interest in, to and under the same, for the sole use and enjoyment of Company, its successors, assigns or other legal representatives.

4.   <u>Further Assurances</u>. Assignor shall provide the Company, its successors and assigns with all such assistance as it may reasonably request for the full utilization of the rights granted in <u>Section 1</u>, above, including, without limitation, upon request by the Company to execute and cause its current or former employees or contractors to execute, as applicable, all applications and any further assignments or other documents or instruments, sign all lawful papers, and make all rightful oaths necessary or desirable to carry out the purposes or intent of this Assignment Agreement and to aid the Company or its successors, assigns or other legal representatives to obtain and enforce proper protection for the Intellectual Property in all jurisdictions and to record the Company as owner of the Intellectual Property, as assignee of the entire right, title and interest in, to and under the same, for the sole use and enjoyment of the Company, its successors, assigns or other legal representatives.  Without limiting the foregoing, Assignor will do all things necessary, proper or advisable to reasonably assist the Company in transferring all domain names that are Intellectual Property, including as applicable, placing each of the domain names in "unlocked" status and provide to Company the Internet domain name registrars' transfer authorization codes for each of the domain names and any other information required to effectuate the transfer of Assignor's right, title and interest in the domain names to Company.

5.   <u>General</u>.

(a)   <u>Entire Agreement</u>.   This Assignment Agreement, together with the Purchase Agreement, constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof, except for the Related Agreements. In the event of a conflict between this Assignment Agreement and the Purchase Agreement, the Purchase Agreement shall take precedence.

(b)   <u>Succession and Assignment</u>.   This Assignment Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

(c)   <u>Governing Law; Jurisdictions</u>.   This Assignment Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of laws provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws.  The Parties agree that any Litigation

one Party commences against any other Party pursuant to this Assignment Agreement shall be brought exclusively in the Bankruptcy Court; <u>provided</u> that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, and the federal courts of the United States of America sitting in the  State of Delaware shall have exclusive jurisdiction over such Litigation.

(d)      <u>Counterparts</u>.   This Assignment Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Assignment Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned have executed this Intellectual Property Assignment Agreement on and as of the date first indicated above.

**SCHRAMM INC.**

By:    _____
        Name:
        Title:

**SCHRAMM II, INC.**

By:    _____
        Name:
        Title:

# EXHIBIT A

## Intellectual Property

<u>Patents; Patent Applications</u>

<u>Trademarks; Trademark Registrations; Trademark Applications</u>

<u>Domain Names</u>

<u>Copyrights; Copyright Registrations</u>

<u>Trade Secrets</u>

**DISCLOSURE SCHEDULE**

**TO THE**

**ASSET PURCHASE AGREEMENT**

by and between

**SCHRAMM, INC.**

Seller

and

**SCHRAMM II, INC.**

Buyer

dated as of

June 24, 2019

# DISCLAIMER

This Disclosure Schedule (this "<u>Disclosure Schedule</u>") has been prepared and delivered by the Seller (as defined herein) in connection with the Asset Purchase Agreement, dated as of June 24, 2019 (the "<u>Agreement</u>"), by and between SCHRAMM, INC., a Pennsylvania corporation ("<u>Seller</u>"), and SCHRAMM II, INC., a Delaware corporation ("<u>Buyer</u>").

Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement. Section 9.14 of the Agreement shall apply to the interpretation of these Disclosure Schedules, *mutatis mutandis*.

This Disclosure Schedule is provided confidentially and is subject to the terms and conditions of the Agreement.  The information provided in this Disclosure Schedule is being provided solely for the purpose of making disclosures to Buyer under the Agreement.  Any item or matter required to be disclosed on a particular section of this Disclosure Schedule pursuant to the Agreement shall be deemed to have been disclosed if information for such item or matter complying with such disclosure requirements is set forth in another section of this Disclosure Schedule, to the extent reasonably apparent that such information applies to such particular section of this Disclosure Schedule.

The inclusion of any matter, information, or item in this Disclosure Schedule shall not be deemed to constitute an admission of any liability by the Seller to Buyer or any third party or otherwise imply, that any such matter, information, or item is material or creates a measure for materiality or any other similar term or concept for the purposes of the Agreement or that any such matter, information, or item did not arise in the ordinary course of business.

Matters reflected in this Disclosure Schedule are not necessarily limited to matters required by the Agreement to be reflected in this Disclosure Schedule.  Such additional matters are set forth for informational purposes and do not necessarily include other matters of a similar nature.  In addition, the disclosure of any matter in this Disclosure Schedule is not to be deemed an admission that such matter actually constitutes noncompliance with, or a violation of applicable Law, Contract, or other topic to which such disclosure is applicable.  In no event shall the disclosure of matters disclosed in this Disclosure Schedule be deemed or interpreted to broaden any of Seller's representations and warranties, obligations, covenants, conditions, or agreements contained in the Agreement.

In disclosing this information, Seller expressly do not waive, and expressly reserve any rights under, any attorney-client privilege associated with such matter, information or item, or any protection afforded by the work-product doctrine with respect to any of the matters, information or items disclosed herein.

The headings contained in this Disclosure Schedule are intended solely for convenience of reference and shall not affect the rights of the parties to the Agreement nor be deemed to modify or influence the interpretation of the information contained in this Disclosure Schedule or the Agreement.

Case 19-11396-MFW    Doc 208-1    Filed 09/17/19    Page 110 of 100

**Schedule A-1**

Existing Facilities

800 E. Virginia Avenue, West Chester PA, 19380

**Section 2.5**

Assumed Indebtedness

1.      All outstanding Term Loan A Indebtedness under the Amended and Restated Credit Agreement among Seller, as Borrower, HDR Holding, Inc., as Holdings and a Guarantor, certain domestic Subsidiaries of Holdings from time to time party thereto, as Guarantors, the Lenders party thereto, and Enhanced Credit Supported Loan Fund, LP, as Administrative Agent, dated as of March 23, 2016, as amended (the "<u>Pre-Petition Credit Agreement</u>")

2.      $5,000,000 of outstanding Term Loan B Indebtedness under the Pre-Petition Credit Agreement

**Section 3.1(d)**

Equity Interests

NONE

**Section 3.3(a)**

Contractual Conflicts and Required Consents

NONE

**Section 3.3(b)**

Required Consents

1.  Governmental Consents:        None

2.  Third Party Consents:         Consent required under Authorized License Agreement
                                  between Quenton Seed and AirDrill Hammers & Bits Pty.
                                  Ltd., a Schramm Company, Dated 12/21/2012 granting the
                                  licensee permission to use Intellectual Property in relation
                                  to the course of business for AirDrill Hammers & Bits Pty.
                                  Ltd.

**Section 3.4**

Title Exceptions

NONE

**Section 3.5**

Contracts

**3.5(a)(i) - personal property leases with annual payments in excess of $50,000:**

NONE

**3.5(a)(ii) – equipment purchase and sale agreements with payments greater than $50,000 or that extent for a period greater than six months:**

1. Rig Purchase, dated December 6, 2018, between Seller and Quest Drilling

2. DR07 Compliance Upgrade, dated April 17, 2019, between Seller and Easternwell Minerals to repair a DR07 Rig

3. M2670 SOW Rebuilt Contract, dated June 7, 2019, between Seller and Swick Mining to rebuild T685SP Rig

**3.5(a)(iii) – service contracts with annual consideration payable greater than $75,000:**

1. Authorized Representative Agreement, dated March 28, 2014, by and between Seller and Exploration Drill Masters Chile S.A.

2. Authorized Retailer Agreement, dated September 24, 2013, by and between Seller and CETCO

3. AirDrill Hammers & Bits Distributor agreement, dated January 25, 2017, by and between AirDrill Hammers & Bits Pty. Ltd., a Schramm Company, and Mantech Mining Services

4. AirDrill Hammers & Bits Distributor agreement, dated February 10, 2018, by and between AirDrill Hammers & Bits Pty. Ltd., a Schramm Company, and HUD Mining Services Pty Ltd

5. Consulting Agreement, dated February 22nd 2013, between Seller and Alan Watson to help manage and develop sales areas nominated for all Schramm Products in specified regions (TERMINATED)

6. Consulting Agreement dated May 15, 2014, between Schramm Inc. and Claudio Soto Lenz, to help manage and develop sales areas nominated for all Schramm Products in specified regions (TERMINATED)

7. Statement of Work, dated September 22, 2016, between Seller and Clark Equipment Company

8. CordiCare Agreement, dated July 1, 2018, between Seller and Cordicate Information Technology as Seller's IT infrastructure partner

Case 19-11396-MFW    Doc 208-1    Filed 09/17/19    Page 117 of 137

3.5(a)(iv) – <u>collective bargaining agreements</u>:

NONE

3.5(a)(v) – <u>material intellectual property licenses</u>:

NONE

3.5(a)(vi) – <u>employment contracts with employees with annual salary in excess of $150,000</u>:

See Employment Contracts listed at part 1 of Section 3.9(b) hereof

3.5(a)(vii) – <u>material non-competition agreements</u>:

NONE

3.5(a)(viii) – <u>contracts relating to indebtedness</u>:

1. Amended and Restated Credit Agreement, dated as of March 23, 2016 (the "<u>A&R Credit Agreement</u>"), among Seller, as Borrower, HDR Holding, Inc. ("<u>HDR</u>"), as Holdings and a Guarantor, Certain Domestic Subsidiaries of Holdings from time to time party thereto, as Guarantors, the Lenders party thereto, and Hark Capital I, LP (f/k/a Enhanced Credit Supported Loan Fund, LP) (in such capacity "<u>Administrative Agent</u>"), as Administrative Agent

2. First Amendment to the A&R Credit Agreement, dated as of May 26, 2016

3. Second Amendment to the A&R Credit Agreement, dated as of December 17, 2018

3.5(a)(ix) – <u>contracts granting liens</u>:

1. Amended and Restated Pledge Agreement, dated as of March 23, 2016, among Seller, HDR, and Administrative Agent

2. Amended and Restated Security Agreement, dated as of March 23, 2016 among Seller, HDR, and Administrative Agent

3.5(a)(x) – <u>real property leases</u>:

See real property leases listed at Section 3.11 hereof

3.5(a)(xi) – <u>options, rights of first refusal, and similar items</u>:

NONE

3.5(a)(xii) – <u>partnership, joint venture, and similar agreements</u>:

NONE

3.5(a)(xiii) – contracts (other than purchase orders) with 10 largest customers for the 12-months <u>ended December 31, 2018</u>:

NONE

3.5(a)(xiv) – contracts (other than purchase or equipment orders) with 10 largest suppliers for the <u>12-months ended December 31, 2018</u>:

NONE

3.5(a)(xv) – <u>contracts with related parties</u>:

NONE

**Section 3.6**

Legal Compliance Exceptions

NONE

**Section 3.7**

Litigation

1.  On October 18, 2017, DNOW L.P., a Delaware limited partnership, filed suit in the Superior Court of the State of Delaware alleging a breach by Seller under that certain Master Services Agreement, dated January 13, 2016, for Seller's failure to pay invoices submitted thereunder.  Seller removed the case to the United States District Court for the District of Delaware and asserted counterclaims against DNOW L.P.  A judgment of $5,560,887.90 was in favor of DNOW L.P. on May 22, 2019.

2.  A suit was filed in Santiago, Chile in 2016 by Barbuss against EDM and Seller for damages sustained by a rig caused by a compressor fire.  Seller and EDM are currently in discussion with Liberty Insurance to share a settlement.

3.  On February 27, 2018, the Republic of Korea filed an action in Seoul, Korea against Seller and its agent, Sekogeo, over the refusal of the South Korean army to accept certain repair parts to replace obsolete components. Seller is in negotiations with Sekogeo to split the settlement with the Republic of Korea.

4.  A suit was filed against Seller on August 5, 2016, in Pettis City, Missouri by an individual plaintiff alleging injuries caused by a defective design, no ladder, and a failure to warn.

5.  A suit was filed against Seller on October 23, 2018, in Allegheny County, Pennsylvania by an individual plaintiff alleging exposure to asbestos fibers resulting in the plaintiff suffering from asbestosis

6.  A suit was filed against Seller on January 3, 2019, in New York, New York by an individual plaintiff alleging workplace related damages

7.  On April 18, 2019, Seller was named as an additional defendant in a suit filed in Twentieth Judicial Circuit Court in St. Clair County, Illinois by a plaintiff alleging exposure to asbestos fibers resulting in the plaintiff suffering from lung cancer

Case 19-11396-MFW    Doc 208-1    Filed 09/17/19    Page 121 of 100

**Section 3.8**

Environmental Issues

NONE

**Section 3.9(a)**

Collective Bargaining Agreements and Layoffs

NONE

**Section 3.9(b)**

Employment and Severance Agreements

1.    Employment Agreements:

    A.    Agreement between David Marwick and Schramm Inc., dated July 10, 2015; Country Manager, Australia

    B.    Agreement between Jesse Glover and Schramm Inc., dated August 21, 2018; VP, Finance and Operations

    C.    Agreement between Craig Mayman and Schramm Inc., dated August 22, 2018; President

    D.    Contract of Employment between Airdrill Pty Ltd and David Shinner, dated May 4, 2012, as amended by letter dated February 15, 2018

    E.    Contract of Employment between Airdrill Hammers & Bits Pty Ltd and Ray Hawke, dated November 3, 2006, as amended by letter dated August 21, 2015

2.    Severance Agreements and Arrangements:   NONE

**Section 3.10**

Benefit Plans

1.    Health and Dental Insurance

2.    Continuation Coverage

3.    Life Insurance

4.    Flexible Spending Accounts (MSA and DSA)

5.    High Deductible Savings Account

6.    401(k) Savings Plan

7.    Section 125 Plan

8.    Leave of Absence Policy

9.    Accident and Sickness Benefit

10.    Long Term Disability Benefit

**Section 3.11**

Real Property Leases

1.      Lease Agreement for Schramm, Inc. and E. Kahn Development Corp., dated November 8, 2017, for 800 E. Virginia Avenue, West Chester PA, 19380

2.      Lease Agreement for Airdrill Pty Ltd and Sedaland Pty Ltd, dated November 30, 2017, for 35 Sudbury Street, Darra, Australia

3.      Lease Agreement for Airdrill Pty Ltd and RDS & G Trust, dated November 22, 2013, for 56 Banskia Road, Welshpool, Australia

4.      Lease Agreement for Airdrill Hammers and Bits Pty Ltd and Beta Investments Pty Ltd, dated March 19, 2019 for 60 Paramount Drive, Wangara, Australia

**Section 3.12**

Permits

1.    Pennsylvania Department of Environmental Protection – Air Quality Synthetic Minor Operating Permit dated May 16, 2013

2.    Pennsylvania Department of Environmental Protection – General Permit for Discharges of Stormwater Associated with Industrial Activities

3.    Pennsylvania Department of Environmental Protection – PAG-03 General NPDES Permit, dated 10/26/2015

4.    Wastewater Discharge Permit dated 9/4/2015

# Section 3.13

## Insurance

| **INSURANCE CARRIER** | **INSURANCE POLICY** | **POLICY NUMBER** | **EXPIRATION DATE** |
|---|---|---|---|
| Landmark American Insurance Company | Property | LHD906299 | 11/30/2019 |
| Evanston Insurance Company | Property | MKLV11XP007059 | 11/30/2019 |
| Homeland Insurance Company of Delaware | Property | 795008943 | 11/30/2019 |
| Continental Casualty Company | Property | 6022649977 | 11/30/2019 |
| Indian Harbor Insurance Company | Terrorism | US00073740SP18A | 11/30/2019 |
| Aspen Specialty Insurance Company | Property | PRAFW2718 | 11/30/2019 |
| Lloyds of London | Property | AMR-61333-01 | 11/30/2019 |
| Landmark American Insurance Company | Property | 10T029659-10896-18-0 | 11/30/2019 |
| Landmark American Insurance Company | Property | CPMD5535800 | 11/30/2019 |
| Indian Harbor Insurance Company | Property | USI-24061-00 | 11/30/2019 |
| Starr Surplus Lines Insurance Company | General Liability | 1000090247181 | 6/29/2019 |
| Starr Indemnity & Liability Company | Automobile | SISIPCA08236818 | 6/29/2019 |
| Starr Indemnity & Liability Company | Workers Comp. | 100 0001028 | 6/29/2019 |
| Insurance Company of the State of Pennsylvania | Foreign Package—General Liability | WS11008811 | 6/29/2019 |
| | Foreign Package—Employee Benefits Liability | | |
| | Foreign Package—Auto | | |
| | Foreign Package—Business Travel Property | | |
| | Foreign Package—Voluntary Workers Comp. and Employers Liability | | |
| Starr Surplus Lines Insurance Company | Commercial Umbrella | 1000095341181 | 6/29/2019 |
| National Union Fire Insurance Company of Pittsburgh | Crime | 01-911-20-46 | 9/17/2019 |
| AIG Specialty Insurance Company | D&O Liability | 19179715 | 9/17/2019 |
| | Employment Practices Liability | | |
| | Fiduciary Liability | | |
| Travelers Indemnity Company of America | Cargo | RATRA18-6384 | 6/29/2019 |
| Travelers Casualty Company of America | Mobile Equipment Dealers Coverage | QT-660-1539M163-TIL-18 | 6/29/2019 |
| Hartford Life Insurance Company | Business Travel | ETB140003 | 10/1/2020 |

| INSURANCE CARRIER | INSURANCE POLICY | POLICY NUMBER | EXPIRATION DATE |
|---|---|---|---|
| | Accident | | |
| National Union Fire Insurance Company of Pittsburgh | Special Contingency Risk | 86-342-739 | 6/29/2021 |

## Section 3.15

## Intellectual Property

*Patents*

| Title | Status | Country | Number | File Date | Grant/ Renew |
|---|---|---|---|---|---|
| Telemast Earth Drill | Registered | Canada | 101261 | 09/30/02 | Exp. 06/30/13 |
| Telemast Earth Drill | Registered | Australia | 154408 | 11/22/02 | Exp. 11/22/18 |
| i-Control Comp Cont | Granted | Canada | 2552793 | 09/05/06 | 07/20/19 |
| i-Control Drlg Cont | Granted | U.S. | 7350593 | 11/07/06 | 10/01/19 |
| i-Control Comp Cont | Granted | U.S. | 7503409 | 04/25/06 | 03/24/27 |
| i-Control Comp Cont | Registered | Australia | 2006203528 | 08/16/06 | 08/16/19 |
| Telemast Earth Drill | Granted | U.S. | D477,332 | 09/30/02 | Exp. 09/30/16 |
| Loadsafe Clamp | Granted | U.S. | 9551193 | | 07/24/20 |

*Trademarks*

| Trademark | Status | Country | Number | Filing Date | Registration Date |
|---|---|---|---|---|---|
| SCHRAMM | Registered | Chile | 890893 | 03/19/10 | 07/19/10 |
| TELEMAST | Registered | Chile | 891155 | 03/19/10 | 07/20/10 |
| LOADSAFE | Registered | Chile | 891158 | 03/19/10 | 07/20/10 |
| I-CONTROL | App For | Chile | 911721 | 03/19/10 | 03/03/11 |
| SCHRAMM BG/BT | Registered | Chile | 916961 | 10/26/10 | 04/28/11 |
| BG/BT | Registered | Chile | 922508 | N/A | 06/24/11 |
| TELEMAST | Registered | Australia | 1357498 | N/A | 04/22/10 |
| AIR-CONTROL | Registered | Australia | 1357680 | 04/22/10 | 40518 |
| LOADSAFE | Registered | Australia | 1357682 | 04/22/10 | 12/06/10 |
| BG/BT | Registered | Canada | TMA849548 | 04/21/10 | 04/26/28 |
| FEEL THE ENERGY | Registered | Australia | 1510350 | 08/31/12 | 08/24/22 |
| SCHRAMM RIG ID INSTANT | Registered | Australia | 1590763 | 11/12/13 | 11/12/23 |
| SCHRAMM RIG ID INSTANT DOCUMENTATION | Registered | Canada | TMA925753 | 11/05/13 | 01/12/31 |
| SCHRAMM | Registered | U.S. | 1889607 | 06/01/93 | 04/18/05 |
| I-CONTROL | | U.S. | 3314173 | 12/27/05 | 10/16/07 |
| LOADSAFE | Registered | U.S. | 3553285 | 04/04/08 | 12/30/08 |
| AIR-CONTROL | Registered | U.S. | 3802184 | 07/22/09 | 06/15/10 |
| MARCELLUS RX RIG XPRESS | Registered | U.S. | 4262419 | 11/09/11 | 12/18/22 |
| FEEL THE ENERGY | Registered | U.S. | 4385485 | 08/23/12 | 08/13/13 |
| TELEMAST (English) | Registered | China | 4578897 | 04/01/05 | 01/21/08 |
| TELEMAST (Chinese) | Registered | China | 4578920 | | 01/20/28 |
| ROTADRILL (English) | Registered | China | 4578898 | 04/01/05 | 1/21//2008 |
| SCHRAMM | Registered | China | 4578920 | N/A | 01/20/28 |
| BG/BT (Class 9) | Registered | China | 9504831 | 06/14/11 | 06/30/14 |
| BG/BT (Class 7) | Registered | China | 9673458 | 07/19/11 | 06/30/14 |
| SCHRAMM RIG ID INSTANT | Registered | U.S. | 4983637 | 10/28/13 | 06/21/22 |
| BG/BT | Registered | U.S. | 4143233 | 05/15/12 | 05/15/22 |
| SCHRAMM | Registered | Australia | B601210 | 04/27/93 | 04/27/10 |
| BG/BT | Registered | Australia | 1357492 | | 04/22/20 |

| TELEMAST | Registered | Canada | TMA694,325 | 04/18/06 | 08/20/07 |
| SCHRAMM | Registered | Canada | TMA704,919 | 04/18/06 | 01/17/08 |
| LOADSAFE | Registered | Canada | TMA786477 | 03/08/10 | 01/05/11 |
| I-CONTROL | Registered | Canada | TMA788879 | 04/09/10 | 01/27/11 |
| AIR-CONTROL | Registered | Canada | TMA810,803 | 04/26/10 | 11/01/11 |
| FEEL THE ENERGY | Registered | Canada | TMA867020 | 08/24/12 | 12/10/13 |
| TELEMAST | Registered | U.S. | 2811561 | 10/29/02 | 02/03/04 |
| FURY | App For | U.S. | 87/207205 | | |
| ROTADRILL | Registered | U.S. | 639297 | | 01/01/27 |
| ROTADRILL | Registered | Chile | 891157 | | 07/20/20 |
| ROTADRILL | Registered | Australia | 1357488 | | 04/22/20 |
| ROTADRILL | Registered | Canada | TMA213325 | | 04/15/21 |

*Domain Names*

Schramminc.com
Schramminc.net

**Section 3.16**

Material Changes

A judgment of $5,560,887.90 was entered in favor of DNOW L.P. on May 22, 2019

**Section 5.2**

Notices and Consents

*See Section 3.3(b)*

01:24647941.1

**EXHIBIT 2**

Assumed Contracts

01:23675674.11

AmericasActive:13923059.13

## DESIGNATED CONTRACTS LIST

| Counterparty Name and Address | Description of Contract | Debtor Counterparty | Cure Amount |
|---|---|---|---|
| 920 S. BOLMAR ASSOCIATES, L.P. C/O E. KAHN DEVELOPMENT CORP. 55 COUNTRY CLUB DRIVE, SUITE 200 DOWNINGTOWN, PA 19335 | Lease | Schramm, Inc. | $138,601.61 |
| AETNA LIFE INSURANCE COMPANY P.O. BOX 804735 CHICAGO, IL 60680 | Insurance DMO Dental Plan Policy Number: 772681 | Schramm, Inc. | $0.00 |
| AETNA LIFE INSURANCE COMPANY P.O. BOX 804735 CHICAGO, IL 60680 | Insurance PPO Dental Plan Policy Number: 772681 | Schramm, Inc. | $0.00 |
| AIG SPECIALTY INSURANCE COMPANY 32 OLD SLIP FINANCIAL SQUARE NEW YORK, NY 10005 | D&O Insurance Policy Number 19179715 | Schramm, Inc. | $0.00 |
| AIG SPECIALTY INSURANCE COMPANY 32 OLD SLIP FINANCIAL SQUARE NEW YORK, NY 10005 | Executive Risk Insurance Policy Number 19179715 | Schramm, Inc. | $0.00 |
| ASPEN SPECIALTY INSURANCE COMPANY 5 90 MADISON AVENUE 7TH FLOOR NEW YORK, NY 10022 | Commercial Property Insurance Policy Number PRAFW2718 | Schramm, Inc. | $0.00 |
| BARCLAY FRIENDS 700 N. FRANKLIN ST. WEST CHESTER, PA 19380 | Lease | Schramm, Inc. | $0.00 |
| COMMERCIAL LIFE INSURANCE COMPANY 350 NORTH SUNNY SLOPE ROAD BROOKFIELD, WI 53005 | Group Life Insurance Policy Number M0047 | Schramm, Inc. | $0.00 |
| CONTINENTAL CASUALTY COMPANY 333 SOUTH WABASH AVENUE CHICAGO, IL 60604 | Commercial Property Insurance Number 6022649977 | Schramm, Inc. | $0.00 |

| Counterparty Name and Address | Description of Contract | Debtor Counterparty | Cure Amount |
|---|---|---|---|
| CORDICATE IT, LLC<br>794 PENLLYN BLUE BELL PIKE<br>SUITE 200<br>BLUE BELL, PA 19422 | IT Agreement | Schramm, Inc. | $169,409.93 |
| CRAIG MAYMAN<br>800 E. VIRGINIA AVENUE<br>WEST CHESTER, PA 19380 | Employment Agreement | Schramm, Inc. | $0.00 |
| EVANSTON INSURANCE COMPANY<br>(MARKEL)<br>TEN PARKWAY NORTH DEERFIELD, IL 60015 | Commercial Property Insurance Policy<br>Number MKLV11XP007059 | Schramm, Inc. | $0.00 |
| FIDELITY SECURITY LIFE INSURANCE<br>COMPANY<br>3130 BROADWAY<br>KANSAS CITY, MO 64111-2406 | Excess Loss Insurance Policy Number EL<br>102-FL00180 | Schramm, Inc. | $0.00 |
| GREENWICH INSURANCE COMPANY<br>70 SEAVIEW AVENUE<br>STAMFORD, CT 06902-6040 | Pollution and Remediation Liability<br>Insurance Policy Number PEC0037974 | Schramm, Inc. | $0.00 |
| HARTFORD LIFE & ACCIDENT INSURANCE<br>COMPANY<br>ONE HARTFORD PLAZA<br>HARTFORD, CT 06155 | Travel Accident Insurance Policy Number<br>ETB-14003 | Schramm, Inc. | $0.00 |
| HOMELAND INSURANCE CO. OF NY (ONE<br>BEACON)<br>1 BEACON STREET, SUITE 5<br>BOSTON, MA 02108 | Commercial Property Insurance Policy<br>Number 795008943 | Schramm, Inc. | $0.00 |
| INDIAN HARBOR INSURANCE COMPANY<br>(XL)<br>100 CONSTITUTION PLAZA<br>HARTFORD, CT 06103 | Commercial Property Insurance Policy<br>Number US00073740SP18A | Schramm, Inc. | $0.00 |
| INDIAN HARBOR INSURANCE COMPANY<br>(XL)<br>100 CONSTITUTION PLAZA<br>HARTFORD, CT 06103 | Commercial Property Insurance Policy<br>Number USI-20461-00 | Schramm, Inc. | $0.00 |
| INSURANCE COMPANY OF THE STATE OF<br>PENNSYLVANIA<br>175 WATER STREET 18TH FLOOR<br>NEW YORK, NY 10038 | Insurance Policy Number WS11008811 | Schramm, Inc. | $0.00 |
| JESSE GLOVER<br>800 E. VIRGINIA AVENUE<br>WEST CHESTER, PA 19380 | Employment Agreement | Schramm, Inc. | $0.00 |

| Counterparty Name and Address | Description of Contract | Debtor Counterparty | Cure Amount |
|---|---|---|---|
| JONATHON IFERT<br>PO BOX 43<br>CHATHAM, PA 19318-0043 | Independent Contractor Agreement | Schramm, Inc. | $0.00 |
| LANDMARK AMERICAN INSURANCE COMPANY<br>945 EAST PACES FERRY RD NE SUITE 1800<br>ATLANTA, GA 30326 | Commercial Property Insurance Policy Number 10T029659-108966-18-00 | Schramm, Inc. | $0.00 |
| LANDMARK AMERICAN INSURANCE COMPANY<br>945 EAST PACES FERRY RD NE SUITE 1800<br>ATLANTA, GA 30326 | Commercial Property Insurance Policy Number CPMD5535800 | Schramm, Inc. | $0.00 |
| LANDMARK AMERICAN INSURANCE COMPANY<br>945 EAST PACES FERRY RD NE SUITE 1800<br>ATLANTA, GA 30326 | Commercial Property Insurance Policy Number LHD906299 | Schramm, Inc. | $0.00 |
| LIFE INSURANCE COMPANY OF NORTH AMERICA (CIGNA)<br>1601 CHESTNUT STREET<br>PHILADELPHIA, PA 19192-2235 | Life Insurance Policy Number SGD-904694 | Schramm, Inc. | $0.00 |
| LIFE INSURANCE COMPANY OF NORTH AMERICA (CIGNA)<br>1601 CHESTNUT STREET<br>PHILADELPHIA, PA 19192-2235 | Life Insurance Policy Number SGD-604653 | Schramm, Inc. | $0.00 |
| LLOYDS OF LONDON<br>42 WEST 54TH STREET<br>14TH FLOOR<br>NEW YORK, NY 10019 | Commercial Property Insurance Policy Number AMR-61333-01 | Schramm, Inc. | $0.00 |
| MERITAIN HEALTH, INC.<br>P O BOX 223881<br>PITTSBURGH, PA 15250 | Welfare Plan EPO Group No. 15953 | Schramm, Inc. | $0.00 |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA<br>80 PINE STREET<br>NEW YORK, NY 10005 | Crime Insurance Policy Number 01-911-20-46 | Schramm, Inc. | $0.00 |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA<br>80 PINE STREET<br>NEW YORK, NY 10005 | Specialty Contingency Risk Policy Number 86-342-736 | Schramm, Inc. | $0.00 |
| OPTUMRX, INC.<br>1600 MCCONNOR PARKWAY<br>SCHAUMBURG, IL 60173-6801 | Participation Agreement | Schramm, Inc. | $0.00 |

| Counterparty Name and Address | Description of Contract | Debtor Counterparty | Cure Amount |
|---|---|---|---|
| STARR INDEMNITY & LIABILITY COMPANY 399 PARK AVENUE, 8TH FLOOR NEW YORK, NY 10022 | Automobile Insurance Policy SISIPCA08236819 | Schramm, Inc. | $0.00 |
| STARR INDEMNITY & LIABILITY COMPANY 399 PARK AVENUE, 8TH FLOOR NEW YORK, NY 10022 | Workers Compensation and Employer Liability Insurance Policy Number 100 0001028B | Schramm, Inc. | $0.00 |
| STARR SURPLUS LINES INSURANCE COMPANY 399 PARK AVENUE, 8TH FLOOR NEW YORK, NY 10022 | Commercial General Liability Insurance Policy Number 1000090247191 | Schramm, Inc. | $0.00 |
| STARR SURPLUS LINES INSURANCE COMPANY 399 PARK AVENUE, 8TH FLOOR NEW YORK, NY 10022 | Umbrella Liability Insurance Policy Number 1000095341191 | Schramm, Inc. | $0.00 |
| TRANSAMERICA LIFE INSURANCE COMPANY P O BOX 30266 LOS ANGELES, CA 90030 | Life Insurance Policy Number 60035928 | Schramm, Inc. | $0.00 |
| TRANSAMERICA LIFE INSURANCE COMPANY P O BOX 30266 LOS ANGELES, CA 90030 | Life Insurance Policy Number 6003952 | Schramm, Inc. | $0.00 |
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA OCEAN MARINE CLAIMS DEPARTMENT 485 LEXINGTON AVENUE NEW YORK, NY 10017 | Cargo / Transportation Policy Number RATRA 19-6384 | Schramm, Inc. | $0.00 |
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA OCEAN MARINE CLAIMS DEPARTMENT 485 LEXINGTON AVENUE NEW YORK, NY 10017 | Equipment Dealer Insurance Policy Number QT-660-159M163-TIL-19 | Schramm, Inc. | $0.00 |
| UNUM LIFE INSURANCE COMPANY OF AMERICA 2211 CONGRESS STREET PORTLAND, ME 04122 | Group Term Life Insurance Policy Number 509982 | Schramm, Inc. | $0.00 |
| WILLIS OF PENNSYLVANIA, INC. 100 MATSONFORD ROAD SUITE 200 BLDG 5 RADNOR, PA 19087 | Commercial Premium Financing Agreement | Schramm, Inc. | $0.00 |